UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
(HOUSTON DIVISION)
www.txs.uscourts.gov

| | |
|---|---|
| In re:<br><br>UPLIFT RX, LLC,[1]<br><br>    Debtors.<br><br>_____/ | CASE NO. 17-32186, et seq.<br>CHAPTER 11<br><br>ADV. NO. |
| Yvette Austin Smith, Liquidating Trustee<br>of the Alliance Health Liquidating Trust,<br><br>    Plaintiff,<br><br>v.<br><br>BAKER & HOSTETLER, LLP, an Ohio<br>limited liability partnership,<br><br>    Defendant.<br><br>_____/ | **ADVERSARY COMPLAINT AND<br>COUNTERCLAIM FOR DAMAGES,<br>OBJECTION TO POST PETITION<br>ADMINISTRATIVE CLAIMS AND<br>FOR OTHER RELIEF AND<br>DEMAND FOR JURY** |

[1] At case inception, the Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, as applicable, were: Uplift Rx, LLC (9306); Belle Pharmacy, LLC (0143); Alliance Medical Holdings, LLC (5945); Geneva Pharmacy, LLC (1929); Ohana Rx, LLC (1722); Benson Pharmacy, Inc. (6606); Kendall Pharmacy, Inc. (0825); Richardson Pharmacy, LLC (9566); Innovative Rx, LLC (9986); Charleston Rx, LLC (5852); On Track Rx, LLC (9021); Uinta Rx, LLC (7157); Goodman Pharmacy, LLC (9373); BrooksideRx, LLC (5927); Osceola Clinic Pharmacy, LLC (4886); Oak Creek Rx, LLC (9722); Waverly Pharmacy, LLC (7342); Newton Rx, LLC (9510); Lone Peak Rx, LLC (5973); Improve Rx, LLC (9120); New Jersey Rx, LLC (0035); Berkshire Pharmacy, LLC (9197); Health Saver Rx, LLC (7810); Best Rx, LLC (0346); Delaney Pharmacy, LLC (7497); New Life Pharmacy, LLC (8292); Skyline Health Services, LLC (6876); Stonybrook Pharmacy, LLC (7700); Woodward Drugs, LLC (2385); Bridgestone Pharmacy, LLC (5294); Brookhill Pharmacy, LLC (5296); Burbank Pharmacy, LLC (5227); Canyons Pharmacy, LLC (1744); Cheshire Pharmacy, LLC (6370); Conoly Pharmacy, LLC (0367); Cottonwood Pharmacy, LLC (5131); Galena Pharmacy, LLC (0672); Garnett Pharmacy, LLC (6505); Hawthorne Pharmacy, LLC (5345); Hazelwood Pharmacy, LLC (1088); Medina Pharmacy, LLC (8987); Raven Pharmacy, LLC (5671); Glendale Square Rx, Inc. (1022); Lockeford Rx, Inc. (1853); Pinnacle Pharmacy Solutions, LLC (9760); Riverfront Rx, LLC (7152); Riverbend Prescription Services, LLC (1862); Raven Pharmacy Holdings, LLC (2464); Bridgestone Pharmacy Holdings, LLC (2840); Crestwell Pharmacy Holdings, LLC (1503); Galena Pharmacy Holdings, LLC (8609); Geneva Rx Holdings, LLC (8247); Hawthorne Rx Holdings, LLC (9531); Woodward Rx Holdings, LLC (2173); Philadelphia Pharmacy Holdings, LLC (8526); Health Rx Holdings, LLC (0909); Canyon Medical, LLC (4915); Alliance Medical Administration, Inc. (2899); Ollin Pharmaceutical, LLC (9815); Alta Distributors, LLC (7407); Eat Great Café, LLC (2314); Alliance Health Networks, LLC (1815).  By Order of the Bankruptcy Court dated July 1, 2020 [Doc. No. 1407], 13 debtor Chapter 11 cases were dismissed, with the caveat that such dismissal "shall not affect or alter any of the terms or provisions of the Plan and the Confirmation Order, including, without limitation, the transfer by the Subject Debtors of all of their Estate Assets, Causes of Action, and Liquidating Trust Assets to the Liquidating Trust."

The Plaintiff, Yvette Austin Smith, as liquidating trustee (the "Liquidating Trustee") of the Alliance Health Liquidating Trust (the "Liquidating Trust") as successor to the estate of the above-captioned debtors (sometimes collectively referred to herein as "Alliance," the "Debtors," or the "company"), files this Adversary Complaint for Damages and for Other Relief and Demand for Jury Trial, against the Defendant, BAKER & HOSTETLER, LLP, an Ohio limited liability partnership ("Baker"), and alleges:

## PRELIMINARY STATEMENT

1.      This lawsuit stems from a straightforward and yet massive fraud.  Shockingly, at the heart of the wrongdoing was the extensive involvement of one of the nation's largest law firms, Baker & Hostetler, LLP ("Baker").  For more than two years, Baker helped a series of corporate executives carry out blatant insurance fraud.  Baker had purported to offer its client expert counsel in healthcare law, but when attorneys at the firm learned that their client was engaged in fraudulent activity—a fraud that was highly profitable for the client—the attorneys shirked their ethical duties and instead used their legal skills and national reputation to facilitate the illegal activity.

2.      Baker's involvement in the illegal activity at Alliance was extensive. Baker intentionally misled auditors who were looking for evidence of precisely the kind of criminal activity that was in fact occurring; it designed a labyrinth of corporate shell companies to hide the extent of, and thereby perpetuate, the fraud; and it installed one of its partners, Lee Rosebush, on Alliance's Board of Directors to cement the close relationship between Alliance and Baker.  These activities, along with the imprimatur of legitimacy that representation by Baker's nationally recognized healthcare practice created, allowed the wrongdoers to conceal their fraudulent misdeeds for far longer than they may have otherwise done.

3.      In February 2017, the FBI raided Alliance's offices and seized company records. In March, the Debtors' secured lender shut off their access to cash.  As a result of these

developments, Alliance could no longer do business and retained Baker as its bankruptcy/restructuring counsel. In April 2017, the company filed voluntary Chapter 11 bankruptcy petitions. Baker continued to represent Alliance during the Chapter 11 cases through September 13, 2019, the Effective Date of the confirmed Plan (both defined below).

4.      Accordingly, the Liquidating Trustee brings this action against Baker seeking damages for legal malpractice/professional negligence, aiding and abetting breach of fiduciary duty, negligent/fraudulent misrepresentation, fraud (including aiding and abetting fraud and conspiracy to commit fraud), and for other relief.

5.      The Liquidating Trustee brings this lawsuit both on behalf of the post-confirmation Liquidating Trust estates of the Debtors, and as assignee of the claims of the estate's three largest creditors—LifeScan, Inc. ("LifeScan"), Roche Diagnostics Corp., and Roche Diabetes Care, Inc. (collectively, "Roche") (LifeScan and Roche shall sometimes collectively be referred to herein as the "Test Strip Manufacturers").[2]

6.      The claims alleged herein involve the acts and omissions of Baker, a well-respected national law firm, and its attorneys, while they provided extensive corporate, business, regulatory, and health care related legal services to certain Debtor business entities within the Alliance Healthcare Network (defined below), from November 2014 to September 2017. These services were primarily, but not exclusively, provided out of Baker's Washington, D.C. office.

7.      Such legal services enabled and otherwise provided cover to the company's deceitful management, directors, and employees (collectively, the "Scheme Participants") to

---

[2] By written stipulation and agreement approved by the Order of this Court dated June 20, 2020 [Doc No. 1403], the Test Strip Manufacturers assigned and conveyed to the Liquidating Trustee all of their potential claims against Baker, including, without limitation, aiding and abetting negligent misrepresentation, aiding and abetting fraudulent misrepresentation, fraud, conspiracy to commit fraud, aiding and abetting tortious interference with prospective business relations, and all other allegations and claims reflected in or that in any way arise out of the allegations set forth in this complaint.

operate, manage, and finance a sophisticated insurance scheme intertwined with a panoply of improper and deceptive business practices (collectively, the "Questionable Business Practices") that caused more than $100 million in damages to the Debtors and the Test Strip Manufacturers.

8.      At all relevant times, Alliance retained and primarily used the legal services of three law firms as its dedicated "outside counsel": Baker, Bennett Tueller Johnson & Deere, LLC ("Bennett"), a local firm based in Salt Lake City, Utah, and Brown & Fortunato PC ("Brown"), a local firm based in Amarillo, Texas.  Each of these firms, including Baker, enabled the company to continue to perpetrate, propagate, and otherwise engage in the Questionable Business Practices.

9.      Baker continuously represented Alliance through and including September 13 2019, the Effective Date of the confirmed Plan (defined below), having never terminated, or requested the termination of, Alliance as a client at any time prior to such date.

10.     Baker and its attorneys had intimate knowledge of the Questionable Business Practices as a result of (i) the direct knowledge they gained while performing legal services on behalf of Alliance, and (ii) the knowledge they gained from Baker partner Lee Rosebush's service on Alliance's Board of Directors (which was approved of and encouraged by Baker).

11.     Baker provided a broad array of legal services that permitted the Scheme Participants to gain illicit profits by making materially inaccurate representations to various third parties.

12.     According to its engagement letter, Baker was retained to perform, and in fact did perform, legal services involving "general regulatory, corporate diligence, compliance, and advocacy in related legal matters, as directed."

13.     In so doing, Baker played a material role in permitting the Scheme Participants to use the Debtors to engage in business that caused millions of dollars of damages to the estates of the Debtors and their creditors.

14.     The Scheme Participants conspired to obtain not-for-retail ("NFR") blood glucose test strips manufactured and packaged by the Test Strip Manufacturers for sale by mail-order to beneficiaries of insurance plans that cover mail-order test strips.  The Scheme Participants then arranged for Alliance-affiliated pharmacies to dispense these test strips to beneficiaries of pharmacy-benefit insurance plans that covered only retail test strips.  They then submitted fraudulent insurance claims to the pharmacy-benefit plans, falsely representing that they had dispensed retail strips.

15.     In so doing, the Scheme Participants fraudulently exploited the substantial difference in wholesale list price and insurance reimbursement rates between the NFR strips and the retail strips.

16.     According to the sworn testimony of former Alliance executives, dispensing NFR strips and submitting improper insurance claims for retail strips was the "foundational practice" of Alliance and an "integral part of [Alliance's] business model."  The practice was openly discussed with Baker, as well as among Alliance's management and Board of Directors (on which a Baker partner, Lee Rosebush, served).

17.     Baker was directly informed about the Questionable Business Practices in writing no later than November 2015 (and, in fact, was informed about them verbally as early as February 2015).  On November 24, 2015, Alliance's general counsel, David Grant, sent Baker partner Lee Rosebush a memorandum describing the "fact" that Alliance regularly submitted insurance claims representing that Alliance had dispensed products bearing the National Drug Code ("NDC") for retail strips, even though it had in fact dispensed NFR test strips bearing different NDCs to patients. The memorandum concluded that, although the practice gave rise to legal risks, Alliance could not afford to stop it, because Alliance's viability as a company depended on receiving the higher reimbursement for retail product while dispensing cheaper NFR product purchased from the

secondary market.   Baker billed Alliance for the time that Rosebush spent reviewing the memorandum.

18.     Immediately before Rosebush received Grant's memorandum describing the "fact" of Alliance's reliance on NDC fraud, Rosebush and Grant had a telephone call to discuss "NDC codes"—a euphemism commonly used by Alliance to describe the company's foundational practice of submitting fraudulent insurance claims using false NDCs.   Grant sought Rosebush's advice during this phone call about the potential legal risks of Alliance's practice of submitting insurance claims bearing the NDC for retail test strips when NFR test strips had in fact been dispensed, and Rosebush advised Grant that Alliance should continue the practice.   (Grant was apparently following his own advice by seeking Rosebush's counsel over the telephone rather than in writing.   Weeks prior, on October 28, 2015, Grant had advised the members of Alliance's Board of Directors to use the telephone, rather than email, to discuss "issues that may involve potential liability.")

19.     Encouraged by Baker's advice, Alliance continued to engage in the Questionable Business Practices until the bankruptcy filings in April 2017.   Baker was fully aware of the company's improper practices, but elected to assist Alliance's efforts to hide its scheme by serving as Alliance's first line of defense against PBMs' attempts to examine its activities.   Baker helped Alliance evade scrutiny by designing a complex ownership structure that shielded the reality of Alliance's ownership from PBMs that might have uncovered the fraud.   When PBMs attempted to audit Alliance pharmacies, Baker negotiated with those entities and even submitted redacted and misleading invoices with the goal of convincing PBMs that Alliance pharmacies had dispensed the same retail test strips for which it had submitted insurance claims (despite knowing for a fact that those pharmacies had in fact dispensed a different product).   Baker's actions preserved the ability of Alliance-affiliated pharmacies to continue their practice of submitting insurance claims

for retail product while dispensing NFR product.

20.     By carrying out their scheme through Alliance, the Scheme Participants caused the Test Strip Manufacturers to wrongfully pay over $100 million in rebates, and to lose a similar amount in sales of retail strips.

21.     Baker's advice and failure to abide by its ethical and professional duties proved fatal to Alliance.  On February 23, 2017, the Federal Bureau of Investigation and U.S. Postal Inspection Service executed search warrants at Alliance's headquarters, its warehouses, and several of the Alliance Pharmacies as part of an investigation into potential criminal wrongdoing.

22.     The FBI also seized the accounts belonging to the Debtors maintained with their secured creditor by ZB, N.A. ("Zions Bank") and issued damming warrants to seize incoming receivables, which precipitated the bankruptcy filings and ultimate demise of Alliance.

23.     By April 2017, it was game, set, and match for Alliance. Alliance filed for bankruptcy and later confirmed a Chapter 11 Plan, which resulted in the formation of the Liquidating Trust.

24.     In bankruptcy schedules filed with the Court, the Debtors disclosed liabilities of $50 million to $100 million, with the top three unsecured creditors, LifeScan, Roche, and the State of Virginia, all being owed in the aggregate in excess of $97 million.

25.     Baker, which had facilitated the company's fraud for over two years, was there at the very end – again representing Alliance, but this time with insolvency attorneys who appeared to have no material involvement with Baker's representation of Alliance prior to the bankruptcy.

## THE PARTIES, JURISDICTION & VENUE

26.     On April 7-9, 2017 (collectively, the "Petition Date"), each of the Debtors filed a voluntary petition for relief (the "Bankruptcy Petitions") under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in Bankruptcy Court for the Southern District of Texas,

Houston Division (the "Bankruptcy Court").[3]

27.    On April 10, 2017, the Court entered an order directing the joint administration of the Debtors' cases [Doc. No. 4].[4]

28.    By Order dated April 18, 2017, the Court ordered the appointment of a Chapter 11 trustee, with Ronald L. Glass of GlassRatner Advisory & Capital Group, LLC being appointed Chapter 11 Trustee (the "Chapter 11 Trustee") of the Debtors' estates on May 18, 2017 [Doc. No. 37]. On May 25, 2017, Mr. Glass accepted his appointment [Doc. No. 320].

29.    Post-petition, the Chapter 11 Trustee operated the Debtors' businesses in the ordinary course pursuant to Bankruptcy Code Sections 1107 and 1108.

30.    By Order dated August 8, 2019 (the "Confirmation Order"), the Court confirmed the Debtors' Chapter 11 Amended Plan (the "Plan") [Doc. No. 1267]. The Effective Date (as defined in the Plan) was September 13, 2019 [Doc. No. 1319]. Pursuant to Paragraph 6.2 of the Plan, entry of the Confirmation Order constituted approval, pursuant to section 105(a) of the Bankruptcy Code effective as of the Effective Date, of the substantive consolidation of the Corporate Debtors (as defined in the Plan and below), with (i) all assets and liabilities of the Corporate Debtors merged, so that all of the assets of the Corporate Debtors will be available to pay all of the liabilities of the Corporate Debtors under the Plan; (ii) no distributions will be made under the Plan on account of Intercompany Claims (as defined in the Plan) between the Corporate Debtors; (iii) all guarantees by any of the Corporate Debtors of the obligations of any other Corporate Debtor will be eliminated so that any Claim against any Corporate Debtor and any guarantee thereof executed by any of the Corporate Debtors are to be one obligation of the

---

[3] Prior to and after the Petition Date, the Debtors operated their businesses in conjunction with certain non-debtor affiliates (collectively, the "Affiliates").

[4] Unless otherwise specified, citations to the docket refer to the consolidated Chapter 11 docket, no. 17-32186.

substantively consolidated entity; and (iv) each and every Claim filed or Allowed (as defined in the Plan), or to be filed or Allowed, in the case of any of the Corporate Debtors will be deemed filed or allowed against the substantively consolidated Corporate Debtors. Pursuant to Section 6.3 of the Plan, confirmation of the Plan did not result in any substantive consolidation of the Pharmacy Debtors (as defined in the Plan and below).

31.     By Order of the Bankruptcy Court dated July 1, 2020 [Doc. No. 1407], the Chapter 11 cases of 13 debtors were dismissed, with the caveat that such dismissals "shall not affect or alter any of the terms or provisions of the Plan and the Confirmation Order, including, without limitation, the transfer by the Subject Debtors of all of their Estate Assets, Causes of Action, and Liquidating Trust Assets to the Liquidating Trust."

32.     Pursuant to Section 6.4 of the Plan, as of the Effective Date, the Debtors transferred and assigned all Liquidating Trust Assets to the Alliance Health Liquidating Trust ("Liquidating Trust"), which assets include, *inter alia*, tort, breach of contract, and avoidance claims under Chapter 5 of the Bankruptcy Code, along with the claims that are the subject of this adversary proceeding.

33.     Upon the initial appointed Liquidating Trustee's resignation in September 2022, Plaintiff was appointed, and accepted her appointment, as successor Liquidating Trustee, and is therefore the duly appointed, authorized, and acting fiduciary of the Liquidating Trust estate with standing and authority to prosecute the claims that are the subject of this action.

34.     Baker is an Ohio limited liability partnership operating as a law firm.  Nearly 1,000 attorneys work in 17 offices spread throughout the United States, including cities such as Orlando, Houston, Dallas, New York, and Washington, D.C.

35.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.

36.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(A), (B), (C), (H) and (O), which includes the assertion of non-core claims as well.

37.     The Liquidating Trustee consents to the entry of final orders and judgment by the Bankruptcy Court pursuant to Fed. R. Bankr. P. 7008(a), but does not consent to a jury trial by the Bankruptcy Court.

38.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## FACTS COMMON TO ALL COUNTS

### I.    Alliance and the Fraudulent Scheme

#### A.    Background on the Debtors

39.     Prior to the Petition Date, the Debtors owned and operated a network of pharmacies across the United States that specialized in providing prescriptions to patients with chronic health conditions, including diabetes (the "Alliance Healthcare Network").

40.     The parent, Debtor Alliance Medical Holdings, LLC, was a Delaware limited liability holding company formed on November 26, 2013 based in Utah that, along with certain other Debtors, collectively owned, controlled, and/or operated a network of pharmacies across the country – in addition to providing an online internet resource center that connected people with chronic conditions to experts – by and through over 60 debtor and non-debtor affiliated business entities (collectively, "Alliance" or the "Debtors").[5]

---

[5] Alliance's network of subsidiaries included entities involved in purchasing test strips, such as Alta Distributors, LLC ("Alta"), Ollin Pharmaceutical, LLC ("Ollin"), SP Diabetic LLC ("SP Diabetic"), Medsource-Direct, Inc., and Western Diabetic Supply Corp. Alliance's network of subsidiaries also included operating, managing, and holding entities, such as Alliance Medical Administration, Inc.; AHN Holding Company, LLC; Alliance Health Networks, LLC; Steel Medical, LLC; Chronic Care Health Foundation, LLC; Skyline Health Services, LLC; White Capital Management, LLC; CSL Capital Holdings, LLC; Ingram Diabetic, LLC; Genshai Holdings, LLC; Namaste Capital Holdings, LLC; Warner Diabetic, LLC; Cloud Management, LLC; and Ingram Medical Administration, Inc. Alliance and/or its predecessor entities also owned, controlled, and/or were affiliated with a large network of pharmacies and their associated holding companies, including: Alameda Rx Holdings, LLC; Alameda Rx, LLC; Aspire Rx, LLC;

41.     The origins of the Alliance Healthcare Network began in July 2007, when Jeffrey Smith (who would later become Alliance's Chief Executive Offer) purchased a majority interest in Fames Enterprises Corporation d/b/a Medsource-Direct, a Utah corporation, which later changed its name to Medsource-Direct, Inc.

42.     On February 22, 2010, Debtor Medsource Rx Pharmacy, LLC ("Medsource" or "Medsource RX Pharmacy") was formed in Utah as a sister company to Medsource-Direct, Inc. with the same ownership structure.  In September 2011, Medsource-Direct, Inc. discontinued its wholesale business operations and began acting as the "purchasing arm" for Medsource, changing its name to SP Diabetic, Inc.

