UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO.  17-32186 (MI) |
| UPLIFT RX, LLC | § | |
| | § | CHAPTER 11 |
| *Debtors* | § | |
| | § | (Jointly Administered) |
| | § | |
| YVETTE AUSTIN SMITH, LIQUIDATING | § | |
| TRUSTEE OF THE ALLIANCE HEALTH | § | |
| LIQUIDATING TRUST, | § | ADVERSARY NO. 22-03275 (MI) |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *v.* | § | |
| | § | |
| BAKER & HOSTETLER LLP, | § | |
| | § | |
| *Defendant*. | § | |

**DEFENDANT BAKER & HOSTETLER LLP'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

George M. Kryder
  State Bar No. 11742900
  gkryder@velaw.com
Matthew W. Moran
  State Bar No. 24002642
  mmoran@velaw.com
Jordan W. Leu
  State Bar No. 24070139
  jleu@velaw.com
Michael C. Lee
  State Bar No. 24109461
  mlee@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas  75201
Telephone: (214) 220-7700

*Attorneys for Baker & Hostetler LLP*

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

Defendant Baker & Hostetler LLP ("Baker") respectfully moves to dismiss the complaint under FED. R. CIV. P. 12(b)(6), 9(b), and applicable bankruptcy rules, subject to its pending motion to withdraw the reference (Dkt. 18).

Plaintiff, as trustee of the Alliance Health Liquidating Trust governed by Texas law – standing in the dirty shoes of an admittedly fraudulent enterprise (Alliance) – confesses that Alliance submitted fraudulent claims to multiple pharmacy-benefit managers (known as "PBMs"), allegedly causing $129 million in damages to test-strip manufacturers LifeScan, Inc. ($80 million) and Roche ($49 million) (Roche Diagnostics Corp. and Roche Diabetes Care, Inc.) (collectively, the "Manufacturers").

Plaintiff cynically sold Alliance's attorney-client privilege to the Manufacturers in exchange for ineffective, time-barred, Texas-governed assignments of the Manufacturers' purported claims for damages *Alliance admits it caused*, then brazenly switched sides to prosecute the Manufacturers' *same $129 million* claim against Alliance's former law firm, Baker, and two other law firms that allegedly failed to stop Alliance's *admitted intentional wrongdoing years before Baker was retained*.

But Federal and Texas law bar Plaintiff's attempt to launder and assert these direct and assigned redundantly-labeled "Counts" seeking the same damages.

First, Texas contribution law – which Plaintiff expressly invokes – bars all claims regardless of their labels because a settling self-confessed tortfeasor (Alliance) in whose dirty shoes Plaintiff stands can't obtain contribution from a purported joint tortfeasor (Baker), and Plaintiff can't prosecute a Texas-governed assignment of side-switching causes of action from

plaintiffs (Manufacturers), whose injury the tortfeasor (Alliance) **admits it caused**, against an alleged joint tortfeasor (Baker).

Second, Plaintiff's release of Baker attorney Lee Rosebush and his "partners" who comprise Baker & Hostetler LLP in a separate, Texas-governed settlement this Court approved, released Baker from both Plaintiff's direct and purchased and assigned side-switching claims.

 Third, Plaintiff's direct "Alliance" claims are barred as a matter of Texas law because: (1) any claims based on breaches of duties or damages to purported "Alliance" entities (other than the five alleged "Client Debtor" entities on whose behalf Plaintiff sues) fail for lack of privity and causation; (2) all direct claims fail as a matter of law for lack of causation (because Alliance caused its own damages) and failure to meet one or more essential elements of the claim; and (3) Plaintiff's allegations seeking turnover and/or disgorgement of Baker's post-petition fees – which this Court expressly approved in a final order – are barred by *res judicata*.

Finally, Plaintiff's purchased and assigned side-switching claims on behalf of the Manufacturers fail as a matter of law because: (1) Plaintiff's purportedly assigned claims have never been tolled under agreements that, at most, only tolled the estates' claims and also are facially time-barred; (2) Baker is immune from suit and liability to non-clients (Manufacturers) for alleged conduct in rendering legal services to Alliance; (3) Plaintiff's aiding and abetting misrepresentation and fraud allegations also fail as a matter of law for lack of reliance, causation, and under the economic loss rule; and (4) any purported RICO claims fail as a matter of federal law for lack of causation, participation, or vicarious liability.

# TABLE OF CONTENTS

STATEMENT OF FACTS ............................................................................................. 6

I.   TEXAS CONTRIBUTION AND ASSIGNMENT LAW BARS ALL CLAIMS REGARDLESS
     OF THEIR LABELS ............................................................................................ 17

     A.   Texas Law Bars Any Contribution Claim, Regardless of its Label, Because
          a Settling Tortfeasor (Alliance) Can't Obtain Contribution from an Alleged
          Non-Settling Tortfeasor (Baker). .............................................................. 17

     B.   Plaintiff Can't Avoid the Bar Against Contribution Through Artful Pleading
          – Seeking the Same Contribution Damages Under Different Labels. ................. 19

     C.   Texas Law Prohibits a Joint Tortfeasor (Alliance) from Taking an
          Assignment of a Cause of Action from Plaintiffs (Manufacturers) Whose
          Injury the Tortfeasor (Alliance) Admits it Caused, then Prosecute that Side-
          Switching Claim Against an Alleged Joint Tortfeasor (Baker). .......................... 22

II.  PLAINTIFF'S RELEASE OF BAKER ATTORNEY LEE ROSEBUSH AND HIS
     "PARTNERS" WHO COMPRISE BAKER & HOSTETLER LLP ALSO RELEASED
     BAKER. ........................................................................................................ 25

III. PLAINTIFF'S DIRECT ALLIANCE "CLAIMS" FAIL AS A MATTER OF LAW AND MUST
     BE DISMISSED. ............................................................................................... 26

     A.   All Claims Based on Alleged Duties or Damage to "Alliance" Entities Other
          than the Only Five Alleged "Client Debtors" on Whose Behalf Plaintiff
          Sues Fail for Lack of Privity and Causation. .............................................. 26

     B.   Plaintiff's Direct "Alliance" Claims Fail as a Matter of Law for Lack of
          Causation ............................................................................................. 27

          (1)   Because Alliance is a self-confessed fraudster, Plaintiff's direct
                claims are barred under causation-negating doctrines and case law
                including *Peeler*, *Rogers*, and *Rothrock*. ..................................... 28

          (2)   The Complaint fails to plausibly allege that Baker was the "but for"
                cause of Alliance's self-inflicted alleged harm. ............................... 31

IV.  PLAINTIFF'S PURCHASED, SETTLED, AND ASSIGNED SIDE-SWITCHING "CLAIMS"
     ON BEHALF OF THE MANUFACTURERS FAIL AS A MATTER OF LAW AND MUST BE
     DISMISSED. ................................................................................................... 34

     A.   Plaintiff's Purportedly Assigned Claims Have Never Been Tolled and Thus
          are Time-Barred. .................................................................................. 34

          (1)   The Tolling Agreements at most, only tolled the estates' claims and
                did not apply to the Manufacturers' purportedly assigned claims. ........... 34

          (2)   The Manufacturers' purportedly assigned claims are facially time-
                barred based on admissions and facts of which this Court can take
                notice. ............................................................................................ 36

     B.   Plaintiff's Alleged Misrepresentation and Fraud Claims On Behalf of Non-
          Client Manufacturers are Barred by Attorney Immunity ................................ 39

(1)    Attorneys are immune from suits and liability to non-clients for conduct while "part" of representing a client, even if that conduct allegedly was wrongful, fraudulent, or criminal. .................................... 39

(2)    Plaintiff – as purported assignee of non-client Manufacturers – complains about actions that Baker took as part of representing Alliance and thus Baker is immune from suit as a matter of law. ............ 41

C.    Plaintiff's Alleged Misrepresentation and Fraud Claims Additionally Fail as a Matter of Law for Multiple Reasons............................................................ 42

(1)    There is no such claim for "aiding and abetting" negligence or fraud. .................................................................................................... 42

(2)    Attorneys (Baker) can't conspire with clients (Alliance) because agents and principals are not two or more persons needed for a conspiracy. ................................................ 43

(3)    Alleged "omissions" are not actionable misrepresentations. ................... 44

(4)    Plaintiff never pleads that Baker's adversarial submissions *to the PBMs* were shared with the Manufacturers............................................. 45

D.    The Economic Loss Rule Prevents Plaintiff from Recovering in Tort when the Complained of Conduct is Governed by Contract – As Here – And Bars Any Negligent Misrepresentation Claim. ........................................................ 47

E.    The RICO Claims Fail as a Matter of Law for Lack of Causation, Participation, or Vicarious Liability. ........................................................ 49

(1)    The Complaint facially negates the direct "but for" causation required to establish a RICO claim. ......................................................... 50

(2)    The Complaint facially negates Baker's alleged operation or management of Alliance's alleged enterprise. .......................................... 54

(3)    The Complaint fails to meet Rule 9(b)'s heightened pleading requirements or establish Baker as RICO "person." ................................ 55

(4)    Baker can't be held vicariously liable under RICO. ................................. 57

(5)    Plaintiff's failure to plead a plausible RICO claim negates any RICO conspiracy claim. ......................................................................... 57

V.    PLAINTIFF'S BANKRUPTCY CLAIMS FAIL AS A MATTER OF LAW .................................... 58

A.    This Court's Final, Not-Appealed Fee Order Bars All Claims Based on Baker's Post-Petition Legal Services Under *Res Judicata*. .................................. 58

(1)    The Fee Order had no limitation on its finality or preclusive effect ........ 58

(2)    This Court entered other orders in the *Uplift RX* Bankruptcy that were not final and expressly had no *res judicata* or collateral estoppel effects............................................................................................ 60

B.    Plaintiff's Fraudulent Transfer Claims for Baker's Pre-Petition Legal Services Fail to Meet Pleading Standards Under *Twombly* and *Iqbal*.................. 62

## STATEMENT OF FACTS

1.      Plaintiff – the liquidating trustee of a Texas trust[1] created under a confirmed chapter 11 plan governed by Texas law[2] – sues on behalf of only five of over 60 "Alliance"[3] entities that allegedly caused or contributed to the purported damages Plaintiff seeks to recover: Alliance Medical Holdings, LLC, Alliance Medical Administration, Inc., Alliance Health Networks, LLC, Alta Distributors, LLC, and Stonybrook Pharmacy, LLC (collectively, the "Alleged Client Debtors").  *See* Compl., p. 78 & ¶ 287.

2.      Plaintiff alleges that Baker's legal services to some Alliance-affiliated pharmacies included submitting information required under those pharmacies' contracts with PBMs that audited and/or cancelled the contracts because the pharmacies had failed to document whether certain blood glucose test strips were retail strips sold in blue boxes (that were eligible for contractual rebates to the PBMs), instead of the same strips sold in gray or white boxes not for retail sale (that were ineligible for rebates).  *See* Compl., ¶¶ 87, 150.

3.      Plaintiff alleges that Alliance – ***not Baker*** – submitted fraudulent insurance claims to PBMs – not Manufacturers – whose contracts and communications were with ***the PBMs*** – not Alliance.  *See* Compl., ¶¶ 142-43.

---

[1] The Liquidating Trust Agreement is governed by Texas Law. *See* EX. 10, APP. P. 236 ("This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to the rules governing the conflict of law which would require the application of the law of another jurisdiction.").

[2] *See* EX. 8, APP. P. 144; (the Plan) ("Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Texas shall govern the construction and implementation hereof and any agreements, documents, and instruments executed in connection with this Plan….").

[3] Plaintiff uses the term "Alliance" generically to reference the numerous Debtors named in the caption of the Complaint – but only sues on behalf of 5 entities. *See* Compl., p. 78. Baker generally makes similar use of that term, without conceding for purposes of this motion that Baker represented any specific Alliance-affiliated entities before the *Uplift* bankruptcy.  Capitalized terms used but not defined in this Statement of Facts ("Facts") otherwise have the meanings given to them in the Complaint.

4.      Indeed, the Complaint never alleges that Alliance or Baker communicated with the Manufacturers.  Plaintiff also never alleges that Baker's adversarial submissions *to the PBMs* were shared with the Manufacturers, and never pleads that the Manufacturers actually received and justifiably relied on any communications from Baker.

5.      Plaintiff has separately sued two other law firms – Brown & Fortunato, P.C. ("Brown") and Bennett Tueller Johnson Deere, LLC ("Bennett") for the same $129 million in allegedly PBM-contract-focused damages – claiming that, years before Baker was retained in 2014, those firms failed to stop Alliance's conduct while admitting that Alliance continuously ignored their advice when they tried.[4]

6.      *None* of Plaintiff's claims are asserted on behalf of the PBMs whose alleged communications with Baker (as attorneys for Alliance-related entities) and contractual relationships with Alliance and the Manufacturers are referenced throughout the Complaint.

### *Alliance's Wrongdoing and Warnings from Other Law Firms Before Baker's Retention*

7.      As this Court found in its Report & Recommendation in Plaintiff's suit against Brown,[5] Plaintiff alleges that as early as mid-2010, Alliance retained the Brown law firm which immediately became aware of Alliance's fraudulent scheme to: (1) obtain lower cost not-for-retail ("NFR") blood glucose test strips on the "gray market" (Ex. 31, APP. PP. 827-28; Brown R&R at 3-4); (2) arrange for Alliance-affiliated pharmacies to sell the strips to beneficiaries of PBM insurance plans that covered only retail test strips; then (3) submit fraudulent insurance claims to

---

[4] *See* Ex. 32, APP. PP. 839-941, Plaintiff's First Amended Complaint in *Shapiro v. Brown & Fortunato, P.C.*, No. 21-03936 (Bankr. S.D. Tex.) ¶¶ 266, 310, 327, 332 (the "Amended Brown Complaint"); Ex. 22, APP. PP. 548-70, Plaintiff's Complaint in *Shapiro v. Bennett Tueller Johnson*, LLC, No. 20-03115 (Bankr. S.D. Tex.) ¶¶ 41, 44-50 (the "Bennett Tueller Complaint").

[5] Report & Recommendation to Withdraw Reference, Dkt. 49, June 27, 2022, Adv. No. 21-3936 ("Brown R&R")

the PBMs, falsely representing that it had dispensed retail strips; and further alleges that (4) this inaccurate reporting allegedly caused PBMs, who are not parties to this case, to reimburse Alliance as if Alliance had sold retail strips (*Id.*, APP. P. 828; Brown R&R at 4).

8.     Plaintiff also alleges that the Bennett law firm began representing Alliance in at least 2013, and Bennett likewise allegedly engaged in wrongdoing and failed to stop Alliance's conduct.[6]

### *Manufacturers File Suits in New Jersey*

9.     Nearly **two years before** Alliance filed bankruptcy, what Plaintiff calls the "Questionable Business Practices" (Compl., ¶ 7) indisputably were well-known not only within Alliance and to Alliance's board of directors, but also by both Manufacturers. *See* EX. 22, APP. P. 555 (Bennett Tueller Complaint, ¶¶ 27-28) (Alliance's "Questionable Business Practices" "came under scrutiny involving serious allegations of misconduct raised by multiple whistleblowers within Alliance" and "***starting in 2015*** … LifeScan and Roche, complained about the same alleged misconduct, and independently privately made multiple written demands on Alliance and its Affiliates for payment of damages and other relief.") (emphasis added).

10.     At least one of the Manufacturers, LifeScan (then owned by Johnson & Johnson), knew of the "Questionable Business Practices" as **early as 2014** because LifeScan alleged in a draft lawsuit, referenced in Plaintiff's complaint, that "[i]n April 2014 … a pharmacist … informed representatives of LifeScan that [an Alliance affiliated pharmacy] was distributing LifeScan's product intended for [NFR patients] to [Retail patients]." EX. 3,[7] APP. P. 37 (draft lawsuit

---

[6] *See* EX. 22, APP. PP. 561-63, Bennett Tueller Complaint, ¶¶ 41, 44-50.

[7] The Complaint refers to, paraphrases, and partially quotes from various pleadings, orders, and agreements that were not attached, but of which this Court respectfully may take judicial notice. This Court may consider these operative documents because they are "referred to in the plaintiff's complaint and are central to [her] claim." *See Taylor v. Hartley*, 488 F. Supp.3d 517, 526 (S.D. Tex. 2020); *Collins v. Morgan Stanley*

¶ 69).  Moreover, LifeScan promised to share a draft lawsuit complaint against Alliance based on the *same* "Questionable Business Practices" no later than July 2015, then actually shared that draft complaint with Alliance in September 2016.  *See* Compl., ¶¶ 96-97 (the threatened Johnson & Johnson suit allegedly was known four months before November 2015) & ¶ 209 (a draft Johnson & Johnson complaint was presented to Alliance on September 19, 2016); *see also* Ex. 3, APP. PP. 18-61 (draft complaint, including letter from LifeScan referring to the related meeting between Johnson & Johnson and Alliance in July 2015).[8]  Relatedly, in May 2016, "Johnson & Johnson [] confirmed [to PBM Express Scripts] that [Johnson & Johnson] authorized wholesalers are [contractually] prohibited from re-selling [diabetic test-strips] to other wholesalers or suppliers." Ex. 2, APP. P. 15 (May 20, 2016 letter from Express Scripts to Baker regarding Alliance pharmacy audit); Compl., ¶ 143.