---

Baytree Rx, LLC; Belle Pharmacy, LLC; Benson Pharmacy, Inc.; Berkshire Pharmacy, LLC; Best Rx Holdings, LLC; Best Rx, LLC; Better Care Rx Holdings, LLC; Bridgestone Pharmacy Holdings, LLC; Bridgestone Pharmacy, LLC; Brighton Pharmacy, LLC; Brookhill Pharmacy, LLC; BrooksideRx Holdings, LLC; BrooksideRx, LLC; Bubba's Rx Holdings, LLC; Burbank Pharmacy, LLC; Canyon Medical, LLC; Canyons Pharmacy, LLC; Central Medical, LLC; Charleston Rx Holdings, LLC; Charleston Rx, LLC; Cheshire Rx Holdings, LLC; Cheshire Pharmacy, LLC; Conoly Pharmacy Holdings, LLC; Conoly Pharmacy, LLC; Cordele Pharmacy, LLC; Cottonwood Pharmacy, LLC; Crestwell Pharmacy Holdings, LLC; Cure Rx, LLC; David Pharmacy, LLC; Delaney Pharmacy, LLC; Eat Great Café, LLC; El Dorado Pharmacy, LLC; El Dorado Rx Holdings, LLC; Everest Pharmacy, LLC; Galena Pharmacy Holdings, LLC; Galena Pharmacy, LLC; Garnett Pharmacy, LLC; Genesee Pharmacy, LLC; Geneva Pharmacy, LLC; Geneva Rx Holdings, LLC; Glendale Square Rx, Inc.; Good Wave, LLC; Goodman Pharmacy, LLC; Hawkins Pharmacy Holdings, LLC; Hawkins Pharmacy, LLC; Hawthorne Pharmacy, LLC; Hawthorne Rx Holdings, LLC; Hazelwood Pharmacy, LLC; Health Rx Holdings, LLC; Health Saver Holdings, LLC; Health Saver Rx, LLC; Improve Rx Holdings, LLC; Improve Rx, LLC; Innovative Rx, LLC; Insight Rx Holdings, LLC; Jefferson Pharmacy, LLC; JTK Medical, LLC; Kendall Pharmacy, Inc.; Living Again Holding Co, LLC; Lockeford Rx Holdings, LLC; Lockeford Rx, Inc.; Lone Peak Rx, LLC; Med Mart Holdings, LLC; Medina Pharmacy, LLC; Medsource Rx Pharmacy, LLC; New Jersey Rx Holdings, LLC; New Jersey Rx, LLC; New Life Pharmacy, LLC; Newton Rx Holdings, LLC; Newton Rx, LLC; Norwood Pharmacy, LLC; Oak Creek Pharmacy Holdings, LLC; Oak Creek Rx, LLC; Ohana Pharmacy Holdings, LLC; Ohana Rx, LLC; On Track Rx Holdings, LLC; On Track Rx, LLC; OpusRx, LLC; Osceola Clinic Pharmacy, LLC; Osceola Rx Holdings, LLC; Peach Medical Holdings, LLC; Peterson Rx, LLC; Pharmacare Holdings, LLC; Philadelphia Pharmacy Holdings, LLC; Pineview Rx Holdings, LLC; Pinnacle Pharmacy Solutions, LLC; Pro Rx Holdings, LLC; Raven Pharmacy Holdings, LLC; Raven Pharmacy, LLC; Richardson Pharmacy, LLC; Riverbend Prescription Services, LLC; Riverbend Pharmacy, LLC; Riverfront Pharmacy, LLC; Riverfront Rx, LLC; Rock City Pharmacy, LLC; Rx Pro Holding Co., LLC; Rx Solutions Holdings, LLC; Smart Rx Holdings, LLC; Staley Pharmacy, LLC; Stonybrook Pharmacy, LLC; Twin Lakes Pharmacy, LLC; Uinta Rx Holdings, LLC; Uinta Rx, LLC; Uplift Rx Holdings, LLC; Uplift Rx, LLC; Vitality Holdings, LLC; Waverly Pharmacy, LLC; Woodward Drugs, LLC; and Woodward Rx Holdings, LLC (together and with other, currently unidentified affiliates, the "Alliance Pharmacies"). For ease of reference, Alliance predecessor entities, subsidiaries, and Alliance Pharmacies will sometimes be referred to simply as "Alliance" throughout this Complaint.

43.     During October 2011, Ingram Medical, LLC was formed as a wholly-owned subsidiary of Warner Diabetic, LLC. Thereafter, Medsource consummated a restructure in which its members contributed their membership interests to holding company Warner Diabetic, LLC, formerly known as Medsource Pharmacy 2, LLC.

44.     In February 2012, Ingram Medical, LLC acquired 100% of the stock of Western Diabetic Supply Corporation and Warner Diabetic, LLC began branding itself as "Ingram Medical," under certain "trade name" license agreements with its affiliates.

45.     On March 22, 2012, SP Diabetic, Inc. sold its business to SP Diabetic Acquisition, LLC causing all aspects of the business to be under the ownership of Warner Diabetic, LLC, with SP Diabetic Acquisition, LLC subsequently being renamed to SP Diabetic, LLC.

46.     In March 2012, the name of SP Diabetic, Inc. was changed to OSD Capital, Inc, in January 2013, the name of Ingram Medical, LLC was changed to WDSC Holdings, LLC, and in December 2013, the name of IM Pharmacy, LLC was changed to New Life Pharmacy, LLC.

47.     On January 1, 2014, Warner Diabetic, LLC consummated a restructure in which the members of Warner Diabetic, LLC contributed their membership interests to a new parent company called Alliance Medical Holdings, LLC.

48.     Thereafter, on January 17, 2014 a subsidiary of Alliance Medical Holdings, LLC, Alliance Health Networks, LLC (formerly known as Alliance Health Acquisition, LLC), acquired all of the assets of Alliance Health Networks, Inc., with Alliance Health Networks, LLC also doing business as Alliance Health and Diabetic Connect, Western Diabetic Supply Corporation also doing business as Western Medical Supplies, Ingram Medical Administration, Inc. also doing business as Ingram Medical, Medsource Rx Pharmacy, LLC also doing business as Medsource Rx, Medsource Diabetic, and Your Diabetic Pharmacy, and Warner Diabetic, LLC also doing business as YourDiabetic Source.

12

49.     In addition to these pharmacies, Alliance Medical Holdings, LLC provided an online internet resource center that purported to connect people with chronic conditions to experts.

50.     Within the Alliance Healthcare Network, Debtors Alliance Medical Holdings, LLC, a Delaware limited liability company, Alliance Medical Administration, Inc., a Utah corporation, and Alliance Health Networks, LLC, a Delaware limited liability company (successor to Alliance Health Network, Inc., a Delaware corporation) (collectively, the "Corporate Debtors") provided marketing, accounting, and administrative functions of the Alliance Healthcare Network in Utah.

51.     Other Debtors, including Alta Distributors, LLC, a Delaware limited liability company, assisted in distribution for the Debtors (the "Distribution Company Debtors") in Utah.

52.     The remainder of the Debtors, including Stonybrook Pharmacy, LLC, a Nebraska limited liability company, either owned and operated or managed pharmacies within the Alliance Healthcare Network in Utah and other states, including (the "Pharmacy Debtors").

53.     Within the Alliance Healthcare Network, patients were identified by the Corporate Debtors and distributed among the Pharmacy Debtors.  On occasion, the Corporate Debtors would transfer patients from one Pharmacy Debtor to another Pharmacy Debtor. The Pharmacy Debtors did not play an active role in deciding which patients they would supply with diabetic testing supplies; rather, the Corporate Debtors would distribute patients with the goal of balancing patient populations across the Pharmacy Debtor.

54.     As the Pharmacy Debtors collected revenue, cash was "swept" from each Pharmacy Debtor's account on a daily basis and distributed to the Corporate Debtors, where it was pooled together with the contents of other Pharmacy Debtors.  From their central account, the Corporate Debtors would directly pay certain expenses of the Pharmacy Debtors, and/or send money back down to the appropriate Pharmacy Debtors to pay other expenses.

13

55.     At all relevant times, the Debtors and their Affiliates were collectively owned, managed, operated, and/or controlled by the same group of overlapping managers, officers, directors, and/or control persons, and were formed and/or otherwise operated within the Alliance Healthcare Network as alter egos of one another and/or of the company's owners as evidenced by, inter alia, the failure of the Debtors and the Affiliates to ever account for obligations amongst themselves or keep any type of ledger showing "due to and due from" among any of them.

56.     As a pretext, the company claimed that new pharmacies were constantly being formed and/or acquired to "keep up" with leads generated by the Corporate Debtors when, in fact, pharmacies were being open and closed as part of Alliance's ongoing fraudulent scheme.

57.     To the outside world, Alliance looked like a promising new healthcare company during the years that it was represented by Baker.  In 2015, it was named the fastest-growing company in the state by Utah Business magazine, which in 2016 also tagged it as one of the best places to work.  And the company was named to 2016's Inc. Magazine's 5000 fastest-growing companies list at number 1,835, reporting three-year growth of 203 percent, and 2015 revenues of $175.4 million.

58.     Baker, however, was not a member of the general public that was misled by Alliance's complex structure or dazzled by its high revenues.  Baker had front-row access to Alliance's internal workings, and it knew that Alliance's financial success was rooted in diabetes test strip fraud—and, due to that fraud, serious legal risk.

**B.     Roche and LifeScan's Blood Glucose Test Strip Products**

59.     LifeScan and Roche are leading manufacturers of blood glucose test strips. Roche markets and sells under the Accu-Chek® brand, while LifeScan markets and sells under the OneTouch® brand.

60.     Diabetes patients place a drop of blood on a strip and insert the strip into a meter,

which provides a blood glucose reading. Millions of people depend on Roche and LifeScan's test strips to monitor their blood sugar.

61.     In the United States, the vast majority of Roche and LifeScan test strips are paid for by health insurance. Some health insurance plans cover test strips under a pharmacy benefit, the same benefit that covers prescription drugs. Other plans cover test strips under a medical benefit (also known as a "durable medical equipment" or "DME" benefit), the same benefit that covers medical equipment such as wheelchairs.  Patients with DME insurance typically purchase test strips from mail-order DME distributors.

62.     Like all major manufacturers, Roche and LifeScan sell their test strips in different packages and through different distribution channels targeted to patients with these different types of insurance coverage.  Test strips that are intended for patients with pharmacy benefit insurance are labelled for "retail" sale and can be purchased at regular retail pharmacies.  Retail test strips can be purchased by anyone, including patients who do not have insurance and pay cash.  Test strips that are intended for patients with DME insurance, on the other hand, are clearly labelled as "Not For Retail Sale" ("NFR").  Because patients with DME insurance typically purchase their test strips from mail-order distributors, the packaging for NFR test strips also sometimes contains a warning that the strips are "Exclusively for Mail Order Use."  The DME distributors purchase NFR products under contracts that require them to sell only to patients with DME insurance.

63.     Each of Roche's and LifeScan's test strip products has a different National Drug Code ("NDC"). An NDC is a unique numerical identifier recorded by the U.S. Food and Drug Administration, which regulates these devices. There is a different NDC for retail and NFR products. For example, one of Roche's most widely used test strip products is Accu-Chek Aviva Plus, most commonly sold in 50-strip vials. The NDC for the principal NFR version of this product

is 65702-0436-10, while the NDC for the retail version is 65702-0407-10.[6] The NDC is printed on each vial's package.

64.     Roche and LifeScan sell their retail test strip products for a significantly higher price than their NFR test strip products.  Roche and LifeScan then pay rebates to "pharmacy benefit managers" (PBMs) for each box of retail test strips dispensed to patients with pharmacy-benefit insurance.  No rebates are paid for the lower-priced NFR test strips.

65.     When a patient with insurance purchases a box of blood glucose test strips, the seller is paid by the patient's insurer. To obtain payment from the insurer, the seller must submit a claim. This process—submitting a claim and receiving payment—is referred to as "adjudication."

66.     When a patient purchases test strips using pharmacy-benefit insurance, the seller— a pharmacy—makes the claim for reimbursement by submitting the NDC of the dispensed product to the patient's insurance. Submitting the dispensed product's NDC is necessary because pharmacy-benefit plans only cover specific pharmaceuticals and medical devices, listed by NDC, that are on their formularies. Products not listed on the formulary are not entitled to any reimbursement.

67.     Whether a seller makes a claim for retail or NFR test strips has a significant financial impact on Test Strip Manufacturers.  For example, during the relevant time period, Roche sold retail strips to wholesalers at list prices ranging from about $51.25 to $78.07 per 50-strip vial. Pharmacy-benefit insurers would reimburse pharmacies for retail test strips at a somewhat higher rate, creating a profit margin for wholesalers and pharmacies.  Under contracts with the pharmacy-benefit insurers, Roche would then pay rebates ranging from about $30 to $70 for every box or retail strips they reimburse. As a result of these rebates, Roche's net revenue per box of retail strips

---

[6] The NDC for the principal NFR versions of one of LifeScan's most widely-used products, a 50-count vial of OneTouch Ultra strips, are 53885-0000-75 and 53885-0963-50, while the NDC for the retail version is 53885-0244-50.

was substantially less than the $51.25 to $78.07 wholesale price. By contrast, Roche sold its NFR strips primarily to mail-order distributors for under $20 per 50-strip vial, and medical-benefit insurance plans reimbursed the mail-order distributors at a small markup on this price. Roche does not pay rebates to insurance plans that cover test strips under a medical benefit.

68.     It was and is well known throughout the diabetes product industry that test strip manufacturers paid rebates to pharmacy-benefit insurers for retail test strips.

C.     **Alliance's Fraudulent Adjudication of Claims for Blood Glucose Test Strips**

69.     Because of the significant differences in how retail strips and NFR strips are sold and paid for, it is crucial for fairness and functioning of the marketplace that blood glucose test strips be sold only within their intended channels. Diversion of NFR strips to retail channels not only deprives the Test Strip Manufacturers of retail sales, it also causes an out-of-pocket loss on each vial of NFR strips. That is because the rebate paid on each claim for a box of retail strips is higher than the total price that the Test Strip Manufacturers receive for the sale of a box of NFR strips.

70.     Because of this harm, the Test Strip Manufacturers and the insurance companies that pay for test strips have implemented systems to prohibit distributors from dispensing NFR strips to pharmacy beneficiaries. For example, the NDCs for NFR strips are not on pharmacy-benefit plans' formularies.  Reimbursement by a pharmacy-benefit plan thus requires the seller to dispense retail strips and submit reimbursement claims using the NDC for retail strips.

71.     It is a fraudulent and deceptive business practice for a seller to obtain the higher retail reimbursement rate by adjudicating a claim for retail strips (by submitting the retail NDC) when NFR strips had in fact been dispensed to the patient.

72.     The Scheme Participants used Alliance to submit fraudulent claims for retail test strips on a regular basis.  The Alliance Pharmacies submitted millions of insurance reimbursement

17

claims in which they falsely stated that they had dispensed retail strips but in fact had dispensed NFR strips.

73.    Purchasing retail strips through legitimate channels and dispensing them to pharmacy beneficiaries would result in low or nonexistent profit margins for Alliance—especially given that Alliance often did not collect co-pays. Seeking the highest profit margins possible, the Scheme Participants opted to purchase low-cost NFR strips, dispense them to pharmacy beneficiaries, and submit improper insurance claims falsely stating that they had dispensed retail strips.

74.    Jose Vargas, Alliance's Director of Procurement, testified that Jeffrey Smith instructed him to buy as many NFR strips as possible from unauthorized distributors. In an e-mail to a business partner, Vargas stated that Alliance "only buy[s] MO or NRS strips." "MO" (mail order) and "NRS" (not for retail sale) strips are NFR strips.

75.    Alliance purchased the vast majority of its NFR strips from third-party "diverters." Diverters obtain NFR strips from distributors willing to breach their contracts with manufacturers and sell NFR strips on the "secondary" or "gray" market, where they can obtain a higher price from parties like Alliance as part of its Questionable Business Practices. The secondary market for diabetes test strips consists almost entirely of NFR strips, because the high wholesale price at which manufacturers like Roche sell retail strips into the market leaves little opportunity for diverters to make a profit. Buying NFR strips from the secondary market was so commonplace for Alliance that its employees used "secondary product" as a synonym for NFR strips.

76.    Alliance did not purchase Roche or LifeScan NFR strips under Alliance's own name, but instead purchased them through its subsidiary purchasing entities. The first such entity was Medsource-Direct, Inc., which changed its name to SP Diabetic in September 2011. At some point, health insurers refused to reimburse Alliance pharmacies for sales of Roche test strips that

18

they "purchased" from SP Diabetic, so Alliance began purchasing through its affiliates Alta Distributors and Ollin Pharmaceuticals.

77.     After Alliance purchased NFR strips from the secondary market, it improperly identified them in its inventory management system using the NDC number for retail strips. As a result, the purchase orders ("POs"), invoices, and other inventory reports generated by Alliance's inventory management system always improperly displayed the retail NDC for the corresponding brand of test strips, even though Alliance was purchasing NFR strips.

78.     Alliance's use of the retail NDC on all of its POs and invoices was crucial to hiding its scheme. When PBM auditors demanded proof from Alliance-affiliated pharmacies that they had purchased sufficient retail strips to support their thousands of adjudications, the pharmacies would produce phony invoices from Medsource-Direct, SP Diabetic, Alta, or Ollin purporting to show that the strips purchased by the pharmacies were retail strips. The auditors were not told that these purchasing entities—like the pharmacies themselves—were part of the same corporate family. Nor were auditors told that the records generated by the purchasing entities improperly displayed retail NDCs despite the fact that the strips being dispensed by the pharmacies were NFR strips.

79.     Baker was aware of the practice of referring to NFR product using the inapplicable retail NDC in Alliance's internal systems.  David Grant specifically described this practice in a March 25, 2016 email to Lee Rosebush.  Grant notified Rosebush that the Mississippi Board of Pharmacy had conducted an inspection of an Alliance pharmacy and expressed "concerns about the mail order and DME diabetic testing supply product on the shelf."  Grant explained that "the wholesalers invoice it as retail product and it is maintained as inventory in the system as retail product," and solicited Rosebush's feedback about "possible strategies going forward at that pharmacy as well as overall."

19

80.     In sworn deposition testimony given on July 19, 2017, two Alliance employees readily admitted to Alliance's improper business practices, with one describing it as "the foundational practice" of the company. A third employee testified in deposition that "delivering one product but billing for another . . . was an integral part of [Alliance's] business model."

## II.   Alliance Hires Baker as Its Health Care Regulatory Counsel in 2014

81.     In November 2014, Alliance's General Counsel David Grant attended a Pharmacy Law conference in California where Baker attorney Lee Rosebush (who was then counsel, but would soon be elevated to Baker's partnership) presented on new developments in the federal regulation of pharmacy compounding.  Sahily Paoline, an Alliance executive, emailed Rosebush on November 10 to set up an introductory discussion. She told Rosebush, "I think your expertise would be extremely valuable in some of the decisions we will be making in the next several months."

82.     Before reaching out to Baker, Alliance had relied on two regional law firms—Brown and Bennett—for legal advice.  As Alliance established pharmacies in new states to evade PBM detection and expand its fraudulent business model, the company sought counsel from a law firm with a national presence that specialized in healthcare matters.  At the time Paoline contacted Rosebush, his attorney profile on Baker's website touted his "strong understanding" of the pharmaceutical industry and emphasized his purported ability to advise pharmacies on complex regulatory compliance issues.

83.     Rosebush immediately recognized that the Alliance engagement would be lucrative for Baker.  He forwarded Paoline's email to Baker partners Christopher Swift, Lance Shea, and Jeffrey Paravano and told them that Baker had hit "a gold mine" at the conference.  In response, Shea and Paravano congratulated Rosebush on bringing in new business for the firm.

84.     Baker's Business Development and Marketing Administrator, Alexandra Moss,

20

also recognized that the Alliance engagement presented a valuable opportunity for Baker. Accordingly, she arranged for a story about the engagement with Alliance to appear in Baker's "B[usiness ]D[evelopment] newsletter."

85.    After a call on November 12, 2014 that included Rosebush, Grant, and Paoline, Alliance moved quickly to sign an engagement letter with Baker and requested Rosebush "provid[e] some guidance on other states with favorable laws in which we could concentrate our acquisition efforts."  The initial engagement letter, effective November 17, 2014, stated that Baker would advise Alliance "with respect to FDA and Healthcare regulatory counseling matters."  The scope of the engagement was expanded the following month to include "general regulatory, corporate diligence and compliance matters."

86.    Almost immediately, Baker began examining Alliance's relationships with the PBMs it relied on to process its insurance claims for retail test strips.  These PBMs were the very entities to which Alliance was submitting fraudulent insurance claims, and Alliance's ability to continue to generate high profits through fraud relied on preventing the PBMs from discovering the true nature of its business model.  Rosebush was asked to review Alliance's PBM contracts, and he was introduced to Kassie Thomas, an Alliance employee who would later head its compliance department.  Soon thereafter, in February 2015, Rosebush and other Baker attorneys traveled to Utah to meet in person with several Alliance executives, including CEO Jeffrey Smith.

**III.    <u>Baker Willingly and Knowingly Facilitated Fraud</u>**

87.    Soon after it was engaged to provide legal advice about Alliance's regulatory and compliance matters, Baker learned that Alliance's business model was dependent on billing fraud: it purchased low-cost NFR strips from the secondary "gray" market, dispensed them to patients, and submitted insurance claims for higher-cost retail test strips to the PBMs that managed its patients' insurance.

88.     Baker never advised Alliance that it should stop submitting fraudulent insurance claims.  Baker also never informed Alliance's Board of Directors that the company was engaged in blatantly illegal activity (despite a Baker partner eventually sitting on that Board).  Nor did Baker withdraw from representing Alliance in light of its continued illegal activities.  Rather, Baker elected to continue providing legal services—and to regularly expand the areas in which it advised Alliance—in order to continue billing the company for its legal services.

89.     To ensure that Alliance continued to be able to pay its bills, it was important that the company continue generating high revenues through its fraudulent activities.  In service of this goal, Baker knowingly and voluntarily assisted in Alliance's efforts to continue committing fraud, including by actively concealing the scheme from being discovered.  Baker's efforts allowed Alliance to continue committing fraud undetected for years, even though various entities— including PBMs and LifeScan—were attempting to unravel its unlawful scheme.

90.     Baker was on notice that Alliance was delivering mail order (that is, NFR), not retail, product to its patients shortly after it began representing the company.  It also knew that Alliance had encountered resistance from PBMs because of this practice.  Handwritten notes produced by Baker and dated February 10, 2015 show that Baker was informed that Alliance purchased product on the "secondary mkt" and had been hit with "[c]hargebacks" from PBMs "if not a retail or deliv mail order".  The same notes show that Alliance reported that PBMs demanded "Pedigree [*sic*] – invoices" for test strips, but that Alliance would "opt not to provide invoices".

91.     On June 7, 2015, in response to LifeScan's investigation into Alliance's business practices, Grant emailed Rosebush and informed him that LifeScan and Alliance were in a dispute "with regard to secondary market issues and diversion from manufacturer intended distribution channels."  He was referring, of course, not only to Alliance's practice of purchasing NFR strips from the gray market but also to its submission of corresponding fraudulent insurance claims

bearing the NDC for retail strips.  Because Grant understood that Baker had a conflict due to its representation of Johnson & Johnson (then the owner of LifeScan) in other matters, Grant asked Rosebush to suggest counsel to advise Alliance in the matter.