    11.    LifeScan ultimately sued certain former Alliance officers, directors, and employees (but not Baker partner Lee Rosebush) on July 28, 2017 in New Jersey federal court. *See* Compl., ¶¶ 251-52. There, LifeScan alleges it suffered purported damages from Alliance's scheme – the same "Questionable Business Practices" complained of here – of not less than $50 million for

---

*Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (quoted in *Taylor*); *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007). These materials can assist the Court "'in making the elementary determination of whether a claim has been stated.'" *Taylor*, 488 F.Supp.3d at 526 (quoting *Collins*, 224 F.3d at 498–99). Further, "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *See Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007), citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir. 1994); *Nino v. Deutsche Bank Trust Co. Americas*, No. 7:18-cv-101, 2018 WL 2864039, at *2 (S.D. Tex. June 8, 2018) (court may refer to documents plaintiff relies upon). For the Court's convenience, Baker has included several of these documents in the separately-filed Appendix supporting this Motion.

[8] The draft Johnson & Johnson complaint clearly confirms that LifeScan knew about the alleged scheme in 2014. *See id*. at ¶ 69-70 ("In April 2014, Confidential Witness 1 ("CW1"), a pharmacist at Defendant Cure Rx, informed representatives of LifeScan that Cure Rx was distributing LifeScan product intended for DME Beneficiaries (*i.e.*, White Box Mail-Order Product and/or Gray Box Wholesale Product) to Pharmacy Beneficiaries. CW1 explained that Cure Rx received the LifeScan DME test strips from Defendant Alta Distributors . . . .  As CW1 told LifeScan, CW1 knew that Defendant Alliance was the parent company to Alta Distributors").

"having already paid rebates on the non-existent sales … of Retail Strips" – the same damages LifeScan claimed against Alliance in the *Uplift* bankruptcy and now seeks here. *See* Ex. 11, App. p. 367 (LifeScan Second Amended Complaint, ¶ 340); Compl., ¶ 252.

12.      Roche filed a similar suit in New Jersey federal court on March 19, 2019 (including against Baker Partner Rosebush who served on the Alliance board for a limited period – approximately three months – in 2016) seeking $87 million in damages – the ***same damages*** Roche claimed against Alliance in the *Uplift* bankruptcy and now seeks here, for "the difference between the price for which [Roche] sold the NFR strips and the price at which it would have sold the retail strips the pharmacy beneficiaries should have received."  *See* Ex. 20, App. p. 523 (Roche First Amended Complaint, ¶ 385); *see also* Compl., ¶ 253.

13.      In the instant suit, Plaintiff seeks the ***same damages*** (as purported assignee of the Manufacturers' claims) that the Manufacturers currently are pursuing in the New Jersey District Court. *See e.g.* Compl., ¶¶ 69-71 (alleging the Manufacturers were damaged by Alliance submitting allegedly false rebate claims to PBMs and that "[d]iversion of NFR strips to retail channels [] deprive[ed] the Test Strip Manufacturers of retail sales."); ¶¶ 334, 350 ("Roche and LifeScan were injured in an amount not less than $129 million."). Thus, while Plaintiff argues in this Court that she owns and can pursue the Manufacturers' purportedly assigned claims against Baker, the Manufacturers simultaneously are pursuing claims for the ***same damages*** in New Jersey federal district court.

### *Alliance Files Bankruptcy and Enters Various Settlements*

14.      As this Court found in the Brown R&R at 2 (Ex. 31, App. p. 826) "[i]n early 2017, the FBI stopped Alliance's growth in its tracks" when "execut[ing] search warrants, freezing Alliance's assets and business" and caused Alliance's failure. "This raid precipitated Alliance's

collapse as its banks declared Alliance in default under the terms of Alliance's loan obligations. Within months, Alliance was in chapter 11 bankruptcy." *Id*. (internal citations omitted).

15.     On August 5, 2019, this Court approved a settlement agreement and releases between the chapter 11 trustee (Ronald L. Glass) and Alliance's officers and directors, releasing and inuring to the benefit of (among others) Baker partner Rosebush and his "partners" (who comprise Baker & Hostetler LLP, "an Ohio limited liability partnership," Compl., ¶ 34) from claims the trustee "ever had or may now or hereafter own." (Ex. 9, App. pp. 200-01; settlement agreement); (Ex. 16, App. pp. 409-13; order approving settlement). The trustee further agreed to "not in the future solicit or accept any assignment of a claim of any kind" against the beneficiaries of the settlement agreement. (Ex. 9, App. p. 202; settlement agreement).

16.     Separately, Alliance stipulated to, settled, and allowed LifeScan and Roche's proofs of claim in the amounts of $49,339,603 and $80,054.970, respectively. *See* Compl., ¶ 255 & Ex. 2 (attaching Dkts. 1176, 1178, 1232, and 1233 (Stipulations and Orders in Case 17-32186)). Plaintiff now characterizes the amounts for which it settled LifeScan and Roche's proofs of claim as "damage to the [Alleged] Client Debtors" or alternatively (and without specifying which of over 60 Alliance entities) "damage to Alliance." *See* Compl., ¶¶ 289, 303.

17.     As part of this settlement, Plaintiff, LifeScan, and Roche also entered a stipulation governed by Texas law which – in violation of the above-described release – purportedly assigned the Manufacturers' claims (including the claims Plaintiff now asserts against Baker) in exchange for selling and waiving Alliance's attorney-client privilege. (Ex. 23, App. pp. 584-91; stipulation). This Court approved the stipulation on June 20, 2020. (Ex. 25, App. pp. 641-43; order approving stipulation). The stipulation provides that "the Test Strip Manufacturers are not conveying … any

claims that are currently pending or could be asserted against any current defendant in either [New Jersey lawsuit (Facts, ¶¶ 11-12)]." (Ex. 23, App. p. 589-90; stipulation).

### *Plaintiff Sues Baker*

18.     Despite filing a 102-page Complaint with 743 pages of attached exhibits (including 718 pages of Baker's invoices for legal services), Plaintiff admits that Alliance's  fraud scheme – started in 2010 *4 years before Baker was retained* – was "straightforward."  Compl., ¶ 1.[9]

19.     *Four years after* Brown allegedly advised Alliance about the scheme and *years after Brown and Bennett failed to stop it,* Plaintiff alleges that Baker began representing an Alliance entity in November 2014.  Plaintiff also admits that, approximately one year later, in November 2015, Alliance's in-house general counsel, David Grant, advised the entire Alliance board of directors about the wrongful scheme. Compl., ¶ 93 ("Grant forwarded Rosebush a copy of his November 4, 2015 memorandum to Alliance's Board of Directors in which Grant confirmed that Alliance had a practice of submitting fraudulent insurance claims containing false NDC numbers."); Ex. 1, App. pp. 6-13; Grant Memorandum.

20.     The Complaint does not allege that Baker submitted any false claims to the PBMs for adjudication.  Instead, it alleges that Baker communicated with the PBMs while representing Alliance in *post-claim* submission audits by the PBMs and assisting with a pharmacy's application to join a PBM's mail-order network.  And it completely fails to allege any communications between Baker and the Manufacturers, or allege that any of Baker's communications with the

---

[9] Specifically, Alliance's personnel allegedly "[1] conspired to obtain not-for-retail ("NFR") blood glucose test strips . . . [2] arranged for Alliance-affiliated pharmacies to dispense these test strips to beneficiaries of pharmacy-benefit insurance plans that covered only retail test strips . . . . then [3] submitted fraudulent insurance claims to the pharmacy-benefit plans, falsely representing that they had dispensed retail strips." Compl., ¶ 14.  The alleged purpose of Alliance's scheme was to exploit "the substantial difference in wholesale list price and insurance reimbursement rates between the NFR strips and the retail strips." *Id.* at ¶ 15. Brown and Bennett allegedly advised Alliance regarding this same scheme. *See* Facts, ¶ 5.

PBMs were passed on to the Manufacturers.  Likewise, the Complaint alleges that Alliance submitted its fraudulent insurance claims to various non-party PBMs – not to the Manufacturers. *See* Compl., ¶¶ 5 n. 2; 14, 19, 65-66, 78, 86, 104, 119, 135, 327.

21.     Plaintiff also alleges that "Alliance purchased the vast majority of its NFR strips from third-party 'diverters' [that] obtain NFR strips from distributors **willing to breach their contracts with [Manufacturers]** and sell NFR strips on the "secondary" or "gray" market, where they can obtain a higher price from parties like Alliance." Compl., ¶ 75 (emphasis added).

22.     Although the Complaint baldly alleges that Baker started representing "Alliance" in November 2014 and became aware of "Alliance's" "Questionable Business Practices" sometime in 2015, *see id.* at ¶ 17 & 85, it ***does not*** allege that Baker:

- Knew anything specific about the PBMs' or wholesale distributors' contracts with the Manufacturers and rebate framework under which the Manufacturers allegedly sold retail test strips for a higher price, but paid rebates to the PBMs to offset all or a portion of the difference in price between the retail and NFR test strips;[10]

- Communicated with any of the Manufacturers who purportedly assigned their claims to Plaintiff; or

- Was copied on or present for many of the documents and events alleged throughout the 102-page Complaint.[11]

---

[10] *See id.* at ¶¶ 62-67. Instead of alleging any specific knowledge, Plaintiff vaguely alleges that "[i]t was and is well known throughout the ***diabetes product industry*** that test strip manufacturers paid rebates to pharmacy-benefit insurers for retail test strips" and that "Baker attorneys had internal discussions about the fact that manufacturers paid rebates to PBMs based on insurance claims for their products as early as January 2015." *Id.* at ¶¶ 68 (emphasis added), 98-99.  Plaintiff does not allege that Baker is a member of the "diabetes product industry."  And the October 6, 2016 e-mail cited in Compl., ¶ 99 related to an article about EpiPens (not test strips) and does not show any specific knowledge by Baker about the Manufacturers' rebate framework.  *See* Ex. 4, App. pp. 62-65 (October 6, 2016 e-mail chain between Baker attorneys and Alliance in-house general counsel David Grant).  Otherwise, ¶ 332 of the Complaint alleges that Baker "knew and intended that Roche and LifeScan would rely on . . . [unidentified] inaccurate and/or false representations and material omissions in providing rebates to [PBMs]" but is entirely conclusory.

[11] *See id.* at ¶¶ 40-49 (corporate history before Baker represented Alliance); 78 & 146 (allegedly phony invoices); 108-109 (May 2016 Alliance Board memo); 128-134 (various materials which either predate Baker's representation or were not allegedly sent to Baker); 157-59 (ESI "Corrective Action Plan" and

23.     The Complaint admits that the PBMs had – and exercised – contractual rights to seek reimbursements (*i.e.*, "chargebacks") from pharmacies for amounts the PBMs paid the pharmacies for NFR strips, *see id*. at ¶¶ 104-106 & 204.  But the Complaint fails to address whether:

- The Manufacturers had their own contractual "audit" and "chargeback" rights against PBMs and third-party distributors whose contract breaches caused NFR strips to be on the "secondary" or "gray" market;

- The Manufacturers availed themselves of any such rights; and

- The PBMs and distributors remitted any of the Alliance-related chargeback amounts to the Manufacturers who claim the purported damages Plaintiff is pursuing in this case.

24.     Plaintiff ultimately complains that "Baker [allegedly] never advised Alliance that it should stop submitting fraudulent insurance claims . . . . [and] never informed Alliance's Board of Directors that the company was engaged in blatantly illegal activity." *Id*. at ¶ 88.  But it is indisputable, based on Plaintiff's own allegations and documents referenced in and central to the Complaint, that ***Alliance's Board already knew everything Plaintiff says Baker should have advised*** and Alliance in fact ***had*** received "repeated and explicit warnings" that its conduct harmed the Manufacturers:

- *See id*. at ¶¶ 17-18 & 94 (referencing the Grant Memorandum, which, in Plaintiff's own words, "describe[ed] the 'fact' of Alliance's reliance on NDC fraud"); Ex. 1, App. pp. 6-13;

- "In other words, Grant advised Alliance management and the Board that Alliance had two choices: (1) continue its practice of improper adjudication and accept risk of liability or (2) stop improperly adjudicating test strips and accept the resulting loss of revenue, which would not be financially feasible";[12]

---

related management of retail inventory); 218 & 221-23 (e-mail and self-disclosure analysis presentation prepared by David Grant, Alliance's in-house general counsel).

[12] *See* Ex. 32, App. p. 908, Amended Brown Complaint, ¶ 249.

- "In response [to the Grant Memorandum], Jeffrey Smith, Blaine Smith, Grant, Hughes, Wistner, and Koopersmith chose the former option.  They therefore made the 'business decision' to continue Alliance's Questionable Business Practices, accepting the risk of liability over the devastating loss that would result from ceasing the Questionable Business Practices";[13]

- *see also* Compl., ¶ 80 (describing fraud as an integral part of Alliance's business model, and the foundational practice of the company); and

- *id*. at ¶ 234 ("***Despite*** such ***repeated*** and ***explicit warnings*** that the Questionable Business Practices harmed manufacturers like Roche, Alliance continued that practice—at ***Alliance Officers'*** direction—until it was raided by the FBI and went bankrupt in 2017.") (emphasis added).[14]

25.      Moreover, the Complaint is, at best, self-contradictory concerning the content of Baker's alleged legal advice, acknowledging that Baker partner "Rosebush wrote to Grant on September 26, 2016 that he 'would not go so far as to say that secondary market is perfectly legal,' in part because the PBMs will 'bring up that you are dispensing mail order [NFR] in lieu of retail.'" *See id*. at ¶ 184.

26.      And in other litigation filed in this Court, Plaintiff is far more forthcoming about what Alliance knew and the advice provided by the Brown and Bennett law firms, admitting that:

- "[N]o later than February 10, 2011 [more than three years before Baker ever represented Alliance], Brown knew that Alliance was engaged in the Questionable Business Practice of shipping NFR products but billing them as if they were retail products;"[15]

- No later than December 2012, almost two years before Baker represented Alliance, Brown attorneys had discussed the illegality of Alliance's Questionable Business Practices with Alliance's CEO, Jeffrey Smith, who responded that he wanted to sell the entities if he could not bring them into compliance within 90 days, and did not believe doing so was possible;[16]

---

[13] *See* EX. 32, APP. P. 908, Amended Brown Complaint, ¶ 250.

[14] Rosebush is not alleged to have been an Alliance Officer.

[15] *See* EX. 32, APP. P. 863, Amended Brown Complaint, ¶ 94 (emphasis removed).

[16] *See* Amended Brown Complaint, ¶¶ 102-04; *see also id*. at ¶ 271.  Brown filed a copy of the December 11, 2012 correspondence cited in the Amended Brown Complaint as Ex. A to its Motion to Dismiss.  *See*

- "As [Alliance CEO] Jeffrey Smith stated in an April 10, 2013 e-mail to Alliance senior management, "the biggest concern under Productive Paranoia is PBM/Payor Risk." Smith was referring to the ever-present risk that PBMs would cancel their contracts with the Alliance Pharmacies as a result";[17]

- In May 2013, approximately 18 months before Baker represented Alliance, Brown had advised Alliance that memorializing its Questionable Business Practices in writing (and specifically the practice of billing all strips as retail even though the strips were NFR) carried "considerable risk" including contract termination and being turned into the government for "violations of state, federal, and various insurance laws;"[18]

- In July 2013, only two months later, Brown advised Alliance that its submission of the wrong NDCs to PBMs could be unlawful or fraudulent;[19]

- In 2015, "[d]espite knowing that Alliance was committing the Questionable Business Practices and faced substantial liability for doing so, Alliance's senior management concluded that abandoning the Questionable Business Practices would be financially unfeasable. They therefore chose to continue the Questionable Business Practices;"[20]

- "Neither Alliance nor any of its senior management ever obtained a legal opinion that the improper adjudication practices [were] lawful. This was despite the fact that multiple individuals desired such a legal opinion, and that Alliance engaged multiple outside counsel, including Bennett, Baker, and Brown, in connection with issues related to its Questionable Business Practices;"[21] and

- Plaintiff also alleges that the Bennett law firm began representing Alliance in at least 2013, and Bennett likewise allegedly engaged in wrongdoing and failed to stop Alliance's conduct. *See* Ex. 22, App. pp. 561-63, the Bennett Tueller Complaint, ¶¶ 41, 44-50.