92.     In November 2015, Rosebush learned that Alliance was under investigation by the Department of Health and Human Services (HHS) for its fraudulent business practices.  Rosebush spoke with a special agent at the HHS Office of the Inspector General regarding the substance of the investigation and then notified Alliance executives that the probe was civil in nature and involved the United States Attorney's Office in Utah.  When Rosebush informed Scott McBride, a Baker partner, that Alliance general counsel David Grant had hired an attorney to represent him personally around the time of this investigation, McBride remarked "Yikes," and observed that this was highly unusual.

93.     In connection with the HHS investigation, Rosebush participated in a conference call with Grant, Alliance in-house attorney BJ Forsgren, and Bennett attorney Barry Johnson on November 24, 2015 to discuss "issues around NDC codes."  That phrase, or similar phrases such as "the NDC issue," were frequently used internally at Alliance to refer to the Questionable Business Practices.  Shortly after the November 24th call, Grant forwarded Rosebush a copy of his November 4, 2015 memorandum to Alliance's Board of Directors in which Grant confirmed that Alliance had a practice of submitting fraudulent insurance claims containing false NDC numbers.  Grant referred to the memorandum as a document he had mentioned during the call. Rosebush's time entries for that date confirm that he reviewed the memorandum.

94.     In the November 4, 2015 memorandum, Grant confirmed it was the regular and deliberate practice at Alliance pharmacies to make reimbursement claims with false NDC codes, and that Alliance intended to continue the practice in order to protect the company's high revenues. The Grant memorandum also specifically connected Alliance's reliance on NFR product with its

23

reliance on the "secondary market" (from which it purchased the diverted NFR product that was dispensed to patients), thus ensuring that Rosebush understood the connection between secondary market participation and Alliance's NDC fraud.

95.     Grant's November 4, 2015 memorandum is filled with obvious legal errors regarding potential defenses to claims arising from the practice of submitting insurance claims bearing false NDC numbers.  The memorandum states that NDCs were not "intended" to be associated with a particular distribution channel, suggesting, without explanation or logic, that Alliance is therefore permitted to submit false insurance claims misrepresenting the NDCs of the products it dispensed.  Grant's memorandum also recites potential affirmative defenses, such as a lack of standing by would-be plaintiffs and difficulty proving damages, even though those defenses do not render Alliance's insurance claims non-fraudulent.

96.     Finally, Grant's November 4, 2015 memorandum states explicitly that the Johnson & Johnson lawsuit against Alliance—about which Rosebush had been informed more than four months previously—arose out of Alliance's fraudulent reimbursement claims.

97.     Thus, no later than November 24, 2015, and in fact as early as February 2015, Baker understood not only that Alliance was shipping NFR products while submitting insurance claims for retail products and that it had no legitimate legal argument to justify that practice.  Baker also understood that test strip manufacturer Johnson & Johnson had already threatened a lawsuit against Alliance for its fraudulent activities.  Baker knew that Alliance's revenues were generated through the submission of false insurance claims, and that the only way for Alliance to continue with its existing business model was to ensure that the full extent of its fraudulent operations remained secret.

98.     Baker also knew that manufacturers, like LifeScan and Roche, paid rebates for adjudicated test strips.  Indeed, in the context of the Alliance representation, Baker attorneys had

internal discussions about the fact that manufacturers paid rebates to PBMs based on insurance claims for their products as early as January 2015.

99.     Baker partner Lee Rosebush explicitly acknowledged that billing a false NDC caused manufacturers like Roche and LifeScan to pay additional rebates, stating in an email that "the class of product"—that is, retail vs NFR—"does have an effect on the rebate paid by the MANUFACTURER" and stating that the differential rebate could be used "for damage considerations."

100.     Although Rosebush knew in 2015 that was Alliance engaged in illegal activity *and* that its illegal activity had led to a dispute with a manufacturer and a government investigation, he refused from taking any action that would interfere with the fraud and jeopardize Alliance's profitability.

101.     Indeed, in February 2016, in response to an audit request for "any pertinent information, pending or threatened litigation, claims, or assessments, including unasserted claims or assessments that ought to be reported" to be reported to Alliance's auditor, Rosebush elected not to identify the potential litigation arising out of the NDC fraud, even though Johnson & Johnson had already threatened to file suit.

102.     On February 26, 2016, Baker sent an audit response letter via fax and regular mail to Alliance's auditor, Tanner LLC.  Baker did not report Alliance's illegal activities or the legal risks thereof, although it was heavily involved in advising Alliance about how to mitigate the inherent risks of its unlawful business practices.  To the contrary, Baker affirmatively represented that it had not reached a professional conclusion that Alliance must disclose any unasserted claims against it:

> Consistent with the last sentence of Paragraph 6 of the ABA Statement of Policy, and pursuant to the Company's request as set forth in the Request Letter, this will confirm as correct the Company's understanding that whenever, in the course of

> performing legal services for the Company with respect to a matter recognized to involve an unasserted possible claim or assessment that may call for financial statement disclosure, we have formed a professional conclusion that the Company must disclose or consider disclosure concerning such possible claim or assessment, we, as a matter of professional responsibility to the Company, will so advise the Company, and if requested will consult with the Company concerning the question of such disclosure and the applicable requirements of Statement of Financial Accounting Standards No. 5.

No one at Baker had advised Alliance that the claims arising out of its NDC fraud, including the claims threated by Johnson & Johnson, should be disclosed to its auditor.

103.    Due to Baker's failure to disclose the massive unasserted claims against Alliance, Tanner provided an "Independent Auditors' Report" for Alliance that showed assets that were greater than Alliance's liabilities.  This clean bill of financial health allowed Alliance to grow its pharmacy network and, thus, expand its fraud.

## IV.   Baker Helps Alliance Build a Network of Pharmacies to Execute and Mask Its Misconduct

104.    Pharmacy benefit plans typically contract with PBMs to manage insurance claims and reimbursements. The PBMs, in turn, have contracts with retail pharmacies that govern the insurance reimbursement process.   Those contracts prohibit pharmacies from receiving reimbursements for sales of NFR strips and typically prohibit them from operating entirely by mail order. In addition, the contracts give PBMs the right to audit pharmacies' compliance and, if breaches are discovered, to seek repayment of reimbursements—called "chargebacks"—and/or terminate the contract outright.

105.    It therefore was essential that the Alliance Pharmacies deceive PBMs into believing they were dispensing retail strips at brick-and-mortar retail locations, when they were in fact dispensing NFR strips exclusively by mail.  As the scheme grew, however, the Scheme Participants could not hide the massive number of diabetic test strips (and relative lack of other items) purportedly being dispensed to walk-in customers at these locations. As PBMs began to catch on

to Alliance's mail-order business model, Alliance's senior management expanded their enterprise beyond a single corporate-owned pharmacy—the MedSource Rx Pharmacy—to additional corporate-owned pharmacies with independent branding. These included Aspire Rx Pharmacy, Everest Pharmacy, and Brighton Pharmacy.

106.    Numerous PBMs audited, claimed chargebacks, and cancelled their contracts with these Alliance-owned pharmacies. For example:

- Prime, a PBM, claimed a $1,860,423 chargeback against Medsource Rx Pharmacy, LLC, and the PBM Catamaran claimed a $3,200,000 chargeback against Medsource.

- Prime claimed a $519,170 chargeback against Aspire Rx, LLC, and Catamaran claimed an $83,883 chargeback against Aspire.

- Prime claimed a $653,207 chargeback against Everest Pharmacy, LLC, and ESI asserted Everest breached its contract. A third PBM, OptumRX, claimed a $1,466,725.60 chargeback against Everest. A fourth, Caremark, claimed a $583,974 chargeback against Everest.

- OptumRX suspended payments and claimed a $1,422,379 chargeback against Brighton Pharmacy, LLC. Prime claimed a $560,717.86 chargeback against Brighton. ESI claimed a $3,337,693 chargeback against Brighton.

Nevertheless, by operating through multiple pharmacies, each with multiple PBM contracts, Alliance was able to absorb the losses of particular PBMs terminating their contracts with particular pharmacies.

107.    Alliance's management became concerned that PBMs were beginning to notice common ownership and locations of Alliance's corporate-owned pharmacies, and that they were cutting off multiple Alliance pharmacies at once rather than one pharmacy at a time. This sort of systemic PBM risk was devastating to Alliance's business:  Medsource Rx Pharmacy was forced to close on May 1, 2014; Aspire Pharmacy closed by May 30, 2014; Everest Pharmacy closed by June 30, 2014; and Brighton Pharmacy closed by August 2015.

108.    To mitigate the risk of being discovered and shut down *en masse*, Alliance, with the knowledge and assistance of Baker, began operating through a network of nominally "independent" pharmacies throughout the United States. These pharmacies each had separate contracts with PBMs, and they each had their own National Provider Identifiers ("NPI"), unique ten-digit numbers assigned to pharmacies and other healthcare providers by the Federal Government and used in adjudication of insurance claims. The pharmacies also had independent branding and ostensibly independent ownership—usually a friend, neighbor, or business associate of Jeffrey Smith. In substance, however, these "independent" pharmacies acted as fronts for Alliance's Questionable Business Practices.

109.    A May 15, 2016 memo prepared for Alliance's Board of Directors succinctly summarized the "independent" pharmacy strategy:

> In late 2013, the company determined to grow its fulfillment capability not by adding new internally owned pharmacies, but by adding pharmacies owned by independent investors owning pharmacies managed by the company. The PBMs cancelled contracts and imposed chargebacks against the internally owned pharmacies because the pharmacies had retail contracts but were fulfilling by mail. Based on updated "transparency" requirements that mandated reporting ownership structure, the PBMs were able to tie all of the internal pharmacies together. The independent pharmacy model was an attempt to diversify and shift risk.

110.    As the May 16, 2016 memo makes clear, the "independent" label was a ruse—Alliance's affiliated pharmacies operated under its direct control.

111.    The "independent" pharmacies were each set up to submit false insurance claims for diabetes test strips.  Alliance required the "independent" pharmacies to use its proprietary software called Pharmacy Patient Management System ("PPMS"), which managed patients' prescriptions and insurance information, as well as the costs, profit margins, and shipment of test strips. Using the PPMS software's insurance tracking capability, Alliance would assign specific patients to each "independent" pharmacy depending on whether that pharmacy had a contract with

the patient's PBM. The PPMS software also tracked the prescription and usage data for the patients assigned to each "independent" pharmacy, which Alliance then used to determine the number and brands of test strips the pharmacy would need to fill its assigned patients' prescriptions. Alliance's purchasing entities then "sold" the requisite number of NFR strips to the pharmacy.

112.    Alliance also required the "independent" pharmacies to use software (called "FSI") that allowed for real-time, electronic adjudication of insurance claims over the internet or modem. Alliance trained the pharmacists and pharmacy technicians at its pharmacies to adjudicate claims in FSI by entering a "short code" or "quick code" for the corresponding brand of test strips. Unbeknownst to the pharmacists, Alliance had modified FSI so that entering the "short code" caused the software to adjudicate an insurance claim using the NDC for retail strips—even though NFR strips were being dispensed. For example, when adjudicating a 50 - count box of Roche's Accu-Chek test strips, pharmacists were instructed to input the short code "ACCU50" regardless of the NDC on the box dispensed to the patient. The ACCU50 short code acted as a stand-in for the NDC of a retail box of Accu-Chek test strips.

113.    Use of short codes resulted in the uniform adjudication of all test strips as retail strips at all of Alliance's pharmacies. In sworn testimony, Alliance's former Director of Pharmacy Operations, Amy McMurtry, stated that "[a]ny adjudication that went through was for the retail NDC regardless of the box received in or dispensed out" and that she could not "think of any exception to that." Former Alliance pharmacist Masum Amin likewise agreed at her deposition that when she "delivered DME test strips to a patient, their insurance would be billed for retail test strips." "DME" test strips are NFR strips.

114.    The use of short codes in FSI also had the benefit of hiding Alliance's Questionable Business Practices from its own pharmacists and technicians. Those employees did not themselves have to enter incorrect NDC numbers into Alliance's software—they simply entered a short code,

and the software provided by Alliance would automatically bill the patients' insurance using the retail NDC.

115.    Baker attorneys were aware of the reliance on "short codes" at Alliance pharmacies, and they were also aware that such software made it easy to commit insurance fraud.  Former Baker associate Lindsey Holmes testified that she came to believe that there was "billing fraud" at Alliance after she and other Baker attorneys were informed by a pharmacist at an Alliance pharmacy that insurance claims were generated through the use of "codes" rather than by entering information about the specific product dispensed.  Although Ms. Holmes raised an objection to Baker's ongoing representation of Alliance to Lee Rosebush, Rosebush and Baker were undeterred by the persistent fraud and continued their representation of Alliance.

116.    The pharmacies remitted the resulting insurance reimbursements to Alliance. Importantly, Alliance's name was divorced from the entire transaction with the PBM, which would have no way of knowing of Alliance's involvement. In this way, Alliance reduced the risk that a PBM discovering problems at one Alliance pharmacy would respond by cutting off the entire Alliance network of pharmacies. Alliance's former Director of Pharmacy Operations Amy McMurtry testified that Alliance's network of "independent" pharmacies was intentionally structured "so that . . . in the event of a contract loss, it would not be across the entire network of pharmacies."

117.    Isolating contract cancellations to a single pharmacy was key to Alliance's Questionable Business Practices. By employing a network of nominally "independent" pharmacies, Alliance could mitigate the impact of PBM contract terminations by simply shifting patients to another pharmacy. Because Alliance's PPMS software tracked patients by insurance plan, that software could easily reassign patients to a different Alliance pharmacy that still had a contract with that PBM (because the PBM had not yet discovered that the new pharmacy was

30

affiliated with Alliance and engaging in the Questionable Business Practices). Alliance shifted its patients in this way on numerous occasions.

118. Alliance went to great lengths to conceal that its "independent" pharmacies were affiliated with each other or with Alliance, including by instructing the pharmacists at its affiliated pharmacies to deny association with other Alliance pharmacies. For example, Director of Pharmacy Operations Amy McMurtry agreed in sworn testimony that pharmacists at Alliance's "independent" pharmacies "were instructed to not tell anyone that they were affiliated with Alliance or affiliated with other pharmacies." She further testified that one reason they were instructed to do so was because a "PBM could cut contracts at more than one pharmacy."

119. Baker intentionally concealed from PBMs the intention for the "independent" pharmacies to be part of the Alliance network. In January 2016, for example, Rosebush emailed in-house counsel at ESI about an application by an Alliance pharmacy, New Life Pharmacy, to join ESI's mail-order network. ESI told Rosebush that it "has previously done business with Mr. Smith. In that interaction, Mr. Smith provided materially misleading and inaccurate information to [ESI] as part of the credentialing process for another pharmacy." ESI also noted that it knew Jeff Smith was involved with "an organization called Alliance," and that ESI would be asking questions about these entities and "will consider its previous interactions with Mr. Smith when reviewing the application." Rosebush responded, "There is no fraud or deception on how [New Life] will be doing business. They are being upfront and are willing to answer any questions you may have about their business." Rosebush also asked whether the "previous actions between Mr. Smith and [ESI] . . . should be held against someone forever"—while also misleadingly representing that he "d[id] not represent Mr. Smith or Stony[brook Pharmacy, another Alliance-affiliated pharmacy]." (Baker represented Stonybrook pharmacy in a PBM appeal no later than February 2016.). When ESI followed up by asking detailed questions about New Life's

31

relationship to Alliance and its ownership structure, Rosebush did not respond.

120.    In June 2016, Rosebush and ESI's in-house counsel re-engaged.  Again, ESI asked Rosebush for detailed information about who owned Alliance, the relationship between different Alliance corporate entities, and Alliance's "pharmacy network."  Rosebush called these questions "[a] little bit of a fishing exercise," to which Jeff Smith said, "Yah don't know that we want to disclose all this at this time."

121.    Also in June 2016, Alliance's compliance team used a template letter prepared by Baker to respond to PBM inquiries directed at multiple Alliance pharmacies.  Rosebush admonished Thomas to obtain Baker's consent before sending out any similar letters because nearly-identical responses by ostensibly "independent" pharmacies would only "further clarif[y] [to the PBMs] that the pharmacies are further tied."

122.    Despite these various safeguards designed to avoid detection by PBMs and mitigate risk, Alliance knew that the massive quantities of improper, and potentially illegal, adjudications running through each "independent" pharmacy would eventually be noticed and that the pharmacies were operating on borrowed time.  The May 15, 2016 memorandum to Alliance's Board of Directors stated that Alliance had anticipated that the independent pharmacies would have a "three year life span" before the Questionable Business Practices were detected and shut down, but that this had turned out to be too generous of an estimate:

> The company anticipated a three year life span for the independent pharmacies. Unfortunately, the PBMs have been cancelling contracts at a faster rate than anticipated, and have imposed chargebacks, although the company is assisting the independent pharmacies to challenge cancellations where appropriate and chargebacks.

The memorandum further explained that its "independent" pharmacy model had become "extremely difficult" to manage because of potential regulatory issues, the straw owners taking excessive draws and using independent accountants, and questions raised by Alliance's auditors.

123.    To address these problems while preserving its "independent" pharmacy ruse, Alliance began acquiring the formerly "independent" pharmacies as part of a so-called "10% PIC" ownership model. Under this model, Alliance would acquire the pharmacy but grant the pharmacist-in-charge (the "PIC") a 10% equity stake, allowing the PIC to act as a straw owner. Alliance would then over-charge the pharmacy in fees and wholesale markup "to assure that the pharmac[y] lose[s] money" until the fourth quarter of each year, when Alliance would allow the pharmacy to break even. Further under the agreements with the "independent" pharmacies Alliance was required to absorb the losses of the "independent" pharmacies in the event of chargebacks by the PBM's.  The 10% equity share thus would be profitless, but would allow Alliance to take advantage of the identity of the PIC as the ostensible owner and appear "as independently owned pharmacies in licensure applications and PBM contracts," even though Alliance bore all the risk.  As with the "independent" pharmacy model, the 10% PIC model was designed for the express purpose of making the pharmacies appear as independent from Alliance to obfuscate discovery of the Questionable Business Practices.

124.    Baker's advice was crucial to Alliance's decision to implement the "10% PIC" ownership model, which was designed to ensure that the pharmacies appeared independent for contract and licensure purposes, and Baker knew that approving this plan would help expand and conceal Alliance's fraudulent enterprise.  The May 15, 2016 memorandum to Alliance's Board regarding the "10% PIC ownership" model explicitly touted Baker's approval of the new shell-ownership model: "***The company has consulted Lee Rosebush, who has indicated his belief that this ownership structure will appear as independently owned pharmacies in licensure applications and PBM contracts.***"

125.    Pursuant to this switch in ownership model, between May 31 and July 1, 2016, Alliance entered into agreements to manage and eventually acquire: Alameda Pharmacy, LLC;

Baytree Pharmacy, LLC; Cordele Pharmacy, LLC; CureRx Pharmacy, LLC; David Pharmacy, LLC; El Dorado Pharmacy, LLC; Genesee Pharmacy, LLC; Hawkins Pharmacy, LLC; Jefferson Pharmacy, LLC; Oak Creek Pharmacy, LLC; PetersonRx, LLC; Rock City Pharmacy, LLC; Staley Pharmacy, LLC; and Twin Lakes Pharmacy, LLC.

126.    Baker also encouraged the pharmacists at these Alliance-affiliated pharmacies to agree to commit retail fraud, even though those pharmacists knew from their training that they should accurately transcribe the NDC code of the product actually dispensed on any reimbursement claim.  To help ensure that there were a steady stream of willing pharmacists to carry out the fraud, Baker downplayed the risk that submitting fraudulent insurance claims for Alliance would lead to liability for those pharmacists.  For example, on August 3, 2016, Baker associate Kameron Brackins advised Sheeba Thomas—a pharmacist at Twin Lakes Pharmacy, an Alliance pharmacy—about what he described as the "Billed vs. Filled Issue" (in other words, Alliance's practice of billing insurance companies for a product that is different from the one dispensed to the patient, or "filled").  Brackins wrongly reassured Thomas that she should not worry about personal liability for committing insurance fraud, because she would be protected by the corporate form:

> Generally, PBMs are highly interested in managing utilization of drugs and most PBM contracts expressly prohibit any activities that inhibit the PBM's ability to manage drug utilization.  Thus, it is likely a pharmacy that bills for a 50 ct. box but fills with a 100 ct. box and/or uses boxes for uses other than their designation is in violation of the PBM contract and risks contract termination by the PBM.  These are mainly contractual issues that impact the pharmacy's network and operations; though, there is the potential that the PBM could raise fraud claims for such activities.  Generally, if your ownership interest in the pharmacy is through an LLC, any personal liability would be limited if the PBM did assert any fraud claims.

Brackins cc'd Michelle Pector, who was at that time a partner in Baker's energy, health care, and technology complex litigation practice, on this email.

127.    Baker's false reassurances about pharmacists' potential liability for insurance fraud

had their intended effect—they encouraged pharmacists to join the scheme as shell owners of the Alliance pharmacies.  In response to Brackins' email stating that her personal liability for false insurance claims would be limited, Thomas reported that she was now "comfortable moving forward in the process."

**V.**     **Alliance Attempts to Conceal Its Questionable Business Practices from Third Parties**

      **A.**     **Alliance's "Productive Paranoia"**

128.     One of the foundational "disciplines" of Alliance was "Productive Paranoia." A May 9, 2012 slide presentation to Alliance's Board of Directors described "productive paranoia" as "The Company's plan for 'protecting the golden goose.'" As the source of over 90% of Alliance's revenue, the "golden goose" was the improper adjudication of NFR strips as retail strips.

129.     As Jeffrey Smith stated in an April 10, 2013 e-mail to Alliance senior management, "the biggest concern under Productive Paranoia is PBM/Payor Risk." Smith was referring to the ever-present risk that PBMs would cancel their contracts with the Alliance Pharmacies as a result of Alliance's deceptive practices. This risk was perennially one of Alliance's biggest business concerns.

130.     Alliance created a "Productive Paranoia Committee" dedicated to mitigating the risks associated with its Questionable Business Practices. The Productive Paranoia Committee operated as Alliance's clearing house for new and innovative ways to deceive PBMs, hide its practice of submitting insurance claims containing inaccurate NDC numbers, and continue growing Alliance's "golden goose." Alliance senior management and others regularly participated in "Productive Paranoia" discussions.