27.    After Alliance filed bankruptcy in April 2017, this Court approved Baker to serve as Debtors' counsel. This Court also approved Baker's application for post-petition fees and

---

Ex. 28, App. p. 801 (Brown attorney stating, among other things, "now that Smith knows that some of the entities' practices are improper . . . .").

[17] *See* Ex. 32, App. pp. 881-82, Amended Brown Complaint, ¶ 159.

[18] *See* Amended Brown Complaint, ¶¶ 191-96, *id.*, App. pp. 892-93.

[19] *See* Amended Brown Complaint, ¶ 146, *id.*, App. pp. 877-78.

[20] *See* Ex. 27, App. pp. 706-07; Plaintiff's Original Complaint (the "Original Brown Complaint") in *Shapiro v. Brown & Fortunato, P.C.*, No. 21-03936 (Bankr. S.D. Tex.), ¶ 211.

[21] *See* Original Brown Complaint, ¶ 216, *id.*, App. p. 708.

expenses in a final order dated September 11, 2019 (Fee Order).  *See* Compl., ¶¶ 244-46; *see also*
Ex. 18, APP. PP. 417-19.

28.     Despite the Fee Order, Plaintiff admits that Baker is still "owed a remaining balance
of $779,066.83 from the Trust Estate." Compl., ¶ 246, n. 7.

## I.     TEXAS CONTRIBUTION AND ASSIGNMENT LAW BARS ALL CLAIMS REGARDLESS OF THEIR LABELS.

Texas contribution law – which Plaintiff invokes – bars all claims regardless of their labels
because a settling self-confessed tortfeasor (Alliance) in whose dirty shoes Plaintiff stands can't
obtain contribution from a purported joint tortfeasor (Baker) no matter how artfully the claims are
pled, and Plaintiff can't prosecute a Texas-governed assignment of side-switching causes of action
from plaintiffs (Manufacturers) whose injury the tortfeasor (Alliance) ***admits it caused***, against an
alleged joint tortfeasor (Baker).

### A.     Texas Law Bars Any Contribution Claim, Regardless of its Label, Because a Settling Tortfeasor (Alliance) Can't Obtain Contribution from an Alleged Non-Settling Tortfeasor (Baker).

Plaintiff impermissibly seeks "contribution from Baker pursuant to the Texas Proportionate
Responsibility Statute, Chapter 33 of the Texas Civil Practice & Remedies Code." Compl., ¶ 309.
Plaintiff settled claims against Alliance by LifeScan and Roche (through stipulations governed by
Texas law which this Court approved – *see* Facts, ¶¶ 16-17), and now impermissibly seeks
contribution for those settled claims from a non-settling alleged joint tortfeasor (Baker).  This is
expressly prohibited under Texas law, which Plaintiff invokes.

As Judge Hanen found in an instructive case, "[t]he Supreme Court of Texas has
consistently held based on Chapter 33 of the Texas Civil Practice and Remedies Code ***that a
settling person cannot pursue an action for contribution from a non-settling person or entity***."
*Perlstein v. Vuono*, No. CIV.A. B-07-133, 2008 WL 3539769, at *5 (S.D. Tex. Aug. 13, 2008)

(emphasis added) (internal citations omitted); *see Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 22 (Tex. 1987) ("A settling defendant who is jointly responsible for personal injuries to a common plaintiff may not preserve contribution rights either by obtaining a complete release for all other parties allegedly responsible or by obtaining assignment of the plaintiff's entire claim."); *Nabors Completion & Prod. Services Co. v. Chesapeake Operating, Inc.*, 648 Fed. Appx. 393, 398 (5th Cir. 2016) (citing *Beech* and finding "Texas law is clear that [plaintiff] – which settled all claims with the landowners before any judgment was entered against it – is not, under [Chapter 33] … entitled to contribution").

On August 5, 2019, this Court approved a stipulation between Alliance and Roche settling Roche's proofs of claim for $80,054,970.00. *See* Facts, ¶ 16; Compl., ¶ 255; Ex. 2. That same day, this Court also approved a stipulation between Alliance and LifeScan, settling LifeScan's proofs of claim for $49,339,603.00. *See id*. By entering the settled Claim Stipulations, Alliance became a "settling person" under Chapter 33 of the Texas Civil Practice and Remedies Code[22] as a matter of law ***thereby losing the ability to seek contribution***. *Vuono*, 2008 WL 3539769, at *5 ("Under well-established Texas law, [] a settling tortfeasor is not entitled to contribution from a non-settling tortfeasor(s)").

Plaintiff admits "Alliance is liable to the Test Strip Manufacturers in the amount of $129,394,573 pursuant to the settled ***Claim Stipulations approved by the Bankruptcy Court***[,]" but impermissibly seeks contribution from Baker because "Alliance … and Baker were, together, joint tortfeasors." Compl., ¶¶ 311-12 (emphasis added). But Plaintiff (an admitted settling

---

[22] "'Settling person' means a person who has, at any time, paid or promised to pay money or anything of monetary value to a claimant in consideration of potential liability with respect to the personal injury, property damage, death, or other harm for which recovery of damages is sought." TEX. CIV. PRAC. & REM. CODE § 33.011.

tortfeasor) can't maintain a contribution claim against Baker (a non-settling alleged joint tortfeasor). *See e.g. Sunbelt Rentals, Inc. v. Rogers*, No. 01-16-00204-CV, 2017 WL 2545094, at *4 (Tex. App.—Houston [1st Dist.] June 13, 2017, pet. denied) (collecting cases and finding that "[s]ince *Jinkins*, this court and numerous other courts have recognized that 'when a co-defendant settles with a plaintiff, the ***settlement extinguishes the settling defendant's right of contribution from a non[-]settling joint tortfeasor*.'") (emphasis added).

### B. Plaintiff Can't Avoid the Bar Against Contribution Through Artful Pleading – Seeking the Same Contribution Damages Under Different Labels.

Plaintiff's purported claims for negligence (Count I) and aiding and abetting breach of fiduciary duty (Count II) likewise fail and must be dismissed because they simply recast Plaintiff's barred contribution claim by seeking the same damages under different labels. For example, Plaintiff seeks to recover $129,394,573.00 – the aggregate amount of the settled Claim Stipulations – for negligence (Compl., ¶ 289[23]), aiding and abetting breach of fiduciary duty (Compl., ¶ 303[24]), and contribution (Compl., ¶ 311[25]). Despite their labels, Count I and Count II merely are Plaintiff's attempt to recover under a contribution theory the $129,394,573.00 for which Alliance agreed to settle with the Manufacturers.

Plaintiff can't overcome the bar to contribution by artfully pleading a contribution claim with different labels. In *FG Holdings, Inc. v. London Am. Risk Specialists, Inc.*, No. 09-05-522 CV, 2007 WL 4341408 (Tex. App.—Beaumont Dec. 13, 2007, pet. denied), the court expressly

---

[23] "The [alleged] foregoing breaches [by Baker] … proximately caused damages to the [Alleged] Client Debtors, totaling no less than $129,394,573, which represents the total aggregate amount of the allowed LifeScan and Roche claims."

[24] "Each of the above breaches adversely impacted and conferred no benefit to Alliance, and as a direct and proximate result of the same, cause damage to Alliance totaling no less than $129,394,573[.]"

[25] "Alliance is liable to the Test Strip Manufacturers in the amount of $129,394,573, pursuant to the settled Claim Stipulations approved by the Bankruptcy Court."

rejected a party's attempt to do just that. There, a third-party plaintiff ("FG") brought claims against a third-party defendant ("London American") for negligence, misrepresentation, violation of the insurance code, and indemnity based on "London American's acts or omissions in obtaining coverage for [plaintiff ("TGS")] [that] subjected FG to liability and damages." *Id.* at *6. But, FG admitted that it was "'***forced to spend $5 million in settlement with TGS because of London America's actions, including both misrepresentations and omission***.'" *Id.* at *7 (emphasis added).

Ultimately, the court held that FG's claims were for contribution and "FG [could not] recast its contribution claim by artful pleading to avoid claim preclusion under Chapter 33 of the Texas Civil Practice and Remedies Code and *Jinkins* [because] … FG's negligence, misrepresentation, and [insurance] claims **[were actually] contribution claims barred by FG's settlement with TGS**." *Id.* (emphasis added); *see also Int'l Proteins Corp. v. Ralston-Purina Co.*, 744 S.W.2d 932, 934 (Tex. 1988) (holding that, as a matter of public policy, a settling joint tortfeasor could not avoid *Jinkins* by "choos[ing] to define its right to reimbursement under the settlement agreement as a right of direct action rather than a right of contribution"); *Walden v. Jeffery*, 907 S.W.2d 446, 447 (Tex. 1995) (finding that a plaintiff could not "simply recast her negligence claim as a DTPA claim" to avoid a statutory bar prohibiting negligence claims against a medical professional); *Viviano v. Moore*, 899 S.W.2d 326, 327 (Tex. App.—Houston [14th Dist.] 1995, writ denied) (citing *Walden* and finding "***The supreme court has recently reiterated that a plaintiff cannot simply recast a claim in order to avoid having a cause of action statutorily barred*** … [and plaintiff] attempted to recast his complaint to avoid the immunity provisions of the Family Code.") (emphasis added).

*Ralston, Walden,* and *FG Holdings* are dispositive. A plaintiff can't disguise a contribution claim with different labels to escape Chapter 33, which prohibits settling tortfeasors from seeking contribution from non-settling alleged joint tortfeasors. This is exactly what Plaintiff attempts to do here by seeking to recover the $129 million **Alliance settled** with LifeScan and Roche through allegations that Baker's alleged conduct somehow establishes claims distinct from Plaintiff's contribution claim. *See* Compl., ¶¶ 291,[26] 307.[27]

As in *FG Holdings*, Plaintiff's purported negligence and aiding and abetting breach of fiduciary duty claims are simply contribution claims pled under different labels. *See e.g. FG Holdings*, 2007 WL 4341408, at *7 (FG admitted it was "'forced to spend $5 million **in settlement** with TGS because of London America's actions, including both misrepresentations and omission.'") (emphasis added). Thus, Counts I-III are barred as a matter of law because a settling tortfeasor can't recover from an alleged non-settling tortfeasor and the claims must be dismissed under FED. R. CIV. P. 12(b)(6) and FED. R. BANKR. P. 7012.

As a matter of controlling Texas law, Alliance's settled Claim Stipulations bar Plaintiff's contribution claims – under any label – and  all such claims should be dismissed under FED. R. CIV. P. 12(b)(6) and FED. R. BANKR. P. 7012. *See e.g. Vuono*, 2008 WL 3539769, at *5 ("given that established Texas law prohibits a settling tortfeasor from prosecuting a claim for contribution from a non-settling tortfeasor, [plaintiff's] claims against [defendant] are hereby DISMISSED WITH PREJUDICE, and [defendant's] Motion to Dismiss Plaintiff's First Amended Complaint under … [Rule] 12(b)(6) is hereby GRANTED."). [28]

---

[26] "The continuing failure of Baker to exercise the skill and knowledge demanded of them by law directly, proximately, and foreseeably caused the injuries complained of herein."

[27] "Baker's foregoing acts and omissions are the direct and proximate cause of damages to Alliance."

[28] In *Today's Destiny, Inc*., 388 B.R. 737, 750-51 (Bankr. S.D. Tex. 2008) (Isgur, J.) this Court held that the chapter 7 trustee's claim for contribution survived a motion to dismiss under Rule 12(b)(6), based on

---

C.   **Texas Law Prohibits a Joint Tortfeasor (Alliance) from Taking an Assignment of a Cause of Action from Plaintiffs (Manufacturers) Whose Injury the Tortfeasor (Alliance) Admits it Caused, then Prosecute that Side-Switching Claim Against an Alleged Joint Tortfeasor (Baker).**

Plaintiff asserts four causes of action – Count VI (Aiding and Abetting Negligent and/or Fraudulent Misrepresentation), Count VII (Fraud), Count VIII (Conspiracy to Violate Federal RICO) and Count IX (Violation of Federal RICO) – as the purported assignee from the Manufacturers under assignments governed by Texas law. *See* Facts, ¶¶ 1 n.2, 16-17; Compl., ¶ 5.

But, Plaintiff (standing in the dirty shoes of an admitted tortfeasor) ***can't*** assert these assigned claims against Baker as a matter of Texas law, and any such assignment or assertion is invalid.[29] Under *Ralston*, the purported assignment is invalid because "***it is contrary to public policy to permit a joint tortfeasor the right to purchase a cause of action from a plaintiff to whose injury the tortfeasor contributed***." *See Ralston-Purina Co.*, 744 S.W.2d at 934 (emphasis added); *see also State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 710 (Tex. 1996) (citing *Ralston* and stating "we held that a tortfeasor cannot take an assignment of a plaintiff's claim as part of a settlement agreement with the plaintiff and prosecute that claim against a joint tortfeasor."); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Am. Eurocopter Corp.*, 692 F.3d 405, 409 (5th Cir. 2012) (affirming dismissal of plaintiff's contribution claim and quoting *Ralston* which "reflects Texas's public policy against 'permit[ting] a joint tortfeasor the right to purchase

---

allegations that certain lenders aided and abetted the debtor's purported fraud. Although some aspects of *Today's Destiny* are similar – Plaintiff trustee seeking contribution from an alleged joint tortfeasor in an adversary proceeding – the correct outcome is different because (unlike here) Today's Destiny **had not settled** the proofs of claim underlying the trustee's contribution allegations. That distinction is critical, as Judge Hanen found in the *Vuono* case.

[29] An assignment of a claim is invalid if it violates the law of the state whose law governs the assignment itself.  *Nicolls Pointing Coulson, Ltd. v. Transportation Underwriters of Louisiana, Inc*., 777 F. Supp. 493, 496 (E.D. La. 1991) ("There is no federal law of assignments, and the Fifth Circuit has held that the validity of a particular assignment of a federal cause of action is governed by the state law that the appropriate conflict of laws principles dictate should control the contract.").  Here, Texas law governs the assignment. *See* Facts, ¶¶ 1 n.2, 16-17.

a cause of action from a plaintiff to whose injury the tortfeasor contributed.'"); *see also PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 82, 89 (Tex. 2004) ("we find the personal and punitive aspects of DTPA claims cannot be squared with a rule allowing them to be assigned as if they were mere property;" explaining that there is a 'personal' aspect in being 'duped' that does not pass to subsequent buyers the way a warranty does").[30]

Texas law further prohibits side-switching assignments that encourage parties to take "positions that appeared contrary to their natural interest for no other reason than to obtain a judgment" against a third-party because it "tend[s] to increase and distort litigation[;]" determining a tortfeasor's true liability is unfairly made "even more difficult when [the tortfeasor's] opposing position must be reconstructed and its merits assessed without [the tortfeasor's] cooperation." *Gandy*, 925 S.W.2d at 707, 711-714, citing *In Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 317-18 (Tex. App.—San Antonio 1994, writ ref'd) (prohibiting assignment of attorney malpractice claims because of their use as a "transparent device to replace a judgment-proof, uninsured defendant with a solvent defendant" causing an "abrupt and shameless shift of positions"). Plaintiff-tortfeasor is not only disincentivized to defend herself as in *Gandy*, but actively incentivized to assert that Alliance caused maximum damage.

Here, Plaintiff (a joint tortfeasor) improperly purchased (through settlement and assignment) the Manufacturers' purported causes of action and now, Plaintiff as side-switching assignee, seeks to prosecute those causes of action against Baker (an alleged joint tortfeasor) which is expressly prohibited under *Ralston* and other authorities. Specifically:

- Plaintiff (as a purported assignee) is asserting indirect claims against Baker that the Manufacturers claim they would have had against Baker;

---

[30] The assignment also violates fundamental Texas principles of attorney immunity, discussed below in Section IV. B.

- Plaintiff purchased these claims through settlement and stipulation with the Manufacturers. *See* Facts, ¶ 16-17; and

- Alliance admittedly caused – not merely contributed to – the Manufacturers' alleged injuries as supported by Plaintiff's express allegations that Alliance acted as a joint tortfeasor bringing about the complained of harm with the assistance of Baker. *See, e.g.* Compl., ¶¶ 327,[31] 337,[32] 358,[33] 376.[34]

Moreover, Plaintiff's "abrupt and shameless shift of positions" and repeated admission of wrongdoing to support a position that now appears profitable is directly prohibited under *Zuniga* and *Gandy*.