131.     Alliance developed a number of methods for mitigating the risks of PBM contract cancellations. As alleged above, the primary method was by maintaining a constant flow of new

"independent" pharmacies to which Alliance could shift patients in the event of contract cancellations. For example, on January 31, 2015, Paoline e-mailed a "Productive Paranoia" slide deck to, among others, Jeffrey Smith, Leavitt, Blaine Smith, and Grant. On a slide labeled "Challenges/Concerns," the deck listed cancellation of contracts by two PBMs, ESI and CVS/Caremark, at four separate Alliance pharmacies. A later slide showed that Alliance was mitigating the risks of such cancellations by opening ten new "independent" pharmacies in Iowa, Texas, Michigan, North Carolina, Nevada, Illinois, Florida, and California.

132.    Once PBMs determined that a certain pharmacy was associated with Alliance, they would subject it to heightened scrutiny based on past audits of other Alliance pharmacies.  To evade detection for as long as possible, it was critical for Alliance to obscure the true extent of its "independent" pharmacy network.

133.    Alliance also addressed the risk of contract cancellation by establishing high "profit thresholds" for new patients whose claims for test strips had to be adjudicated to "high-risk" PBMs—i.e., PBMs that were more likely to audit Alliance's pharmacies and discover the Questionable Business Practices. Patients who were serviced by the three largest PBMs had to meet a steep profit threshold—$40 per box of test strips—to be accepted.

134.    Alliance was able to achieve such high profit margins on boxes of Roche and LifeScan test strips only by purchasing low-cost NFR strips and improperly adjudicating them as retail strips. In this way, Alliance's efforts to address the risk of having its Questionable Business Practices discovered actually led to the further entrenchment of these practices. The purpose of Alliance's compliance and risk management efforts was to maximize Alliance's profits, not to avoid engaging in the Questionable Business Practices.

        **B.**       **Baker Uses Its Legal Acumen and National Reputation to Help Alliance Avoid Scrutiny and Perpetuate the Questionable Business Practices**

135.    Baker, aware that the Questionable Business Practices were illegal and a major part of Alliance's business model, knew that Alliance had to hide the true nature of its business from PBMs and other third parties.  In 2015 and 2016, Baker took a lead role in helping Alliance conceal its Questionable Business Practices by helping its pharmacies pass PBM audits when the PBMs suspected—correctly—that the pharmacies had not purchased sufficient retail test strips to support the volume of retail claims they submitted.

136.    Passing these audits was critically important to Alliance's bottom line.  While the audits were ongoing, PBMs withheld from Alliance tens of millions of dollars in suspicious reimbursements and threatened to cease doing business with the pharmacies under investigation.

137.    Most PBM audits of Alliance were directly related to Alliance's Questionable Business Practices.  PBMs noticed that Alliance's "independent" pharmacies distributed far more retail product than they had purchased from suppliers.  They would then request that the pharmacies provide supplier invoices and information about its purchases.  The PBMs were close to flagging Alliance's core Questionable Business Practice of purchasing NFR test strips on the gray market and falsely adjudicating them as retail product.  Many PBM audit letters noted that Alliance pharmacies were distributing "mail order" product rather than retail product or improperly buying product on the secondary market.

138.    Starting in May 2015, Baker's billing records record many instances of its attorneys conducting legal research and engaging in communications regarding PBM audits and Alliance's Questionable Business Practices.

### a.  Communications with PBMs During Audits

139.    Baker frequently attempted to block PBM inquiries into Alliance's business by arguing that the PBMs were not entitled, under their contracts, to demand product tracing or pedigree information beyond Alliance's captive wholesalers.  Baker was also directly involved in

more egregious types of concealment.

140.   On May 7, 2015, Alliance requested Rosebush's help responding to PBM OptumRX's attempted chargeback of over $800,000 to Hawkins Pharmacy in Mississippi.  During an audit, Optum sought information to support Hawkins' submission of claims for retail test strips. Although Alliance had attempted to substantiate its purchases by relying on invoices from Alta Distributors—its own affiliate—Optum rejected the Alta invoices as unacceptable and concluded that Hawkins did not have sufficient invoice evidence to support its retail claims.

141.   Rosebush asked Baker associate Lindsay Holmes and another Baker partner, Robert Wolin, to assist with Alliance's response.  Baker's May 26, 2015 response, signed by Lee Rosebush, urged Optum to accept the Alta invoices.  Moreover, Baker offered a blatant falsehood to Optum: "Hawkins Pharmacy's claims accurately stated the Products that were dispensed and contained all the necessary information for processing."  In fact, as Baker was aware, Hawkins' claims did not accurately state the products that were dispensed.

142.   Until Alliance's bankruptcy, Baker continued to represent Alliance pharmacies in an increasing number of audit appeals, responding to PBMs concerns that Alliance pharmacies had failed to provide evidence sufficient to prove that they had purchased the product for which they had submitted insurance claims.  During this time, Baker argued that PBMs should accept the invoices that had been provided—often from Alliance affiliates Alta or Ollin—to prove that the Alliance pharmacy had in fact purchased retail test strips, even though it had not actually purchased and dispensed retail test strips at all.

143.   PBMs explicitly informed Baker that its rejection of Alta invoices was based on its concern about NDC fraud.  In a May 19, 2016 letter regarding Peterson Pharmacy, PBM Express Scripts Inc. stated that it was difficult to understand how Alta would have obtained retail test strips from certain manufacturers, including LifeScan, because those manufacturers have a "finite list"

of authorized distributors who are prohibited from re-selling products to other wholesalers or suppliers, and Alta was not an authorized distributor. Express Scripts explained that it was "aware of . . . schemes involving purposely dispensing a 'not for retail sale' product and billing payors using more expensive retail NDCs," and that it had "serious questions" about the authenticity of Alliance's product in light of these schemes and its reliance on a non-authorized distributor. For its part, Baker acknowledged the PBMs' focus on whether Alliance pharmacies were in fact purchasing *retail*—as opposed to NFR—product, affirmatively representing that Alliance pharmacies had purchased and were actively purchasing retail product.

144.    Jeffrey Smith repeatedly impressed upon Rosebush the importance of Baker's work on PBM audits. On July 21, 2016, after an in-person meeting with Rosebush and Baker associate attorney Lindsay Holmes, Smith wrote to Rosebush with the following "action item": "Lee solves ESI problem [a major audit-related dispute with the PBM ESI] – Alliance buys Lee Harley Davidson :) ha ha." Rosebush responded, "I am looking forward to that Harley."

145.    With the promise of a Harley Davidson, and billable legal work worth hundreds of thousands of dollars, Baker knowingly assisted Alliance in hiding its Questionable Business Practices from PBM auditors and government regulators and mitigating any fallout when their practices were detected.

146.    In response to PBM purchasing audits, Alliance would often produce invoices from its captive purchasing entities: Medsource-Direct, SP Diabetic, Alta Distributors ("Alta"), and Ollin Pharmaceuticals. As alleged *supra*, these invoices were doctored because they displayed the NDC for retail strips even though Alliance only purchased and dispensed NFR strips. Nevertheless, Alliance would further alter the invoices by redacting other information that could reveal that the pharmacy was dispensing NFR strips. For example, Alliance regularly redacted pricing information from invoices because observant auditors would see that those prices were too low for

legitimate purchases of retail strips.

147.    Baker affirmatively concealed Alliance's relationship to its related purchasing

entities, enabling them to continue relying on fraudulent purchasing invoices from those entities

during audits.  In May 2016, for example, Rosebush also represented to Leah Stoecker, an

Assistant General Counsel at Express Scripts, that Alta "is *not related* to my client" and

suggested that he would have to inquire whether Alta could independently provide detailed

product information and invoices that ESI had requested from Alliance.  Rosebush knew that his

representation was false and that Alliance entirely controlled Alta.  Rosebush also sent a letter to

Stoecker on May 12, 2016, representing that the "only relationship" between Alliance pharmacy

Peterson Pharmacy and Alta was that Alta "is a distributor from which Peterson purchases DTS

products."  Rosebush affirmatively claimed to Stoecker that Peterson *did not* "have access to any

of Alta's records with respect to Alta's purchases."  Of course, since both Peterson and Alta were

controlled by the same people, Peterson did have access to *all* Alta's records.

148.    Rosebush knew that his representation to Leah Stoecker was false, and that there

was a close relationship between Alta, Alliance, and Alliance pharmacies.  One year prior—on

May 15, 2015—Rosebush had asked for clarification about the relationships between Alliance,

Alta, and Hawkins (an Alliance pharmacy).  Alliance Director of Complaint Kassie Thomas had

informed him in an email that "Jeff Smith is a beneficial majority owner for both Alliance Health

and Alta Distributors," and that Alta Distributors provided diabetes testing products, including

test strips, to Hawkins.  Moreover, in May 2016, Rosebush sent an e-mail to Alliance General

Counsel David Grant asking whether "phones were being answered at Alta"—that is, whether

Alliance employees were responding to communications directed at the ostensibly independent

Alta.

149.    During a September 23, 2016 call, Rosebush and Holmes advised Alliance about

how to ensure that the pharmacists at their subsidiary pharmacies did not provide harmful information to PBM Express Scripts Inc.  Baker advised that the pharmacists should "answer ESI questions on only current processes.  In the event they are asked about ESI secondary product [they should respond,] '[]I am unable to speak to what the previous owners did however this is our current process' or something along those lines".

150.    Baker explicitly represented to PBMs that Alliance pharmacies had *retail* product—not NFR product—in stock.  In an August 23, 2016 letter to Leah Stoecker from PBM Express Scripts, Inc., for example, Rosebush contended that Alliance pharmacy Cure Pharmacy had documents that would "demonstrate that Cure has ***retail based product***, currently in stock." The goal of this representation was to convince PBMs not only that Alliance pharmacies would be dispensing retail test strips to patients moving forward, but also that the pharmacies had already been purchasing and dispensing retail product (and, thus, that past claims for retail test strips were truthful and should be allowed).

### b.  Photographs of "Dummy" Retail Product

151.    As part of their efforts to manage the risk of PBMs and others discovering the Questionable Business Practices, the Scheme Participants took active measures to conceal those practices from outside auditors and inspectors. On numerous occasions, Alliance showed auditors and inspectors pictures or samples of retail strips to create the misleading appearance that its pharmacies had been stocking and dispensing retail strips, when they had actually been fraudulently dispensing NFR strips.

152.    In March 2016, inspectors from the Mississippi Board of Pharmacy conducted a surprise on-site inspection of the Alliance-affiliated Hawkins Pharmacy. The inspectors noticed that, though Hawkins Pharmacy adjudicated huge quantities of retail strips, the pharmacy had no retail strips in stock.  The inspectors expressed concern and stated that they would conduct a

41

follow-up inspection in one month.

153.    Alliance sprang into action, "order[ing] a small amount of retail strips" and "keep[ing] a small supply on hand" to make it appear as though Hawkins Pharmacy regularly stocked retail strips even though it continued to dispense NFR strips.  Grant enlisted Baker's help in this effort, emailing Rosebush on March 25, 2016 to say: "The MS BOP did an inspection of one of the independent pharmacies, and had concerns about the mail order and DME diabetic testing supply product on the shelf.  Given that the wholesalers invoice it as retail product and it is maintained as inventory in the system as retail product.  We just want to talk about possible strategies going forward at that pharmacy as well as overall."

154.    Around the time of the Hawkins Pharmacy inspection, Baker associate attorney Lindsay Holmes spent hours conducting research on "Hawkins pharmacy Mississippi NDC code on dispensed product requirements" and the "Hawkins Mississippi NDC code issue."  Billing records indicate she discussed her findings with Rosebush.

155.    When Grant was informed in April 2016 that the inspectors had returned, he asked Paoline, "Had we stocked with correct NDCs as we discussed?" Paoline replied: "Yes."  Grant wrote back: "Perfect.  The quick action by you and your team likely saved the day. Well done."

156.    In 2016, the Alliance-affiliated pharmacies Cure Pharmacy, Baytree Pharmacy, and Alameda Pharmacy were audited by ESI. One of the purposes of the audit was to determine whether these pharmacies had purchased enough retail strips to justify the thousands of adjudications they submitted.

157.    In response, Paoline sought to re-create the tactic that had worked so well during the Hawkins audit and that had been supervised by Baker.  On September 15, 2016, Paoline sent an e-mail to Alliance employees with the subject "ESI Corrective Action Plan." That plan included the "[p]hysical separation of primary/secondary product" and taking "[p]ictures of primary product

on shelf" at the audited pharmacies. "Primary product" meant retail strips; as alleged above, "secondary product" meant NFR strips. Paoline's action plan also included "Pharmacist education on how to respond to ESI onsite auditor" and "[e]nsur[ing] there is retail product at these sites."

158.    Alliance submitted pictures of "primary product"—boxes bearing retail NDCs procured solely for the purpose of audit responses—to PBMs in an effort to mislead PBMs into believing that Alliance was complying with its contracts.

159.    The boxes of retail strips shown to ESI were never intended to be dispensed to patients.  In fact, on August 29, 2016, after requesting that the audited pharmacies be provided with only five boxes each of certain brands of retail strips (Alliance's pharmacies adjudicated hundreds of boxes a week), John Renola, Alliance's Vice President of Operations, added: "If possible, can we put some kind of caution tape or something like that on these boxes so that the pharmacies have a reminder not to use them? And then we should brainstorm how to write off so that we don't keep counting this as usable inventory."

160.    On September 16, 2016, Holmes wrote to Kassie Thomas with the subject "Inventory Photos," to ask if Thomas was "able to provide the inventory photos we discussed?" Thomas responded with photos of retail product, apologizing for the delay in sending those pictures because "*it took a bit to separate the product*"—that is, to separate the retail product (of which Holmes wanted pictures to submit to ESI) from the NFR product (which Baker intended to hide from ESI).  Holmes then asked if Thomas could also send "photos of boxes with lot number and *retail ndc (up close)*?"

161.    On September 16, 2016, Baker wrote letters to ESI on behalf of Baytree Pharmacy, Cure Pharmacy, and Alameda Pharmacy, to which photos showing retail lots numbers were attached. The letter from Baytree Pharmacy read in part:

[I]n order to demonstrate that Baytree Pharmacy is purchasing retail product from

> manufacturers and/or what Baytree Pharmacy understands to be "authorized
> distributors," Baytree Pharmacy has provided several photos of current inventory
> on Baytree Pharmacy's shelf that contain retail lot numbers and NDCs . . . .

Baker made the same representation—that the photos showed "current inventory" including retail test strips—regarding Cure and Alameda.

162.    In November 2016, Grant told Jeff Smith and Rosebush that Alliance "pulled a group of invoices from secondary wholesalers that do not identify the product based on NDC number.  Kassie's team is doing a final review of these invoices this morning to assure that we have sufficient invoices for the ESI chargebacks for Baytree and Alameda.  If we can get a quick settlement from ESI on this basis, we will continue the process for the pharmacies with the largest chargebacks until we run out of invoices that do not identify the NDC . . . I will let you know when all invoices are in the hands of the Baker team.  I am sending Alameda this morning."

163.    In these and other instances, Alliance—with Baker's assistance—showed auditors retail strips (or pictures of retail strips) for the purpose of misleading them into believing that Alliance was dispensing retail strips when in fact it was dispensing NFR strips.

### c.  Falsified and Misleading Invoices

164.    Occasionally, PBMs were not satisfied with the invoices generated by Alta and other Alliance-controlled purchasing entities.  In those instances, the PBMs would demand to see "pedigree" invoices from the external sources that had originally sold those test strips to Alliance.  Vargas described these requests as "tricky since we don't have all invoices showing the Retail NDC." Vargas explained that although some of Alliance's outside vendors would improperly "put the retail NDC" on their invoices for NFR strips, some would not.

165.    Baker used invoices bearing the retail NDC to intentionally and materially mislead PBMs about the identity of the products that Alliance pharmacies were dispensing.  Although Baker understood that Alliance pharmacies were *in fact* dispensing NFR product, it concluded that

the pharmacies should respond to PBM audits by providing invoices that displayed the retail NDC—regardless of whether those invoices or the NDC listed thereon actually corresponded to the product dispensed.  On August 22, 2016, Lee Rosebush specifically asked Alliance employees to isolate invoices bearing the retail NDC for LifeScan product so that he could include those invoices in Baker's audit response on behalf of Alliance pharmacies, saying "We are in need of invoices that have retail lot numbers. . . . [W]hile the Bayer and Strategic direct invoices are helpful to show direct purchases, they do not answer the questions raised in the audit related to J&J product."  By providing only the carefully filtered selection of invoices that displayed a retail NDC, Rosebush intended for the PBM to believe that Alliance pharmacies were in fact dispensing retail product—a fact that he knew to be false.

166.    Alliance and Baker also worked together to identify "NDC neutral" invoices during audits—that is, invoices that did not contain the NDC code for NFR product.  Although less convincing than invoices bearing the retail NDC, Baker recognized that some PBMs might be tricked by "neutral" invoices into believing the false claim that Alliance purchased sufficient numbers of retail product to support its insurance claims for that product.

167.    Sometimes, despite the systematic efforts to ensure that external suppliers of test strips would provide invoices listing the NDCs for retail strips even though these suppliers were shipping NFR strips to Alliance, Alliance management was unable to cobble together enough retail or neutral invoices to satisfy the PBMs.  For example, when ESI audited Baytree Pharmacy in August 2016, Kassie Thomas informed Rosebush that Alliance did not have proof of any actual retail purchases to submit to ESI because "all products listed are received from secondary suppliers where *the lot number could be mail order or DME only at which we do bill the retail NDC on these products*."

168.    When it was unable to procure retail or neutral invoices to submit to PBMs,

Alliance and Baker took matters into their own hands.

169.     When OptumRx audited the Alliance-affiliated Hawkins Pharmacy in March 2015, for example, it requested invoices of Hawkins's purchases of test strips from Alta Distributors. Alliance employee Kassie Thomas sought advice on how to respond, and later e-mailed Sahily Paoline: "I just met with David [Grant] and Justin [Leavitt] (by phone) I am going to white out the dollar amounts on the invoices but they want me to have the item number that is listed on the invoice, verified by . . . someone that that is the NDC number that we are billing them for the product." In other words, Grant and Leavitt explicitly instructed Alliance employees to both remove true information (pricing) and add false information (retail NDCs) in documents provided to PBMs.

170.     Baker understood that some of the invoices on which Alliance relied during audits—and, thus, the invoices that Baker urged PBMs to accept as sufficient evidence that pharmacies were in fact purchasing retail test strips—had been altered to remove information that would indicate to the PBMs that NFR product, not retail product, had been purchased.   On September 23, 2016, for example, Rosebush and Baker associate Lindsay Holmes participated in a phone call with Kassie Thomas, David Grant, Sahily Paoline, and Amy McMurtry.  Thomas's notes from that call show that the participants discussed the "Alta/Ollin Invoices – *removal of NDC*."  Thomas noted that Holmes was tasked with "confirm[ing] if there are regulatory or contractual requirements to have some form of product identifier (Lot number, product number, etc.) placed on OTC [over-the-counter] invoices."  In the absence of such requirement, Baker intended to submit invoices that in fact reflected the purchase of *NFR* test strips to substantiate purchases of *retail* test strips, because they thought that the PBMs would not catch them as long as they were able to remove the incriminating NDC.

171.     Rosebush and Holmes participated in weekly "legal stand-up" calls in September

and October 2016 with Alliance management and compliance personnel, during which they discussed Alliance's efforts to generate a sufficient quantity of misleading invoices to supply to PBMs. Notes from these calls include instructing pharmacists to evade questions about "secondary product," "Remove NDC from all secondary product invoices ASAP," "Watch for audit charge back feedback due to NDC being missing," and, later, "New update *for Lee*: Lot numbers being placed on invoices from wholesalers is not possible at this time."

172.    Some attorneys at Baker recognized that providing knowingly misleading audit responses was crossing the line, but Baker continued to do so. Baker associate Lindsey Holmes, for example, testified that the "invoice issue gave [her] the heebie jeebies."

173.    On December 8, 2016, David Grant emailed Lee Rosebush, Gilbert Keteltas, and Lindsay Holmes and informed them that Alliance would be "uploading tonight a large number of additional invoices to cover the claimed chargeback for the remaining pharmacies where ESI is withholding money into the Sharepoint file" so that Baker could provide the invoices to ESI on Alliance's behalf. Grant warned that Alliance was "short on a few products" and said that he would be able to determine the next day "whether there are additional invoices that can realistically be provided." The Baker attorneys who received this email understood that Grant was attempting to locate invoices that did not list the NDC code for DME product (and thus could "realistically" be provided to ESI), despite the fact that Alliance had in fact purchased mostly DME product.

174.    Baker explicitly acknowledged that it should have withdrawn its representation of Alliance rather than intentionally misleading PBMs—but it did not do so. On December 20, 2016, David Grant emailed Rosebush to ask about supplying ESI with "the invoices from secondary market suppliers that show the retail NDC." Because Rosebush was aware that invoices that displayed the retail NDC did not necessarily reflect the purchase of actual retail product (because Alliance ensured that Alta invoices erroneously displayed retail NDCs), he asked Grant "if [ESI]

ha[s] even one example of a box that has nonretail NDC, and we give these examples of only retail NDC, how do you explain Alta's or the pharmacy's actions?"  Baker partner Gilbert Keteltas, who was cc'd on Rosebush's response, responded privately to Rosebush and warned him "we cannot provide invoices with retail NDC that we have reason to believe are for not for retail product."  If Grant wanted to provide such invoices with the goal of misleading PBMs, Keteltas said, "we should not be part of it and should help him find other counsel."  But Rosebush did not heed Keteltas's advice; rather, he told Grant that "[p]roviding the material is your call."

175.    Keteltas—who was presumably not aware that Baker had *already* been involved in submitting invoices to PBMs despite having reason to believe that the invoices were for NFR product—was correct.  Baker should not have been involved in Alliance's misdeeds, and it should have withdrawn rather than involve itself in them.  But it did not.