Thus, Plaintiff can't take assignments of the causes of action from the allegedly injured Manufacturers whose purported damages Plaintiff admits Alliance caused, and then switch sides to assert those claims against Baker. *See e.g. Chemetron Corp. v. Syngas Co.*, No. B14-90-00389-CV, 1991 WL 22391, at *5 (Tex. App.—Houston [14th Dist.] Feb. 21, 1991, writ denied) (finding plaintiff could not maintain claims assigned to it by an injured party because the plaintiff purchased the claims through settlement and contributed to the injury it now sought to redress.); *BDO Seidman, LLP v. Bracewell & Patterson, LLP*, No. 05-02-00636-CV, 2003 WL 124829, at *5 (Tex. App.—Dallas Jan. 16, 2003, pet. denied) (finding Texas law prohibited a joint tortfeasor from

---

[31] "The Former Officers of Alliance, along with the other Scheme Participants (collectively, the "Remaining Scheme Participants"), misrepresented to pharmacy plans that they were selling retail strips when in fact they were selling NFR strips."

[32] "The Former Officers and the Remaining Scheme Participants knowingly and intentionally made and caused to be made false insurance reimbursement claims to insurance companies."

[33] "The Scheme Participants, on multiple occasions, and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be sent and delivered across state lines by commercial interstate carrier shipments of products that were represented to be Test Strip Manufacturers' retail strips but in fact were different products."

[34] "The Scheme Participants, on multiple occasions and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of the federal wire fraud statute, 18 U.S.C. § 1343."

maintaining claims against the Bracewell law firm that the tortfeasor received by assignment as part of a settlement with a plaintiff in an underlying suit).

The purported assignments of the Manufacturers' claims to Plaintiff were invalid under the assignments' governing Texas law, and each allegedly assigned claim must be dismissed.

## II.   PLAINTIFF'S RELEASE OF BAKER ATTORNEY LEE ROSEBUSH AND HIS "PARTNERS" WHO COMPRISE BAKER & HOSTETLER LLP ALSO RELEASED BAKER.

On June 27, 2019, Plaintiff's current counsel filed a motion on behalf of a predecessor trustee, Ronald L. Glass, for an order approving a Settlement Agreement.  *See* Facts, ¶ 15; Ex. 9, APP. PP. 147-215. This Court entered an order approving the Settlement Agreement on August 5, 2019.  *See id.*; Ex. 16, APP. P. 409-13.

The Settlement Agreement, governed by Texas law, releases the "Settling Insureds" – which includes Baker attorney Lee Rosebush and his "partners"[35] who comprise Baker & Hostetler LLP – from "any and all claims … or causes of action of any kind, both known and unknown, held by the Trustee … relating to any act or omission by any Settling Insured … or in any way relating to the Debtors, the Debtors' estates…" and bars all claims "that the Trustee ever had or may now or ***hereafter own***[.]"  *See* Ex. 9, APP. PP. 200-01; Settlement Agreement, ¶ 3.

---

[35] Paragraph 13 provides that the Settlement Agreement "inure[s] to the benefit of the Parties and their … employees, ***partners*** …" and others (emphases added).  Paragraph 14 provides that the Settlement Agreement "shall be governed by, and construed and enforced in accordance with the laws of the State of Texas, without regard to its conflict of law principles."  *See* Dkt. 1151. Texas law does not require that Baker be identified by name in the release, only that "a stranger to the agreement could readily understand and recognize the release intended to include [Rosebush's partners]." *See Kalyanaram v. Burck*, 225 S.W.3d 291, 300 (Tex. App.—El Paso 2006, no pet.) (finding reference to "employees" of a company named in the release "sufficiently descriptive" to release the individual employees); *Fritts v. McDowell*, No. 02-16-00373-CV, 2017 WL 3821889, at *5 (Tex. App.—Fort Worth Aug. 31, 2017, pet. denied) (a release's reference to a company's agents was "sufficiently descriptive [] to allow a stranger to readily identify [defendant] as a released party … as a matter of law."). Lee Rosebush's "partners" can only mean Baker which is sufficiently identified as a released party in the Settlement Agreement. *See id.*, at *5 ("[U]nless the [release] shows the parties used a term in a technical or different sense, the terms are given their plain, ordinary, and generally accepted meaning").

The Settlement Agreement thus releases Rosebush and Baker & Hostetler LLP not only from:

> all clams … or causes of action of any kind, both known and unknown, held by the Trustee … relating to any act or omission by any Settling Insured [Rosebush and his partners] … or in any way relating to the Debtor

but also extends to claims the Trustee may "hereafter" own – including those through the later purported side-switching assignments from the Manufacturers. *See* Ex. 9, APP. PP. 200-01; Settlement Agreement, ¶ 3; *See Kern v. Sitel Corp.*, 517 F.3d 306, 309 (5th Cir. 2008) ("Under Texas law, '[i]f the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law.'") (internal citation omitted).

## III.   PLAINTIFF'S DIRECT ALLIANCE "CLAIMS" FAIL AS A MATTER OF LAW AND MUST BE DISMISSED.

### A.   All Claims Based on Alleged Duties or Damage to "Alliance" Entities Other than the Only Five Alleged "Client Debtors" on Whose Behalf Plaintiff Sues Fail for Lack of Privity and Causation.

Although Plaintiff seeks to recover the same $129 million in purported damages the Manufacturers allege were caused by various Alliance-related entities, Plaintiff cannot recover damages for any of the "Alliance" entities that Plaintiff admits Baker did not represent before the bankruptcy. Baker didn't owe a duty and can't be liable to any of the over 60 Alliance entities that Baker *is not alleged to have* represented before the bankruptcy[36] because it "is well settled that an attorney does not owe a professional duty of care to third parties who are damaged by the attorney's negligent representation of a client." *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex.

---

[36] *See* Facts, ¶ 1 (Plaintiff only identifies five Alliance entities (the Alleged "Client Debtors") as Baker's clients).

2015); *Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex. 1996) (Under the common-law "privity barrier," "an attorney owes a duty of care only to his or her client.").

Plaintiff does not plead that any of the "Alliance" entities other than the five Alleged Client Debtors were Baker's pre-petition clients. Yet, Plaintiff inconsistently pleads that Baker's allegedly negligent conduct caused *Alliance* (without specifying which entity) to suffer approximately $129 million in damages. *See* Compl., ¶¶ 289, 303. As a matter of law, Plaintiff can't recover damages from Baker on behalf of any Alliance-related entities other than the five Alleged Client Debtors. Thus, any claims on behalf of other Alliance entities must be dismissed.

## B.    Plaintiff's Direct "Alliance" Claims Fail as a Matter of Law for Lack of Causation.

Plaintiff hasn't (and can't) pled allegations meeting the mandatory elements needed to establish proximate cause. Proximate cause requires both cause-in-fact and foreseeability. Cause in fact requires: (1) that the negligence was "a substantial factor in bringing about the harm", (2) "'but for' [which], the harm would not have occurred." *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016); *Rogers v. Zanetti*, 518 S.W.3d 394, 403 (Tex. 2017) ("our cause-in-fact standard requires not only that the act or omission be a substantial factor but also that it be a but-for cause of the injury or occurrence"). A mere showing that the negligence created the condition making the harm possible is insufficient to prove it was a substantial factor in causing the harm. *Neubaum*, 494 S.W.3d at 97. Foreseeability requires that "a person of ordinary intelligence should have anticipated the danger" created by the negligence. *Id.*

Plaintiff can't plead that Baker proximately caused Alliance any injury because: (a) as a self-confessed fraudster, Alliance (not Baker) was the sole proximate cause of its own harm; (b) the Complaint's allegations and public record make clear that Alliance knew it was committing fraud (including on advice from its in-house general counsel and outside law firms – *see* Facts,

¶¶ 9-10, 19, 24-26) long before Baker became involved; and (c) regardless, Alliance has failed to plead that it would have **followed** Baker's advice thus destroying causation. Count I (negligence) and Count II (aiding and abetting breach of fiduciary duty) must be dismissed because each claim requires Plaintiff to establish that Baker proximately caused Alliance's alleged harm, which Plaintiff has not plausibly pled.[37]

> (1) Because Alliance is a self-confessed fraudster, Plaintiff's direct claims are barred under causation-negating doctrines and case law including *Peeler*, *Rogers*, and *Rothrock.*

As an admitted fraudster, Plaintiff (standing in Alliance's dirty shoes) can't recover from Baker because, under well-established law, *a plaintiff cannot establish causation where the complained of damages were caused by its own intentional misconduct*. *See, e.g., Rothrock v. Akin, Gump, Hauer & Feld*, No. 05-94-01965-CV, 1996 WL 179439, at *6 (Tex. App.—Dallas Apr. 16, 1996, writ denied) (finding that the debtor's alleged damages "were caused by [his] own actions: his intentionally fraudulent conversion of non-exempt assets into exempt [assets] … [and] any advice given by [the law firm] Akin Gump, negligent or otherwise, [was] immaterial because Akin Gump's advice did not lead to the [complained of harm]."); *see also Rogers*, 518 S.W.3d at 403-04 (finding that the plaintiff's fraudulent acts before the attorneys' alleged negligence rendered the "malpractice allegation causally irrelevant").

---

[37] *See Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex. 1995) ("to recover on a claim of legal malpractice, a plaintiff must prove that (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the **breach proximately caused the plaintiff's injuries**, and (4) damages occurred.") (emphasis added). Baker contests the application of Delaware law for Plaintiff's fiduciary duty claim (*see* Compl., ¶ 294 "This is a claim under Delaware statutory and common law") but, in any event, Plaintiff must establish that Baker proximately caused Alliance harm to prevail on this claim under Delaware law. *See In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447519, at *9 (Bankr. D. Del. Sept. 16, 2019) (granting defendants motion to dismiss under 12(b)(6) for aiding and abetting breach of fiduciary duty claim and stating "[t]here are four elements necessary to establish a claim for aiding and abetting a breach of fiduciary duty claim [including] … damages proximately caused by the breach.") (internal quotations and citation omitted).

Here, like the plaintiffs in *Rothrock* and *Rogers*, Plaintiff cannot escape Alliance's admitted knowledge about the illegality of the self-confessed "Questionable Business Practices" and that Alliance's Board already knew everything Plaintiff says Baker should have advised and Alliance in fact had received "repeated and explicit warnings" that its conduct harmed manufacturers. *See* Facts, ¶¶ 9-10, 19, 24-26. Alliance perpetuated and knew the "Questionable Business Practices" were fraudulent **years before** Baker's alleged involvement. *See id.*, *see also* Compl., ¶ 128.[38] Ultimately, Alliance admits committing the fraud that proximately caused its own alleged damages. *See, e.g.*, Compl., ¶¶ 311, 327. Thus, as a matter of law under *Rothrock* and *Rogers*, Plaintiff cannot establish that Baker was the proximate cause of Alliance's alleged injuries.

Further, Alliance admits committing wire fraud in violation of 18 U.S.C. § 1343 (Compl., ¶¶ 359, 376) which destroys proximate causation, and under public policy, prevents Plaintiff from recovering from Baker for the consequences of Alliance's admitted crimes. In *Peeler v. Hughes & Luce*, the Texas Supreme Court held that Peeler, who admitted to committing federal crimes, was barred from maintaining her negligence claim against her attorneys because "as a matter of law, it is the illegal conduct [of Peeler] ***rather than the negligence of [Peeler's] counsel that is the cause in fact*** of any injuries flowing from the conviction." 909 S.W.2d 494, 495, 498 (Tex. 1995). The "opportunity to shift much, if not all, of the punishment assessed against convicts for their criminal acts to their former attorneys, drastically diminishes the consequences of the convicts' criminal conduct and seriously undermines our system of criminal justice." *Id.* at 498. "[A]t no time, [did Peeler] even assert[] that she did not commit the acts which formed the basis of the matters

---

[38] "One of the foundational 'disciplines' of Alliance was 'Productive Paranoia.' A ***May 9, 2012*** slide presentation to Alliance's Board of Directors described 'productive paranoia' as 'The Company's plan for 'protecting the golden goose.'" As the source of over 90% of Alliance's revenue, the 'golden goose' was the improper adjudication of NFR strips as retail strips.'" Baker did not begin representing an Alliance entity until November 2014 and even that was on an unrelated issue. Facts, ¶ 19.

charged. To the contrary, she conceded in her deposition that she committed many of the acts for which she was indicted, but not prosecuted because of the deal she struck." *Id.*  Thus, Peeler's claims for negligence against Hughes & Luce failed because "her illegal acts remain[ed] the sole proximate and producing causes of her indictment and conviction as a matter of law." *Id.*

Like Peeler, Alliance admits that it committed federal crimes by repeatedly violating the federal wire fraud statute, 18 U.S.C. § 1343, a violation subject to criminal prosecution.[39] Compl., ¶¶ 359, 376. Plaintiff ignores "the public policy principle at issue that [Alliance, which admitted to wrongdoing] may not shift the consequences of [its] crime to a third party [Baker]."  *Peeler*, 909 S.W.2d at 494. Thus, Plaintiff (standing in Alliance's dirty shoes) is prevented from shifting the consequences of its wrongdoing to Baker.

Similarly, "[u]nder the unlawful acts rule, [Alliance] cannot recover for [its] claimed injury [because], at the time of the injury, [Alliance] was engaged in the illegal act." *Sharpe v. Turley*, 191 S.W.3d 362, 366 (Tex. App.—Dallas 2006, pet. denied) (finding plaintiff's fraud claim against his law firm was barred under the unlawful acts rule ***because the claim was based on plaintiff's own unlawful act of stealing***) (emphasis added).[40]

This rule "prevents a plaintiff from recovering claimed damages that arise out of his or her own illegal conduct." *Id.* (citing *Saks v. Sawtelle, Goode, Davidson & Troilo*, 880 S.W.2d 466, 467 (Tex. App.—San Antonio 1994, writ denied) (because legal malpractice plaintiffs' damages

---

[39] *See e.g. United States v. Scully,* 951 F.3d 656, 670 (5th Cir. 2020), cert. denied, 208 L. Ed. 2d 79, 141 S. Ct. 344 (2020) (finding the government provided sufficient evidence to convict defendant for wire fraud and conspiracy to commit wire fraud).

[40] In *Dugger*, the Texas Supreme Court held that "the common law unlawful acts doctrine is not available as an affirmative defense ***in personal injury and wrongful death cases*** …. [because] it was abrogated by Chapter 33's proportionate responsibility scheme." *Dugger v. Arredondo*, 408 S.W.3d 825, 836 (Tex. 2013) (emphasis added). But, the court recognized that several Texas courts have extended the reasoning set forth in the wrongful acts doctrine to bar negligence claims against attorneys, and expressly "limit[ed] the holding in [*Dugger*] to personal injury and wrongful death cases." *Id.* at 33.

"were suffered by reason of their own illegal conduct, recovery is barred as a matter of law for reasons of public policy.")). Although there was no underlying criminal conviction, the *Sharpe* court held that, whenever a plaintiff has engaged in an "illegal act [that] is inextricably intertwined with the claim and the alleged damages would not have occurred but for the illegal act, the plaintiff is not entitled to recover as a matter of law." *Id.* at 366.

Alliance's unlawful acts here (confessed participation in a fraudulent scheme – *see, e.g.,* Compl., ¶¶ 311, 327, are "inextricably intertwined" with the alleged damages (the aggregate amount of the Claim Stipulations). *See* Compl., ¶¶ 289, 303, 311 (alleging that Alliance suffered damages in the amount of the settled Claim Stipulations). Moreover, Plaintiff admits that Alliance, through the Scheme Participants, acted knowingly and willfully in perpetuating fraud. *See e.g.* ¶ 344 ("The Former Officers and the Remaining Scheme Participants ***had actual knowledge of***, and substantially assisted in, ***the fraudulent scheme*** to sell NFR strips to pharmacy beneficiaries and obtain insurance reimbursements for fraudulent claims.") (emphasis added). The policy of preventing a plaintiff from recovering for her own unlawful acts "particularly applies when the plaintiff commits the illegal act knowingly and willfully." *Andrew Shebay & Co., P.L.L.C. v. Bishop*, 429 S.W.3d 644, 649 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

Plaintiff (standing in the dirty shoes of an admitted fraudster) can't plead the facts necessary to plausibly allege that Baker proximately caused Alliance's complained of harm because the foregoing no-causation doctrines prevent a plaintiff who engaged in fraud from recovering from a third party for those very acts.

> (2)   The Complaint fails to plausibly allege that Baker was the "but for" cause of Alliance's self-inflicted alleged harm.