### C.    Baker Grows Its Representation of Alliance

176.    As Baker learned more about Alliance and its Questionable Business Practices, it could have raised the alarm on Alliance's fraud or disengaged from the representation.  Instead, not only did Baker continue to represent Alliance, it expanded its lucrative engagement into new areas and deepened the relationship between the company and Baker's partners.

177.    Early on in the engagement, Rosebush introduced Grant to Baker partner Lynn Sessions, a Houston-based attorney specializing in HIPAA.  Sessions reviewed the telephone script Alliance used to generate customer leads and other corporate agreements.  Robert Wolin, another Houston-based partner, began advising Alliance on regulatory aspects of telemedicine.

178.    When, in late 2015, two Alliance pharmacies in West Virginia were under investigation by the state's attorney general for violating consumer protection laws, a Baker team led by litigation partner Elizabeth Scully represented the pharmacies and filed motions to dismiss on their behalf.

179.    An Alliance database containing sensitive patient information was left unsecured and then accessed by a hacker in December 2015.  Immediately following the incident, a cohort of Baker data privacy lawyers, led by Ms. Sessions and Cincinnati-based partner Patrick Haggerty, was brought in to advise Aldecember liance and direct the company's response to the breach.

180.    Baker attorney Lee Rosebush also continued to provide Alliance advice about whether its business practices were compliant with applicable law.  On January 27, 2016, for example, Alliance's senior executives asked Rosebush to participate in a conference call about how Alliance could "meet Medicare compliance requirements." Alliance's Chief Revenue Officer, Blaine Smith, specifically asked Rosebush, "What are the risks of using secondary product sourcing?"

181.    In total, according to their own billing records, Baker represented Alliance in 25 discrete matters in less than two-and-a-half years.

### D.    **Baker Understood that Alliance's Questionable Business Practices Were Illegal**

182.    Baker not only knew that Alliance was engaged in NDC fraud, it also knew and should have known that those practices were illegal.  The Baker attorneys that represented Alliance held themselves out as healthcare regulatory experts.   Given their backgrounds, they had a particularly sophisticated understanding of the importance of accurately recording the NDC of the product dispensed to a patient on an insurance claim.   However, specialized healthcare law knowledge is unnecessary for any lawyer to conclude that NDC fraud is illegal: it meets all of the common law elements of fraud.

183.    Baker knew that Alliance's PBM contracts prohibited the Questionable Business Practices, but recognized that helping Alliance dodge PBM inquiries would generate substantial legal fees for Baker.  For example, in August 23, 2016, Baker associate Lindsay Holmes wrote to

Rosebush—while drafting a PBM audit response letter—that she had avoided citing to the PBM's provider manual "because we know that we have violated it." Rosebush responded disingenuously that "I would not go so far as to say we KNOW we violated. We want them to tell us what we violated allegedly."

184.    Rosebush wrote to Grant on September 26, 2016 that he "would not go so far as to say that secondary market is perfectly legal," in part because the PBMs will "bring up that you are dispensing mail order in lieu of retail."

185.    On December 2, 2016, Baker associates working for Rosebush were dispatched to scan pages from a national pharmacy reference guide containing the NDC numbers for retail-sale test strips. These pages were sent to Rosebush with the subject line "NDC Codes."

186.    When Baker attorneys reviewed ESI's provider manual, they focused on the explicit statement in the manual that "the submitted NDC must be the complete NDC of the medication dispensed" and "DME products labeled 'Not for Retail Sale' . . . must not be substituted for products containing valid NDC numbers." The Baker attorneys expressed serious reservations that filing a planned antitrust lawsuit against ESI, *see infra* ¶¶ 194-197, would expose Alliance to attack for doing exactly that. Baker attorney Gregory Baker flagged this issue as a "MAJOR CAUTIONARY COMMENT" and observed that "the adverse implications from the client having sought and received reimbursement from [a PBM] for products not purchased from [the PBM] are enormous." Baker went on to presciently observe that there would be a "significant risk" of counterclaims for fraud and government investigations if the practice of dispensing NFR product but billing retail product was exposed.

187.    Once Baker devoted a cursory amount of attention to the question of whether Alliance's NDC fraud was illegal, it easily concluded that it was. In March 2017, Baker associate Allison Rochford drafted a memorandum for Rosebush in which she analyzed the truth or falsity

of various claims made in Grant's November 4, 2015 board memorandum.  The document rated

as "***possibly false***" Grant's claim that "utilizing for billing purposes a[ different] NDC that has

been assigned to identical product, packaged for a different distribution channel" does not

"necessarily violate[] any state or federal statute or regulation."  Rather, Rochford concluded that

liability ***would*** likely result from this practice because "[i]f the rate changed based on whether the

product is retail or mail order, it will not be billed correctly."

188.     Despite understanding that Alliance was committing billing fraud that could give

rise to liability under state and federal law, Baker continued to represent Alliance, expanded its

representation into numerous different areas, and helped the company conceal its fraudulent

practices from third parties.

### E.        Baker Hatches a Plot with Alliance to Sue ESI

189.     In 2016, Alliance was desperate to recoup mounting losses from PBM cancellations

and chargebacks.  In addition to mounting a new defense to PBM investigations in the form of new

"10% PIC" pharmacies, Alliance sought Baker's assistance with an offensive strategy against ESI:

Baker would file a lawsuit against ESI for antitrust violations. Alliance and Baker sought to

reframe ESI's requests for evidence that Alliance had actually purchased retail test strips as the

actions of a jealous competitor in the "mail order pharmacy" industry, despite knowing that ESI's

suspicions that Alliance had not actually purchased Retail test strips were entirely accurate.

Alliance hoped that the lawsuit would discourage ESI from auditing its business practices or

issuing chargebacks for fraudulent insurance claims that it had submitted.  Accordingly, the ESI

lawsuit was yet another example of Alliance's multifaceted cover-up strategy.

190.     Handwritten notes produced by Baker show that on January 12, 2016, at least four

Baker attorneys—Thomas Hogan, Gilbert Keteltas, Danyll Foix, and Greg Baker—participated in

a meeting with Kassie Thomas, Sahily Paoline, and Amy McMurtry from Alliance to discuss the

newly hatched "ESI litigation."  During this meeting, Baker attorneys were explicitly told about Alliance's practice of relying on explicitly false statements to PBMs to induce them into doing business with Alliance pharmacies.  Paoline explained that Alliance pharmacies regularly and intentionally lied on their applications to ESI in order to obtain "credential[s]" to do business with it. (Obtaining credentials from a PBM for each pharmacy was an annual project.) The applications asked pharmacies to list the percentage of their business that was "mail order" (that is, delivered via mail rather than in-person to a patient at a brick-and-mortar pharmacy)—however, if a pharmacy listed "over 5% mail order [on the] ESI form", ESI would not allow the pharmacy to "move forward."  In fact, Paoline told the Baker attorneys, one Alliance pharmacy had listed that 100% of its business was mail order, and that pharmacy was "immediately denied."  Accordingly, Alliance had determined that a truthful response—that the vast majority of its pharmacies' business was mail order—should not be given.  Instead, Alliance pharmacies "normally" listed that "2-3%" of their business was mail order, so that the 5% ceiling would not be breached.

191.    One such misstatement, the Alliance team told Baker, had been made during a recent recredentialling process for Stonybrook Pharmacy.  They had listed Stonybrook as having "below 5% mail order although its mail order volume was much higher."  And Alliance had had a near miss recently with Brookside Pharmacy:  ESI had concluded that Brookside was engaging in too much mail order, and Brookside had told ESI that it would get its mail order volume down to 4%.  (Of course, there was no intention for Brookside to actually decrease its mail order volume to 4% or lower; Paoline told the Baker attorneys that even 5% would be unprofitable.)  Alliance sought to sue ESI over its restrictions on mail-order volume.

192.    Baker recognized that Alliance's ESI lawsuit presented a lucrative billing opportunity.  In May 2016, Rosebush wrote to his partners that "the litigation I mentioned with the $2 million budget for the year"—that is, the antitrust lawsuit against ESI—was "finally on."  Lance

Shea, the Co-Chair of Baker's Life Sciences practice, responded "excellent."

193.    D.C.-based Baker partners Danyll Foix and Gilbert Keteltas led the effort to draft a complaint, determine which Alliance pharmacies might potentially serve as named plaintiffs, and secure litigation funding.

194.    Although Keteltas never advised Alliance to cease its practice of committing insurance fraud, he recognized that his client's illegal activities would be a liability in the planned ESI litigation.  Accordingly, on January 13, 2017, he sought input from five other Baker lawyers (Gregory Baker, Danyll Foix, Thomas Hogan, Lee Rosebush, and Lindsay Holmes) on a "Draft Email to [Alliance General Counsel David] Grant".  Keteltas advised Grant in writing about the "potential . . . risks" of a confrontation with Alliance.  Specifically, Keteltas noted that there was a "High" likelihood that ESI would file a counterclaim for "fraud" due to Alliance pharmacies' "submission of claims for reimbursement of 'not-for-retail' product under a retail code."

195.    Keteltas also noted the possibility that government regulators might investigate Alliance based on "allegations by ESI of fraud by Alliance or its pharmacies." Although Keteltas originally reported the risk of a Government Investigation into Alliance's fraud as "Low," Gregory Baker responded that the risk of such an investigation was "'medium' rather than 'low.'"

196.    Lee Rosebush was acclimatized to Alliance's business practice and was eager to avoid a negative interaction with Alliance, his golden goose.  Rosebush suggested that Keteltas tone down the email because, in his view, Alliance would continue to get away with its fraudulent behavior just as it had in the past:

> I understand we are trying to CYA and fully disclose all the risks.  We have done so several times already.  But, as is, there is no mention of mitigating steps.  For example, ESI may very well claim contract damages based on fraud.  But, they have already done so via chargeback and hold millions of dollars of the claims.  Therefore, if our pharmacy has not been paid, what the damages be [*sic*]?  Don't forget, under the audits, they collect the drug spend and the dispensing fees (admin costs).  Second, on the government investigation front, this information has already

been turned over by ESI and Johnson & Johnson to the government.  The OIG has already approached the company's past employees and had conversations with them on this topic.  Scott McBride and I have worked on this issue.  Therefore, yes I agree there is a risk of government investigation, but again there is no mention of any of these other actions.

I get that we are CYAing.  Yes, it needs to be done.  But, I can tell you the client is starting to lose patience.

Of course, Rosebush's attempt to downplay the risk of Alliance's illegal business model was nonsense:  Alliance faced risks well beyond "contract damages based in fraud" for its business practices.  Alliance had already been threatened with legal action by one of the test strip manufacturers who bore the ultimate cost of the "drug spend and [] dispensing fees (admin costs)" that Rosebush invoked.

197.    In his response to Rosebush, Keteltas acknowledged that he did not intend for his email to actually influence Alliance's behavior.  Rather, since proceeding with the lucrative-for-Baker antitrust suit might bring Alliance's illegal activities to light (and to the attention of government investigators), Keteltas agreed that Baker needed to send a "CYA" (that is, "Cover Your Ass") email to create a record that would protect Baker in the event that Alliance's lawsuit against ESI went sideways.  This email—which was intended to fly under Alliance's radar and was sent only for the purpose of protecting Baker—was far too little, too late.  In fact, Keteltas floated and then immediately rejected the possibility of placing his warnings about the Alliance litigation in a standalone communication (rather than sending them alongside a draft settlement letter to ESI):

I hear you about the client losing patience, but this is a major undertaking and we are getting information piecemeal that gives us concerns.  So I think it is important to have this in writing to protect you, and us and to make sure they do not have unreasonable expectations.    That said, I could break these into separate communications, but I think that may overly highlight the risk/reward discussion.

Keteltas knew that "overly highlight[ing] the risk/reward discussion" would create the risk that

Alliance would choose not to pursue the ESI litigation and that Baker would no longer be able to

bill for it.

F.     **Lee Rosebush Joins Alliance's Board of Directors**

198.    Baker's relationship with Alliance deepened when Baker partner Rosebush voluntarily assumed a seat on Alliance Medical Holdings, LLC's Board of Directors (the "Board"), effective June 9, 2016.  The Board was the entity with ultimate control and authority over the entire Alliance enterprise, including all of the Debtors.

199.    Rosebush remained on the Board until October 26, 2016.  As alleged above, Rosebush already knew when he agreed to join the Board, and during his entire tenure as a Director, that Alliance's business involved the regular submission of fraudulent insurance claims.

200.    Lee Rosebush's service on the Alliance Board of Directors was part and parcel of his position as a partner at Baker.  He sought and received approval from Baker management for his position, although Baker required him confirm the amount of insurance coverage that Alliance would provide him as a Director before providing their stamp of approval.  Indeed, Rosebush filled out an internal Baker document entitled "Checklist for Serving as Officer, Director, Shareholder or Fiduciary with a Company" (the "Checklist") describing his service on the Alliance Board of Directors, and he submitted that document to Baker partner Jeffrey Paravano for approval.  In the Checklist, Rosebush was asked to describe his "proposed relationship with [Alliance] and the expected advantages thereof to you and B&H."  In response, Rosebush noted that Baker served as Alliance's "Current Outside Counsel"—a lucrative position for the firm.

201.    Attorneys at Baker understood that Rosebush's service as a member of the Alliance board created value for the firm as a whole.  Several Baker partners (Jeffrey Paravano, Scott McBride, and Robert Wolin) expressed enthusiastic congratulations to Rosebush following his appointment to the Alliance board.  Their enthusiasm was based on a shared understanding that

Rosebush's service on the board of a Baker client would inure to the firm's benefit.

202.    Rosebush emphasized the financial value to Baker of his Board service explicitly on July 21, 2016, when he responded to an inquiry from Baker partner Thomas Lucchesi regarding whether he served on the Board of Directors for any Baker clients and, if so, the "approximate annual amount of legal fees that the Firm provides to that entity."  Rosebush explained:

> I recently accepted a position on a client's board.  The client is Alliance Health based out of Salt Lake City, UT.  Jeff Paravano has knowledge of the position and is cc'd on this email. Alliance is a healthcare and IT services company and is privately owned by management and 2 private equity firms.  Baker currently provides regulatory and litigation counsel to Alliance and I serve as the billing partner for those matters. Jan 1 through June 30, Baker has collected over $350,000 from the client and its relationship partners.  Therefore, an annual estimate [of the annual legal fees that Alliance would pay to Baker] would be ~$750,000.  I am not compensated separately and all Director compensation is through billed hours to the company via their legal bills.  My official title is Independent Director, of which I am 1 of 7 board members.

203.    Alliance compensated Baker at Rosebush's normal hourly rate for time spent in connection with his Board position.

- On June 22, 2016, Baker billed Alliance 1.10 hours for time Rosebush spent on the following tasks: "Communications with J. Smith regarding the Board position; maintaining clearance and paperwork for Board."

- On July 21, 2016, Baker billed Alliance 1.80 hours for time Rosebush spent on the following tasks: "Meetings with J. Smith to discuss information related to the Alliance Health Board; follow-up on requests from J. Smith."

- On July 29 2016, Baker billed Alliance 2.4 hours for time Rosebush spent on the following tasks: "Communications with L. Stoecker regarding a business meeting; review materials for Board consent; communications with M. Simas [another Board member]."

- On August 23, 2016, Baker billed Alliance 4.9 hours for time Rosebush spent on, *inter alia*, "Travel to Utah" for a Board meeting.

- On August 24, 2016, Baker billed Alliance 7.8 hours for time Rosebush spent on the following the following tasks: "Meet with J. Woolley and P. Berger to discuss business opportunities; attend board meeting; travel back to DC."

- In its August 31, 2016 invoice to Alliance, Baker sought reimbursement for

Rosebush's travel costs for attending the Alliance Board meeting in Utah.

204.    As an Alliance Director, Rosebush received detailed information about Alliance's Questionable Business Practices and PBM efforts to uncover those practices.  He also received Board materials detailing the mounting financial losses Alliance was suffering due to PBM audits and chargebacks, losses with which Rosebush was already familiar.  An August 24, 2016 memo to the Board contained a table titled "PBM Contracts Lost Since 1/1/2016" and listing 29 contract cancellations at 16 different corporate-owned and independent pharmacies.  The November 16, 2016 Board materials relayed that there were "$10M in payments withheld for secondary product" and stressed the importance of "[f]ast track acquisitions," or the acquisition of new pharmacies to service patients impacted by PBM cancellations.  The updated table of "PBM Contracts Lost Since 1/1/16" in the November 2016 Board materials listed 41 contract cancellations at 18 different corporate-owned and "independent" pharmacies.

205.    Rosebush also attended an August 24, 2016 meeting of the Alliance Board of Directors.  At this Board meeting, Rosebush received a presentation that specifically discussed the challenges that Alliance was facing for "PBM Contract Loss"—that is, the fact that Alliance pharmacies were losing PBM contracts because they could not survive audits (despite Baker's attempts to help them mislead the auditors into believing that Alliance really was purchasing and dispensing the retail test strips for which it was submitting claims).  The presentation proposed that one way for Alliance to "[r]educe risk from contract loss" was to "[m]ove away from secondary DTS product."  Since Alliance purchased its NFR strips from the secondary "gray" market, it often referred to its practice of committing NDC fraud in terms of the secondary market. Because Rosebush already understood that Alliance was purchasing NFR product, however, he would have understood the reference to "secondary DTS product" to refer to NFR test strips. Sahily Paoline also made a presentation to the Board regarding "Product" at this Board meeting.

206.    At the August 24, 2016 Board meeting, Board members—including Rosebush—also discussed Alliance's acquisition of new pharmacies to shield its fraudulent activities from PBM scrutiny.   The Board presentation specifically discussed Alliance's plan to operate 49 pharmacies by the end of the second quarter of 2017, including 10 additional acquisitions by the end of 2016.   The Board presentation stated clearly that the strategy of acquiring new pharmacies was intended to "to *reduce risk* and *increase capacity*"—that is, to help Alliance increase the number of fraudulent adjudications it could submit by (1) operating with a "[l]ower per-pharmacy patient count" to avoid attracting PBM scrutiny to any particular Alliance pharmacy and (2) providing a path for "[a]dditional shipment volume for DTS".   To make sure that any pharmacy that attracted PBM attention could be easily shut down and its patients surreptitiously transferred to a new Alliance location, priority pharmacy acquisitions were identified based on "transferable patient volume."   Pharmacy acquisitions were also required to have their own contracts with ESI. Although the Board materials referred to these as "Corporate Owned Pharmacies," they used the "10% PIC" ownership model—so, as the Board was reassured, the "10% PIC" owner "will be the only person disclosed in PBM contract applications or licensure applications."   Because PBMs would not know that the Alliance pharmacies were all part of a vast network, they would not be able to shut the entire network down—they would have to move pharmacy-by-pharmacy, giving Alliance ample time to transfer patients to a new "independent" pharmacy with its own PBM contract.

207.    Rosebush also received a presentation about "Productive Paranoia" at the August 24, 2016 Board meeting.   As part of that presentation, Alliance informed the Board that it was addressing potential risks by "[m]eet[ing] with Lee [Rosebush] monthly to discuss concerns, priorities, business practices."

208.    The minutes of the August 24, 2016 Board meeting do not reflect any objection

from Lee Rosebush, nor did he raise any concern about Alliance's business practices or expansion plans at that meeting.

209.    On September 19, 2016, while Rosebush was serving on Alliance's Board of Directors, Grant e-mailed Rosebush to inform him that "Johnson and Johnson [LifeScan] ha[d] presented a draft complaint . . . alleging fraud and RICO [claims against Alliance] based on adjudicating retail claims after dispensing diabetic testing supplies packaged not for retail sale (mail order, DME, etc.)."

210.    As described in more detail below, Rosebush (then a Director) participated in discussions in October 2016 regarding whether Alliance should make an incomplete self-disclosure of the Questionable Business Practices to government authorities.  Although Rosebush initially endorsed the plan for certain Alliance pharmacies and Alliance's wholesaler to self-disclose the billing practices to federal authorities, he ultimately agreed that Alliance should not self-disclose at all.  That decision not to self-disclose allowed Alliance to continue falsely billing for NFR test strips undetected.

211.    As a director, Rosebush voted to expand Alliance's operations, knowing that such expansion would involve an increase in the number of fraudulent insurance claims that were submitted.  For example, he voted to approve Alliance taking on an additional $9 million in debt, which would be used in part to fund the acquisition of additional pharmacies.

212.    On October 26, 2016, Lee Rosebush informed Jeffrey Smith that he "may need to" temporarily resign from his position as a director on Alliance's board.  Rosebush had not decided to resign due to a crisis of conscience over Alliance's misdeeds—to the contrary, he took pains to make clear that he was resigning in order to ensure that he would be able to shield the details of Alliance's fraudulent business practices behind the cloak of attorney-client privilege.  He explained,

> With the potential litigation, I do not want to cause a conflict.  Obviously, we have
> not discussed the ESI litigation with the Board and I would, therefore, have nothing
> to testify to, if called as a witness.  However, if the Board discusses the litigation,
> Board members could be called as a witness.  Therefore, if we are going to move
> forward with the ESI or Prime litigation, and we are going to go for the jugular, I
> may be in a position where I need to step down from the board until the litigation
> is over.  This does not mean I cannot attend the meetings.  I would just attend as
> the company's attorney and not as a Board member.

Rosebush left unstated the other justification for his temporary resignation: he did not want to

jeopardize Baker's lucrative engagement to represent Alliance in litigation with the PBMs, which

he had already celebrated with his partners.

### G.     Alliance Considers But Rejects Reporting the Questionable Business Practices to the Authorities

213.    In 2016, as more and more PBMs began to catch on to Alliance's Questionable

Business  Practices,  certain  of  the  Scheme  Participants  considered  disclosing  Alliance's

Questionable Business Practices to federal authorities.

214.    On September 27, 2016, Grant wrote to Jeffrey Smith and Rosebush (at that time,

a member of Alliance's Board of Directors):

> After speaking with Lee Rosebush, I recommend that Alta Distributors, LLC
> ("Alta") and the pharmacies involved as identified in the Johnson & Johnson draft
> complaint self-disclose to the federal authorities the practice by Alta of identifying
> all secondary market product distributed to the network of pharmacies it sells to
> using the retail NDC on the invoice regardless of the class of trade NDC established
> by the manufacturer for the particular boxes sold. . . .