Plaintiff also hasn't (and can't) plausibly alleged that Baker was the "but for" cause of Alliance's alleged harm because: (a) Plaintiff admits that Alliance engaged in and was aware of

the purported "Questionable Business Practices" as early as 2010 – *four years before* Baker's involvement (Facts, ¶ 7); (b) public records indicate that Brown advised Alliance its scheme was illegal *years before* Baker's retention, yet Alliance continued its scheme (Facts, ¶¶ 19, 24-26); (c) there is no plausible allegation that Alliance would have followed Baker's or any other law firm's advice to discontinue the scheme; and (d) Alliance's actions make clear that Alliance would not have followed any advice to cease its wrongful conduct – thus destroying causation as a matter of law.

"[Alliance] knew [it was] committing – indeed, fully intended to commit – fraud, [so] it is not apparent how [Baker's alleged] failure to tell [Alliance] what [it] already knew could be a negligent breach of a lawyer's duty to the client." *Reneker v. Offill*, No. CIV.A.3:08-CV-1394-D, 2009 WL 3365616, at *5 (N.D. Tex. Oct. 20, 2009) (dismissing plaintiff's negligence claim against a law firm under Rule 12(b)(6) because "[t]he amended complaint fail[ed] to plead sufficient facts to support a claim that [the law firm's] alleged failure to notify the [plaintiffs] of their activities proximately caused their damages."). *Id.* at *6; *see also Taylor v. Scheef & Stone, LLP*, No. 3:19-CV-2602-D, 2020 WL 4432848, at *5 (N.D. Tex. July 31, 2020) (dismissing negligence claim against a law firm under Rule 12(b)(6) because "even if the court assumes *arguendo* that [the law firm's] conduct and advice constituted a 'conceivable breach' of its duties to the [clients], [the clients' receiver] has failed to plead a plausible right to relief because he has not alleged that the [clients] were *unaware of the illegality of their actions* or that the [clients] *would have heeded competent advice*.") (emphasis added).[41]

---

[41] "Breach of the standard of care and causation are separate inquiries . . . and an abundance of evidence as to one cannot substitute for a deficiency of evidence as to the other." *Alexander v. Turtur & Associates, Inc.*, 146 S.W.3d 113, 119 (Tex. 2004).

*Reneker* and *Taylor* stand for a straightforward proposition which is dispositive here: a plaintiff fails to plead facts necessary to support an allegation that a law firm defendant's actions were the substantial factor and "but for" cause of plaintiff's alleged damages when the plaintiff can't plausibly plead that the client would have heeded the lawyer's advice. *Id.*; *see also Smith v. O'Donnell*, 288 S.W.3d 417, 422 (Tex. 2009) (If a client "would have ignored [the attorney's] advice no matter how competently provided, the malpractice claim will fail for lack of proximate causation").

Baker can't plausibly be the "but for" cause of Alliance's purported damages because the Complaint and public record show Alliance was aware of and fully intended to engage in the "Questionable Business Practices," ***regardless of Baker's advice***, as established by:

- Alliance's failure to heed earlier advice from Brown and Bennett regarding the illegality of the Questionable Business Practices well before Baker's involvement (Facts, ¶¶ 8, 24-26); and

- Alliance's continued engagement in "Questionable Business Practices," despite repeated warnings that such practices harmed manufacturers and were illegal (Facts, ¶¶ 9, 19, 24-26).

Accordingly, Plaintiff has failed to adequately plead causation and can't overcome Alliance's admitted knowledge of committing fraud for years after learning that the "Questionable Business Practices" were unlawful. Dismissal under FED. R. CIV. P. 12(b)(6) and FED. R. BANKR. P. 7012 is appropriate.

IV.   PLAINTIFF'S PURCHASED, SETTLED, AND ASSIGNED SIDE-SWITCHING "CLAIMS" ON BEHALF OF THE MANUFACTURERS FAIL AS A MATTER OF LAW AND MUST BE DISMISSED.

A.   **Plaintiff's Purportedly Assigned Claims Have Never Been Tolled and Thus are Time-Barred.**

(1)   The Tolling Agreements at most, only tolled the estates' claims and did not apply to the Manufacturers' purportedly assigned claims.

Plaintiff asserts that Baker entered a tolling agreement on March 28, 2019 that extended the time for Plaintiff to file suit (through multiple amendments) (collectively, the "Tolling Agreements") until September 30, 2022. Compl., ¶ 258. But, the plain language of the Tolling Agreements shows that the agreements at most, only tolled estate claims that the original chapter 11 trustee may have owned.

Ronald L. Glass, the chapter 11 trustee for Alliance (***not Plaintiff or her predecessor***) entered a tolling agreement with Baker on March 28, 2019 (the "Initial Tolling Agreement") attempting to toll only the ***chapter 11 trustee's*** potential estate claims against Baker, "including potential claims for breach of fiduciary duty, professional negligence and other claims and relief against the Debtors' professionals and other third parties, including BAKER (collectively, the defined "Claims")." EX. 7, APP. PP. 98-101; Initial Tolling Agreement.

The Initial Tolling Agreement purportedly tolled "All Claims by [only] the [chapter 11] TRUSTEE against BAKER" through September 27, 2019. *Id.*[42] The Initial Tolling Agreement (and September 11 and November 22, 2019 amendments) indisputably ***did not*** include, apply to, or ***even mention*** any of the Manufacturers' purportedly assigned claims (including Counts VI-IX).

---

[42] Plaintiff's predecessor (Mark Shapiro as Liquidating Trustee) entered written amendments to the Initial Tolling Agreement with Baker on September 11, 2019 (extending the September 27, 2019 deadline to November 30, 2019) (EX. 17, APP. PP. 414-16) and November 22, 2019 (extending deadline to June 30, 2020) (EX. 21, APP. PP. 545-47); Compl., ¶ 258.

On June 14, 2020 Plaintiff's predecessor (Mark Shapiro) entered another amendment to the Tolling Agreements purportedly as "assignee of the claims of [the Manufacturers] pursuant to that certain Stipulation by and between [the Manufacturers] and [Plaintiff] (A) Resolving Assertion of Privilege by Trustee and (B) Further Amending Liquidating Trust Agreement [Main Case ECF No. 1395]." *See* EX. 24, APP. P. 638-40.

But the purported assignment did not take effect (if at all) until ***six days later*** upon this Court's Order entered June 20, 2020.[43]  Thus, the June 14, 2020 amendment ***didn't mention, didn't include – and didn't toll – any of the assigned claims*** (Counts VI-IX) because:

- The amendment (like the previous amendments) at most ***only tolled the chapter 11 trustee's estate claims against Baker***, which did not encompass or mention any purported assignments of claims to Plaintiff from any third-party, including the Manufacturers;

- Importantly, the amendments did not modify the definition of "Claims" covered in the Initial Tolling Agreement and expressly stated that "***all other terms and conditions of the Initial Tolling Agreement shall remain in full force and effect***." (emphasis added) EXS. 7, 17, 21 & 24, APP. PP. 98-101, 416, 547, 640; and

- Indeed, none of the Tolling Agreements even mentions the Manufacturers' purportedly assigned claims and can't silently encompass them.

Thus, the June 14, 2020 amendment at most extended the tolling deadline only for the chapter 11 trustee's defined original estate "Claims" (which did not encompass any assigned non-estate claims) and did not apply to or have any effect on the Manufacturers' later, purportedly assigned claims.

Plaintiff subsequently entered three further amendments (December 15, 2020, February 22, 2022, and May 3, 2022 (EXS. 26, 29 & 30, APP. PP. 645, 819, 822)) as the purported assignee of

---

[43] "By written stipulation and agreement approved by the Order of this Court ***dated June 20, 2020*** [Doc No. 1403], the Test Strip Manufacturers assigned and conveyed to the Liquidating Trustee all of their potential claims against Baker." Compl., ¶ 5, n. 2.

the Manufacturers' non-estate claims, ultimately extending the tolling deadline to September 30, 2022. But all of those amendments expressly incorporated the Initial Tolling Agreement and *only tolled the chapter 11 trustee's original estate Claims* (as defined in the Initial Tolling Agreement) which indisputably did not include the Manufacturers' purportedly assigned claims.

Each of the amendments to the Initial Tolling Agreement expressly covered only the *chapter 11 trustee's original estate claims* as of March 28, 2019 – more than one year before Plaintiff received the purported assignments of the Manufacturers' non-estate claims – and stated that "*all other terms and conditions of the Initial Tolling Agreement shall remain in full force and effect*." EXS. 26, 29, & 30, APP. PP. 646, 820, 823. Thus, the Tolling Agreements never tolled the Manufacturers' purportedly assigned claims as a matter of law. *See Kern v. Sitel Corp.*, 517 F.3d 306, 309 (5th Cir. 2008) ("Under Texas law, '[i]f the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law.'") (internal citation omitted).

Because the Tolling Agreements did not cover any assigned claims (including Counts VI-IX) – and never even mention the Manufacturers' purportedly assigned claims – Plaintiff never tolled the Manufacturers' claims before filing this suit on September 26, 2022.

            (2)    <u>The Manufacturers' purportedly assigned claims are facially time-barred based on admissions and facts of which this Court can take notice.</u>

LifeScan indisputably was aware of the alleged "Questionable Business Practices" *in 2014* because LifeScan (then owned by Johnson & Johnson) claimed in a draft lawsuit that "*[i]n April 2014* … a pharmacist … informed representatives of LifeScan that [an Alliance affiliated pharmacy] was distributing LifeScan product intended for [NFR patients] to [Retail patients]." *See* Facts, ¶ 10; EX. 3, APP. P. 37 (LifeScan draft lawsuit, ¶ 69 (emphasis added)).

Moreover, Plaintiff admits that both Manufacturers were aware of the alleged "Questionable Business Practices" **as early as 2015**. *See* Facts, ¶ 9. Specifically, Plaintiff alleged in the Bennet Tueller Complaint that "starting in 2015 … LifeScan and Roche, complained about [the "Questionable Business Practices"], and independently made multiple written demands on Alliance and its Affiliates for payment of damages and other relief." *Id.*; EX. 22, APP. P. 555, ¶ 28.

Plaintiff's negligent misrepresentation claim (Count VI) is subject to a **two year** statute of limitations and clearly was barred no later than 2017 because Plaintiff admits that the Manufacturers were aware of facts giving rise to the claim – and made written demands about it – no later than 2015. *See Kansa Reinsurance Co., Ltd. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1371 (5th Cir. 1994) (applying a two-year limitations period to negligent misrepresentation claim).[44]

Similarly, Plaintiff's RICO and fraud claims (Counts VII-IX) – subject to a four year limitations – have been barred since no later than 2019 based on each Manufacturer's admitted knowledge of the Alliance scheme no later than 2015. *Rogers v. McDorman*, 521 F.3d 381, 387 (5th Cir. 2008) ("[A]lthough civil RICO does not provide for a statute of limitations, the Supreme

---

[44] Bankruptcy courts "sit[] in federal question jurisdiction [pursuant to 28 U.S.C. § 1334] and not diversity jurisdiction." *Tow v. Rafizadeh (In re Cyrus II P'ship)*, 413 B.R. 609, 613 (Bankr. S.D. Tex. 2008) (Isgur, J.); *see also Reed v. Carecentic National, LLC (In re Soporex, Inc.)*, 446 B.R. 750, 761 (Bankr. N.D. Tex. 2011). When determining choice of law issues involving state law claims "bankruptcy courts also apply choice-of-law rules of the forum in which they sit over state-law claims that do not implicate federal policy." Plaintiff's common-law claims, including negligent misrepresentation, arise from state law and do not implicate federal policy. Texas choice of law rules thus require the application of Texas statutes of limitation regardless of which state substantive laws are ultimately found to govern the claims. *Mondrian Global Equity Fund, L.P. v. BP P.L.C. (In re BP P.L.C. Securities Litigation)*, 51 F. Supp. 3d 693, 697 (S.D. Tex. 2014); *see also In re Soporex, Inc.*, 446 B.R. at 761. "Texas generally treats statutes of limitations as procedural in nature for conflict-of-law purposes . . . . Similarly, under federal conflict of law principles, federal courts apply the applicable limitations period of the forum state." *In re Soporex, Inc.*, 446 B.R. at 761.

Court nevertheless held that civil RICO claims are subject to a four-year statute of limitations."); TEX. CIV. PRAC. & REM. CODE § 16.004 (four year statute of limitations for fraud claims).[45]

Finally, Plaintiff's attempt to circumvent limitations and preserve the Manufacturers' purported fraud claims under the discovery rule fails because, as explained above, the Manufacturers clearly were well aware of the purported scheme giving rise to their claims as early as 2015 (2014 in the case of LifeScan) and admit they knew such information no later than 2017. Plaintiff also admits that the Manufacturers had access to "communications demonstrating that Baker had advised Alliance regarding regulatory matters and PBM audits" in March 2018 but baldly assert that the documents did not "disclose the full nature of Baker's role in the fraud." Compl., ¶ 276. Moreover, it is undisputed that the Manufacturers were aware of Baker's role representing Alliance no later than May 2017 when Baker filed its application to serve as Debtors' counsel in the *Uplift* bankruptcy. *See* EX. 5, APP. P. 68 (Verified Statement of Elizabeth A. Green in Support of Debtors' Application to Employ Baker, ¶ 4 ("*As a result of its prepetition representation*, B&H possesses an in-depth knowledge of the Debtors' capital structure and has gained an understanding of the current condition of the Debtors' businesses and operations.") (emphasis added).

In making these admissions, Plaintiff ignores that "it is knowledge of the injury itself, not knowledge of every detail, fact, or element of a cause of action that starts the statute of limitation." *Mitts v. Sikorsky Aircraft Corp.*, No. CV H-10-5164, 2012 WL 12893657, at *3 (S.D. Tex. June

---

[45] Moreover, Plaintiff admits that the Manufacturers "discover[ed] [on] ***July 19, 2017***, that the Scheme Participants had made and caused to be made insurance claims falsely stating that the Alliance Pharmacies had sold the Test Strip Manufacturers' retail strips, when in fact they had sold NFR strips (the 'wrongful conduct'), thereby causing the Test Strip Manufacturers injuries." Compl., ¶ 262 (emphasis added). Thus, all of the Manufacturers' purported assigned claims ***were time barred on July 19, 2021 at the latest***, assuming (contrary to the pleaded facts showing the Manufacturers knew sooner) that the Manufacturers did not have knowledge of the facts giving rise to their purported claims until July 19, 2017.

26, 2012) (Hittner, J.). Even putting all of the earlier dates aside, Plaintiff cannot plausibly deny that the Manufacturers had information necessary to pursue any alleged fraud claim no later than March 2018 – still early enough to bar any such claim on the face of the pleadings.

The Manufacturers' purportedly assigned claims (Counts VI-IX) **never were tolled and are time-barred** because Plaintiff did not file suit (September 26, 2022) until well after the two year (negligent misrepresentation) and four year (fraud and RICO) statute of limitations had passed. The Manufacturers' purportedly assigned claims should be dismissed under Rule 12(b)(6) and Rule 7012.

**B.    Plaintiff's Alleged Misrepresentation and Fraud Claims On Behalf of Non-Client Manufacturers are Barred by Attorney Immunity.**

(1)    Attorneys are immune from suits and liability to non-clients for conduct while "part" of representing a client, even if that conduct allegedly was wrongful, fraudulent, or criminal.

Attorney immunity broadly protects attorneys from suits and civil liability to nonclients for conduct in which attorneys engage when representing a client – even if that conduct allegedly is wrongful,  fraudulent, or criminal – if the "complained-of actions were *part* of [the attorney's] responsibility to his clients, *even if done improperly*." *Youngkin v. Hines*, 546 S.W.3d 675, 682 (Tex. 2018) (emphasis added); *Ironshore Europe DAC v. Schiff Hardin, L.L.P.,* 912 F.3d 759, 764 (5th Cir. 2019), and cases cited therein.[46]

In *Ironshore*, the Fifth Circuit reviewed the district court's denial of the law firm's Rule 12(b)(6) motion to dismiss on the basis of attorney immunity (and other grounds) as an appealable

---

[46] As the Fifth Circuit held in *Ironshore*, "attorney immunity is properly characterized as a true immunity from suit, not as a defense to liability." 912 F.3d at 763.  A unanimous Fifth Circuit panel also has observed that attorney immunity is "an issue that is completely separate from the merits." *Troice v. Proskauer Rose, L.L.P.*, 816 F.3d 341, 345-46 (5th Cir. 2016).  Thus, immunity is properly raised in a motion to dismiss under Rule 12(b)(6).  *See LJH, Ltd. v. Jaffe*, No. 4:15-CV-639 2016 WL 3668170, *8 (E.D. Tex. July 11, 2016) (granting motion to dismiss under Rule 12(b)(6) in favor of law firm based on attorney immunity).

collateral order which the Fifth Circuit reversed and rendered, finding that the Schiff law firm was immune from suit by a non-client claiming it was damaged by Schiff's allegedly negligent misrepresentations.   As courts have held, "[t]he only facts required to support an attorney–immunity defense are the type of conduct at issue and the existence of an attorney–client relationship at the time" the attorney engaged in the conduct.   *Youngkin*, 546 S.W.3d at 683; *Ironshore*, 912 F.3d at 766.   Once those facts are established, the trial Court decides "the ***legal question*** of whether said conduct was within the scope of representation." *Youngkin* at 683 (emphasis added); *Ironshore* at 767.