Smith responded: "Per our conversation, I completely agree and support the self-disclosure on

the timeline you discussed below."  Notably, Grant and Rosebush discussed self-disclosure only

by the pharmacies that Johnson & Johnson had *already identified*.

215.    Rosebush forwarded this email to Baker partner Scott McBride on September 29,

2016.  McBride printed a copy of this email.

216.    Multiple Baker attorneys were involved in the self-disclosure discussions.  Billing

records reflect that, in September 2016, McBride participated in a "[t]elephone conference with L. Rosebush regarding NDC issue and self-disclosure"; he also "research[ed] and analyze[d] reimbursement and claim issues related to matter."  McBride conferred about the potential self-disclosure with Baker associate Banafshe Pachuca, who conducted research on the "diabetes test strip billing issue."  Billing records also reflect that a specific matter number for "Self Disclosure" at Alliance, 094205.000021, was opened, and associate Lindsey Holmes billed 10.3 hours to that matter in September and October 2016.  In addition to participating in telephone conferences about self-disclosure with Rosebush and McBride, Holmes discussed "remittance and payment information" with McBride and reviewed documents related to potential remittance.

217.    This e-mail triggered an internal audit whereby Alliance gathered and provided documentation regarding its practices—including detailed pharmacy and claim information—to Baker attorneys Rosebush and Scott McBride.   A team of Baker attorneys reviewed this information and again researched the "NDC issue."  Upon further consideration and consultation with counsel, Alliance's senior management realized that reporting the Questionable Business Practices to federal authorities would result in enormous financial liabilities they were unwilling to accept.

218.    On September 28, 2016, Grant e-mailed Jeffrey Smith, Blaine Smith, and Paoline to discuss the possibility of making a voluntary disclosure to the United States Department of Health and Human Services' Office of Inspector General in order to settle any civil claims arising from Alliance's improper adjudication. In the e-mail, Grant noted that self-disclosure would be in Alliance's interests only if the company could promise that it had ended its practice of the Questionable Business Practices:

> With regard to informal settlement with DOJ on the criminal side, we discussed that self-disclosure might make sense later once we have settlement on the civil side and the company can affirmatively state that there will be no more dispensing

of secondary market product using a product packaged for other than retail sale.

219.    But these members of Alliance's senior management, along with Baker, became concerned that the consequences of self-disclosure would be devastating to Alliance's business. Sahily Paoline's notes from two meetings regarding self-disclosure on October 3, 2016 and October 18, 2016 reflect that "Scott McBride – Baker Hostetler" was present.  McBride advised Alliance that it should not disclose its billing fraud to the federal government because it had not harmed the federal government, and emphasized the "[e]quitable argument" that patients received the "same product."  As Paoline's notes reflect, McBride said that the fraudulent billing was a "[c]ivil issue – no obligation to disclose" and that Alliance's "[i]ssue [was] with PBM[s] not [Center for Medicare & Medicaid Services]" because the false billing "doesn't change the amount CMS has paid to contractor"—accordingly, he advised "[a]ggressive litigation against PBMs" in lieu of self-disclosure.  Of course, Baker would benefit financially by representing Alliance in that aggressive litigation against PBMs.

220.    Rosebush also participated in a conference call on October 18, 2016 with Jeffrey Smith, Paoline, and others to discuss the self-disclosure possibility.  After the call, Paoline e-mailed Rosebush to confirm that Alliance would follow Baker's advice to keep the fraudulent practices under wraps: "we will pause on self disclosure."

221.    On the same day that McBride and Rosebush advised Alliance's management to abandon the self-disclosure plan, Grant circulated a slide deck memorializing the pros and cons of self-disclosure.  This deck was titled "Self-Disclosure Analysis." In the third slide, titled "Previous Rational for Self-Disclosure," Grant wrote: "Getting full civil settlement with the federal government on the NDC billing issues would resolve the question for future financing, merger and acquisition sources."

222.    In the fourth slide, titled "New Data," Grant wrote:

- Pharmacy techs have run test claims, and determined that the pharmacies could not have submitted claims on the pharmacies' retail plans for dispensing mail-order, DME or institutional packaged DTS, because the retail plans do not accept the mail order, DME or institutional 'NDC' codes.

- Accordingly, the issue may be whether the pharmacies should be required to disgorge the entire adjudicated amount rather than the amount that the federal government was harmed.

Grant recommended a two-part course of action: first, "Pursue Civil Action Against ESI, Prime and J&J"; and second, "Do Not Self-Disclose."

223.     The eighth slide of Grant's presentation stated:

- After discussion, outside counsel [Baker] recommends and I recommend that the pharmacies and distribution companies do not self-disclose.

- Any benefit may only come at the cost of the Company's ultimate survival.

- The potential downside does not justify whatever benefits might come from self-disclosure.

224.     Baker's abrupt reversal on the question of self-disclosure reveals the extent of the firm's facilitation and endorsement of Alliance's fraudulent business model.  The decision not to disclose Alliance's conduct was not premised on any new-found belief that the conduct was legal.  Rather, it was a calculated risk that the federal government would not be interested in billing fraud that did not directly harm Medicare, and that therefore the greatest risk to Alliance's operations would come from civil litigation—in which case the downside to self-disclosure was greater and the upside not as significant.  Baker knew that the billing fraud was wrong, but it believed that its legal strategy would allow the perpetrators to get away with it.

**H.      The Scheme Collapses**

225.     On February 23, 2017, the United States Government (the "Government") executed sealed search and seizure warrants on several of the Debtors at Alliance's headquarters in Salt Lake City, Utah in connection with a United States Department of Justice inquiry into the Debtors'

purchase of certain secondary market diabetic testing strips (the "Alliance Investigation").

226.    As part of the Alliance Investigation, the Government raided offices of the Debtors and served sealed warrants on Zions Bank to effectuate the seizure of the Debtors' business funds and other assets. The Government also caused Zions Bank to "dam" a substantial portion of accounts receivables to be received by the Debtors and seized approximately $1.2 million in cash from the Debtors' bank accounts with Zions Bank.

227.    The Government's actions immediately halted the Debtors' operations, as they had no ability to access funds to operate. The Government's actions also prevented Zions Bank from sweeping certain of the Debtors' accounts to pay down the term loan and the line of credit. Thereafter, the Debtors provided volumes of business documents to the Government and negotiated to have the damming warrants lifted on the Debtors' bank accounts, so that the Debtors could attempt to resume operations.

228.    On March 16, 2017, the Government lifted the damming orders, but by such time Zions Bank had declared a default on the loans and froze the Debtors' accounts, which completely shut off the Debtors' access to cash. Despite the freeze, Zions Bank continued "sweeping" Alliance's various bank accounts and applying the cash to pay down the amounts due to it under the Credit Facility.

229.    On or about March 17, 2017, the Government transmitted a one-page letter to Zions Bank formally notifying it of a pending criminal investigation against Alliance:

> This letter is to formally inform [Zions Bank] of the ongoing criminal investigation by the U.S. Attorney's Office for the District of Utah into the suspected business practices of Alliance Health, a Zions customer.

> The U.S. Attorney's Office considers this letter to constitute notice in this matter relevant to the question of Zions' priority regarding any potentially forfeitable assets of Alliance Health going forward.

> Please do not hesitate to call or write with any questions.

230.    In the weeks just prior to the Petition Date, the Debtors attempted efforts to negotiate a workout with Zions Bank that would allow the Debtors to continue to operate and provide a reasonable time period for the Debtors to refinance in order to take out the Zions Credit Facility, but were unsuccessful.

231.    On or about February 23, 2017, the Federal Bureau of Investigation and U.S. Postal Inspection Service executed search warrants at Alliance's headquarters, its warehouses, and several of the Alliance Pharmacies as part of an investigation into potential criminal wrongdoing. The FBI also seized the Zions Bank accounts belonging to Alliance and its affiliates and issued damming warrants to seize incoming receivables.

232.    On April 9, 2017, unable to access cash held in its own bank accounts due to an asset freeze, and under increasing government and commercial scrutiny for the Questionable Business Practices, Alliance and a number of its affiliates filed voluntary petitions for relief under the Bankruptcy Code in the Bankruptcy Court .

233.    Within weeks after the commencement of the bankruptcy cases, Jeffrey Smith was forced by the Board to resign and replaced with an interim CEO. Just a few weeks after that, the Bankruptcy Court entered an order appointing the Chapter 11 Trustee to manage all aspects of the business.

234.    Despite such repeated and explicit warnings that the Questionable Business Practices harmed manufacturers like Roche, Alliance continued that practice—at Alliance Officers' direction—until it was raided by the FBI and went bankrupt in 2017.

**I.      Baker Raises the Alarm Internally and Tries to Cover Its Tracks**

235.    After the FBI raid on Alliance's headquarters in February 2017, a group of Baker white-collar litigators based in Houston oversaw the company's response to the government

investigation.   Among others, partners Scott McBride, Gregory Saikin, and Sameer Mohan represented Alliance in this matter.

236.    Behind the scenes, however, Baker attorneys focused on entirely different tasks: assessing Baker's own liability in light of the fact that Alliance's obvious fraud had finally attracted governmental attention, and developing a (false) narrative to defend itself from any accusation of wrongdoing.

237.    Rosebush searched his emails for communications in which he had warned Alliance about the risks of NDC fraud—and, since no such emails existed, he also tried in vain to locate evidence that might support the (incorrect) assertion that he had not endorsed the plainly erroneous view that NDC fraud was legal.  On February 25, 2017, Rosebush forwarded a flurry of past emails with Alliance employees to Scott McBride and Gregory Saikin that involved references to Alliance's NDC misdeeds, attempting to cobble together a record that would establish that he had warned Alliance about the risks of engaging in NDC fraud or, at least, that he had not approved of the practice.  For example, he forwarded a January 27, 2016 email in which Alliance had asked for a call regarding, *inter alia*, the "risks of using secondary product sourcing" (although he did not describe to McBride and Saikin the advice that he had provided on that call).

238.    Rosebush also forwarded to McBride and Saikin the December 20, 2016 email that he had sent to David Grant, regarding the submission of Alta invoices to Express Scripts to bolster the (false) claim that Alliance had purchased retail test strips.  Although Rosebush claimed to McBride and Saikin that he had told Grant "that we cannot provide data or contracts for the mail-order/retail situation or the secondary supply contact [*sic*] because of Fraud," that characterization is blatantly contradicted by the pre-FBI raid email that Rosebush actually sent: Rosebush had in fact told Grant that "[p]roviding the material is your call."

239.    Saikin and McBride emailed extensively about Grant's insistence during the fallout

of the FBI raid that Rosebush had advised Alliance that the NDC fraud was not a violation of state or federal law.  They looked for evidence that Rosebush had not given such advice (at least in writing) and fixated on the fact that Rosebush had not edited Grant's November 2015 memo before it was circulated.  But the Liquidating Trustee has received no documentary record in which Saikin and McBride—or any other Baker attorneys—asked Rosebush if he had ever advised Alliance that its NDC fraud did not violate the law, orally or in writing.  Given the wealth of evidence that Baker attorneys participated in phone calls on precisely this subject, and David Grant's admonition that Alliance affiliates (including Board members like Lee Rosebush) should use the phone for communications that might lead to liability, it is likely that Rosebush and the Scheme Participants discussed the fraud much more explicitly over the phone than in writing.

> **J.**     **The Legal Services Provided by Baker**

240.     Starting in November 2014, Baker was retained to "represent Alliance Health with *respect to FDA and Healthcare general regulatory, corporate diligence and compliance matters*."

241.     Invoices Baker submitted to Alliance for services rendered, copies of which are attached as **Composite Exhibit 1** to this Complaint, identify 25 separate matters within the scope of its representation.  Such matters include:

- PBM audit responses for numerous individual Alliance pharmacies;
- Pharmacy compounding issues;
- Corporate - General Advice;
- General Regulatory Counseling Involving Telemedicine;
- ESI Litigation;
- Lifescan Contract;
- Telemedicine;
- Salix;
- Walgreens;
- West Virginia litigation;
- Breach of IT Systems; and

- Restructuring Advice.

242.     Baker attorneys, paraprofessionals, associates, and other staff provided detailed time entries describing the legal services it provided to Alliance for each matter worked on during an invoice period.

243.     The billing records indicate that from November 2014 through April 2017, Baker performed outside legal counsel services for Alliance primarily involving those general regulatory, corporate diligence, and compliance matters referenced in Paragraphs 238-239 above.

244.     As a result of the negative financial fallout from the FBI seizure, Baker's national bankruptcy and restructuring group was urgently mobilized to prepare and file voluntary Chapter 11 petitions for Alliance, which occurred from April 2-4, 2017.

245.     Ultimately Baker billed and/or incurred approximately $1.2 million representing Alliance through the Petition Date (a portion of which appears to have been written off to satisfy the "disinterestedness" requirement governing the retention of bankruptcy estate professionals).

246.     On August 20, 2019, Baker filed its final fee application as counsel for Alliance in the Chapter 11 cases seeking the approval of an award of $3,764,891.25 in fees and expenses incurred from April 7, 2017 through August 8, 2019, which application was approved with a full reservation of rights as to the Liquidating Trustee.[7]

247.     At all relevant times, as described more fully in the preceding paragraphs of this Complaint, Baker and certain of its attorneys knew and/or had reason to know that Alliance was working in concert with the Scheme Participants to engage in the Questionable Business Practices

---

[7] With the inclusion of post-confirmation fee and costs, a total of $3,997,487.90 in legal fees and expenses was incurred by Baker in respect of its services involving the bankruptcy proceedings. After deducting the payment of $3,074,875.07 in fees awarded and approved by the Court, along with $143,546.00 paid from its $250,000 pre-petition retainer, Baker is owed a remaining balance of $779,066.83 from the Trust Estate, which sum is being held in reserve by the Liquidating Trustee pending the resolution of this action via the entry of judgment or otherwise.

and, in violation of its ethical obligations and applicable law: (i) assisted and/or counseled Alliance to engage in conduct, the Questionable Business Practices, that Baker knew was criminal or fraudulent; (ii) failed to make a good faith effort to fully or properly determine the validity, scope, meaning or application of the law to discuss the legal consequences of the Questionable Business Practices; (iii) having obtained confidential information clearly establishing that Alliance was likely to commit a criminal or fraudulent act by engaging in the Questionable Business Practice that was likely to result in substantial injury to the financial interests or property of Test Strip Manufacturers and others, failed to promptly make reasonable efforts to dissuade Alliance from committing the crime or fraud; (iv) having obtained confidential information clearly establishing that Alliance had committed a criminal or fraudulent act by engaging in the Questionable Business Practices in the commission of which Baker's services had been used, failed to make reasonable efforts to persuade Alliance to take corrective action.

248.    From and after 2015, Baker knew, and/or had reason to know, of the extent and scope of Alliance's improper business model, including the potentially illegal nature of the Questionable Business Practices, and provided substantial assistance in regard to same, with communications and ongoing legal services, as described in detail in the preceding paragraphs of this Complaint.

**K.**    **Payments made by Alliance to Baker Prior to the Petition Date**

249.    During the four years prior to the Petition Date, the Debtors paid Baker for the performance of various legal services, including those related to the legality (or lack thereof) of the facts and conclusions described in the Grant Memo and the Questionable Business Practices (collectively, the "Baker Transfers"):

| Payment Date | Amount |
|---|---|
| 2/26/2015 | $5,066.50 |
| 3/9/2015 | 46,628.00 |

| | |
|---|---|
| 3/26/2015 | 70,741.75 |
| 6/11/2015 | 12,515.21 |
| 7/2/2015 | 36,229.94 |
| 9/4/2015 | 46,896.19 |
| 10/7/2015 | 12,595.75 |
| 1/7/2016 | 13,784.25 |
| 1/25/2016 | 17,947.00 |
| 3/9/2016 | 8,953.00 |
| 3/14/2016 | 33,543.00 |
| 4/5/2016 | 89,062.29 |
| 4/14/2016 | 23,968.83 |
| 4/23/2016 | 18,252.50 |
| 6/30/2016 | 29,651.30 |
| 7/18/2016 | 76,463.98 |
| 8/1/2016 | 22,936.84 |
| 8/16/2016 | 73,820.76 |
| 9/22/2016 | 87,483.18 |
| 12/20/2016 | 64,995.96 |
| 3/6/2017 | 48,564.61 |
| 3/27/2017 | 50,000.00 |
| 4/3/2017 | 50,000.00 |
| Total: | $940,100.84 |

**L.**   **Prior to the Government Raid, the Debtors are Accused by Whistleblowers and Outside Third-Parties of Engaging in Serious Misconduct**

250.   From early 2014 through early 2017, certain of the Debtors' primary business practices came under scrutiny involving serious allegations of misconduct raised by multiple whistleblowers within Alliance.  Notably, such allegations were similar, if not identical, to those being raised by the Government in respect of the Government Raid.

251.   On July 28, 2017, LifeScan sued certain former officers, directors, and employees of the Debtors and their Affiliates in New Jersey federal district court making the same allegations of serious misconduct involving the Debtors' Questionable Business Practices (the "LifeScan Lawsuit").

252.   In the LifeScan Lawsuit, which seeks damages totaling no less than $50 million,

70

LifeScan alleges, *inter alia*, that:

- LifeScan is a manufacturer of medical equipment, including blood glucose test strips, for patients with diabetes.

- The claims of LifeScan arise out of a "years-long, fraudulent racketeering scheme" perpetrated by the named defendants that allegedly "cheated LifeScan out of tens of millions of dollars," and that the named defendants are former officers and directors of Debtor Alliance Medical Holdings, LLC, as well as investors and banks that "knowingly supported Alliance's fraud."

- The purpose "of the fraud was to generate millions of dollars of illicit profits" for Alliance, and its investors and funders, by taking "improper advantage of the fact that LifeScan sells its blood glucose test strips through two insurance regimes for two different prices."

- LifeScan manufactures blood glucose test strips packaged for sale to beneficiaries of healthcare plans that cover them under a so-called pharmacy benefit, defined as "Pharmacy Plans", and it also manufactures test strips packaged for sale to beneficiaries of healthcare plans that cover them under a so-called durable medical equipment benefit, defined as "DME Plans."

- Test strips packaged for sale through Pharmacy Plans, defined as "Retail Strips," have a substantially higher wholesale price than test strips packaged for sale through DME Plans, defined as "DME Strips." LifeScan, however, pays substantial rebates on Retail Strips paid for by Pharmacy Plans, which it does not pay on the lower-priced DME Strips. As a consequence, LifeScan's net revenues on sales of Retail Strips and DME Strips are comparable.

- The Scheme Participants, knowing this price structure and acting through businesses that they controlled and financed, "concocted and perpetrated a scheme wherein they bought millions of boxes of DME Strips on the gray market, sold them to beneficiaries of Pharmacy Plans by falsely claiming to have sold higher-priced Retail Strips." The Pharmacy Plans paid out on what they did not know to be "fraudulent insurance claims and then claimed and received substantial rebates from LifeScan."

- According to sworn testimony of former Alliance executives, the practice of "fraudulently" claiming to Pharmacy Plans that Retail Strips were sold, when, in fact, DME Strips were sold, was the "foundational practice" of Alliance and an "integral part of [Alliance's] business model." It was known to and facilitated by Alliance's senior management, its Board of Directors and its key investors.

- David Grant ("Grant"), Alliance's general counsel, described the "fraud" as a "fact" in a November 4, 2015 memorandum to Alliance's Board of Directors (the "Grant Memo"). The Grant Memo also stated that Alliance's profitability

71

"depended on the fraud." The fraud continued for more than a year after the memorandum was circulated."

- Through their "fraud," the named Defendants "scammed tens of millions of dollars from Pharmacy Plans and, ultimately, from LifeScan, which was not only deprived of sales of more than one million boxes of Retail Strips but also paid tens of millions of dollars in rebates to Pharmacy Plans on illusory sales of Retail Strips."

253.    On March 19, 2019, Roche sued certain former officers, directors, and employees of the Debtors and their Affiliates in New Jersey federal district court alleging serious misconduct involving the Debtors' Questionable Business Practices (the "Roche Lawsuit") similar to that alleged by LifeScan in the LifeScan Lawsuit, seeking an award in excess of $87 million.

**M.**    **The Claims of LifeScan and Roche are Allowed in Full by Stipulations and Orders Approving Same**

254.    While the Debtors' Chapter 11 cases were pending, LifeScan and Roche filed multiple proofs of claim against the estates of the Debtors (the "LifeScan and Roche Claims") based upon acts and omissions of the Debtors that were the subject of the misconduct alleged in the LifeScan Lawsuit and the Roche Lawsuit, including the Questionable Business Practices.

255.    Prior to confirmation of the Plan, the Debtors independently entered into separate stipulations with LifeScan and Roche (the "Claim Stipulations") allowing their claims in the amounts of $49,339,603 and $80,054,970, respectively, which the Bankruptcy Court approved by separately entered orders [Doc. Nos. 1233, 1232].  Copies of the Claim Stipulations and Orders approving same are attached as **Exhibit 2** to this Complaint.

**N.**    **The Impact of Alliance's Questionable Business Practices**

256.    At all relevant times, (i) the Questionable Business Practices provided no benefit to the Debtors in that they caused, *inter alia*, material liabilities to be incurred; and (ii) certain members of the Debtors' management or board had no knowledge of the extent of and/or the improper nature of the Questionable Business Practices or, in the alternative, all members of the

board and management adversely dominated Alliance by virtue of their knowledge of the extent, scope, and nature of the Questionable Business Practices.

### O.   Discovery Rule, Tolling, and Fraudulent Concealment

257.   Baker's representation of Alliance was continuous from November 17, 2014 through September 13, 2019, the Effective Date of the Plan.

258.   On March 28, 2019, the Liquidating Trustee and Baker entered into a tolling agreement that extended the time for the Liquidating Trustee to file suit to September 27, 2019. Thereafter, this tolling agreement was amended: (i) on September 11, 2019, extending the time to file suit to November 30, 2019; (ii) on November 22, 2019, extending the time to file suit to June 30, 2020; (iii) on June 14, 2020, extending the time to file suit on December 31, 2020; (iv) on December 15, 2020, extending the time to file suit to March 31, 2021; (v) on February 22, 2021, extending the time to file suit to December 31, 2021; (vi) on September 15, 2021, extending the time to file suit to March 31, 2022, (vii) on February 22, 2022, extending the time to file suit to June 30, 2022; (vii) on May 3, 2022, extending the time to suit to September 30, 2022.