Decisions from the Texas Supreme Court and the Fifth Circuit provide the following further guidelines which require dismissal of Counts VI and VII as a matter of law:

- How a plaintiff chooses to label its cause of action is irrelevant.   *Troice v. Proskauer Rose, L.L.P.*, 816 F.3d 341, 345 (5th Cir. 2016) ("merely labeling an attorney's conduct 'fraudulent' does not and should not remove it from the scope of client representation or render it 'foreign to the duties of an attorney' such that the attorney would not be immune.") (quoting *Cantey Hanger*, 467 S.W.3d at 484).   "That some of [the attorney's conduct] was allegedly wrongful, or that he allegedly carried out some of his responsibilities in a fraudulent manner, is no matter."  *Troice*, 816 F.3d at 348;

- Rather, "the dispositive question is whether the attorney's conduct was part of the discharge of his duties in representing a party in a lawsuit."  *LJH, Ltd. v. Jaffe*, No. 4:15-CV-639 2016 WL 3668170, *6 (E.D. Tex. July 11, 2016) (emphasis added); *Van Hauen v. Wells Fargo Bank, N.A.*, No. 4:12-CV-344, 2012 WL 4092590, at *1, *3 (E.D. Tex. Aug. 16, 2012) (Mazzant, Mag. J.) (recommending dismissal of defendant law firm under Rule 12(b)(6), because "conduct of providing legal oversight and assistance with the enforcement of security instruments in real property requires the professional training, skill, and expertise of an attorney" such that law firm was protected by attorney immunity), report and recommendation adopted by 2012 WL 4092516 (E.D. Tex. Sept. 17, 2012);

- Immunity focuses on the role the attorney was performing, not the alleged wrongfulness or even asserted criminality, of the attorney's conduct. *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651 at 657-58 (Tex. 2020); *Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018); *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477 at 481 & 485 (Tex. 2015);

- Indeed, in *Cantey Hanger*, the Texas Supreme Court held that even intentionally fraudulent omissions and misrepresentations are not actionable under attorney immunity. 467 S.W.3d at 481;

- In *Bethel*, the Texas Supreme Court rejected the request to create a "criminal conduct" exception to the attorney-immunity defense and applied the defense to litigation conduct alleged to be criminal in nature. 595 S.W.3d at 657; the Fifth Circuit likewise rejected a "criminal conduct" exception in *Troice*, 921 F.3d at 507;

- Claims for alleged conspiracy likewise are barred by attorney immunity. *U.S. Bank National Association v. Sheena*, 479 S.W.3d 475 (Tex. App.—Houston [14th Dist.] 2015, no pet.), (affirming dismissal of claims for fraud, negligence, tortious interference, conversion, and conspiracy based on attorney immunity); and

- Immunity applies to attorneys' conduct in both litigation and non-litigation contexts. "Today we confirm that attorney immunity applies to claims based on conduct outside the litigation context, so long as the conduct is the 'kind' of conduct we have described above." *Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 79 (Tex. 2021).

As the Fifth Circuit confirmed in *Troice*, "[a]ttorney immunity is intended to assure attorneys that they will not be 'liable for damages' full stop, not that they are protected from liability but only from opposing parties." 816 F.3d at 349 (citing *Kruegel v. Murphy*, 126 S.W. 343, 345 (Tex. Civ. App.—Dallas 1910, writ ref'd)); *see also Cantey Hanger*, 467 S.W.3d at 481 ("attorneys are immune from civil liability to non-clients 'for actions taken in connection with representing a client in litigation.'") (emphasis added) (quoting *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)). "The idea is to immunize conduct, not to protect attorneys only from certain potential plaintiffs." *Id*.

> (2) <u>Plaintiff – as purported assignee of non-client Manufacturers – complains about actions that Baker took as part of representing Alliance and thus Baker is immune from suit as a matter of law.</u>

Here, all – not just "part" – of Baker's conduct at issue was representing its client, Alliance, and is protected by attorney immunity as a matter of law. Specifically, in Count VI (aiding and abetting negligent and/or fraudulent misrepresentation) and Count VII (fraud), Plaintiff incorporates alleged facts from ¶¶ 1-285 of the Complaint, which complain about actions that

Baker allegedly took as part of representing Alliance; thus Baker is immune from suit as a matter of law. *See, e.g.*:

- The Complaint attaches over 650 pages of Baker's invoices for pre-petition services from November 17, 2014 until March 31, 2017 and several of Baker's invoices for services rendered preparing to file Alliance's bankruptcy;

- Compl., ¶ 4 ("When PBMs attempted to audit Alliance pharmacies, Baker negotiated with those entities and even submitted redacted and misleading invoices with the goal of convincing PBMs that Alliance pharmacies had dismissed the same retail test strips for which it had submitted insurance claims . . . .");[47]

- *Id*. at ¶ 119 (In communications with a PBM on behalf of Alliance, "Baker intentionally concealed from PBMs the intention for the independent pharmacies to be part of the Alliance network.");

- *Id*. at ¶ 135 ("In 2015 and 2016, Baker took a lead role in helping Alliance conceal its Questionable Business Practices by helping its pharmacies pass PBM audits . . . .");

- *Id*. at ¶ 139 ("Baker frequently attempted to block PBM audits into Alliance's business by arguing that PBMs were not entitled, under their contracts, to demand product tracing . . . .");

- *Id*. at ¶ 142 ("Baker argued that PBMs should accept the invoices that had been provided . . . ."); and

- *Id*. at ¶ 163 ("Lee Rosebush specifically asked Alliance employees to isolate invoices bearing the retail NDC for LifeScan product so that he could include those invoices in Baker's audit response on behalf of the Alliance pharmacies").

Counts VI and VII thus are barred as a matter of law by attorney immunity.

### C. Plaintiff's Alleged Misrepresentation and Fraud Claims Additionally Fail as a Matter of Law for Multiple Reasons.

#### (1) There is no such claim for "aiding and abetting" negligence or fraud.

Count VI (aiding and abetting negligent and/or fraudulent misrepresentation) and Count VII (to the extent Plaintiff asserts aiding and abetting fraud) fail on their face because the Fifth Circuit has held that "no such claim [for aiding and abetting] exists in Texas" and will not

---

[47] *See also* Compl., ¶ 141 (similar).

recognize such claim because "a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by state courts." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781-82 (5th Cir. 2018); *see also Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N. A.*, 800 Fed. Appx. 239, 250 (5th Cir. 2020) ("[W]e cannot recognize a claim that the Texas Supreme Court has yet to expressly adopt … [and] affirm the dismissal of the aiding and abetting claim.").

In fact, Baker is unaware of any Texas court upholding judgment for the plaintiff on a claim for aiding and abetting negligent and/or fraudulent misrepresentation. *See e.g. Garcia v. Vasilia*, No. CV H-17-1601, 2019 WL 4105559, at *10 (S.D. Tex. Aug. 29, 2019) (Miller, J.) (denying "plaintiffs' claim that MidCap aided and abetted Graebel in its fraud … because no such claim has been expressly recognized by the State of Texas").

> (2)  Attorneys (Baker) can't conspire with clients (Alliance) because agents and principals are not two or more persons needed for a conspiracy.

Plaintiff's allegation that Baker engaged in a conspiracy to commit to fraud (Count VII)[48] fails as a matter of law because an allegation that an attorney conspired with a client does not allege a conspiracy of two or more persons. *See Martinez-Bey v. Bank of Am., N.A.*, No. 3:12-CV-4986-G BH, 2013 U.S. Dist. LEXIS 85440, at **8-9 (N.D. Tex. June 18, 2013); RESTATEMENT (THIRD) OF TORTS § 27TD(d) (2018) ("To be held liable for participating in a conspiracy, the lawyer must be shown to have acted  . . . in a capacity other than as the client's counsel and

---

[48] "The elements of civil conspiracy are: (1) two or more people; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Shunta v. Westergren*, No. 01-08-00715-CV, 2010 WL 2307083, at *17-18 (Tex. App.—Houston [1st Dist.] June 10, 2010, no pet.). "A specific intent to agree to accomplish the unlawful purpose or to accomplish the lawful purpose by unlawful means is also required." *Boales v. Perry Homes, J.V.*, No. 14-98-00975-CV, 2000 WL 674922, at *6 (Tex. App.—Houston [14th Dist.] May 25, 2000, pet. denied).

representative."); 1 RONALD E. MALLEN, LEGAL MALPRACTICE § 6:10 (2022) ("Lawyers have been sued frequently for allegedly conspiring with their clients or others to commit a variety of wrongs.  The rule is that wrongs attributed to an attorney, as the client's agent, cannot support a conspiracy.") (footnotes omitted).

Indeed, cases rejecting attorney-client conspiracy claims exemplify a broader rule under Texas law that an agent cannot conspire with its principal.  *See Bradford v. Vento*, 48 S.W.3d 749, 761 (Tex. 2001) (recognizing that Bradford could not have conspired with two other defendant-entities (Simon and Golden Ring) because "Bradford was the agent of Simon and Golden Ring");[49] *see also Lyons v. Lindsey Morden Claims Mgmt.*, Inc., 985 S.W.2d 86, 92 (Tex. App.—El Paso 1998, no pet.) ("As a matter of law, the acts of an agent and its principal are the acts of a single entity and cannot constitute conspiracy."); 15A CORPUS JURIS SECUNDUM § 10 ("A conspiracy cannot exist between a principal and an agent").

(3)    Alleged "omissions" are not actionable misrepresentations.

Under Texas law, there is no cause of action for "negligent misrepresentation" that is based merely on omissions.  *Hopkins v. Green Dot Corporation*, No. 5:16-CV-365-DAE, 2016 WL 4468272, at *9 (W.D. Tex. Aug. 24, 2016):

> [T]here is *no Texas case law* supporting a misrepresentation claim based upon an omission. . . . [T]o the extent that [the plaintiff's] negligent misrepresentation claims are based upon [the defendant's] alleged failure to disclose certain information, these failures are *not active misrepresentations actionable* under the tort of negligent misrepresentation.

---

[49] In the Court of Appeals, the defendant-appellants successfully argued that "it is a rule of law that agents and their principals cannot conspire together."  *Bradford v. Vento*, 997 S.W.2d 713, 729 (Tex. App.—Corpus Christi 1999).  Specifically, they argued that the parties' unanimous concession "that Bradford was the agent of Simon and Golden" meant that, without evidence Simon and Golden were separate companies, none of Bradford, Simon, and Golden could have conspired with each other.  *Id.*  The Texas Supreme Court affirmed the Court of Appeals' opinion rejecting the conspiracy claim, expressly stated that it "agree[d] with the court of appeals' analysis and judgment on this issue[.]").  48 S.W.3d at 760-61.

*Id.* (citation omitted) (emphasis added). Negligent misrepresentation requires "a misstatement of *existing* fact." *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 357 (5th Cir. 1996). Accordingly, to the extent Plaintiff relies on alleged omissions to support negligent misrepresentation, the claim fails as a matter of law. *Zipp Indus., Inc. v. Ranger Ins. Co.*, 39 S.W.3d 658, 669 (Tex. App.—Amarillo 2001, no pet.) ("Without evidence of a ***representation***, [plaintiff] cannot meet the first element of a negligent ***misrepresentation*** claim." (emphasis added)). Negligent misrepresentation contemplates a misstatement of ***existing fact***." *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 578–79 (Tex. App.—Dallas 2007, no pet.) (emphasis added) (holding that attorneys' alleged omissions to a non-client "cannot form the basis for a tenable negligent misrepresentation action") (citations omitted).

> (4)    Plaintiff never pleads that Baker's adversarial submissions ***to the PBMs*** were shared with the Manufacturers.

The Complaint pleads that ***Alliance*** made false statements to PBMs that were indirectly transmitted to the Manufacturers, but is devoid of any allegations that ***Baker*** ever communicated with the Manufacturers or any plausible allegations that the Manufacturers' even indirectly received communications from Baker, let alone justifiably relied on such communications. Moreover, Baker's allegedly false representations to the ***PBMs*** when advocating for Alliance in connection with PBM audits were part of ***an adversarial dispute*** – thus destroying reliance. *See* Facts, ¶ 2-3, 20; *see also Cox v. Steak N Shake, Inc.*, No. 3:20-CV-00061, 2020 WL 5232826, at *2 (S.D. Tex. Sept. 2, 2020) (Edison, Mag. J.) (granting motion to dismiss on plaintiff's fraudulent/negligent misrepresentation claims because "[i]t is a 'well-settled rule that a party may not justifiably rely on an opposing attorney's statements made in an adversarial setting[.]'") (internal citation omitted); *see also Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 443 (Tex. App. – Houston [14th Dist.] 2000, pet. denied) (finding that as a matter of

law, plaintiff was not justified in relying on opposing counsel's representations "given the adversarial nature of the parties' relationship").

Under well-established law, Baker's alleged misrepresentations to the PBMs ***do not give rise to misrepresentation claims*** by the Manufacturers because ***there is no allegation that the Manufacturers actually ever received Baker's alleged misrepresentations***, much less relied on such alleged misrepresentations or that any such reliance (whether by the PBMs or by the Manufacturers) was justifiable. *See Petty v. Portofino Council of Coowners, Inc.*, 702 F. Supp. 2d 721, 734 (S.D. Tex. 2010) (Jack, J.) (granting defendant's motion to dismiss because plaintiffs' complaint failed to allege that they relied on the complained of misrepresentations); *Shanley v. First Horizon Home Loan Corp.*, No. 14-07-01023-CV, 2009 WL 4573582, at *14 (Tex. App.— Houston [14th Dist.] Dec. 8, 2009, no pet.) (finding plaintiffs could not have justifiably relied on allegedly misleading reports that plaintiffs ***did not see until after suit was filed***, even if a third party may have relied on such reports) (emphasis added); *see generally Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) ("Both fraud and negligent misrepresentation require that the plaintiff show actual and justifiable reliance.").

Plaintiff never alleges that Baker communicated with the Manufacturers – at any point in time – and has not plausibly pled that the ***Manufacturers*** actually received and relied upon any alleged misrepresentations ***from Baker***, thus destroying causation. *See Physicians ACO, LLC v. Computer Scis. Corp.*, No. 4:16-CV-1293, 2017 WL 3187609, at *2 (S.D. Tex. July 26, 2017) (Harmon, J.) (finding "Plaintiff's First Amended Complaint contains no such allegations [that the plaintiff received the misrepresentation] … [or] "attempt to argue that Plaintiff received and relied upon CSC's statements.").

**D.    The Economic Loss Rule Prevents Plaintiff from Recovering in Tort when the Complained of Conduct is Governed by Contract – As Here – And  Bars Any Negligent Misrepresentation Claim.**

Plaintiff's negligent-misrepresentation claim also is barred by Texas's economic loss rule, because Plaintiff (on behalf of the Manufacturers) attempts to recover in tort against Baker (a third-party with which the Manufacturers had no contract) for conduct subject to and damages arising from a series of contracts involving Alliance and the PBMs.

> Under the economic loss rule, if a plaintiff only seeks to recover for the loss or damage to the subject matter of a contract, he cannot maintain a tort action against a defendant.  Simply stated, under the economic loss rule, a duty in tort does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim

*Sterling Chem., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (internal citation omitted).

In *Sterling*, plaintiff Sterling contracted for raw materials from one company (PHS), while knowing that PHS would rely upon services from a third party (Texaco), in order to perform. *Id*. at 795.  Sterling argued that Texaco negligently misrepresented its technology during meetings with Sterling, which induced Sterling to contract with PHS. *Id*. When PHS breached by interrupting service, Sterling sued Texaco. *Id*. at 796.  But the court affirmed summary judgment based on the economic loss rule, holding that "a plaintiff may not bring a claim for negligent misrepresentation unless the plaintiff can establish that he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." *Id*. at 797.  Put another way, a contracting party cannot recover the benefit of its contractual bargain with one party by suing a different party in tort. *Id*. at 797-800 (explaining that permitting such suits would disrupt the parties' contractual risk allocations, and further holding that benefit-of-the-bargain damages are not recoverable under a negligent misrepresentation claim).

The economic loss rule applies even if there is no direct contractual relationship between the plaintiff and the defendant. *Sterling*, 259 S.W.3d at 797 ("Texas courts have applied the economic loss rule to preclude tort claims between parties who are not in contractual privity."); *In re All Texas Electrical Contractors, Inc.*, No. 21-3287, 2021 WL 4467548, at *4 (Bankr. S.D. Tex. Sept. 29, 2021) (Rodriguez, J.) ("[T]he lack of a contractual arrangement between Plaintiff and Defendant will not bar application of the economic loss rule.").