259.   The discovery rule applies to delay the accrual of the Test Strip Manufacturers' claims for fraud (including aiding and abetting fraud and conspiracy to commit fraud).

260.   In addition, the fraudulent concealment doctrine tolls the statute of limitations associated with the Test Strip Manufacturers' claims for fraud (including aiding and abetting fraud and conspiracy to commit fraud).

261.   The Test Strip Manufacturers' injuries resulting from the Scheme Participants' submission of false insurance reimbursement claims, while objectively verifiable, were inherently undiscoverable.  As alleged above, the false insurance reimbursement scheme was elaborate and well-concealed, and the nature of the scheme made it extremely difficult for the Test Strip Manufacturers to discover their injuries, notwithstanding their exercise of reasonable diligence.

262.     Despite due diligence, the Test Strip Manufacturers did not discover prior to July 19, 2017, that the Scheme Participants had made and caused to be made insurance claims falsely stating that the Alliance Pharmacies had sold the Test Strip Manufacturers' retail strips, when in fact they had sold NFR strips (the "wrongful conduct"), thereby causing the Test Strip Manufacturers injuries.

263.     In sworn deposition testimony given on July 19, 2017, two Alliance employees admitted to such wrongful conduct, with one describing it as "the foundational practice" of the company.  Such testimony provided the first concrete and objective verification of the wrongful conduct and the Test Strips Manufacturers' resulting injuries.

264.     Prior to July 19, 2017, proof that Alliance Pharmacies were dispensing NFR strips, rather than retail strips, was particularly within Alliance's knowledge and control, and Alliance did not allow the Test Strip Manufacturers access to such information.

265.     To the contrary, Baker and its co-conspirators, the Scheme Participants, actively and fraudulently concealed facts demonstrating that Alliance Pharmacies were dispensing NFR strips while adjudicating claims using the NDCs for retail strips.

266.     As alleged above, Baker and its co-conspirators, the Scheme Participants, had actual knowledge that Alliance Pharmacies were dispensing NFR strips while adjudicating claims using the NDCs for retail strips.

267.     Nonetheless, Baker and its co-conspirators actively and fraudulently concealed such wrongful conduct through multiple means.

268.     First, as alleged above, when auditors demanded proof from Alliance-affiliated pharmacies that they had purchased sufficient retail strips to support their thousands of adjudications, the pharmacies, with the knowledge of and assistance from Baker, produced misleading invoices that hid the true nature of the purchased strips.

74

269.    Second, as alleged above, to mitigate the risk of being discovered and shut down *en masse*, the Scheme Participants, with the knowledge and assistance of Baker, began operating through a network of nominally "independent" pharmacies, which were, in fact, fronts for the false insurance reimbursement scheme.

270.    Third, as alleged above, when the Scheme Participants discovered that LifeScan was investigating the false insurance reimbursement scheme, they executed Grant's plan to obstruct LifeScan's investigation by filing a pretextual lawsuit against LifeScan and its outside counsel.

271.    As a result of these acts of concealment, as well as the nature of the underlying fraud, the Test Strip Manufacturers did not discover – and could not have discovered with the exercise of reasonable diligence – prior to July 19, 2017, that the Scheme Participants had made and caused to be made insurance claims falsely stating that the Alliance Pharmacies had sold the Test Strip Manufacturers' retail strips, when in fact they had sold NFR strips, thereby causing the Test Strip Manufacturers injuries.

272.    However, even the July 19, 2017 deposition testimony failed to demonstrate *Baker's* knowing participation in and assistance of the fraud.

273.    In an effort to ensure that its participation in the fraud would never be discovered, Baker transitioned from counsel for the Debtors to counsel for the Liquidating Trustee.  Baker's position as counsel for the Liquidating Trustee would allow it to continue to assert attorney-client privilege on behalf of the Debtors, which would allow it to keep its involvement in the fraud hidden.  And, indeed, Baker did use its position as counsel to interfere with the Test Strip Manufacturers' attempts to uncover the truth about Alliance's activities.  On behalf of the Liquidating Trustee, Baker filed a letter with the U.S. District Court for the District of New Jersey in an action brought by the Test Strip Manufacturers against certain directors and officers of

75

Alliance, purporting to assert attorney-client privilege in the face of the Test Strip Manufacturers' document requests.

274.    During the bankruptcy proceedings, Baker represented that it had not advised the Debtors about its submission of insurance claims bearing false NDCs.  Alliance CEO Jeffrey Smith sent a contemporaneous text message during the proceeding disagreeing with that representation: "Baker claims they haven't advised us on the NDC issue – I beg to differ[.]"

275.    Even with the exercise of reasonable diligence, the Test Strip Manufacturers could not have discovered prior to November 6, 2020, that Baker had knowingly participated in the fraud, conspired to commit fraud, and aided and abetted the fraud.  As detailed below, the Test Strip Manufacturers' discovery of these facts was, and continues to be, frustrated by Baker's baseless invocation of the attorney-client privilege and attorney work product doctrine.

276.    Prior to March 7, 2018, neither Test Strip Manufacturer had access to communications between Baker and the Scheme Participants.  Beginning on March 7, 2018, and continuing through July 27, 2018, Alliance and Upwell Holdings LLC ("UpWell"), the entity that purchased substantially all of Alliance's assets after Alliance declared bankruptcy, produced over one million documents to LifeScan.  Collectively, these productions contained communications demonstrating that Baker had advised Alliance regarding regulatory matters and PBM audits. These productions did not, however, disclose the full nature of Baker's role in the fraud.

277.    After reviewing the productions from Alliance and UpWell, LifeScan and Roche served subpoenas on Baker on October 2, 2018 and September 30, 2019, respectively.  The Test Strip Manufacturers' subpoenas were substantially similar and sought the following categories of documents from Baker: all documents and communications concerning Alliance, including but not limited to documents and communications concerning Alliance's procurement, sale, use, or adjudication of Strips, Alliance's use of NDCs in documents or Adjudications, and/or Alliance's

representations to PBMs; and all documents and communications concerning any analysis or due diligence carried out with respect to Alliance, including but not limited to any analysis of potential liabilities, including but not limited to liabilities in contract or in tort, liabilities to PBMs and/or manufacturers of Strips, and enforcement risk from government agencies.

278. Baker served its objections to LifeScan and Roche's subpoenas on September 20, 2019 and October 22, 2019, respectively. Baker made a small production of approximately 120 non-privileged documents, accompanied by a voluminous privilege log, and objected to both subpoenas on the grounds that, according to Baker, they sought information protected by the attorney-client privilege and the attorney work product doctrine.

279. Baker's objections on these bases clearly lacked a good faith basis, however, because Alliance had affected a broad waiver of attorney-client privilege and work product protection by disclosing substantially all of its communications – including attorney-client communications with Baker – to a third party, UpWell.

280. Baker also knew or should have known that its objections on the grounds of attorney-client privilege and attorney work product were baseless at least as of December 4, 2018, when the Test Strip Manufacturers' outside counsel communicated that fact to Baker. Nonetheless, Baker did not produce any purportedly-privileged documents in response to the Test Strip Manufacturers' subpoenas until August 20, 2020.

281. On June 23, 2020, counsel for the Liquidating Trustee wrote to Baker, confirming that the attorney-client privilege and work-product protection belonging to Alliance had been waived, and directing Baker to produce documents in response to the Test Strip Manufacturers' subpoenas.

282. Approximately two months later, on August 20, 2020, Baker made its first production of purportedly-privileged documents to the Test Strip Manufacturers, totaling

approximately 4,500 documents.   Baker made a small additional production of about 500 documents on October 2, 2020.

283.    Baker, however, continued to withhold tens of thousands of additional responsive documents under a baseless claim of work-product protection.  Despite Baker's resistance, the Test Strip Manufacturers obtained a subset of these documents on December 1, 2020, after Baker provided them to the Liquidating Trustee, its client.   But Baker conceded in subsequent communications with the Test Strip Manufacturer's outside counsel that, as of December 1, 2020, it **had not even begun to search** purely internal Baker emails relating to the Alliance representation.   Baker subsequently collected and produced approximately 11,000 internal documents on March 9, 2021.  On April 8, 2021, after further negotiations with the Liquidating Trustee, Baker produced an additional 306 responsive documents it had initially withheld under claims of attorney-client privilege and work-product protection.  Baker continues to withhold or redact 32 documents under a claim of privilege.

284.    Collectively, Baker's productions revealed that Baker knowingly participated in the fraud, conspired to commit fraud, and aided and abetted the fraud.

**P.**    **Conditions Precedent**

285.    All conditions precedent to the filing of this action have occurred, been waived, or have expired.

**COUNT I**
**PROFESSIONAL NEGLIGENCE/**
**LEGAL MALPRACTICE**

The Liquidating Trustee, for and on behalf of the Trust Estate and the beneficiaries of the Trust Estate, as the assignee of all claims and interests of Debtors Alliance Medical Holdings, LLC, Alliance Medical Administration, Inc., Alliance Health Networks, LLC, Alta Distributors, LLC, and Stonybrook Pharmacy, LLC (collectively, the "Client Debtors"), sues Baker and alleges:

286.    The Liquidating Trustee realleges Paragraphs 1 through 285 above.

287.    This is an action by the Liquidating Trustee for and on behalf of the Client Debtors arising from as actual and/or implied attorney client relationship for professional negligence/legal malpractice under Washington DC, Utah, and/or other applicable law for the breach of the duties of loyalty and/or care.

288.    As their counsel, Baker owed duties of loyalty and care to the Client Debtors that required Baker to exercise the necessary, proper, and ordinary skill and knowledge of members of the legal profession required in connection with their representation of the Client Debtors, and to ensure that the Client Debtors were fully and adequately apprised and advised of its litigation and settlement options and risks. Among other acts and omissions engaged in by Baker, the firm breached its duties of loyalty and/or care to the Client Debtors by, *inter alia*: (i) failing to fully or properly advise the Client Debtors regarding the illegality of the Questionable Business Practices; (ii) failing to fully or properly advise the Client Debtors regarding the potential risks and harm to the Client Debtors in respect of the Questionable Business Practices; and (iii) failing to fully or properly advise the Client Debtors whether the company was required by law to immediately cease and desist from engaging in the Questionable Business Practices.

289.    The foregoing breaches, in addition to others, proximately caused damage to the Client Debtors, totaling no less than $129,394,573, which represents the total aggregate amount of the allowed LifeScan and Roche Claims.

290.    In its representation of the Client Debtors, Baker failed to perform with the degree of specialized skill and care that it held itself out as possessing.

291.    The continuing failure of Baker to exercise the skill and knowledge demanded of them by law directly, proximately, and foreseeably caused the injuries complained of herein.

292.    Had Baker met or otherwise satisfied its standard of care in representing and

rendering legal advice to the Client Debtors, the Client Debtors could have prevented, or at least lessened, the damage to the Client Debtors.

WHEREFORE, the Liquidating Trustee demands judgment against Baker for compensatory, consequential and/or special damages and other relief including, but not limited to: (i) damages totaling no less than the amount of the allowed claims of LifeScan and Roche; (ii) the disgorgement of all pre-and post-petition fees paid or otherwise awarded to Baker under the faithless servant doctrine and/or other applicable law; (iii) pre-judgment and post judgment interest, costs, and attorneys' fees (as provided by agreement or statute); (iv) the entry of an order requiring disgorgement of the value of Baker Transfers and the Baker Transfers; and (v) for any other relief the Court deems appropriate.

## COUNT II
## <u>AIDING AND ABETTING</u>
## <u>BREACH OF FIDUCIARY DUTY</u>

The Liquidating Trustee, for and on behalf of the Trust Estate and the beneficiaries of the Trust Estate, sues Baker and alleges:

293.    The Liquidating Trustee realleges Paragraphs 1 through 292 above.

294.    This is a claim under Delaware statutory and common law for breach of fiduciary duty by the Liquidating Trustee against Baker for aiding and abetting the breaches of fiduciary duty of Alliance officers Jeffrey Smith, Grant, Paoline, Leavitt, and Blaine Smith (collectively, the "Former Officers") based upon their acts and omissions as senior management and officers of Alliance.

295.    During at least the time periods alleged above, Former Officers were officers, directors, managers, members, employees, and/or control persons of Alliance and, as such, owed Alliance a fiduciary duty to discharge their duties in good faith, with the care an ordinarily prudent officer, director or manager in a like position would exercise and in a manner reasonably believed

to be in the best interests of Alliance.

296.    Specifically, the duty of loyalty and good faith under Delaware law required the Former Officers to put the interests of Alliance above their own interests and those of others, and were not limited to disloyalty in the classic sense, *i.e.* self-dealing, personal gain, or a cognizable conflict of interest. In addition, in discharging their duty of loyalty and good faith, the Former Officers were required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than that of advancing the best interests of Alliance, and by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities.

297.    The Former Officers were also required to ensure that they did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to their decisions, such that it was qualitatively more culpable than gross negligence. Additionally, the duty to exercise due care under Delaware law required the Former Officers to use that amount of care which an ordinarily careful and prudent person would use in similar circumstances and to consider all material information reasonably available.

298.    In exercising the duty of due care, the Former Officers could not engage in acts or omissions on behalf of Alliance that resulted in a loss arising from decisions that: (i) were ill-advised, uninformed or that failed to consider material information; (ii) constituted an unconsidered failure of the Former Officers to act in circumstances in which due attention would, arguably, have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; (iv) were grossly negligent, such as engaging in an irrational decision-making process signifying more than ordinary inadvertence or inattention; or (v) resulted in a corporate strategy that reflected an indifference to the potential risk of harm to Alliance, such that reasonable businesspersons would have carefully considered the obvious negative consequences. Moreover, the more

significant the subject matter of the decision, the greater the requirement to probe and consider alternatives.

299.    To further satisfy the duty of due care, a reasonable and informed deliberative process was required by attending meetings, asking questions, reviewing written materials, and otherwise becoming informed of relevant information reasonably available, and to seek the input of experts, such as investment bankers, attorneys, and accountants, and to provide materially accurate information.

300.    Based upon the application of the foregoing duties of loyalty, good faith and due care under Delaware law, the Former Officers knew, should have known and otherwise were required to act as follows: (i) to provide or otherwise cause materially accurate information or representations to be disseminated or made within Alliance and to third parties; (ii) to implement or follow, or to otherwise cause the implementation and following of, adequate safeguards or controls in regard to financial reporting; (iii) to implement or follow, or to otherwise cause the implementation and following of, adequate safeguards and controls in regard to material business, operational, financial reporting, and regulatory functions; (iv) while Alliance was insolvent or not paying its debts as they became due, to undertake sufficient and adequate measures to ensure that payments to third parties did not constitute preferential or fraudulent transfers which could result in a loss of assets of Alliance; (v) while Alliance was insolvent or not paying debts as they became due, not to cause, allow or otherwise abdicate their duties by allowing Alliance's assets and enterprise value to continue to decrease in value; (vi) while Alliance was insolvent or not paying debts as they became due, to cause Alliance to file bankruptcy or other insolvency proceedings as soon as reasonably practical, necessary, or appropriate; (vii) while Alliance was insolvent or not paying debts as they became due, to act in the best interests of Alliance and all stakeholders, and not in the interests of themselves or certain insiders of Alliance; and (viii) to ensure that Alliance

was not engaging in or otherwise permitting corporate waste.

301.   In regard to the facts alleged above involving Alliance's flagrant business, operational, financial reporting, and regulatory compliance deficiencies, and lacking good faith, the Former Officers exhibited a knowing, conscious, grossly negligent or reckless disregard for the best interests of Alliance and, except for their knowing, conscious, grossly negligent or reckless disregard of the facts, they should have known of the risk of damage that ultimately befell Alliance.

302.   Specifically, the Former Officers actively engaged in breaches of fiduciary duties, and otherwise abdicated their fiduciary duties of loyalty, good faith, and due care owed to Alliance, with breaches that include, but that may not necessarily be limited to, the following: (i) permitting, causing, or otherwise allowing Alliance to engage in the Questionable Business Practices; (ii) failing to cause or require the implementation of or follow adequate safeguards and controls in regard to financial reporting and other material business, operational, regulatory, and financial reporting functions in respect of the Questionable Business Practices; (iii) permitting Alliance's assets and enterprise value to decrease in value as a result of, *inter alia*, the Questionable Business Practices; (iv) failing to fully or adequately inform themselves in regard to material business, operational, regulatory or financial reporting decisions affecting Alliance in respect of the Questionable Business Practices; (v) when Alliance was insolvent or not paying its debts as they became due, acting with the purpose of furthering the interests of themselves and certain other insiders of Alliance, instead of the best interests of Alliance and all stakeholders, by causing the company to engage in the Questionable Business Practices; (vi) permitting, causing, or otherwise allowing corporate waste resulting from the Questionable Business Practices; and (vii) other breaches and proximately caused damages as may be ascertained through discovery.

303.   Each of the above breaches adversely impacted and conferred no benefit to Alliance, and as a direct and proximate result of same, caused damage to Alliance totaling no less

than $129,394,573, which represents the total aggregate amount of the allowed LifeScan and Roche Claims.

304.    Among other acts and omissions engaged in by Baker, the firm aided and abetted the breaches of fiduciary duties of the Former Officers by, *inter alia*: (i) failing to fully or properly advise Alliance regarding the lack of legality of the Questionable Business Practices; (ii) failing to fully or properly advise Alliance regarding the potential risks and harm to Alliance in respect of the Questionable Business Practices; and (iii) failing to fully or properly advise Alliance whether the company was required by law to immediately self-disclose and/or forthwith cease and desist from engaging in the Questionable Business Practices.

305.    Had Baker duly and properly performed its duties and obligations, the bad faith and other questionable acts and omissions of the Former Officers, including the Questionable Business Practices, would have been discovered sooner, thereby preventing such actions from occurring, mitigating the damage caused by such actions and/or otherwise causing Alliance to be managed and controlled by a non-conflicted fiduciary acting in the best interests of Alliance and its creditors.

306.    As the result of vast array of legal services the firm provided to Alliance, Baker had knowledge of and rendered substantial assistance regarding the breaches of fiduciary duty of the Former Officers.

307.    Baker's foregoing acts and omissions are the direct and proximate cause of damages to Alliance.

WHEREFORE, the Liquidating Trustee demands the entry of a judgment against Baker for compensatory damages, consequential damages and special damages including, but not limited to: (i) the loss of assets of the Debtors; (ii) increased liabilities of the Debtors; (iii) the decrease in the asset values and enterprise value of the Debtors; (iv) the increased insolvency of the Debtors; (v) the loss of business opportunities; (vi) corporate waste; (vii) the value of the allowed claims of

the Test Strip Manufacturers; (viii) pre-judgment, post-judgment interest, court costs and expenses; and (ix) for any other relief the Court deems appropriate.

## COUNT III
## CONTRIBUTION

The Liquidating Trustee, for and on behalf of the Trust Estate and the beneficiaries of the Trust Estate, sues Baker and alleges:

308.    The Liquidating Trustee realleges Paragraphs 1 through 307 above.

309.    This is an action by the Liquidating Trustee for contribution from Baker pursuant to the Texas Proportionate Responsibility Statute, Chapter 33 of the Texas Civil Practice & Remedies Code, for the direct harm imposed by Baker on Alliance, as well as for the generalized harm inflicted upon the creditors of the Debtors.

310.    As of the date of this Complaint, creditors of Alliance have asserted claims against the Estate totaling in excess of $130 million.

311.    Alliance is liable to the Test Strip Manufacturers in the amount of $129,394,573 pursuant to the Claim Stipulations approved by the Bankruptcy Court, which claims directly arise from the Questionable Business Practices engaged in by Alliance and certain of its senior management.

312.    Alliance, along with certain of its senior management, and Baker were, together, joint tortfeasors in negligently, recklessly, and/or intentionally defrauding the Test Strip Manufacturers in respect of the Questionable Business Practices, and for the other wrongful acts and omissions as described herein.

313.    Based upon the foregoing, the Liquidating Trustee, standing in the shoes of Alliance and its affiliates, asserts a right of contribution from Baker pursuant to the Texas Proportionate Responsibility Statute, Chapter 33 of the Texas Civil Practice & Remedies Code.

WHEREFORE, the Liquidating Trustee demands the entry of a judgment against Baker: (i) for compensatory damages, consequential damages and special damages to be determined, assessed, and/or allocated in accordance with the Texas Proportionate Responsibility Statute, Chapter 33 of the Texas Civil Practice & Remedies Code; (ii) for pre-judgment, post-judgment interest, court costs and expenses; and (iii) for any other relief the Court deems appropriate.

## COUNT IV
## ACTION TO AVOID AND RECOVER
## AVOIDABLE TRANSFERS

The Liquidating Trustee, for and on behalf of the Trust Estate and the beneficiaries of the Trust Estate, sues Baker and alleges:

314.    The Liquidating Trustee realleges Paragraphs 1 through 313 above.

315.    This is an action against Baker seeking to avoid and recover fraudulent transfers.

316.    Pursuant to 11 U.S.C. §§ 544 and 548, and applicable state avoidance law, a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years (under Section 548 of the Bankruptcy Code) and 4 years (under applicable state avoidance law) before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual intent to hinder or delay, any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

86

317.   Pursuant to 11 U.S.C. § 550, in an avoidance action commenced under Sections 544 and 548 of the Bankruptcy Code and applicable state avoidance law, a trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from: (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; and (2) any immediate or mediate transferee of such initial transferee.

318.   Prior to the Petition Date, Baker provided legal services to or for the Debtors, and received the Baker Transfers (defined in Paragraph 249 above) from the Debtors in regard to or on account of such services.

319.   The Debtors did not receive reasonably equivalent value for the Baker Transfers and they: (i) were insolvent at the time of the Baker Transfers; or (ii) intended to incur, or believed or reasonably should have believed, that they would incur debts beyond their ability to pay as they came due or matured.

320.   Alternatively, the Baker Transfers were made by the Debtors with actual intent to hinder or delay creditors of the Debtors, and are otherwise avoidable pursuant to Section 548 and applicable state avoidance law.