Alliance had contracts with the PBMs that required Alliance, among other things, to provide certain information to the PBMs. *See* Compl., ¶ 104 ("Pharmacy benefit plans typically contract with PBMs to manage insurance claims and reimbursements. The PBMs, in turn, have contracts with retail pharmacies.") In turn, the PBMs had separate contracts with the Manufacturers, which, among other things, required the PBMs to provide certain information to the Manufacturers. *See e.g.*, Compl., ¶ 67 ("Under contracts with the [PBMs], Roche would then pay rebates.")

In the scope of its legal representation of Alliance, Baker provided certain information to the PBMs at the request of and for the benefit of its client, Alliance, under the terms of the contracts between Alliance and the PBMs. *See* Compl., ¶ 150 (alleging that "Baker explicitly represented to PBMs" statements in connection with audits). Plaintiff (on behalf of the Manufacturers) argues that Baker, in providing information to the PBMs on behalf of its client Alliance, omitted certain required information or provided false or misleading information, which – if true – would be a breach of the contracts between Alliance and the PBMs. *Id.* ¶¶ 142, 147, 150. And Plaintiff (on behalf of the Manufacturers) alleges that this alleged conduct harmed the Manufacturers as a result of the information that the PBMs provided to the Manufacturers under their own contracts, which – if false – would be a breach of the contracts between the PBMs and the Manufacturers.

Thus, because Plaintiff is suing Baker in tort for *the same alleged acts and omissions* that – if proven – would give rise to breach-of-contract claims and is seeking to recover the same purported damages caused by those breaches of contract, Plaintiff's claim is barred by the economic loss rule. *See id.* (negligent hiring and supervision claim was barred by economic loss rule because claim "rests solely on the economic harm Plaintiff suffered when [third party] allegedly breached the subcontract with Plaintiff").

Indeed, the economic loss rule "reflects a preference for allocating some economic risks by contract rather than by law" *See LAN/STV v. Martin K. Eby Const. Co., Inc.*, 435 S.W.3d 234, 235 (Tex. 2014). In *Eby*, for example, the Texas Supreme Court held that, because construction projects "operate by agreements among the participants," "one participant on a construction project cannot recover from another . . . for economic loss caused by negligence" without a contract between them creating such liability. *See id.* at 245-46. Here, to the extent the alleged conduct occurred, the Manufacturers can't deny that have a clear contractual remedy against the PBMs, just like the PBMs have a reciprocal contractual remedy against Alliance under their own bargained-for contracts. Allowing Plaintiff (on behalf of the Manufacturers) to go outside the contract and sue a third-party in tort for the same conduct and same damages governed by clear contractual relationships, would be an inappropriate disruption to the "web of contracts" designed to impose a bargained-for allocation of risk among contractual counterparties. *See id.* at 246.

### E.     The RICO Claims Fail as a Matter of Law for Lack of Causation, Participation, or Vicarious Liability.

Plaintiff's allegations for violating federal RICO (18 U.S.C. § 1962(c)) and conspiracy to violate federal RICO (18 U.S.C. § 1962(d)) must be dismissed because: (1) the Complaint demonstrates that Baker was *not* the proximate and "but for" cause of the Manufacturers' alleged injuries, (2) Baker did not participate in the operation or management of the alleged enterprise, (3)

Baker is not a RICO "person," (4) the Complaint flunks Rule 9(b)'s pleading requirements, (5) an

allegedly vicariously liable party is not a proper RICO defendant under §§ 1962(c) or (d), and (6)

Plaintiff's failure to plead a claim for RICO under § 1962(c) bars any claim under § 1962(d).

> (1)    The Complaint facially negates the direct "but for" causation
> required to establish a RICO claim.

United States Supreme Court precedent as a matter of law expressly bars Plaintiff's RICO

allegations – as purported assignee of  the Manufacturers – because the alleged predicate offense

– Alliance submitting false reimbursement claims **to PBMs** – did not **directly harm** the

Manufacturers thus destroying causation. *See* Facts, ¶¶ 7, 11-13, 18, 20; *see e.g. Anza v. Ideal Steel

Supply Corp.*, 547 U.S. 451, 458 (2006) (finding plaintiff's alleged injury was too remote to

establish a RICO claim because "[t]he direct victim of…" the failure to remit sales taxes was "the

State of New York, not [plaintiff].").

Commencing with *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258

(1992), and subsequent opinions in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) and

*Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010), the United States Supreme Court

has held that a RICO plaintiff must establish "that a RICO predicate offense 'not only was a 'but

for' cause of [the] injury, but was the proximate cause as well.'" *Hemi Group, LLC*, 559 U.S. at 9

(quoting *Holmes*, 503 U.S. at 268). "[P]roximate cause thus requires 'some direct relation between

the injury asserted and the injurious conduct alleged.'" *Id.* In *Holmes*, *Anza*, and *Hemi*:

**Holmes**

- Securities Investor Protection Corporation (SIPC) alleged that a defendant
  manipulated stock prices in furtherance of a RICO enterprise. *Holmes*, 503 U.S. at
  262-63. SIPC had a duty to ensure against the collapse of registered broker-dealers
  and reimburse customers of the dealers if a collapse occurred. *Id.* at 261. The
  defendant's alleged manipulation caused a crash and SIPC was on the hook for $13
  million to the broker-dealer customers. In denying SIPC's RICO claim, ***the court
  held that the alleged conspiracy directly harmed the broker-dealers but SIPC's
  injury was "purely contingent" on that harm***. *Id.* at 271 (emphasis added).

Therefore, SIPC's injury was "too remote" to satisfy the direct causation requirement for RICO. *Id.*

*Anza*

- Plaintiff asserted RICO claims against its market competitor, alleging that the competitor defrauded the State of New York by failing to remit sales tax and thus undercut plaintiff's prices. *Anza*, 547 U.S. at 458. Against the backdrop of *Holmes*, the court held that plaintiff's alleged injury was too remote to establish RICO because "[t]he direct victim of…" the failure to remit sales taxes was "the State of New York, not [plaintiff]." *Id.* The cause of the plaintiff's harm was based on "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* Thus, plaintiff had not established a direct causal connection between the predicate offense (failing to remit sales taxes to the state) and the alleged harm (undercutting plaintiff's prices). *Id.* at 460-61.

*Hemi*

- The City of New York, which taxes the possession of cigarettes, filed a RICO claim against an out-of-state cigarette vendor alleging that the vendor failed to disclose the required customer information to the state, which, in turn, stunted the city's ability to tax its residents. *Hemi*, 559 U.S. at 4. But the city's claim failed, because it could not show that its alleged injury – lost tax revenue – was proximately caused by the alleged RICO violation. *Id.* at 5. The predicate RICO act (failing to file tax related information with the state in violation of the federal Jenkins Act) did not directly lead to the city's alleged injury. There was no direct causation because the city's harm came from the customers' failure to pay the taxes, but the alleged RICO act was the failure to file Jenkins Act reports (*i.e.*, the conduct causing the harm was distinct from the alleged RICO act). *Id.* at *11.[50]

Here, the alleged predicate RICO act is mail and wire fraud arising from submitting allegedly false information to **PBMs**, **_not Manufacturers_**. *See* Compl., ¶ 382 ("Baker used wire communications … to provide false information and assurances to PBMs."); *id.* ¶ 86 ("[The] PBMs were the very entities to which Alliance was submitting fraudulent insurance claims."). The PBMs thus are akin to the parties that were directly harmed in *Holmes* (broker-dealers), *Anza* (the State of New York) and *Hemi* (the State of New York and the federal government) because the alleged

---

[50] Under *Anza* and *Hemi*, it makes no difference whether the harm to the Manufacturers was a foreseeable consequence of Alliance or Baker's actions with respect to the PBMs; the RICO claim still fails. *See id.* at 13.

scheme – submitting false claims to the PBMs – *directly harmed the PBMs* which paid Alliance based on the false claims.[51]

But, just as in those cases, Plaintiff has no RICO claim, because the conduct which allegedly caused the Manufacturers' damage was: (1) *the PBMs' distinct, unidentified representations* (under contracts between the PBMs and Manufacturers; none of which are alleged to have come from Baker) to the *Manufacturers* and (2) the Manufacturers' wholly speculative purported loss of retail sales resulting from *distributors* "willing to breach their contracts with manufacturers and sell NFR strips on the "secondary" or "gray" market." *See* Facts, ¶¶ 7, 11-13, 18, 20; *see also* Compl., ¶ 75.[52]

In other words, the Manufacturers are situated much like the losing plaintiffs in *Holmes* (SIPC), *Anza* (the competitor), and *Hemi* (the City of New York), who may have been *indirectly* damaged, but were not proximately *damaged* as RICO requires. *See Hemi* 559 U.S. at 2, ("'[t]he general tendency of the law, in regards to damages at least, *is not to go beyond the first step*,' and that 'general tendency' applies with full force to proximate cause inquiries under RICO") (internal citations omitted) (emphasis added), quoting *Holmes*, 503 U.S. at 271-272.  Any purported injury

---

[51] In addition to paying Alliance, Plaintiff also admits that numerous PBMs "audited, claimed chargebacks, and cancelled their contracts" with Alliance pharmacies. *Id.* ¶ 106 (For example, "Prime, a PBM, claimed a $1,860,423 chargeback against" an Alliance Pharmacy). The PBMs would not have aggressively investigated and asserted millions of dollars in chargebacks against Alliance and canceled contracts with Alliance related pharmacies *unless they believed they were harmed*.

[52] Plaintiff alleges Manufacturers suffered lost profits "each time a box of NFR strips was substituted for a box of [R]etail strips … [because] such substitution deprived the Test Strip Manufacturers of the sale of a box of Retail Strips that they would have sold absent" the alleged scheme. Compl., ¶¶ 365, 386. But Plaintiff has not pled a single fact showing that Alliance's customers would have – and at what price – purchased the Retail Strips or that Baker was the "but for" cause of customers not purchasing Retail Strips. Plaintiff's purported (and wholly speculative) lost profits damages *rely on actions of Alliance's customers* – not Baker – and Baker can't be the proximate or "but-for" cause of damages that depend on actions of a third-party – the customers.

to the Manufacturers necessarily was at least one step removed from any direct harm *because Alliance and Baker are not alleged to have communicated with the Manufacturers at all*.

Moreover, the *Holmes* court explained that "[i]f the nonpurchasing customers were allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets." *Holmes*, 503 U.S at 272.

Here, the Manufacturers' alleged injuries are dependent on the *PBMs actions* – including whether the PBMs fulfilled their contractual duties to the Manufacturers in supplying information from Alliance – and, at a minimum, are one step removed from the alleged fraud – Alliance submitting false reports to PBMs. *Holmes* declined to allow a plaintiff to maintain a RICO claim when – as here – other intervening factors could have contributed to the harm. *Id.*[53]

Thus Plaintiff (in the side-switching shoes of the Manufacturers) can't establish the direct harm necessary to maintain the RICO allegations and Counts VIII & IX must be dismissed. *See e.g. Segal v. Lynch*, No. CV H-07-083, 2007 WL 9753726, at *6 (S.D. Tex. June 29, 2007) (dismissing plaintiff's RICO claim under Rule 12(b)(6) because "[a]side from exceedingly general allegations, Plaintiff's Amended Complaint lacks any factual basis as to how the alleged predicate acts "led directly" to Plaintiff's [alleged harm].").

---

[53] In *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 658 (2008), on the other hand, the Supreme Court distinguished *Holmes* and *Anza*, finding that losing bidders at an auction were *the only parties injured* by the defendants' misrepresentations. But, *Bridge* is inapplicable here because the PBMs were injured by Alliance's scheme.

(2)    The Complaint facially negates Baker's alleged operation or management of Alliance's alleged enterprise.

From 2014-2017, Baker provided pre-petition *legal services* – as evidenced by over 650 pages of Baker invoices attached to the Complaint.  Plaintiff alleges that Alliance – not Baker – submitted the allegedly fraudulent insurance claims to the *PBMs*.  Facts, ¶¶ 7, 11-13, 18, 20.

Baker allegedly provided legal services to certain Alliance-related pharmacies for PBM audit appeals, advocating for Alliance against PBM chargebacks and contract cancellations, *but Baker never communicated with the Manufacturers*. *Id.* ¶ 15. Providing these legal services, even to an alleged RICO enterprise, *does not subject Baker to RICO liability*. *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (finding RICO liability applies only to individuals who "participate in the operation or management of the enterprise itself" not to accountants providing professional services); *In re Taxable Mun. Bond Sec. Litig.*, No. 90-4714, 1993 WL 534035, at *4 (E.D. La. Dec. 13, 1993) ("Performance of legal services that facilitate operation of an enterprise does not represent participation in the 'operation or management' of the enterprise. This is so even when the defendant has substantial persuasive power to induce certain action by the enterprise, or, as part of its professional services offers consultation on important management decisions.").

In *Reves*, the Supreme Court found that Ernst & Young's professional services in compiling financials and failing to advise the company's board regarding allegedly fraudulent financial statements was too passive to qualify as "conducting" the "operation or management" of a RICO enterprise. *Reves*, 507 U.S. at 184-86. Plaintiff similarly complains about Baker's professional services – "Baker [allegedly] never advised Alliance that it should stop submitting fraudulent insurance claims … [and] never informed Alliance's Board of Directors that the company was engaged in blatantly illegal activity" – which, under *Reves*, cannot rise to the level

of "conducting" the "operation or management" of Alliance's alleged enterprise.  *See* Compl., ¶ 88.

Moreover, the 102-page complaint is devoid of any plausible allegations that Baker actively participated in or directed the alleged enterprise.[54] Courts around the country – including this Circuit – have consistently held that a law firm (Baker) providing legal services to a client (Alliance) – does not support a RICO claim. *See St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) (upholding the district court's dismissal of plaintiff's RICO claim because "'patterns of racketeering activity' [plaintiffs'] alleged [inaccurate billing practices, among others] are at worst violations of the rules of professional responsibility."); *see also Rolfes v. MBNA Am. Bank N.A.*, 416 F.Supp.2d 745, 752 (D.S.D. 2005) (dismissing client's RICO claim against an attorney who provided legal services); *Penn, LLC v. Prosper Bus. Dev. Corp.*, No. 2:10-CV-993, 2011 WL 2118072, at *13 (S.D. Ohio May 27, 2011) (same).

(3)    The Complaint fails to meet Rule 9(b)'s heightened pleading requirements or establish Baker as RICO "person."

Plaintiff has not plausibly pled that Baker is a RICO "person" because merely alleging that "Baker, on multiple occasions … [violated] the federal wire fraud statute" (Compl., ¶ 382) is insufficient to establish Baker as a RICO "person." Alleging that Baker has "'willfully committed multiple, related acts of mail and/or wire fraud' … fail[s] to adequately plead the existence of a RICO person, since [Plaintiff's Complaint] alleges nothing that would constitute a continuous threat on the part of [Baker] to bring them within the definition of RICO persons." *Goldin, Peiser*

---

[54] Any allegations that Lee Rosebush's three-month stint on the Alliance board in 2016 can somehow be imputed to Baker must fail, because Plaintiff released all claims against Rosebush. *See* Section II (C) above (explaining Plaintiff released Rosebush and his "partners"); *see also* Compl., ¶¶ 198-99 (Rosebush joined the Board June 9, 2016 and remained until October 26, 2016.

*& Peiser, L.L.P. v. Delta Brands, Inc.*, No. 3:02-CV-0127-M, 2002 WL 550450, at *2 (N.D. Tex. Apr. 11, 2002).

According to the Fifth Circuit, "isolated and sporadic … acts  spread out over a four-year period, simply do not show the continuous threat of racketeering activity that RICO was designed to address." *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995). Plaintiff alleges that "the ***Scheme Participants'*** [not Baker] racketeering acts were multiple and repeated, with tens of thousands occurring every year from 2011 [over three years before Alliance retained Baker] until Alliance's bankruptcy in 2017." Compl., ¶¶ 360, 377. But, Plaintiff fails to allege that Baker was a continuous participant in the scheme and has not supported the bald assertion that Baker is a RICO person. *See* Compl., ¶¶ 354, 370; *Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 625, 648 (S.D. Tex. 2007), aff'd sub nom. *Bradley v. Phillips Chem. Co.*, 337 Fed. Appx. 397 (5th Cir. 2009) (finding plaintiff failed to establish law firm as RICO person because "the acts pled are too isolated and discrete to satisfy RICO's continuity requirement.").