321.   As a result of the above, the Liquidating Trustee can avoid the Baker Transfers pursuant to Sections 544 and 548 of the Bankruptcy Code and applicable state avoidance law, and recover the value thereof for the benefit of the estate pursuant to Section 550 of the Bankruptcy Code.

WHEREFORE, the Liquidating Trustee demands the entry of judgment against Baker: (i) avoiding the Baker Transfers; (ii) awarding a money judgment to the Liquidating Trustee in an amount equal to the amount of the Baker Transfers pursuant to 11 U.S.C. § 550(a); (iii) awarding pre-judgment interest; (iv) disallowing any claim that Baker may have against the Debtors' bankruptcy estates until such time as Baker pays the Baker Transfers asserted herein as provided

in 11 U.S.C. § 502(d); and (v) awarding any other relief the Court deems appropriate.

## COUNT V
## OBJECTION TO POST-PETITION CLAIM AND
## TURNOVER AND/OR DISGORGEMENT OF FEES PAID

The Liquidating Trustee, for and on behalf of the Trust Estate and the beneficiaries of the Trust Estate, sues Baker and alleges:

322.    The Liquidating Trustee realleges Paragraphs 1 through 321 above.

323.    This is an action pursuant to Sections 542 and 549 of the Bankruptcy Code objecting to the post-petition claim of Baker and for turnover and/or disgorgement of all fees paid by or on behalf of the Debtors to Baker.

324.    In the event the relief sought in Counts I -IV above are granted in whole or in part, the Liquidating Trustee requests that all fees paid to Baker from and after the Petition Date (the "Fee Payments") be turned over and/or disgorged to the Liquidating Trustee under Section 549 of the Bankruptcy Code, the faithless servant doctrine, and/or pursuant other applicable law, whether by statute, common law, or in equity.

WHEREFORE, the Liquidating Trustee demands the entry of judgment in favor of the Liquidating Trustee against Baker disallowing the post-petition claim of Baker in whole or in part, ordering that Baker disgorge and turn over to the Liquidating Trustee the Fee Payments, and for any relief the Court deems appropriate.

## COUNT VI
## AIDING AND ABETTING NEGLIGENT
## AND/OR FRAUDULENT MISREPRESENTATION

The Liquidating Trustee, for and on behalf of the Trust Estate and the beneficiaries of the Trust Estate,  as assignee of the claims of Roche and LifeScan, sues Baker and alleges:

325.    The Liquidating Trustee realleges Paragraphs 1 through 285 above.

326.    This is an action for negligent and/or fraudulent representation filed by the

Liquidating Trustee as assignee of the claims of Roche and LifeScan.

327.    The Former Officers of Alliance, along with the other Scheme Participants (collectively, the "Remaining Scheme Participants"), misrepresented to pharmacy plans that they were selling retail strips when in fact they were selling NFR strips.

328.    These statements of fact and material omissions were false and misleading.

329.    Additionally, these statements and omissions were negligent because the Former Officers did not exercise reasonable care in verifying the accuracy of these statements or in ensuring that they did not fail to make material disclosures.

330.    Alliance's Former Officers and the Remaining Scheme Participants and did not take any affirmative steps to correct their materially inaccurate or false statements or material omissions.

331.    Alliance's Former Officers and the Remaining Scheme Participants had a duty to provide the pharmacy plans with accurate information because they knew and intended the pharmacy plans would rely on their false representations and material omissions in providing reimbursements to Alliance.

332.    Alliance's Former Officers and the Remaining Scheme Participants, including Baker, further knew and intended that Roche and LifeScan would rely on the Remaining Scheme Participants' and the Former Officers' materially inaccurate and/or false representations and material omissions in providing rebates to pharmacy plans.

333.    The pharmacy plans, LifeScan, and Roche reasonably relied upon the Remaining Scheme Participants' and the Former Officers' misrepresentations and material omissions and were unaware that they were false.

334.    As a result of the Remaining Scheme Participants' and the Former Officers' conduct, Roche and LifeScan were injured in an amount not less than $129 million.

WHEREFORE, the Liquidating Trustee demands the entry of a judgment against Baker for compensatory damages, consequential damages, and special damages including, but not limited to, (i) the value of the allowed claims of the Test Strip Manufacturers; (ii) punitive damages; (iii) pre-judgment, post-judgment interest, court costs, and expenses; and (iv) for any other relief the Court deems appropriate.

### COUNT VII
### FRAUD (INCLUDING AIDING AND ABETTING
### FRAUD AND CONSPIRACY TO COMMIT FRAUD)

The Liquidating Trustee, for and on behalf of the Trust Estate and the beneficiaries of the Trust Estate, as assignee of the claims of Roche and LifeScan, sues Baker and alleges:

335.     The Liquidating Trustee realleges Paragraphs 1 through 285 above.

336.     This is an action for fraud, including aiding and abetting fraud and conspiracy to commit fraud, filed by the Liquidating Trustee as assignee of the claims of Roche and LifeScan.

337.     The Former Officers and the Remaining Scheme Participants knowingly and intentionally made and caused to be made false insurance reimbursement claims to insurance companies.

338.     These insurance reimbursement claims falsely stated that the Alliance Pharmacies had sold Roche's retail strips to patients, when in fact they had sold NFR strips.

339.     The Former Officers and the Remaining Scheme Participants knowingly and intentionally deprived Roche of sales of retail strips and also caused the insurance companies to submit rebate claims to Roche based on fraudulent insurance claims.

340.     The Former Officers and the Remaining Scheme Participants made or caused to be made those false representations with the intent of defrauding Roche.

341.     Specifically, the Former Officers and the Remaining Scheme Participants made or caused to be made those false representations in order to profit from the higher reimbursements

the insurance companies pay for boxes of retail strips.

342.    The Former Officers and the Remaining Scheme Participants knew that the insurance companies could only pay such high reimbursements because they submitted claims for, and received, rebates from Roche.

343.    The Former Officers and the Remaining Scheme Participants, as the executives, principals, directors, owners, and financiers of Alliance and/or the Alliance Pharmacies were personally involved in and approved of the fraudulent scheme.

344.    The Former Officers and the Remaining Scheme Participants had actual knowledge of, and substantially assisted in, the fraudulent scheme to sell NFR strips to pharmacy beneficiaries and obtain insurance reimbursements for fraudulent claims.

345.    Each Scheme Participant intentionally provided substantial assistance to the others and to Alliance and the Alliance Pharmacies in advancing the fraud against Roche and LifeScan.

346.    The Former Officers and the Remaining Scheme Participants could not have perpetrated their fraud without the substantial and material assistance of each other Scheme Participant, including Baker. Each Scheme Participant, including Baker, benefited from the success of the fraud.

347.    The Former Officers, the Remaining Scheme Participants, and Baker, unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to defraud Roche and LifeScan, and adopted the goal of furthering and facilitating this conspiracy.

348.    The Former Officers, the Remaining Scheme Participants, and Baker committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

349.    Roche, LifeScan, and the insurance companies justifiably relied on the Former Officers and the Remaining Scheme Participants' misrepresentations and were unaware of fraud

91

of the Former Officers and the Remaining Scheme Participants.

350.     As a result of the conduct of the Former Officers, the Remaining Scheme Participants, and Baker, Roche and LifeScan have been injured in an amount not less than $129 million.

WHEREFORE, the Liquidating Trustee demands the entry of a judgment against Baker for compensatory damages, consequential damages, and special damages including, but not limited to, (i) the value of the allowed claims of the Test Strip Manufacturers; (ii) punitive damages; (iii) pre-judgment, post-judgment interest, court costs, and expenses; and (iv) for any other relief the Court deems appropriate.

**COUNT VIII**
**CONSPIRACY TO VIOLATE**
**FEDERAL RICO, 18 U.S.C. § 1962(d)**

The Liquidating Trustee, for and on behalf of the Trust Estate and the beneficiaries of the Trust Estate, as assignee of the claims of Roche and LifeScan, sues Baker and alleges:

351.     The Liquidating Trustee realleges Paragraphs 1 through 285 above.

352.     This is an action seeking damages for conspiracy to violate Federal Rico, 18 U.S.C. § 1962(d) filed by the Liquidating Trustee as assignee of the claims of Roche and LifeScan.

353.     At all relevant times, the Test Strip Manufacturers were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

354.     At all relevant times, Baker and the Scheme Participants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

355.     The entities identified in Paragraph 40 above formed an association-in-fact for the purpose of obtaining NFR blood-glucose test strips; dispensing them to patients by mail order; submitting false insurance claims representing that they had dispensed retail strips; and concealing the nature of this scheme from insurance companies, PBMs, and manufacturers like the Test Strip

Manufacturers.  This association-in-fact was a continuing and cohesive unit with specific and assigned responsibilities and constituted an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).  This enterprise comprises Alliance Medical Holdings, LLC d/b/a Alliance Health and its predecessor corporations as well as Alliance's individually operating, nominally "independent" pharmacies that Alliance managed, operated, and/or controlled; Alliance's corporate-owned pharmacies, as well as the "independent" pharmacies that Alliance later acquired; Alliance's purchasing and wholesaling subsidiaries; and Alliance's operating, managing, and holding entities.

356.    Each Scheme Participant, by engaging in the acts set forth above, participated in the operation and management of the enterprise.  At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

357.    Each Scheme Participant, by engaging in the acts set forth above, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1) and (5), in violation of RICO, 18 U.S.C. § 1962(c).

358.    The Scheme Participants, on multiple occasions, and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be sent and delivered across state lines by commercial interstate carrier shipments of products that were represented to be Test Strip Manufacturers' retail strips but in fact were different products. Each shipment of NFR strips falsely adjudicated using the NDC for retail strips constituted a separate violation of 18 U.S.C. § 1341 and a separate act of racketeering.  The Scheme Participants' purchase and receipt by interstate carrier of Test Strip Manufacturer test strips also was integral to the operation and maintenance of the scheme.

359.    The Scheme Participants, on multiple occasions and in furtherance of their scheme

to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of the federal wire fraud statute, 18 U.S.C. § 1343.  Each false insurance reimbursement claim was transmitted by means of wire communication in interstate or foreign commerce and constituted a separate violation of 18 U.S.C. § 1343 and a separate act of racketeering.  The Scheme Participants' use of interstate wire communications to continually upload, transmit, and receive patient data and information regarding prescriptions to and from Alliance entities, including via Alliance's proprietary PPMS software; to create and maintain NPI and NCPDP database entries regarding the Alliance entities; and/or to establish additional Alliance entities was also integral to the scheme and the operation and maintenance of the enterprise.

360.    Each Scheme Participant committed and/or aided and abetted the commission of two or more of these racketeering acts in violation of 18 U.S.C. §§ 2, 1341, and/or 1343.  In fact, the Scheme Participants' racketeering acts were multiple and repeated, with tens of thousands of acts occurring every year from 2011 until Alliance's bankruptcy in 2017.

361.    These multiple racketeering acts were related and constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants; common victims (the Test Strip Manufacturers); a common method of commission; and the common purpose and common result of defrauding the Test Strip Manufacturers and insurers, and of enriching the Scheme Participants while concealing their fraudulent activities.

362.    Baker was associated with the Alliance enterprise described above, and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through the pattern of racketeering activity

described herein, in violation of 18 U.S.C. § 1962(d).  Baker committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.  For example, and as set forth above, Baker advised the Alliance enterprise to conceal its scheme from PBMs by stonewalling their requests for information and altering documents they requested.  Baker also helped the Alliance enterprise further its scheme by advising Alliance to omit truthful disclosures about the nature of its business to pharmacies Alliance sought to acquire; the acquisition of pharmacies was essential to furthering the scheme, and the pharmacies likely would not have agreed to be acquired if they understood that the Alliance enterprise was engaged in fraud.

363.   The fraudulent scheme depended upon, among other things, (a) the Alliance Pharmacies serving as false fronts to which fraudulent adjudications could be attributed; (b) the Alliance Pharmacies' maintenance of the appearance of independence when contracting with and obtaining reimbursements from PBMs; (c) the submission of fraudulent insurance claims to insurers and PBMs for the purposes of obtaining undeserved reimbursements; (d) the collection of the undeserved reimbursements made to each Alliance Pharmacy into Alliance's corporate accounts without revealing the pharmacy's affiliation with Alliance; (e) a large credit facility that ensured continued operations despite fluctuations in corporate revenue caused by frequent PBM chargebacks and contract terminations; and (f) a financial institution willing to provide such a credit facility with the assets of Alliance Pharmacies serving as collateral, even though such assets frequently would lose substantially all their value as the result of PBM chargebacks and contract terminations.

364.   The Test Strip Manufacturers were directly and proximately injured by the pattern of racketeering activity because the fraudulent adjudication data was passed directly from pharmacy-benefit insurance companies and PBMs to the Test Strip Manufacturers and served as

the sole basis and justification for their payments of rebates to those pharmacy-benefit insurance companies and PBMs.

365.    The Test Strip Manufacturers were directly and proximately injured by the pattern of racketeering activity because each time the Scheme Participants fraudulently substituted a box of NFR strips for a box of retail strips that were adjudicated, and for which Alliance was reimbursed by pharmacy-benefit insurance companies, such substitution deprived the Test Strip Manufacturers of the sale of a box of Retail Strips that they would have sold absent the fraudulent substitution.

366.    As a result of their misconduct, Baker is liable to the Test Strip Manufacturers for these injuries.

367.    Pursuant to 18 U.S.C. § 1964(c), the Test Strip Manufacturers are entitled to recover threefold their damages, plus costs and attorneys' fees.

WHEREFORE, the Liquidating Trustee demands the entry of a judgment against Baker for compensatory damages, consequential damages, and special damages including, but not limited to, (i) the value of the allowed claims of the Test Strip Manufacturers; (ii) punitive damages; (iii) treble damages pursuant to 18 U.S.C. § 1964(c); (iv) attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c); and (v) pre-judgment, post-judgment interest, court costs, and expenses; and (vi) for any other relief the Court deems appropriate.

## COUNT IX
## VIOLATION OF FEDERAL RICO,
## 18 U.S.C. § 1962(c)

The Liquidating Trustee, for and on behalf of the Trust Estate and the beneficiaries of the Trust Estate, as assignee of the claims of Roche and LifeScan, sues Baker and alleges:

368.    The Liquidating Trustee realleges Paragraphs 1 through 285 above.

369.    This is an action seeking damages for conspiracy to violate Federal RICO, 18

96

U.S.C. § 1962(d) filed by the Liquidating Trustee as assignee of the claims of Roche and LifeScan.

370.    At all relevant times, the Test Strip Manufacturers were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

371.    At all relevant times, Baker and the Scheme Participants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

372.    The entities identified in Paragraph 40 above formed an association-in-fact for the purpose of obtaining NFR blood-glucose test strips; dispensing them to patients by mail order; submitting false insurance claims representing that they had dispensed retail strips; and concealing the nature of this scheme from insurance companies, PBMs, and manufacturers like the Test Strip Manufacturers.  This association-in-fact was a continuing and cohesive unit with specific and assigned responsibilities and constituted an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).  This enterprise comprises Alliance Medical Holdings, LLC d/b/a Alliance Health and its predecessor corporations as well as Alliance's individually operating, nominally "independent" pharmacies that Alliance managed, operated, and/or controlled; Alliance's corporate-owned pharmacies, as well as the "independent" pharmacies that Alliance later acquired; Alliance's purchasing and wholesaling subsidiaries; and Alliance's operating, managing, and holding entities.

373.    Each Scheme Participant, by engaging in the acts set forth above, participated in the operation and management of the enterprise.  At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

374.    Each Scheme Participant, by engaging in the acts set forth above, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1) and (5), in violation of RICO, 18 U.S.C. § 1962(c).

375. The Scheme Participants, on multiple occasions, and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be sent and delivered across state lines by commercial interstate carrier shipments of products that were represented to be Test Strip Manufacturers' retail strips but in fact were different products. Each shipment of NFR strips falsely adjudicated using the NDC for retail strips constituted a separate violation of 18 U.S.C. § 1341 and a separate act of racketeering. The Scheme Participants' purchase and receipt by interstate carrier of Test Strip Manufacturer test strips also was integral to the operation and maintenance of the scheme.

376. The Scheme Participants, on multiple occasions and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of the federal wire fraud statute, 18 U.S.C. § 1343. Each false insurance reimbursement claim was transmitted by means of wire communication in interstate or foreign commerce and constituted a separate violation of 18 U.S.C. § 1343 and a separate act of racketeering. The Scheme Participants' use of interstate wire communications to continually upload, transmit, and receive patient data and information regarding prescriptions to and from Alliance entities, including via Alliance's proprietary PPMS software; to create and maintain NPI and NCPDP database entries regarding the Alliance entities; and/or to establish additional Alliance entities was also integral to the scheme and the operation and maintenance of the enterprise.

377. Each Scheme Participant committed and/or aided and abetted the commission of two or more of these racketeering acts in violation of 18 U.S.C. §§ 2, 1341, and/or 1343. In fact, the Scheme Participants' racketeering acts were multiple and repeated, with tens of thousands of acts occurring every year from 2011 until Alliance's bankruptcy in 2017.

378.    These multiple racketeering acts were related and constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants; common victims (the Test Strip Manufacturers); a common method of commission; and the common purpose and common result of defrauding the Test Strip Manufacturers and insurers, and of enriching the Scheme Participants while concealing their fraudulent activities.

379.    Baker participated in the operation and management of the enterprise.  Among other acts, Baker partner Lee Rosebush sat on the Board of Directors of Alliance Medical Holdings, LLC, and in that capacity directed the activities of the Alliance enterprise.

380.    At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

381.    Baker conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1) and (5), in violation of RICO, 18 U.S.C. § 1962(c).

382.    Baker, on multiple occasions and in furtherance of the scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of the federal wire fraud statute, 18 U.S.C. § 1343.  Baker utilized wire communication to advise the Scheme Participants about the most effective ways to hide their scheme, and to provide false information and reassurances to PBMs that were investigating the fraudulent activities at Alliance pharmacies.  Moreover, each false insurance reimbursement claim was transmitted by means of wire communication in interstate or foreign commerce and constituted a separate violation of 18 U.S.C. § 1343 and a separate act of racketeering.  The Scheme Participants' use of interstate wire communications to continually upload, transmit, and receive

99

patient data and information regarding prescriptions to and from Alliance entities, including via Alliance's proprietary PPMS software; to create and maintain NPI and NCPDP database entries regarding the Alliance entities; and/or to establish additional Alliance entities was also integral to the scheme and the operation and maintenance of the enterprise.

383.    Baker committed and/or aided and abetted the commission of two or more of these racketeering acts in violation of 18 U.S.C. §§ 2, 1341, and/or 1343.   In fact, the Scheme Participants' racketeering acts were multiple and repeated during the time that Baker represented Alliance.

384.    These multiple racketeering acts were related and constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants; common victims; a common method of commission; and the common purpose and common result of defrauding the Test Strip Manufacturers, and of enriching the Scheme Participants while concealing their fraudulent activities.

385.    The Test Strip Manufacturers were directly and proximately injured by the pattern of racketeering activity because the fraudulent adjudication data was passed directly from pharmacy-benefit insurance companies and PBMs to the Test Strip Manufacturers and served as the sole basis and justification for the Test Strip Manufacturers' payment of rebates to those pharmacy-benefit insurance companies and PBMs.

386.    The Test Strip Manufacturers were directly and proximately injured by the pattern of racketeering activity because each time a box of NFR strips was substituted for the box of retail strips, and for which they were reimbursed by pharmacy-benefit insurance companies, such substitution deprived the Test Strip Manufacturers of the sale of a box of Retail Strips that they would have sold absent the Scheme Participants' fraudulent substitution.

387. As a result of their misconduct, Baker is liable to the Test Strip Manufacturers for its injuries.

388. Pursuant to 18 U.S.C. § 1964(c), the Liquidating Trustee (standing in the shoes of the Test Strip Manufacturers) is entitled to recover threefold its damages plus costs and attorneys' fees.

WHEREFORE, the Liquidating Trustee demands the entry of a judgment against Baker for compensatory damages, consequential damages, and special damages including, but not limited to, (i) the value of the allowed claims of the Test Strip Manufacturers; (ii) punitive damages; (iii) treble damages pursuant to 18 U.S.C. § 1964(c); (iv) attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c); and (v) pre-judgment, post-judgment interest, court costs, and expenses; and (vi) for any other relief the Court deems appropriate.

## THE DISCOVERY RULE AND LAW OF, EQUITABLE TOLLING, AND/ OR THE ADVERSE DOMINATION DOCTRINE AS TO ALL CLAIMS

389. The Liquidating Trustee pleads the application of the discovery rule, equitable tolling, and/or, in the alternative, the law of adverse domination doctrine as to all claims asserted herein.

## ALTERNATIVE PLEADINGS

390. The foregoing facts, claims, and legal theories are pled cumulatively and alternatively, with no election or waiver of rights or remedies.

## RESERVATION OF RIGHTS

391. The Liquidating Trustee reserves her right to amend this Complaint, upon completion of her investigation and discovery, to assert any additional claims for relief against Baker as may be warranted under the circumstances and allowed by law.

**DEMAND FOR JURY TRIAL**
**AND NON-CONSENT TO A JURY TRIAL**
**BY AND BEFORE THE BANKRUPTCY COURT**

392.    The Liquidating Trustee hereby: (i) demands a trial by jury on all claims and issues triable by such; and (ii) requests in regard to such demand that the reference to the Bankruptcy Court not be withdrawn, if at all, unless and until all discovery and all pre-trial motions and matters, including case dispositive motions, are disposed of and otherwise adjudicated by the Bankruptcy Court.  The Liquidating Trustee specifically does not consent to a jury trial by and before the Bankruptcy Court.

Submitted this 26th day of September, 2022.

CIMO MAZER MARK PLLC
*Special Litigation Counsel*
*for the Liquidating Trustee*
100 S.E. 2nd Street, Suite 3650
Miami, FL 33131
Tel: (305) 374-6482
Fax: (305) 374-6488

By:   /s/ David C. Cimo
        David C. Cimo, Esq.
        Fla. Bar No. 775400
        Email: dcimo@cmmlawgroup.com
        (admitted *pro hac vice*)
        Marilee A. Mark, Esq.
        Fla. Bar No. 725961
        Email: mmark@cmmlawgroup.com
        (admitted *pro hac vice*)