Similarly, the Complaint fails to meet Rule 9(b)'s and Rule 7009's heightened pleading requirements for the predicate acts of mail and wire fraud because the allegations fail to identify the who, what, when, where, and why of Baker's purported acts of fraud. *See FMC Intern. A.G. v. ABB Lummus Glob., Inc.*, No. CIV. A. H-04-3896, 2006 WL 213948, at *4 (S.D. Tex. Jan. 25, 2006) ("In the civil RICO context, Rule 9(b) also requires the plaintiff to allege specifically how *each* act of mail or wire fraud furthered the fraudulent scheme, who caused what to be mailed or wired when, and how the mailing or wiring furthered the fraudulent scheme.") (Stacy, Mag. J.) (emphasis in original).

The Complaint baldly asserts that "Baker utilized wire communications to advise the Scheme Participants about the most effective ways to hide their scheme, and to provide false

information and reassurance to PBMs" without alleging the specifics regarding each purported act as required under Rule 9(b). *See* Compl., ¶ 382.

(4)   <u>Baker can't be held vicariously liable under RICO.</u>

Baker's alleged involvement with Alliance's purported RICO "enterprise" is solely through the legal services provided by the Baker attorneys who represented Alliance entities, and the brief service of a Baker partner, Rosebush, on Alliance's board of directors. *See* Compl., ¶¶ 362, 379, 382. Thus, although Plaintiff seeks to hold Baker liable for RICO under vicarious liability, "*respondeat superior* can *never* be the basis of liability for a civil RICO suit." *First Nat. Bank of Louisville v. Lustig*, 727 F. Supp. 276, 280 (E.D. La. 1989) (emphasis in original). "[I]t is necessary to distinguish between a corporation that actively violates the [RICO] statute and a corporation whose disloyal employee violates the statue without his employer's complicity or knowledge." *Id.* at 280-81. Baker is not a proper RICO defendant under a vicarious liability theory.

(5)   <u>Plaintiff's failure to plead a plausible RICO claim negates any RICO conspiracy claim.</u>

Fifth Circuit precedent mandates that Plaintiff first establish a substantive civil RICO claim (which she has not) in order to maintain a claim for RICO conspiracy. Failing to properly plead the substantive RICO claim under § 1962(c) (Count IX) means that Plaintiff's RICO conspiracy claim under § 1962 (d) (Count VIII) also must fail. *See e.g. N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 203 (5th Cir. 2015) ("Since North Cypress failed to properly plead a claim under §§ 1962(a), (b), or (c), it correspondingly failed to properly plead a claim under § 1962(d)."); *Nolen v. Nucentrix Broadband Networks Inc.,* 293 F.3d 926, 930 (5th Cir. 2002) ("The failure to plead the requisite elements of … a § 1962(c) violation implicitly means that [Nolen] cannot plead a conspiracy to violate either section.") (internal citation and quotation omitted); *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 552 (5th Cir. 2012), as revised (Jan. 12,

2012) (finding plaintiff "failed to establish injury from an act that is independently wrongful under RICO [§ 1962(c)]," thus destroying its RICO conspiracy claim under § 1962(d)).

Moreover, Plaintiff's RICO conspiracy claim must be dismissed because she has not adequately pled that Baker and Alliance entered an actual agreement to specifically engage in illegal conduct. *See Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 526 (5th Cir. 2016) (granting attorney defendants' motion to dismiss RICO conspiracy claim because the complaint contained no allegation of actual agreement between the alleged conspirators).

## V.   PLAINTIFF'S BANKRUPTCY CLAIMS FAIL AS A MATTER OF LAW

### A.   This Court's Final, Not-Appealed Fee Order Bars All Claims Based on Baker's Post-Petition Legal Services Under *Res Judicata*.

#### (1)   The Fee Order had no limitation on its finality or preclusive effect

Under two controlling Fifth Circuit cases, *Intelogic Trace* and *Frazin*, this Court's September 11, 2019 Fee Order (Facts, ¶¶ 27-28, EX. 18, APP. PP. 417-19) bars all claims against Baker arising from post-petition services to any Alliance debtors through August 9, 2019.

In *Intelogic Trace*, a chapter 7 trustee brought negligence and malpractice claims against Ernst & Young "arising from services Ernst & Young performed during [Intelogic's] previous chapter 11 bankruptcy proceeding." 200 F.3d at 383. In response, Ernst & Young asserted that the bankruptcy court's approval of its chapter 11 fee application was *res judicata* barring the trustee's claims. *Id*. at 385-86. In affirming the bankruptcy court's dismissal based on *res judicata*, the Fifth Circuit explained that "an award of fees for professionals . . . employed by a bankruptcy estate represents a determination of 'the nature, the extent, and the value of such services.'" *Id*. at 387 (quoting 11 U.S.C. § 330). "By granting Ernst & Young's fee application, the bankruptcy court implied a finding of quality and value in Ernst & Young's services" and there was an

"identity of claims between the fee application hearing and [the] malpractice suit," resulting in *res judicata*. *Id*. at 387-88.[55]

As here, the debtor in *Intelogic Trace* never objected to Ernst & Young's fee application. *See id*. at 384. The Fifth Circuit thus considered "whether [Intelogic] could and should have brought its malpractice claims in the former [fee application] proceedings." *Id*. at 388. In doing so, the court noted "that [Intelogic] was sufficiently aware of the real possibility of there being errors by Ernst & Young such as now alleged and of their likely consequences before the fee hearing." *Id*. Accordingly, because "[r]es judicata bars claims that **should have** been litigated in a previous proceeding," the court found the trustee's claims barred, even though Intelogic's "Board may not have been aware of all the precise facts or reached a firm conclusion on Ernst & Young's performance . . . ." *Id*. (emphasis added); *see also id*. at 389 ("[Intelogic] had sufficient **general awareness** of the real potential for claims against Ernst & Young such as those here asserted") (emphasis added).

Here (as in *Intelogic Trace*), Alliance was "aware of the real possibility of there being errors by [Baker] such as now alleged and of their likely consequence before the fee hearing"[56] and the Fee Order. For example, Ronald L. Glass, the chapter 11 trustee for Alliance, entered the Initial Tolling Agreement with Baker on March 28, 2019 attempting to toll potential claims against Baker, "including potential claims for breach of fiduciary duty, professional negligence and other

---

[55] Although *res judicata* has four elements (that the parties be identical, the prior judgment be rendered by a court of competent jurisdiction, there be a final judgment on the merits, and the same cause of action be involved in both cases), the Fifth Circuit in *Intelogic Trace* only analyzed the final element because the first three elements were undisputed. *See id*. at 386. As in *Intelogic Trace*, the parties here are identical (Alliance/Plaintiff and Baker), the prior judgment was from a court of competent jurisdiction (this Court), and there was a final judgment on the merits (*see* Ex. 18, App. p. 419; Fee Order, ¶¶ 1-2). Accordingly, the first three elements of *res judicata* are not further addressed in this brief because their existence is both obvious and indisputable.

[56] *See* 200 F.3d at 388.

claims and relief." Ex. 7, App. p. 100. Baker filed its final fee application on August 20, 2019 [Case 17-32186 – Dkt. 1287] – ***more than four months after the Initial Tolling Agreement*** – but Plaintiff, despite knowledge of the facts allegedly giving rise to the claims now asserted against Baker and being represented by various attorneys other than Baker, failed to object.[57]

*In re Frazin* similarly addressed a debtor's malpractice claims against his court-approved attorneys at Haynes and Boone, except that the *Frazin* debtor had unsuccessfully objected to the fee application, then filed state-law counterclaims.  *See* 732 F.3d at 316-17.  Nevertheless, as in *Intelogic Trace*, the Fifth Circuit in *Frazin* held that "in awarding fees, the bankruptcy court . . . . necessarily rejected the claims of malpractice contained within Frazin's fee objections." 732 F.3d at 320.  Moreover, the court held that a "malpractice claim for those services 'cannot stand alone' from the determination of quality the bankruptcy court made in determining fees."  *Id*. at 321-22 (quoting *Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 931 (5th Cir. 1999)).

> (2)    This Court entered other orders in the *Uplift RX* Bankruptcy that
> were not final and expressly had no *res judicata* or collateral
> estoppel effects.

Plaintiff's actions with other fee applicants demonstrate that Plaintiff (and her counsel other than Baker) knew that this Court's Fee Order was *res judicata*. For example, on October 15, 2019, this Court entered an order approving Alliance's accountant's (Tanner, LLC) final fee application but unlike the Baker Fee Order, the Tanner fee order expressly stated that "this Order

---

[57] Plaintiff admits that the request for disgorgement of post-petition fees is contingent on whether "the relief sought in Counts I – IV above (based on allegations regarding pre-petition conduct that is purportedly addressed in the Initial Tolling Agreement) are granted in whole or in part." Compl., ¶ 324. Further, Plaintiff also admits that "Baker is owed a remaining balance of $779,066.83 from the Trust Estate." Facts, ¶ 28.

*shall not* be deemed a final order … [and] this Order [shall not] be deemed or otherwise result in any *res judicata*." (EX. 19, APP. P. 422) (emphasis in original).

In contrast, the Fee Order approving Baker's fees has no limitation on its finality or *res judicata* effect. Thus, Plaintiff deliberately refrained from objecting to the Fee Order knowing that this Court's approval of the final Fee Order was *res judicata*.

A comparison of the Tanner order [Dkt. 1346] and the Fee Order portrays the key differences, including the specific limitations on finality of the Tanner order (in blue) and the absence of the same language in the Fee Order.

> 2.    Applicant is finally allowed compensation of $1,666,508.90 for professional services rendered and $71,153.46 for reimbursement of actual and necessary expenses incurred on behalf of the Debtors during the Second Interim Period of January 1, 2018 through August 9, 2019, for a total amount of $1,737,662.36.
>
> 2.    Applicant shall credit $20,000.00 toward the total amount awarded herein to account for the post-petition payment made to Applicant by the Debtors.
>
> 3.    All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms as set forth in the ~~Second Interim and Final Application~~Application. For the avoidance of any doubt, this Order *shall not* be deemed a final order, with court appointed Liquidating Trustee Mark Shapiro (the "Liquidating Trustee") expressly reserving, as set forth in the confirmed Plan of Reorganization, all rights, claims, and demands against the Applicant of and related to services it rendered to or otherwise performed for or on behalf of the Debtors prior to the Petition Date, nor shall this Order be deemed or otherwise result in any *res judicata*, collateral estoppel, issue preclusion, and/or claim preclusion in regard to any such pre-Petition Date rights, claims, or demands of the Debtors, the estates of the Debtors, the Liquidating Trust[2], or the Liquidating Trustee.

For the same reasons as in *Intelogic Trace* and *Frazin*, Plaintiff's purported claims against Baker to recover post-petition fees are facially barred by *res judicata* from this Court's Fee Order. Indeed, this Court should enforce its Fee Order and require Plaintiff immediately to pay Baker the "remaining balance of $779,066.83 from the Trust Estate."

B.     **Plaintiff's Fraudulent Transfer Claims for Baker's Pre-Petition Legal Services Fail to Meet Pleading Standards Under *Twombly* and *Iqbal*.**

Under Supreme Court pleading standards, "a pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Similarly, conclusory statements in a pleading "are not entitled to the assumption of truth." *Id.* at 679-81.

Failure to meet these standards mandates dismissal under Rule 12(b)(6) for failure to satisfy the pleading requirements in Rule 8(a)(2). *See Clapper v. Am. Realty Inv'rs, Inc.*, No. 3:14-CV-2970-D, 2018 WL 3868703, at *9 (N.D. Tex. Aug. 14, 2018) (dismissing fraudulent transfer claim because the "allegations d[id] not satisfy Rule 8 because plaintiffs d[id] not allege facts that allow the court to draw the reasonable inference that defendants acted with constructive fraudulent intent: *e.g.*, that the transfer of property occurred 'without receiving a reasonably equivalent value in exchange for the transfer or obligation.'").

Additionally, FED. R. CIV. P. 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Under longstanding Fifth Circuit precedent, the plaintiff must plead "the who, what, when, where, and how" of any fraud – which Plaintiff fails to do. *See Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 652 (N.D. Tex. 2020) ("The Court concludes that Rule 9 applies to actual fraudulent transfer claims"); *Clapper*, 2018 WL 3868703, at *9 ("If plaintiffs rely on actual fraudulent intent, their allegations fail to satisfy Rule 9(b)'s heightened pleading requirements.").

Plaintiff's "constructive" fraudulent transfer claim is largely based on vague and conclusory allegations that "[Alliance] did not receive reasonably equivalent value for the Baker Transfers and [it]: (i) [was] insolvent at the time of the Baker Transfers; or (ii) intended to incur,

or believed or reasonably should have believed, that [it] would incur debts beyond their ability to pay as they came due or matured." Compl., ¶ 319. Such allegations fail to state a claim because they are wholly inadequate under Rule 8(a), *Iqbal*, and *Twombly*. *See Campbell v. Tex. Tea Reclamation, LLC*, No. 3:20-CV-00090, 2021 WL 2211690, at *6 (S.D. Tex. May 6, 2021) (Edison, Mag. J.), report and recommendation adopted, No. 3:20-CV-90, 2021 WL 2211807 (S.D. Tex. June 1, 2021) (citing *Twombly* and finding that the complaint's mere repetition of "the words 'without receiving reasonably equivalent value' over and over and over does not survive a motion to dismiss under Rule 12(b)(6)."); *In re Cyr*, 602 B.R. 315, 332 (Bankr. W.D. Tex. 2019) (finding that the trustee "failed to properly plead insolvency for purposes of a constructively fraudulent transfer claim … [because] [t]he Trustee presented no allegations regarding the value of the Cyr's debt relative to the value of the Cyr's assets at the time the transfers were made.").

Plaintiff identifies payments to Baker for a variety of legal services provided to Alliance before it filed for bankruptcy. Compl., ¶ 249.[58] However, the mere identification of payments does not suggest (much less plausibly show) a lack of reasonably equivalent value, especially when Plaintiff has not identified the work it complains of.  The Complaint also cannot sustain a fraudulent transfer claim because it contains only generic and conclusory allegations about Alliance's financial condition at various times – without alleging anything about Alliance's financial condition at the time of the alleged payments to Baker. These threadbare allegations fail to go beyond the legal elements of a claim and fall far short of federal pleading standards.

Plaintiff's failures are even worse when it comes to "Actual Fraudulent Transfer." *See In re Specialty Select Care Ctr. of San Antonio, LLC*, No. 17-44248-ELM, 2021 WL 3083522, at *16

---

[58] Plaintiff conveniently fails to identify that Baker "wrote off any pre-petition fees owed by [Alliance]." *See* Ex. 5, APP P. 70 (Verified Statement of Elizabeth A. Green in Support of Debtors' Application to Employ Baker).

(Bankr. N.D. Tex. July 21, 2021) (dismissing "actual" fraudulent transfer claims because the complaint failed to meet Rule 9(b) standards – the "Complaint fails to specify (1) whether the Debtor intended to hinder its creditors, intended to delay its creditors, or intended to defraud its creditors (or some specified combination thereof), (2) how or in what way the Debtor intended such harm, (3) towards which creditors or groups or categories of creditors the Debtor's conduct was directed, and (4) the factual basis for the Trustee's belief that the Debtor intended such conduct to affect these creditors or groups or categories of creditors (including, as applicable, any relevant badges of fraud and the factual basis for the existence of such badges of fraud)); *In re Almazan*, 2011 WL 841349, at *2 (Bankr. S.D. Tex. Mar. 7, 2011) (finding plaintiff failed to state a claim for "actual" fraudulent transfer because there were no allegations as to the transferor's intent). Although Plaintiff makes a conclusory allegation that "the Baker Transfers were made by [Alliance] with actual intent to hinder or delay creditors of [Alliance]" (Compl., ¶ 320), Plaintiff alleges no facts whatsoever that could support a finding of "actual" fraudulent transfers to Baker.

## CONCLUSION

Baker respectfully requests that the Court enter an order dismissing all claims against Baker with prejudice under FED. R. CIV. P. 12(b)(6) and 9(b) and applicable bankruptcy rules, and granting Baker such other and further relief to which it is entitled.

Respectfully submitted,

*/s/  George M. Kryder*
George M. Kryder
  State Bar No. 11742900
  gkryder@velaw.com
Matthew W. Moran
  State Bar No. 24002642
  mmoran@velaw.com
Jordan W. Leu
  State Bar No. 24070139
  jleu@velaw.com
Michael C. Lee
  State Bar No. 24109461
  mlee@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas  75201
Telephone: (214) 220-7700

*Attorneys for Baker & Hostetler LLP*

## CERTIFICATE OF SERVICE

I certify that on January 13, 2023, a true and correct copy of the foregoing instrument was served on all counsel of record using the Court's electronic filing system.

*/s/  George M. Kryder*
George M. Kryder

US 9534984