UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 17-32186 (MI) |
| UPLIFT RX, LLC | § | |
| | § | CHAPTER 11 |
| *Debtors* | § | |
| | § | (Jointly Administered) |
| | § | |
| YVETTE AUSTIN SMITH, LIQUIDATING | § | |
| TRUSTEE OF THE ALLIANCE HEALTH | § | |
| LIQUIDATING TRUST, | § | ADVERSARY NO. 22-03275 (MI) |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *v.* | § | |
| | § | |
| BAKER & HOSTETLER LLP, | § | |
| | § | |
| *Defendant.* | § | |

**DEFENDANT BAKER & HOSTETLER LLP'S
REPLY SUPPORTING MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

George M. Kryder
  State Bar No. 11742900
  gkryder@velaw.com
Matthew W. Moran
  State Bar No. 24002642
  mmoran@velaw.com
Jordan W. Leu
  State Bar No. 24070139
  jleu@velaw.com
Michael C. Lee
  State Bar No. 24109461
  mlee@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas  75201
Telephone: (214) 220-7700

*Attorneys for Baker & Hostetler LLP*

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

Texas law applies to all tort claims because Plaintiff's failure to meet her burden of proving any conflict of laws results in a ***presumption*** that Texas law applies. Further, Plaintiff expressly invoked ***Texas substantive tort law*** under Remedies Code Chapter 33, Texas has a ***substantial relationship***, and Texas statutes of limitations apply on procedural grounds.

Baker & Hostetler LLP's ("Baker") Motion to Dismiss (Dkt. 31) (the "Motion") must be granted because Plaintiff fails plausibly to plead – or her pleadings negate – her claims.

Plaintiff's direct tort claims, Counts I-III (negligence, aiding and abetting breach of fiduciary duty, and contribution), fail because they ***improperly seek contribution*** from Baker under Chapter 33 – and must be dismissed under Judge Hanen's *Perlstein*[1] decision. These claims also fail for ***lack of causation*** because Plaintiff doesn't (and can't) allege that Alliance: (a) was unaware that its conduct was illegal, or (b) would have changed its self-sustaining behavior with different legal advice. Indeed, Plaintiff's allegations here and in the Brown and Bennett cases[2] negate any suggestion that Plaintiff would have followed different legal advice.[3]

In fact, Plaintiff's allegations confirm that Alliance knew its conduct was illegal ***years before*** Baker was engaged in 2014. Thus, Alliance wasn't the victim of poor legal advice; instead, by Plaintiff's own admission, "[d]espite . . . repeated and explicit warnings that the Questionable Business Practices harmed manufacturers like Roche, Alliance continued that practice—at

---

[1] *See Perlstein v. Vuono*, No. CIV.A. B-07-133, 2008 WL 3539769 (S.D. Tex. Aug. 13, 2008), discussed at p. 15, *infra*.

[2] *See* Adv. Nos. 20-03115 (*Shapiro v. Bennett Tueller Johnson Deere, LLC*) and 21-03936 (*Smith v. Brown & Fortunato, P.C.*).

[3] *See Reneker v. Offill*, No. CIV.A.3:08-CV-1394-D, 2009 WL 3365616 (N.D. Tex. Oct. 20, 2009), *Taylor v. Scheef & Stone, LLP*, No. 3:19-CV-2602, 2020 WL 4432848 (N.D. Tex. July 31, 2020), discussed at pp. 18-20, *infra*.

DEFENDANT BAKER & HOSTETLER LLP'S REPLY SUPPORTING MOTION TO DISMISS PLAINTIFF'S COMPLAINT – PAGE 2

Alliance Officers' direction—until it was raided by the FBI and went bankrupt in 2017."[4] Wrongdoing-clients can't sue lawyers for warnings they've already rejected.[5]

Plaintiff's indirect claims also fail. They are ***facially time-barred*** based on LifeScan and Roche's knowledge of Alliance's fraud scheme more than 4 years before any purported tolling agreements – which don't even mention or cover the Manufacturers' claims. Attorney immunity also bars suit for all claims, including alleged fraud, in the course of Baker's representation. Further, as a matter of law, none of the PBMs or Manufacturers could have relied on Baker's ***adversarial submissions*** on behalf of Alliance. Baker represented Alliance, not the PBMs or Manufacturers. Any RICO claim fails for lack of proximate causation because Alliance's alleged false statements at most directly harmed the PBMs – not the Manufacturers – and because vicarious liability does not exist under the only RICO sections Plaintiff invokes: 18 U.S.C. § 1962(c) & (d).

Finally, Plaintiff's novel attempt to use Baker's alleged pre-petition wrongdoing to escape the *res judicata* impact of this Court's final order awarding Baker's post-petition fees is contrary to clear Fifth Circuit precedent affirming the *res judicata* impact of fee orders – and also is wholly unsupported by Plaintiff's baseless attempt to impugn the candor of Baker partner Elizabeth Green's declarations to this Court in support of Baker's retention by the Debtors.

The foregoing defects are incurable and amendment would be futile.  This Court should grant Baker's Motion and dismiss all claims against Baker with prejudice.

---

[4] Compl., ¶ 234.

[5] Plaintiff also can't sue Baker for "aiding and abetting" breaches of fiduciary duty by directors and officers whom Plaintiff already released. By eliminating the primary breach claim, the D&O release also bars recovery on the aiding and abetting claim. *See Clingman & Hanger Management Associates LLC v, v. Rieck*, No. 4:21-CV-02698, 2023 WL 2744399, at *13-16 (S.D. Tex. Mar. 30, 2023) (Eskridge, J.) (elimination of fiduciary duties in amended LLC agreement negated aiding and abetting breach of fiduciary duty claim against debtor's attorneys – even for events before the amendment).

## TABLE OF CONTENTS

I.   TEXAS LAW APPLIES TO ALL TORT CLAIMS BECAUSE PLAINTIFF'S FAILURE TO
     SHOW ANY CONFLICT OF LAWS RESULTS IN A PRESUMPTION THAT TEXAS LAW
     APPLIES, PLAINTIFF HAS EXPRESSLY INVOKED TEXAS SUBSTANTIVE TORT LAW
     UNDER REMEDIES CODE CHAPTER 33, AND TEXAS HAS THE MOST SUBSTANTIAL
     RELATIONSHIP. ......................................................................................... 6
     A.   Texas (Not Federal) Choice of Law Rules Apply. ................................ 6
     B.   Plaintiff Failed to Show any Conflict of Laws, so Texas Law Applies. ................ 7
     C.   Courts Routinely Decide Choice of Law on Motions to Dismiss. .......................... 8
     D.   Plaintiff Expressly Invoked Chapter 33 of the Texas Civil Practice &
          Remedies Code, Which Controls all Tort Claims. ................................... 9
     E.   Texas Has a Substantial Relationship to This Dispute. ........................ 10
     F.   Texas Law Provides the Applicable Statutes of Limitations. ............... 11
     G.   Internal Affairs Doctrines Do Not Apply to Claims That an Attorney Aided
          and Abetted Breach of Fiduciary Duty. ................................................. 12

II.  PLAINTIFF (AN ADMITTED TORTFEASOR) CAN'T SEEK CONTRIBUTION –
     REGARDLESS OF THE LABEL – AGAINST AN ALLEGED JOINT TORTFEASOR
     (BAKER) BECAUSE PLAINTIFF COMPROMISED AND SETTLED THE
     MANUFACTURERS' DISPUTED CLAIMS. ............................................................ 13
     A.   The Claim Stipulations Settled the Manufacturers' Unliquidated and
          Disputed Proofs of Claim. ...................................................................... 13
     B.   Plaintiff Failed to Distinguish Well-Established Texas Law Prohibiting a
          Settling Person (Plaintiff) from Seeking Contribution. ........................ 14

III. PLAINTIFF FAILED TO PLEAD HOW DIFFERENT LEGAL ADVICE WOULD HAVE
     CAUSED UNIDENTIFIED PERSONS TO CHANGE ALLIANCE'S SELF-SUSTAINING
     BUSINESS PRACTICES AND CAN'T OVERCOME MULTIPLE CAUSATION NEGATING
     DOCTRINES. ............................................................................................... 16
     A.   Plaintiff Flunked the Pleading Requirements Under *Twombly* and *Iqbal*. .......... 16
     B.   Plaintiff Failed to Plead That Different Legal Advice Would Have Caused
          Unidentified Persons to Change Alliance's Knowing Conduct. ......................... 18
     C.   Imputation (or Not) Does Not Change Plaintiff's Failure to Allege That
          Alliance Would Have Followed Different Legal Advice. ................................... 20
     D.   Plaintiff Ignores the Causation-Negating Doctrines in the Motion, Which
          Independently Are Fatal to Causation Here. .......................................... 22

IV.  BECAUSE PLAINTIFF GLOBALLY RELEASED ALLIANCE'S FORMER OFFICERS
     FROM ALL CLAIMS (INCLUDING BREACH OF FIDUCIARY DUTY) AND AIDING AND
     ABETTING IS NOT A STAND-ALONE TORT, BAKER CAN'T BE LIABLE FOR AIDING
     AND ABETTING A BREACH OF FIDUCIARY DUTY PLAINTIFF CAN NEVER PROVE. ............. 22

V.   PLAINTIFF'S INDIRECT CLAIMS ARE BARRED UNDER APPLICABLE STATUTES OF
     LIMITATIONS. ............................................................................................. 23

A.    The Tolling Agreement at Most Only Tolled Plaintiff's Direct Claims, but Never Mentions and Doesn't Toll the Manufacturers' Purported Claims. ........... 24

B.    Even if the Tolling Agreements Cover Plaintiff's Indirect Claims (Which They Do Not), They Could Not Be Tolled Until December 2020 at the Earliest. ............................................................................................................. 25

C.    Plaintiff's Purported Claims on Behalf of the Manufacturers Are Time-Barred Because the Manufacturers and Their Outside Attorneys at Patterson Belknap Clearly Knew – Not Merely Should Have Known – of the Purported "Straightforward" Fraud, and Causally-Linked Injury and Damages No Later than 2014 (LifeScan) and 2015 (Roche). .............................. 26

    (1)    The alleged aiding and abetting negligent misrepresentation claim has been barred since 2016 (LifeScan) and 2017 (Roche) and the purported fraud claim has been barred since 2018 (LifeScan) and 2019 (Roche). ....................................................................................... 27

    (2)    Plaintiff's purported RICO claims are time barred because the Manufacturers' knew of the alleged RICO scheme outside the four-year limitations period. ................................................................ 29

VI.    PLAINTIFF'S ALLEGATIONS (ON BEHALF OF MANUFACTURERS) FOR NEGLIGENT AND FRAUDULENT MISREPRESENTATION FAIL AS A MATTER OF LAW BECAUSE A PARTY CAN'T JUSTIFIABLY RELY ON AN ADVERSARY'S STATEMENTS OR OMISSIONS. ........................................................................................................... 30

A.    As a Matter of Law, Neither the PBMs Nor the Manufacturers Could Rely on Baker's Adversarial Statements to the PBMs. ................................................. 30

B.    Plaintiff Doesn't Even Plead the Who, What, When, Where, or How the Manufacturers Ever Received Baker's Adversarial Submissions. ...................... 31

C.    There is No Fraud Exception to Attorney Immunity, Which Bars Plaintiff's Indirect Claims. .................................................................................................. 31

VII.    REGARDLESS OF LIMITATIONS, THE RICO CLAIMS STILL FAIL AS A MATTER OF LAW FOR LACK OF CAUSATION AND VICARIOUS LIABILITY. ............................. 34

A.    Alliance's Allegedly False Statements to PBMs – Who Sought Damages for Their Purported Injury – Only Indirectly Affected the Manufacturers Thus Destroying Causation. ......................................................................................... 34

B.    Vicarious Liability Can't Create RICO Liability for Baker. ............................... 36

C.    Plaintiff Does Not Dispute That Failure to Plead a Plausible RICO Claim Negates any RICO Conspiracy Claim. .............................................................. 37

VIII.    PLAINTIFF'S RELEASE OF BAKER PARTNER LEE ROSEBUSH EXPRESSLY INURES TO THE BENEFIT OF ROSEBUSH'S PARTNERS AND THUS SHIELDS BAKER FROM LIABILITY. ........................................................................................................... 37

IX.    RES JUDICATA BARS PLAINTIFF'S ATTEMPT TO BELATEDLY CHALLENGE THIS COURT'S FINAL FEE ORDER. .............................................................................. 38

I.    **TEXAS LAW APPLIES TO ALL TORT CLAIMS BECAUSE PLAINTIFF'S FAILURE TO SHOW ANY CONFLICT OF LAWS RESULTS IN A PRESUMPTION THAT TEXAS LAW APPLIES, PLAINTIFF HAS EXPRESSLY INVOKED TEXAS SUBSTANTIVE TORT LAW UNDER REMEDIES CODE CHAPTER 33, AND TEXAS HAS THE MOST SUBSTANTIAL RELATIONSHIP.**

   A.    **Texas (Not Federal) Choice of Law Rules Apply.**

As this Court explained in *In re iHeartMedia, Inc.*, a court sitting in Texas applies Texas choice of law rules to determine the applicable law for any alleged state law causes of action. 597 B.R. 339, 350 (Bankr. S.D. Tex. 2019) (Isgur, J.) ("In this dispute, [Plaintiff's] alleged causes of action *arise outside of the Bankruptcy Code and are based on state law causes of action* such as tortious interference, unjust enrichment, and the prevention doctrine. Accordingly, *the Court applies the choice of law rules of Texas*, the applicable forum, to determine the applicable law for [Plaintiff's] causes of action.") (emphasis added) (internal citation omitted).

Counts I-III (negligence, aiding and abetting breach of fiduciary duty, and contribution) and Counts VI-VII (aiding and abetting negligent misrepresentation and aiding and abetting fraud) are state law claims which require the application of Texas choice of law rules. *See id.*

Plaintiff incorrectly argues that federal choice of law rules apply to her claims by distorting this Court's opinion in *In re Cyrus II P'ship*, 413 B.R. 609 (Bankr. S.D. Tex. 2008), which involved bankruptcy claims – not state law claims. *See* Response, p. 15. In *Cyrus*, this Court applied federal choice of law rules to § 544 fraudulent transfer claims because "these federal causes of action *involve important bankruptcy law and policy* [and] the Court concludes that federal choice of law rules should apply." *Id.* at 614 (emphasis added). The only claims that even remotely involve bankruptcy law here are Count IV (avoidable transfers) and Count V (disgorgement of post-petition fees). Counts IV and V are distinct from Plaintiff's pre-bankruptcy tort claims and present completely different legal issues. Regardless, Texas choice of law principles apply to Plaintiff's state law tort claims: Counts I-III and VI-VII.

### B.     Plaintiff Failed to Show any Conflict of Laws, so Texas Law Applies.

"The burden is on [Plaintiff][,] asserting the application of foreign law[,] not only to show the existence of a true conflict of laws, but also [to] demonstrate which law should apply based on the state contacts of the asserted claims." *Taylor v. U.S. Bank Nat. Ass'n*, No. CIV.A. H-12-3550, 2015 WL 507526, at *6 (S.D. Tex. Feb. 6, 2015) (Miller, J.); *see also Playboy Enterprises, Inc. v. Sanchez-Campuzano*, 519 Fed. Appx. 219, 225 (5th Cir. 2013) ("Texas choice-of-law rules place the burden on [movant] to show how the application of Illinois law compels a result different from what Texas law would yield").

Plaintiff's 102-page Complaint and 66-page Response fail to meet the threshold burden of showing any "true conflict" between Texas law and the multitude of other states' laws that Plaintiff speculates *might* apply. ***Nowhere*** has Plaintiff shown that Texas law materially differs from the broad purported menu of options behind which Plaintiff attempts to hide (at various times, these include Delaware, District of Columbia, New Jersey, Ohio, Utah, or some other law).[6] Because Plaintiff has not met her threshold burden to show a "true conflict" between Texas and another state's law,  this Court must ***presume*** that any other law Plaintiff suggests is identical to Texas. Thus, Texas law applies. *See Playboy Enterprises, Inc.*, 519 Fed. Appx. at 225 (affirming the district court's application of Texas law because movant failed to meet his burden of demonstrating a conflict between Texas and Illinois law); *Janvey v. Univ. of Miami*, No. 3:11-CV-0041-N, 2013 WL 12361381, at *3 (N.D. Tex. July 11, 2013) ("[Movant] fail[ed] to indicate how or why Florida law is different from Texas Law …'The failure to provide adequate proof [of choice of law] …

---

[6] For example, Plaintiff's conclusory assertion that "Plaintiff could state a viable claim under Utah, Washington DC, New Jersey or [some unidentified and un-pled] other applicable law" – utterly fails to meet her burden to show any conflict. *See* Response, p. 15.

results in a presumption that the law of the foreign jurisdiction is identical to the law of Texas.'")

(internal citation omitted); *see also Taylor*, 2015 WL 507526 at *6.

Accordingly, no choice of law analysis is necessary. Baker's Motion must be resolved

under Texas law. *See R.R. Mgmt. Co., L.L.C. v. CFS Louisiana Midstream Co.*, 428 F.3d 214, 222

(5th Cir. 2005) ("Where there are no differences between the relevant substantive laws of the

respective states, there is no conflict, and a court need not undertake a choice of law analysis");

*Univ. of Miami*, 2013 WL 12361381, at *3 (applying Texas law in deciding a motion to dismiss

because "[the Defendant] fail[ed] to provide any evidence or argument that Florida treats its claims

of unjust enrichment differently than does Texas").

### C.      Courts Routinely Decide Choice of Law on Motions to Dismiss.

Plaintiff asks the Court to abstain from making a choice of law determination under the

false premise that it would be premature. *See*, *e.g.*, Response, p. 14. But this Court has all the

knowledge it needs: ***Plaintiff failed to show a conflict*** of laws (indeed, ***Plaintiff never even tried***),

so Texas law applies without needing any factual development. *See Energy Coal v. CITGO

Petroleum Corp.*, 836 F.3d 457, 459 (5th Cir. 2016) ("Choice-of-law decisions can be resolved at

the motion to dismiss stage when factual development is not necessary to resolve the inquiry.");

*Milligan, Tr. for Westech Capital Corp. v. Salamone*, No. 1:18-CV-327-RP, 2019 WL 1208999,

at *2 (W.D. Tex. Mar. 14, 2019) ("Milligan argues that choice of law issues should not be resolved

at the motion-to-dismiss stage. ***That position is incorrect***. In the Fifth Circuit, '[c]hoice-of-law

decisions can be resolved at the motion to dismiss stage when factual development is not necessary

to resolve the inquiry.' ***Indeed, district courts regularly resolve choice-of-law questions in

deciding motions to dismiss***.") (internal citations omitted) (emphasis added).

Further, Plaintiff's side of this case has been involved in the Alliance bankruptcy for ***almost

six years***. For example, the Manufacturers (whose purported claims Plaintiff pursues and who

comprise Plaintiff's trust committee) have been involved in the bankruptcy from inception in April 2017. This Court granted Plaintiff's counsel's (Cimo Mazer Mark, PLLC) application as special counsel to the Debtors in the bankruptcy on June 26, 2018 (Case No. 17-32186, Dkt. 864), **_more than four years_** before Plaintiff filed this suit. Cimo Mazer Mark took extensive pre-suit discovery under Rule 2004 and through client-file requests from Baker and other attorneys, and also filed similar suits against Alliance's other outside counsel, Bennett Tueller and Brown Fortunato, in April 2020 and October 2021, respectively.[7]

Before filing her Response, Plaintiff had all the facts necessary to take a position on which state's law should apply and to identify any purported "true conflict" between that (hypothetical) state's law and Texas – but **_failed to do so_**. This confirms that choice of law is ripe for adjudication. *See Mandell v. TA Operating LLC*, No. EP-09-CV-260-DB, 2012 WL 13075595, at *2-3 (W.D. Tex. Aug. 21, 2012) (rejecting plaintiff's argument "that the conflict-of-law issue is not ripe for adjudication" because the case had been on file for years and plaintiff knew of the choice of law issues).

This Court can and should determine now that Texas law applies to all state law tort claims.

### D.      Plaintiff Expressly Invoked Chapter 33 of the Texas Civil Practice & Remedies Code, Which Controls all Tort Claims.

Plaintiff can't contest the application of Texas law because she expressly invoked Texas substantive tort law for contribution, proportionate responsibility, and responsible third parties under Tex. Civ. Prac. & Rem. Code § 33.001 *et seq*. *See* Compl., ¶ 309. Chapter 33 applies to "any cause of action based on tort." Tex. Civ. Prac. & Rem. Code § 33.002; *see also Nunez v. City of Corpus Christi, Tex.*, No. 2:12-CV-00092, 2013 WL 164045, at *1 (S.D. Tex. Jan. 14,

---

[7] *See* Adv. Nos. 20-03115 (Bennett Tueller) and 21-03936 (Brown & Fortunato).

2013) ("Chapter 33 … applies to all torts governed by Texas law, including those tried in federal courts.") (Ramos, J.). Thus, under Plaintiff's own pleading, potential recovery for any tort will be subject to Chapter 33 and substantive Texas tort law.

Further, as shown in Baker's Motion, Plaintiff's purported claims for negligence (Count I) and aiding and abetting breach of fiduciary duty (Count II) simply are Chapter 33 contribution claims pled under different labels. *See* Motion, pp. 19-21. Plaintiff expressly invoked contribution under Chapter 33 which forecloses any argument that the statute's provisions governing substantive tort law somehow don't govern Plaintiff's claims for contribution under different labels.[8]

Accordingly, Plaintiff selecting Texas law on contribution also should be treated as selecting Texas law for all state law tort claims.

### E.   Texas Has a Substantial Relationship to This Dispute.

Although Plaintiff's failure to prove a "true conflict" of law obviates the need for any relationship analysis, Texas has a substantial relationship to this dispute – certainly enough to justify applying Texas law.

First, Plaintiff, acting on behalf of a Texas trust, voluntarily selected this Texas forum to file this adversary proceeding (and suits against two other law firms based on similar facts) and expressly invoked the Texas proportionate responsibility statute to govern her potential recovery.

Second, Texas is:

- Where Baker performed legal services for Alliance from its Texas offices (*see* Compl., ¶ 177 – alleging Houston-based Baker partners Lynn Sessions and Robert Wolin performed

---

[8] Even if the Court finds that Counts I and II do not seek contribution, Chapter 33 § 33.001 applies and if "[P]laintiff [] is more than 50% responsible for [her] injuries [she] cannot recover for [her] injuries." *In re Today's Destiny, Inc.*, 388 B.R. 737, 762 (Bankr. S.D. Tex. 2008) (Isgur, J.) (finding that § 33.001 applies to a plaintiff's claims under Texas tort law, but not to a party seeking contribution).

legal services for Alliance; Compl., ¶ 235 – alleging Houston-based Baker partners Scott McBride, Gregory Saikin, and Sameer Mohan represented Alliance);

- A domicile of Baker (Houston office (*see* Compl. ¶ 34));

- The domicile of five Debtor pharmacies, including lead Debtor Uplift Rx. LLC;[9] and

- The domicile of the original Alliance liquidating trustee, Mark Shapiro.

Moreover, the Debtors chose a Texas forum to file bankruptcy, agreed to this Court's continuing jurisdiction, and:

- Texas law expressly governs the Plan (*see* EX. 8, APP. P. 144) and the Liquidating Trust Agreement. *See* EX. 10, APP. P. 236;

- The Manufacturers are the sole members of the Trust Committee formed in Texas and governed by Texas law. *See* EX. 23, APP. P. 604 ("The initial members of the Trust Committee shall be LifeScan and Roche."); and

- Plaintiff concedes that the Manufacturers are before this Court, arguing that they could be added as named parties under FED. R. CIV. P. 17. *See* Response, pp. 25-26.

Finally, Plaintiff admits that the Manufacturers' purportedly assigned claims for aiding and abetting negligence and fraud (Counts VI-VII) involve Alliance pharmacies "***located throughout the United States***" that were submitting allegedly false rebate claims. Response, p. 38 (emphasis added).[10] Because these claims allege harm from a widespread scheme throughout the country, Plaintiff fails to show why any other state has a more substantial relationship with these facts than Texas, where multiple Alliance pharmacies and multiple Baker attorneys were located.

### F.   Texas Law Provides the Applicable Statutes of Limitations.

Regardless of the substantive law that may apply to Plaintiff's purported causes of action, Texas law governs all statutes of limitations. *See In re Soporex, Inc*., 446 B.R. 750, 761 (Bankr.

---

[9] Debtors Belle Pharmacy, LLC, Conoly Pharmacy, LLC, Medina Pharmacy, LLC, Richard's Pharmacy, LLC, and Uplift Rx. LLC are all Texas LLCs.

[10] Notably, although Plaintiff asserts Washington, DC law conceivably could apply to this dispute, no *Uplift* Debtor was located there.

DEFENDANT BAKER & HOSTETLER LLP'S REPLY SUPPORTING MOTION TO DISMISS PLAINTIFF'S COMPLAINT – PAGE 11

N.D. Tex. 2011) ("Texas generally treats statutes of limitations as procedural in nature for conflict-of-law purposes. Thus, the Court concludes that Texas courts would apply the Texas statute of limitations to the Trustee's claims") (internal citations omitted). So, Plaintiff's assertion that Utah law imposes a four-year statute of limitations for legal malpractice claims is irrelevant. *See* Response, p. 17; *Woolley v. Clifford Chance Rogers & Wells, L.L.P.*, No. CIV.A. 3:01-CV-2185, 2004 WL 57215, at \*1 (N.D. Tex. Jan. 5, 2004) ("the court [] decided whether Texas would apply its own statute of limitations to plaintiffs' legal malpractice and related claims … [finding] that Texas would apply its own statute of limitations as a matter of procedure").

### G.   Internal Affairs Doctrines Do Not Apply to Claims That an Attorney Aided and Abetted Breach of Fiduciary Duty.

The internal affairs doctrine doesn't apply to the purported aiding and abetting breach of fiduciary duty claim against Baker because the doctrine, at most, applies to the duties of corporate directors,[11] not outside attorneys like Baker. *See e.g. Nano-Proprietary, Inc. v. Canon Inc.*, No. A-05-CA-258-SS, 2006 WL 6058423, at \*5 (W.D. Tex. Nov. 14, 2006) (The internal affairs doctrine does not apply in cases that are "not a dispute between shareholders over their voting rights, but a claim for fraud and breach of contract between two companies dealing at arms' length"); *Askanase v. Fatjo*, 130 F.3d 657, 670 (5th Cir. 1997) (refusing to apply the internal affairs doctrine because the "alleged[] preferential transfers in a bankruptcy context are [***not***] matters peculiar to the relationship between a corporation and its directors and officers."); *Zloop, Inc. v. Phelps Dunbar LLP*, No. 6:18-CV-00031, 2019 WL 1978357, at \*10 (W.D. La. Mar. 27, 2019), report and recommendation adopted, No. 6:18-CV-00031, 2019 WL 1941058 (W.D. La. Apr. 29, 2019) ("The internal affairs doctrine does not apply to disputes that involve people or entities that are not

---

[11] Plaintiff globally released Baker attorney Lee Rosebush and all of the other former directors. *See* EX. 9, APP. P. 200-01 (Trustee released Rosebush and [others] from "any and all claims … held by [Plaintiff]").

part of the corporation. The [law firm] defendants in this lawsuit are third parties to the corporation's inner workings and therefore are not governed by the internal affairs doctrine."); *In re Verilink Corp.*, 408 B.R. 420, 425 (Bankr. N.D. Ala. 2009), *rev'd and remanded on other grounds*, 410 B.R. 697 (N.D. Ala. 2009) (internal affairs doctrine "does not apply to lawyers, and [p]laintiff did not provide any reason why this rule would extend to the attorney-client relationship, such that the rule would apply to the claims asserted against [the law firm] in this case").

II. **PLAINTIFF (AN ADMITTED TORTFEASOR) CAN'T SEEK CONTRIBUTION – REGARDLESS OF THE LABEL – AGAINST AN ALLEGED JOINT TORTFEASOR (BAKER) BECAUSE PLAINTIFF COMPROMISED AND SETTLED THE MANUFACTURERS' DISPUTED CLAIMS.**

A. **The Claim Stipulations Settled the Manufacturers' Unliquidated and Disputed Proofs of Claim.**

The Claim Stipulations indisputably *are settlements* because they:

- Used textbook settlement language, stating that they were entered "[t]o avoid the uncertainty and costs associated with litigating objections to the [Manufacturers'] Filed Claims;"[12]

- Consolidated the Manufacturers' numerous (and disputed) claims against multiple debtors in various amounts into a single allowed claim with an agreed amount for each Manufacturer;[13]

- Required each Manufacturer to waive (*i.e.*, compromise and settle) the first $50,000 in distributions on its allowed claim in favor of other creditors;[14]

- Deemed each Manufacturer to have voted its filed claims in favor of the Plan;[15] and

- Sought Court approval of the related stipulation terms, which this Court granted, more than 21 days after the stipulations were filed, in orders separate from the confirmation order.[16]

---

[12] EX. 12, APP. P. 383 (Roche); EX. 13, APP. P. 393 (LifeScan).

[13] EX. 12, APP. P. 384 (Roche); EX. 13, APP. P. 394 (LifeScan).

[14] EX. 12, APP. P. 384 (Roche); EX. 13, APP. P. 394 (LifeScan).

[15] EX. 12, APP. P. 385 (Roche); EX. 13, APP. P. 395 (LifeScan).

[16] EX. 12, APP. P. 386, 402 (Roche); EX. 13, APP. P. 396, 408 (LifeScan). The 21-day notice period and separate approval orders underscore that these were settlements requiring Court approval, not mere "mechanisms for the allowance of claims in the bankruptcy cases" as Plaintiff argues. *See* Response, p. 20.

Plaintiff also is incorrect that enforcing the contribution bar against settling joint tortfeasors would preclude claims by creditors whose claims are "allowed as scheduled by a debtor." *See* Response, p. 19. A claim "allowed as scheduled," by definition, has not been settled. But LifeScan and Roche's claims ***indisputably were settled***. In Plaintiff's own words, LifeScan and Roche "receive[d] modified treatment under the Amended Plan, whereby ***each one waived*** entitlement to half of the first $100,000 distributed to creditors." *Id*. (emphasis added). That isn't a claim being "allowed as scheduled;" it's a settlement, compromise, and waiver of a previously disputed claim.

### B. Plaintiff Failed to Distinguish Well-Established Texas Law Prohibiting a Settling Person (Plaintiff) from Seeking Contribution.

Plaintiff's attempt to distinguish well-settled Texas law barring a settling tortfeasor (Alliance) from seeking contribution from an alleged non-settling joint-tortfeasor (Baker) – arguing that cases involving settlements outside of bankruptcy are inapplicable, or suggesting that Plaintiff's mislabeled direct claims might seek something other than barred contribution (*see* Response, pp. 19-22) – also falls flat.

As Judge Hanen noted in *Perlstein*, Chapter 33 defines a "Settling Person" as "a person who has, at any time, paid or promised to pay money or ***anything of monetary value to a claimant*** in consideration of potential liability with respect to the personal injury, property damage, death, or other harm for which recovery of damages is sought." *See Perlstein v. Vuono*, No. CIV.A. B-07-133, 2008 WL 3539769, at *6 (S.D. Tex. Aug. 13, 2008) (emphasis added) (citing TEX. CIV. PRAC. & REM. CODE § 33.011(5)); *see also In re Today's Destiny, Inc.*, 388 B.R. at 756 ("A creditor filing a proof of claim is a 'claimant'").

Plaintiff is a "Settling Person" under Chapter 33 because Plaintiff (through her predecessor) promised monetary value (agreed, liquidated claims) to the Manufacturers (*i.e.*, the Claimants) in exchange for, among other things: (a) avoiding the uncertainties and costs of

litigating claim objections, (b) the Manufacturers' vote in favor of the Plan, and (c) the Manufacturers' agreement to waive the first $50,000 in recovery on their previously disputed and unliquidated claims in favor of other creditors. That's a settlement, no matter the document's title. *See Perlstein*, 2008 WL 3539769, at *6 (S.D. Tex. Aug. 13, 2008) ("[Plaintiff] became a 'settling person' for purposes of Chapter 33 of the Texas Civil Practice and Remedies Code on May 18, 2007, the day that he chose to sign the Settlement Agreement with [third-party] …. Despite having these other options and remedies at his disposal, [plaintiff] chose instead to become a settling person before he ever sought to obtain contribution from [defendant]").

This Court in *Today's Destiny* firmly rejected Plaintiff's argument that well-settled Texas cases barring a settling tortfeasor from seeking contribution are inapplicable because those cases do not involve bankruptcy. *See* 388 B.R. at 758 ("The procedural differences between filing a proof of claim in a bankruptcy court and filing a civil complaint in a district court are not significant enough to warrant excluding the Texas Proportionate Responsibility Statute from bankruptcy courts, particularly where there is no evidence that the legislature intended an exclusion"). In *Today's Destiny*, this Court also rejected the argument that the creditors' filing proofs of claim against the debtors (rather than filing an adversary proceeding) somehow eliminated the possibility for the debtors to seek contribution against the alleged joint tortfeasors. *Id.* at 757-59.

Here, Plaintiff makes a similar procedural argument by claiming that a stipulation to resolve claims is somehow distinct from a settlement of claims in a lawsuit. The Court should reject this argument because it's irrelevant whether Plaintiff entered a settlement, stipulation, or some other type of contract. Because Plaintiff promised something of monetary value to the Manufacturers to resolve their proofs of claim, Plaintiff is prohibited from seeking contribution from Baker.

III.   **PLAINTIFF FAILED TO PLEAD HOW DIFFERENT LEGAL ADVICE WOULD HAVE CAUSED UNIDENTIFIED PERSONS TO CHANGE ALLIANCE'S SELF-SUSTAINING BUSINESS PRACTICES AND CAN'T OVERCOME MULTIPLE CAUSATION NEGATING DOCTRINES.**

Plaintiff's direct claims fail because they lack plausible allegations on the element of causation. Specifically, Plaintiff fails to plead that: (a) Alliance was unaware its conduct was illegal, or (b) Alliance would have stopped its illegal conduct if so advised. As shown below and in the Motion, these omissions are fatal because they leave the Court without an answer on the key causation question: ***what would have happened but for the attorney's alleged wrongdoing?***[17]

After failing plausibly to allege causation, Plaintiff erroneously asks the Court to ignore causation at the pleading stage based on a long-abandoned characterization of federal pleading standards taken from *Conley v. Gibson*,[18] which the Supreme Court held, almost sixteen years ago, "has earned its retirement" and "is best forgotten as an incomplete, negative gloss on an accepted pleading standard . . . ." *See* Response, p. 29; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). But modern federal pleading standards require much more than Plaintiff has, or can ever, plead.

### A.   Plaintiff Flunked the Pleading Requirements Under *Twombly* and *Iqbal*.

As this Court has recognized, *Twombly* and *Iqbal* require that: "(1) ***every element*** of each cause of action must be supported by ***specific factual allegations***; and (2) the complaint must state a plausible claim for relief." *Keba Energy LLC v. ATP Oil & Gas Corp. (In re ATP Oil & Gas*

---

[17] "Whether a negligent lawyer's conduct is the cause in fact of the client's claimed injury requires an examination of the hypothetical alternative: What should have happened if the lawyer had not been negligent?" *Rogers v. Zanetti*, 518 S.W.3d 394, 404 (Tex. 2017).

[18] In *Conley*, the Supreme Court stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45-46 (1957). Although Plaintiff elsewhere acknowledges the modern, plausibility-driven test from *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff's causation arguments improperly rely on the old *Conley* test (quoted from a 1986 Fifth Circuit case) and erroneously suggest (based on another pre-*Twombly* case) that causation allegations cannot be tested on a motion to dismiss. Plaintiff is wrong, especially under modern federal pleading standards.

*Corp.*), No. 12-03517, 2013 WL 5308862, at *4 (Bankr. S.D. Tex. Sept. 18, 2013) (Isgur, J.) (emphasis added) (quoting *Kan v. One West Bank, FSB*, 823 F.Supp.2d 464, 468 (W.D. Tex. 2011)).

Causation is not exempt from these basic requirements, and many claims have been dismissed for failure plausibly to plead causation. Representative cases include:

- *Reneker v. Offill*, No. CIV.A.3:08-CV-1394-D, 2009 WL 3365616, at *6 (N.D. Tex. Oct. 20, 2009), cited in the Motion, where the court dismissed claims against a law firm for failure plausibly to plead causation because "[i]t is speculative to assume that any change in [the law firm's] actions would have altered the actions of the  . . . [c]lients" and, as here, "the . . . complaint [d]id not allege that the . . . clients were unaware of the illegality of their actions or that their illegal actions were unintentionally so . . . .;"

- *Taylor v. Scheef & Stone, LLP*, No. 3:19-CV-2602, 2020 WL 4432848, *6 (N.D. Tex. July 31, 2020), cited in the Motion, where the court, citing *Reneker*, dismissed malpractice claims against a law firm for failure plausibly to plead causation. As here, "by failing to allege that the [clients] were unaware of the illegality of their actions, or that they would have followed competent advice, [plaintiff] . . . failed to plead sufficient facts to support a plausible claim that Scheef & Stone *caused* the [clients'] damages;" (emphasis in original);

- *Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 387 (N.D. Tex. 2022), *aff'd*, 2023 WL 2645553 (5th Cir. Mar. 27, 2023), where the district court, affirmed by the Fifth Circuit, dismissed with prejudice plaintiffs' claims that an employer's negligence caused plaintiffs to contract COVID-19 because the plaintiffs had failed plausibly to plead causation;[19]

- *Kelley v. City of Dallas*, No. 3:16-CV-1015-B-BK, 2017 WL 3891680, at *5 (N.D. Tex. Aug. 17, 2017), report and recommendation adopted, 2017 WL 3868257 (N.D. Tex. Sept. 5, 2017), where plaintiffs' claims were dismissed because plaintiffs had not plausibly alleged that, if the defendant telecom companies had "pinged" the victim's phone sooner, any of the emergency responders would have responded sooner; and

- *DM Arbor Court, Ltd. v. City of Houston*, No. CV H-18-1884, 2021 WL 4926015, at *34 (S.D. Tex. Oct. 21, 2021), where a property owner's tortious interference claim against the City of Houston failed because the complaint contained only conclusory allegations that the City's communications with HUD had caused the owner to lose a

---

[19] As the Fifth Circuit explained, "Plaintiffs' pleading must proffer facts which plausibly suggest that each plaintiff contracted COVID-19 *at the Tyson facility* as a result of Tyson's failures to warn, remediate, or implement government-promulgated protocols" (emphasis in original). 2023 WL 2645553, at *3.

contractual relationship with HUD, and contained other allegations which refuted the notion that the City's communications had caused the loss.

**B.     Plaintiff Failed to Plead That Different Legal Advice Would Have Caused Unidentified Persons to Change Alliance's Knowing Conduct.**

Plaintiff's entire theory of this case is that Alliance and its decisionmakers were engaged in willful, intentional fraud – not unwitting technical violations. The most instructive cases on claims against a law firm in that context are *Reneker* and *Taylor*. Both cases dismissed malpractice claims because the plaintiff failed plausibly to plead causation – ***what would have happened with different advice***? Plaintiff barely acknowledges these cases, even omitting their full citations on p. 32 of her Response, and suggests that they are distinguishable because they purportedly only involved "limited allegations of 'legal advice.'" Again, Plaintiff is wrong and hasn't plausibly pled causation.

In *Reneker*, the plaintiff receiver alleged two categories of claims. The first alleged that Godwin Pappas attorneys had "improperly responded to securities authorities after receiving an inquiry regarding the . . . Clients; gave false information to the authorities; failed to correct this false information upon later learning of the error; and failed to take action to stop the . . . Clients' actions."  2009 WL 3365616, at *4. The court characterized those allegations as improperly premised on a non-existent duty to investors, securities authorities, or the public at large and thus dismissed them for failure to ***plausibly plead a breach of duty*** owed to the client. *Id*.

But the *Reneker* receiver also alleged a second category of claims, more relevant here, which complained that "Godwin Pappas did not properly investigate the . . . Clients' actions and did not advise them to stop issuing the securities ***upon learning*** of their illegality" (emphasis added). *Id*. at *5. The key point for this case, which Plaintiff misses, is that this ***second*** category of claims was dismissed for failure ***plausibly to plead causation***. *See id*. at *6 (finding the causation allegations implausible because the complaint did not "allege that the . . . Clients were

unaware of the illegality of their actions or that their illegal actions were unintentionally so"). As a result, the Court found it would have been "speculative to assume that any change in Godwin Pappas' actions *would have altered the actions of the . . . Clients themselves.*"  *Id*. (emphasis added). The same is true here, and just as in *Reneker*, it makes no difference that Baker allegedly knew of Alliance's illegal conduct because the fatal causation problem is the *absence* of any allegation that *Alliance didn't know* it was breaking the law or *would have changed course* but for the absence of different legal advice.

Likewise, in *Taylor*, the law firm's alleged breaches included "creating a bonus program that assisted [the client's CEO] in using unlicensed securities sales staff to sell unregistered securities; advising [the CEO] that his Internet-based securities sales tactics did not constitute "general solicitation"; failing to urge [the CEO] to disclose investor fraud claims; *lying to regulators*, and "*acquiesc*[*ing*] *in* [*the CEO's*] *lies* to and withholding of relevant documents from regulators[.]" 2020 WL 4432848, at *5 (emphasis added). Despite these allegations, as in *Reneker*, the Court found that plaintiff's "failure to plead that the [clients] were unaware of the illegality of their conduct [was] fatal to his [malpractice] claim."  *Id*. at *6 (the claim also failed because *plaintiff failed to plead that the clients "would have heeded competent advice*") (emphasis added).

Plaintiff's citation to *Janvey v. Proskauer Rose LLP*, No. 3:13-CV-0477-N, 2015 WL 11121540 (N.D. Tex. June 23, 2015), is uninformative because *Janvey* only addresses the first category of claims in *Reneker*, making misrepresentations to regulators, which was dismissed because the receiver failed to identify a *breach of duty* to the client.  *See id*. at *6 ("In *Reneker*, this Court held that a malpractice claim based on an attorney's failure to report the client's wrongdoing was deficient on its face because the attorney owed no duty to third-parties to apprise

them of the client's wrongdoing."). *Janvey*, however, does not address the second category of alleged wrongdoing in *Reneker* (*i.e.*, failing to advise the client that its actions were illegal) – and it was the second category which *Reneker* dismissed for failure to plead causation.

Indeed, *Taylor* distinguishes *Janvey* at length, explaining that "it is entirely possible for '[a] lawyer [to] be negligent and yet cause no harm.'" *Taylor*, 2020 WL 4432848, at *6 n.7 (quoting *Rogers*, 518 S.W.3d at 400). As *Taylor* explains:

> [W]hile an attorney's assistance in skirting regulations may be a *breach* of his duties to the client, it does not necessarily follow—absent sufficient allegations to the contrary—that his assistance *caused* harm to the client. If a client knowingly skirts regulation and intentionally engages in wrongdoing, irrespective of an attorney's advice, it is not clear how the attorney's adequate advice could have avoided or otherwise reduced the harm the client.

*Id*. (emphasis in original) (further explaining that "[f]or this reason, allegations that a lawyer 'assisted' a client's illegal action or provided deficient legal advice that contributed to the client's harm, without more, are insufficient to satisfy the causation prong [of a] professional negligence claim."). Plaintiff's malpractice claim fails for these same reasons – Plaintiff hasn't alleged what would have happened but for Baker's alleged negligence.

### C.    Imputation (or Not) Does Not Change Plaintiff's Failure to Allege That Alliance Would Have Followed Different Legal Advice.

Finally, Plaintiff tries to distinguish the causation-negating doctrines in Baker's Motion with a single citation to *F.D.I.C. v. Ernst & Young*, 967 F.2d 166, 168 (5th Cir. 1992), and an attempt to question whether Alliance's directors' and officers' alleged wrongdoing should be imputed to Alliance itself. But an imputation question does not save Plaintiff's malpractice claim from dismissal, because even if one or more of Alliance's directors and officers acted entirely

adverse to Alliance,[20] it still would be implausible to conclude that Alliance – governed by the same individuals – would have followed advice to stop committing the same illegal acts.

Although Plaintiff also alleges there was at least one (unidentified and un-pled after years of investigation) member of the Debtors' management or board who lacked full knowledge of the Questionable Business Practices, *see* Compl., ¶ 256, this does not make it plausible to find that Alliance would have followed any different advice from Baker. Instead, Plaintiff's own allegations, along with those of the Manufacturers in the New Jersey litigation, repeatedly show that Alliance already had advice and ample warnings about the illegality of its conduct.

Among other things, Plaintiff alleges that for a three-year period ***before the Alliance bankruptcy***, "certain of the Debtors' primary business practices came under scrutiny involving serious allegations of misconduct raised by multiple whistleblowers within Alliance." *See* Compl., ¶ 250. These whistleblowers didn't change Alliance's conduct;[21] various "repeated and explicit warnings," including ***years of advice*** from Brown Fortunato before Baker ever got involved didn't change Alliance's conduct;[22] and it is entirely speculative and implausible for Plaintiff to contend – especially without any pleaded supporting allegations – that different advice from Baker would have changed Alliance's conduct.

---

[20] *See F.D.I.C. v. Shrader & York*, 991 F.2d 216, 223 (5th Cir. 1993) (explaining that to avoid imputation, an agent's actions must be ***entirely*** for his or her own purposes and adverse to the principal's interests; imputation is not avoided merely by showing that the agent had some level of adversity with the principal's interests, or even that the agent had a primary interest inimical to that of the principal).

[21] *See e.g.* EX. 11, APP. P. 308, ¶ 141, EX. 20, APP. P. 456, ¶ 121 ("On February 10, 2014, Mr. Gubler [a pharmacist] sent an email to Defendant Sahily Paoline [Alliance's Senior Vice President of Pharmacy Operations]… detail[ing] Mr. Gruber's concern that he was not 'following the laws'"); EX. 20, APP. P. 458 ¶ 133 ("In 2014, Amin [a pharmacist] raised concerns about Alliance's practice of dispensing NFR strips but adjudicating them using the NDC for retail strips.").

[22] *See* Motion, ¶¶ 24-26 (summarizing same); *see e.g.* EX. 31, APP. P. 828.

From a causation perspective, it thus makes no difference whether the wrongdoers were working (at least in part) for Alliance's benefit, or solely for their own benefit. What matters is the resulting conduct, as alleged in the Complaint: Alliance pharmacies routinely submitted false insurance claims when they sold diabetic test strips because doing so was, in Plaintiff's own words, key to the company's "financial success."[23]  Thus, regardless of whether, or how, the Court chooses to consider imputation, any malpractice claim fails for lack of causation.

>  D.  **Plaintiff Ignores the Causation-Negating Doctrines in the Motion, Which Independently Are Fatal to Causation Here.**

Plaintiff tries to evade numerous causation-negating doctrines cited in the Motion by arguing that "Baker fails to justify the application of Texas[] . . . [law]."  *See* Response, p. 30. But as shown in Section I above, it was Plaintiff's burden to show a conflict of laws in order to escape the presumption that Texas law applies, and Plaintiff failed to meet that burden. Accordingly, Baker stands on each of the causation-negating doctrines as urged in section III.A of the Motion and respectfully urges the Court to dismiss the direct claims on those grounds.[24]

>  IV.  **BECAUSE PLAINTIFF GLOBALLY RELEASED ALLIANCE'S FORMER OFFICERS FROM ALL CLAIMS (INCLUDING BREACH OF FIDUCIARY DUTY) AND AIDING AND ABETTING IS NOT A STAND-ALONE TORT, BAKER CAN'T BE LIABLE FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY PLAINTIFF CAN NEVER PROVE.**

Plaintiff's global release of fiduciary duty claims against Alliance's former directors and officers (the parties alleged to have breached fiduciary duties (*see* Compl., ¶ 294)) is fatal to any

---

[23] *See, e.g.*, Compl., ¶¶ 58 ("Alliance's financial success was rooted in diabetes test strip fraud—and due to that fraud, serious legal risk."); 72 ("The Alliance Pharmacies submitted millions of insurance reimbursement claims in which they falsely stated that they had dispensed retail strips but in fact had dispensed NFR strips."). Moreover, if Alliance's governing persons were acting at least in part for Alliance's benefit, their actions are imputed to Alliance, and all of the causation-negating doctrines cited in the Motion are an even clearer bar to any malpractice claim for lack of causation.

[24] It makes no difference that certain of Baker's cited cases arose in the summary-judgment context, because Plaintiff's admissions, including those identified in ¶¶ 9-10, 19, and 24-26 of the Motion and ¶¶ 128, 311 and 327 of the Complaint, make it undisputed that Alliance committed the fraud which proximately caused its own alleged damages. There is no fact issue when, as here, Plaintiff admits the facts barring her claim.

aiding and abetting breach of fiduciary duty claim because Plaintiff ***can't establish liability for the underlying breach***. *See Clingman & Hanger Management Associates LLC v, v. Rieck*, No. 4:21-CV-02698, 2023 WL 2744399, at *13-16 (S.D. Tex. Mar. 30, 2023) (Eskridge, J.) (elimination of fiduciary duties in amended LLC agreement negated aiding and abetting breach of fiduciary duty claim against debtor's attorneys – even for events before the amendment – because "such a claim requires an underlying breach of fiduciary duty. And none exists here as to officers of Furie [the debtor]"); *W. Fork Advisors, LLC v. SunGard Consulting Services, LLC*, 437 S.W.3d 917, 921 (Tex. App.—Dallas 2014, pet. denied) ("[W]hen an underlying tort fails, there [can't be] an aiding and abetting claim related to that failed tort. [Plaintiff's] failure to establish independent tort liability against any named defendant is fatal to its aiding and abetting claims."); *PrevMED, Inc. v. MNM-1997, Inc.*, No. CV H-15-2856, 2017 WL 785656, at *12 (S.D. Tex. Feb. 28, 2017) (Lake J.) ("The Texas Supreme Court has specifically dealt with aiding and abetting as a dependent claim premised on the underlying tort") (internal citation omitted).

## V.   PLAINTIFF'S INDIRECT CLAIMS ARE BARRED UNDER APPLICABLE STATUTES OF LIMITATIONS.

As discussed in Section I(F) above, Texas law governs the statute of limitations for Plaintiff's purported negligent misrepresentation claim on behalf of Manufacturers (Count VI) – two-year limitations – and purported fraud claim (Count VII) – four-year limitations.[25] The alleged RICO claims (Counts VIII-IX) also are subject to four-year limitations.[26]

---

[25] *See Kansa Reinsurance Co., Ltd. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1371 (5th Cir. 1994) (applying a two-year limitations period to negligent misrepresentation claim); TEX. CIV. PRAC. & REM CODE § 16.004 (four-year statute of limitations for fraud claims).

[26] *See Rogers v. McDorman*, 521 F.3d 381, 387 (5th Cir. 2008) ("[A]lthough civil RICO does not provide for a statute of limitations, the Supreme Court nevertheless held that civil RICO claims are subject to a four-year statute of limitations").

A.     **The Tolling Agreement at Most Only Tolled Plaintiff's Direct Claims, but Never Mentions and Doesn't Toll the Manufacturers' Purported Claims.**

Plaintiff fails to address (let alone rebut) Baker's point that the Tolling Agreements' definition of "Claims" ***does not*** encompass third-party claims, including the Manufacturers' purportedly assigned claims which are not even mentioned.

The Initial Tolling Agreement between "RONALD L. GLASS (the 'TRUSTEE'), Chapter 11 Trustee of and for the estates of the above-referenced jointly administered Debtors (collectively, the 'Debtors')" states:

> [S]ince his appointment the TRUSTEE and his Court-approved professionals have been investigating the business and financial affairs of the Debtors, including potential claims for breach of fiduciary duty, professional negligence and other claims and relief against the Debtors' professionals and other third parties, including BAKER (collectively, the "Claims");

Ex. 7, APP. P. 99-100. The Initial Tolling Agreement does not cover third-party claims (assigned or otherwise) and the Trustee had no claims for RICO, negligent misrepresentation, fraudulent misrepresentation, or aiding and abetting alleged wrongdoing – which are the purportedly assigned claims which Plaintiff now pursues on behalf of the Manufacturers. *See id.*

Critically, every purported extension of the Initial Tolling Agreement ***did not*** modify or alter the scope of the ***Trustee's*** "Claims" which ***never*** mentioned or encompassed the Manufacturers' purportedly assigned claims. *See* EXS. 17, 21, 24, 26, 29, & 30, APP. PP. 416, 547, 640, 646, 820, & 823 ("***[A]ll other terms and conditions of the Initial Tolling Agreement shall remain in full force and effect***") (emphasis added). Accordingly, the purported Tolling Agreements never tolled the Manufacturers' claims, which are barred by limitations.

**B.      Even if the Tolling Agreements Cover Plaintiff's Indirect Claims (Which They Do Not), They Could Not Be Tolled Until December 2020 at the Earliest.**

If the Plaintiff's indirect claims were tolled, those claims were tolled ***no earlier than December 15, 2020*** because the Court did not approve the Manufacturers' purported assignment of claims until June 20, 2020, ***six days after*** the June 14, 2020 amendment to the Initial Tolling Agreement. *See* Motion, p. 35.[27]

Plaintiff argues that the May 2020 "Privilege Stipulation" immediately conveyed the Manufacturers' purported claims to Plaintiff because "[n]owhere did the Privilege Stipulation condition the assignment of claims upon subsequent Court approval." Response, p. 33. But Plaintiff contradicts herself elsewhere in the Response, conceding that "the Test Strip Manufacturers, ***with permission from this Court***, have assigned their [purported] claims against Baker to the Liquidating Trustee." Response, p. 46 (emphasis added). The Court did not approve the Privilege Stipulation until June 20, 2020 and, despite Plaintiff's inconsistent positions, the purported assignment could not become effective before then. *See* Ex. 25, App. p. 641-43 (Order Granting Privilege Stipulation).

Importantly, the Privilege Stipulation states that the purported assignment was "[s]ubject to the Trustee's compliance with all the foregoing [conditions]" which required the Trustee to take action ***after*** the Court approved the stipulation. *See e.g.* Ex. 23, App. pp. 588-89, ¶ 2 ("Within ***five (5) business days after approval of this Stipulation by the Bankruptcy Court***, the Trustee will" instruct persons regarding waiver of privilege) ¶ 8 ("***Subject to the Trustee's compliance with all of the foregoing*** [*i.e.* ¶ 2], the Test Strip Manufacturers hereby convey any and all TSM Potential

---

[27] The December 15, 2020 Amendment to Standstill Tolling Agreement (Ex. 26, App. pp. 645-46) was the first agreement between Plaintiff's predecessor and Baker after the Court approved the purported assignment of the Manufacturers' claims.

Claims to the Trustee for him to assert on behalf of all beneficiaries of the Liquidating Trust").

The Trustee could not comply with ¶ 2 (and others) until *after* this Court approved the stipulation

on June 20, 2020.

> **C.    Plaintiff's Purported Claims on Behalf of the Manufacturers Are Time-Barred Because the Manufacturers and Their Outside Attorneys at Patterson Belknap Clearly Knew – Not Merely Should Have Known – of the Purported "Straightforward" Fraud, and Causally-Linked Injury and Damages No Later than 2014 (LifeScan) and 2015 (Roche).**

Plaintiff didn't (and couldn't) refute that LifeScan and Roche knew of the

"straightforward" Questionable Business Practices (and causally-linked injury and damages) in

2014 and 2015 respectively – ***more than four years before any purported tolling agreement***. But

– like choice of law – Plaintiff claims the Court must wait to decide any limitations defense. *See*

Response, p. 35. Not so. Materials before the Court on the Motion clearly establishes the

Manufacturers' knowledge of the purported scheme outside the limitations period for all indirect

claims and refutes Plaintiff's assertion that the Manufacturers could not have discovered the

alleged wrongdoings until July 2017. *See* Compl, ¶ 262.

### *LifeScan*

- ***April 2014*** – LifeScan (then owned by Johnson & Johnson) claimed in a ***draft lawsuit*** that "[i]n April 2014 … a pharmacist … informed representatives of LifeScan that [an Alliance affiliated pharmacy] was distributing LifeScan product intended for [NFR patients] to [Retail patients]." Ex. 3, App. p. 37, ¶ 69;

- ***June 2015*** – "In June 2015, a second confidential witness, a former employee of Alliance, confirmed that Alliance engages in diverting blood-glucose test strips intended for DME Beneficiaries (e.g., Gray Box Wholesale Product) to Pharmacy Beneficiaries, thereby profiting from the high reimbursements insurance companies pay on test strips intended for Pharmacy Beneficiaries (e.g., Blue Box Retail Product)" *See id.*, App. p. 41 (emphasis added); *see also* Ex. 32, App. 902, ¶ 234 (Plaintiff alleges in the Brown & Fortunato amended complaint that "[o]n ***June 25, 2015***, LifeScan's counsel e-mailed Alliance's outside counsel Bennett stating: '***the current allegation is that Alliance is engaged in a massive billing fraud***.'") (emphasis added);

- ***July 2015*** – LifeScan agreed to ***mediate disputed matters*** with Alliance. *See* Ex. 3, App. p. 61 (Letter from Patterson Belknap (counsel for LifeScan) to Bennett Tueller (counsel for

Alliance) stating "In July 2015, my clients LifeScan, Inc. and Johnson & Johnson [] entered into an Agreement to Mediate [] with your clients [Alliance]");

- ***November 2015*** – Plaintiff alleged that "***no later than November 24, 2015*** … that test strip manufacturer Johnson & Johnson [then owner of LifeScan] had ***already threatened a lawsuit against Alliance for its fraudulent activities***." Compl,. ¶ 97 (emphasis added); and

- In its draft complaint, LifeScan ***claimed damages amounting "to no less than $38.9 million" for alleged improper reimbursement "[b]etween 2009 and 2015.***" Ex. 3, App. P. 45, ¶¶ 103, 107 (emphasis added).

***Roche***

- Plaintiff alleged that "[i]n the final version of the memorandum provided to the Board in ***November 2015***, Grant made no attempt to deny the [prior] ***allegations made by Roche … that Alliance was engaged in what was described as a 'massive insurance fraud scheme.***'" Ex. 32, App. P. 907, ¶ 244 (Plaintiff's First Amended Complaint against Brown & Fortunato) (emphasis added); and

- Plaintiff alleges that "***starting in 2015*** … Roche[] complained about the [Questionable Business Practices], and independently privately made multiple written demands on Alliance and its Affiliates for ***payment of damages and other relief***." Ex. 22, App. P. 555, ¶ 28 (Plaintiff's Complaint against Bennet Tueller) (emphasis added).

Plaintiff's allegations thus show that the Manufacturers ***knew*** of the Questionable Business Practices, and casually-linked injury and damages no later than 2014 (LifeScan) and 2015 (Roche).

> (1) <u>The alleged aiding and abetting negligent misrepresentation claim has been barred since 2016 (LifeScan) and 2017 (Roche) and the purported fraud claim has been barred since 2018 (LifeScan) and 2019 (Roche).</u>

The Manufacturers' knowledge of the Questionable Business Practices (and causally-linked injury and damages) no later than 2014 (LifeScan) and 2015 (Roche) barred Plaintiff's indirect fraud claims by 2018 and 2019, respectively, and by 2016 and 2017, respectively, for negligent misrepresentation. Thus, Counts VI and VII were barred long before the purported June 2020 tolling agreement that Plaintiff claims – and Baker disputes – tolled the indirect claims.

Plaintiff's reliance on the discovery rule is misplaced because the rule "defers the accrual of a cause of action until the ***plaintiff knew*** or, exercising reasonable diligence, should have known

of the ***facts giving rise to the cause of action***." *Curtis v. Cerner Corp.*, 621 B.R. 141, 165, 169 (S.D. Tex. 2020) (Alvarez, J.) (granting defendants' motion to dismiss on limitations, including fraud claim) (emphasis added).[28] The Manufacturers clearly knew those facts – and even threatened legal action based on them – no later than 2014/2015.

Further, the Manufacturers' discovery of Baker's purported involvement in the Questionable Business Practices is immaterial and has no bearing on applying the discovery rule because limitations commenced when the Manufacturers knew (or should have known) of the harm caused by the Questionable Business Practices, not the identity of every potentially liable party:

- *PPG Industries, Inc. v. JMB/Houston Centers Partners Ltd. Partnership*, 146 S.W.3d 79, 93-94 (Tex. 2004) ("[The discovery rule] tolls limitations ***only until a claimant learns of a wrongful injury*** . . . . ***even if the claimant does not yet know***: the specific cause of the injury; the ***party responsible for it***; the full extent of it; or the chances of avoiding it.") (footnotes omitted) (emphasis added);

- *Timberlake v. A.H. Robins Co., Inc.*, 727 F.2d 1363, 1365-66 (5th Cir. 1984) (limitations began running when plaintiff discovered that a medical device caused her health problems, ***not when plaintiff learned that the device's manufacturer may have engaged in wrongful conduct***, which the Court found that plaintiff should have investigated during the two years after she learned of her injury) (emphasis added); and

- *Tarpley v. Texaco, Inc.*, No. CA-3-96-CV-3209, 1998 WL 133122 (N.D. Tex. Mar. 16, 1998) ("All that is required to commence the running of the limitations period is the discovery of the injury and its general cause, ***not*** the exact cause in fact and ***the specific parties responsible***.") (citing *Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co.*, 866 S.W.2d 740, 743 (Tex. App.—Houston [14th Dist.] 1993, writ denied)) (emphasis added).[29]

---

[28] Further, the discovery rule is inapplicable to Plaintiff's alleged negligent misrepresentation claim (Count VI). *See Kansa Reinsurance Co., Ltd. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1372 (5th Cir. 1994). The *Precept* opinion cited in Plaintiff's Response also acknowledges that "in Texas, the statute of limitation for claims of negligent misrepresentation is not tolled by application of the discovery rule." *In re Precept Bus. Servs., Inc.*, No. 01-31351-SAF-7, 2004 WL 2074169, at *6 (Bankr. N.D. Tex. Aug. 23, 2004).

[29] Although Plaintiff also attempts to rely on Baker's "continuous representation" of Alliance as a purported basis for tolling, *see* Response, pp. 35-36, the Texas Supreme Court rejected that doctrine 35 years ago. *See Willis v. Maverick*, 760 S.W.2d 642, 645 & n.2 (Tex. 1988).

(2)    <u>Plaintiff's purported RICO claims are time barred because the Manufacturers' knew of the alleged RICO scheme outside the four-year limitations period.</u>

As shown above, the Manufacturers **knew** of the "straightforward" fraudulent scheme in 2014 and 2015 which commenced the four-year RICO limitations clock. In the Fifth Circuit, "[t]he 'separate accrual' rule [for civil RICO claims] … **does not apply where a plaintiff already knows or should know of the fraud.**" *DeShazo v. Nations Energy Co. Ltd*., 286 Fed. Appx. 110, 117 (5th Cir. 2008) (internal citations omitted); *see also Bradley v. Phillips Petroleum Co*., 527 F. Supp. 2d 625, 654 (S.D. Tex. 2007) (Atlas, J.), *aff'd sub nom*., *Bradley v. Phillips Chem. Co*., 337 Fed. Appx. 397 (5th Cir. 2009) (granting law firm defendant's motion to dismiss time-barred RICO claim and finding "[t]he running of the statute of limitations does not await the 'leisurely discovery of the full details of the alleged scheme.' **Nor does the discovery rule permit putative RICO plaintiffs to await detection of some 'vast scheme' by which they were injured**; the [discovery] rule contemplates that plaintiffs will exercise due diligence in the detection of their injury") (emphasis added) (internal citations omitted).

Here, Plaintiff can't escape her admission that the Manufacturers **knew and alleged** that Alliance was engaged in a **massive billing fraud scheme** that forms the basis of her RICO claims in 2015. *See* Ex. 32, APP. 902, ¶ 234 (Plaintiff alleges in the Brown & Fortunato amended complaint that "[o]n **June 25, 2015**, LifeScan's counsel e-mailed Alliance outside counsel Bennett stating: '**the current allegation is that Alliance is engaged in a massive billing fraud**.'") (emphasis added); "In the final version of the memorandum provided to the Board in **November 2015**, Grant made no attempt to deny the [prior] **allegations made by Roche** … **that Alliance was engaged in what was described as a 'massive insurance fraud scheme**.'" Ex. 32, APP. P. 907, ¶ 244 (Plaintiff's First Amended Complaint against Brown & Fortunato) (emphasis added). The Manufacturers' admitted knowledge and allegations regarding the purported fraudulent scheme in

2015 (although LifeScan knew of the fraud in April 2014) barred any purported RICO claim no later than 2019 – six months before Plaintiff even alleges tolling of the indirect claims.

Thus, all indirect claims are time-barred as a matter of law and must be dismissed.

**VI.    PLAINTIFF'S ALLEGATIONS (ON BEHALF OF MANUFACTURERS) FOR NEGLIGENT AND FRAUDULENT MISREPRESENTATION FAIL AS A MATTER OF LAW BECAUSE A PARTY CAN'T JUSTIFIABLY RELY ON AN ADVERSARY'S STATEMENTS OR OMISSIONS.**

**A.    As a Matter of Law, Neither the PBMs Nor the Manufacturers Could Rely on Baker's Adversarial Statements to the PBMs.**

Plaintiff concedes that Baker made "adversarial" submissions to the PBMs. *See Response*, p. 41 ("Baker's *adversarial submissions* to the PBMs") (emphasis added). Plaintiff claims she "is relying on the application of the 'indirect reliance' theory" (Response, p. 41), but that theory cannot support justifiable reliance when the alleged statements and omissions were made in an adversarial setting by Baker – on behalf of its client (Alliance).

The Response ignores clear authority that a party may not justifiably rely on an opposing attorney's statements in an adversarial setting. As a matter of law, the PBMs and, in turn, the Manufacturers, couldn't rely on Baker's alleged statements (indirect or otherwise) in adversarial PBM audits. *See Cox v. Steak N Shake, Inc*., No. 3:20-CV-00061, 2020 WL 5232826, at *2 (S.D. Tex. Sept. 2, 2020) (Edison, Mag. J.) (granting motion to dismiss plaintiff's fraudulent/negligent misrepresentation claims because "[i]t is a 'well-settled rule that a party may not justifiably rely on an opposing attorney's statements made in an adversarial setting[.]'") (internal citation omitted); *see also Chapman Children's Trust v. Porter & Hedges, L.L.P*., 32 S.W.3d 429, 443 (Tex. App. – Houston [14th Dist.] 2000, pet. denied) (finding that as a matter of law, plaintiff was not justified in relying on opposing counsel's representations "given the adversarial nature of the parties' relationship"). This negates any claim with a reliance element, including fraud and negligent misrepresentation.

B.     **Plaintiff Doesn't Even Plead the Who, What, When, Where, or How the Manufacturers Ever Received Baker's Adversarial Submissions.**

Finally, Plaintiff has failed to meet her burden under Rule 9(b) because the Complaint does not plead with particularity, much less sufficiently identify the who, what, when, where and how any of Baker's alleged misrepresentations ***to the PBMs*** ever reached the Manufacturers. *See Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (Under longstanding Fifth Circuit precedent, the plaintiff must plead "the who, what, when, where, and how" of any fraud – which Plaintiff fails to do).

Plaintiff can't establish reliance, so Counts VI & VII must be dismissed.

C.     **There is No Fraud Exception to Attorney Immunity, Which Bars Plaintiff's Indirect Claims.**

Contrary to Plaintiff's Response, the Texas Supreme Court has repeatedly held there is no fraud exception to attorney immunity. As the Texas Supreme Court held in *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477 (Tex. 2015):

- "Merely labeling an attorney's conduct 'fraudulent' does not and should not remove it from the scope of client representation or render it 'foreign to the duties of an attorney;'" and

- "***Fraud is not an exception to attorney immunity***; rather, the defense does not extend to ***fraudulent conduct that is outside the scope*** of an attorney's legal representation of his client, ***just as it does not extend to other wrongful conduct outside the scope*** of representation."

*Id*. at 483-84 (emphasis added). *Cantey Hanger* involved allegations of fraud by an attorney: a divorce litigant who sued opposing counsel for "fraud, aiding and abetting, and conspiracy," alleging that "[his ex-wife] and [her law firm, Cantey Hanger] falsified a bill of sale transferring [an airplane] from [a company owned by the plaintiff ex-husband] to a third party." *Id*. at 479-80 (further explaining that the alleged falsification was designed "to shift tax liability for the [airplane] from [the ex-wife] to [the ex-husband] in contravention of the [divorce] decree." *Id*. at 480.

Despite Cantey Hanger's allegedly fraudulent conduct, the Supreme Court upheld immunity, explaining that, because preparing the bill of sale "was within the scope of [Cantey Hanger's] representation of [the ex-wife] in the divorce proceedings," any "remedy is against [the ex-wife, not Cantey Hanger]." *Id*. at 485-86.

In repeatedly suggesting that fraudulent behavior is "foreign to the duties of an attorney," Plaintiff ignores the central holding in *Cantey Hanger* – **there is no fraud exception to immunity**. In fact, *Cantey Hanger* expressly rejected a series of prior court-of-appeals cases which had "broadly stated that attorney immunity does not extend to an attorney's knowing participation in fraudulent activities on a client's behalf." *See* 467 S.W.3d at 483. The only question for immunity is whether the alleged conduct **was part of** the attorney's "discharge of his duties to his client." If the answer is yes, then immunity applies – regardless of any alleged fraud by the attorney. *See id*. at 484.

All of Plaintiff's indirect/assigned claims complain about Baker's conduct **as part of representing Alliance**; thus, immunity bars all those claims. For example, the Response specifically references allegations that Baker "refused to take any action that would interfere with the [Alliance] fraud," and "intentionally concealed the fraud through the creation of the company's 'independent' pharmacies.'" *See* Response, p. 37. But alleging that an outside law firm failed to blow the whistle on a client's fraud, or filed legal paperwork to create pharmacies (or even advised Alliance about the independent pharmacy model),[30] still complains about the attorney's legal

---

[30] Baker could not have created the independent pharmacy model, which existed before 2014 when Baker was first engaged. *See* Response p. 53, n.32 (quoting an Alliance document stating that the independent pharmacy model started in 2013). Likewise, Plaintiff's Complaint against Brown Fortunato alleges that, four years before Baker was engaged, "**as early as September 2010**, Brown knew that Alliance intended to set up a network of 'independent' pharmacies to circumvent the legal obligations imposed by its contracts with PBMs." APP. P. 681 (emphasis in original); *see also id*. at APP. PP. 682-84 (Plaintiff alleges that Brown advised on the independent pharmacy model in 2013 and, in ¶ 134 of the Brown Complaint, alleges that "Alliance started executing on this plan almost immediately"); *id*. at APP. P. 718 (alleging that "Brown

services – not participating as a principal[31] in a "fraudulent business scheme" or "assaulting opposing counsel during trial," which are the examples of non-immune conduct the Supreme Court gave in *Cantey Hanger*. *See* 467 S.W.3d at 482.

Moreover, interpreting contracts and case law to determine whether Alliance's alleged business model was illegal, fraudulent, or violated a contract, and whether self-disclosure would be an advisable path, requires the training, skill, and expertise of an attorney. Likewise, it requires an attorney's skills to respond to PBM audits with adversarial submissions denying wrongdoing under PBM contracts. Accordingly, all of Baker's alleged conduct is immune, because all of Baker's alleged conduct was "part of" its representation of Alliance. *Id*. at 484.

None of the cases Plaintiff cites change this result:

- *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2015 WL 13741905, at *2 (N.D. Tex. Feb. 4, 2015), is a pre-*Cantey Hanger* case which found that lying to regulators about a client and conspiring with a client to commit fraud might overcome immunity, while relying on several cases the Texas Supreme Court abrogated or criticized in *Cantey Hanger* for their overly narrow views on immunity for allegedly fraudulent actions on behalf of a client.[32] *Stanford* is not current law on attorney immunity;

- *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 657-58 (Tex. 2020), reiterated *Cantey Hanger*'s holding that: fraud is not "an exception to the attorney-immunity doctrine;" crime is not a categorical exception to immunity; a law firm's allegedly criminal destruction of evidence through improper testing of a brake system was subject to immunity, and merely cited the "long recognized" rule,

---

knew . . . no later than July 2013 that Alliance's network of 'independent' pharmacies would misrepresent itself on PBM applications as retail pharmacies.").

[31] For example, in *Poole v. Houston & T.C. Ry. Co.*, 58 Tex. 134, 137 (Tex. 1882), the Supreme Court upheld an attorney's liability as a principal for using a false company's name to "assume[] the apparent ownership of . . . goods." Likewise, in *LJH, Ltd. v. Jaffe*, No. 4:15-CV-639, 2016 WL 3668170, at *8 (E.D. Tex. July 11, 2016), an attorney who owned an interest in the seller entity and acted as a principal of that entity was not immune from suit by the buyer as a principal, but the attorney's law firm was immune because it "did not have a personal stake in the sale of the equipment and realty, and, thus, if it was involved in the transaction at all, its actions were purely those of legal representation, which must be protected [on a motion to dismiss]."

[32] *See* 467 S.W.3d at 483.

**DEFENDANT BAKER & HOSTETLER LLP'S REPLY SUPPORTING MOTION TO DISMISS PLAINTIFF'S COMPLAINT – PAGE 33**

inapplicable here, that fraudulent activities "that fall outside the scope of the attorney's representation of a client" are not immune;

- *Haynes and Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 77 (Tex. 2021), held that "attorney immunity applies to claims based on conduct outside the litigation context" reiterated *Cantey Hanger*'s holding that "attorney immunity extends even 'to an attorney's knowing participation in fraudulent activities *on his client's behalf*,'" and reiterated the same limitation that "'participation in *independently* fraudulent activities'" as a principal is not shielded by immunity (emphasis in original).

Everything Baker allegedly did or failed to do was ***part of its representation*** of Alliance. All of Plaintiff's allegations involved conduct which required Baker's "uniquely lawyerly capacity of one who possesses 'the office, professional training, skill, and authority of an attorney.'" *See NFTD*, 631 S.W.3d at 77-78 (quoting another case decided the same day, *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 47, 52 (Tex. 2021), which held that publicizing a client's allegations was not immune because ***anyone***, not only an attorney, could have made the same public statements). So, all of Baker's alleged conduct is immune and the indirect claims fail as a matter of law.

## VII. REGARDLESS OF LIMITATIONS, THE RICO CLAIMS STILL FAIL AS A MATTER OF LAW FOR LACK OF CAUSATION AND VICARIOUS LIABILITY.

### A. Alliance's Allegedly False Statements to PBMs – Who Sought Damages for Their Purported Injury – Only Indirectly Affected the Manufacturers Thus Destroying Causation.

Alliance's purported RICO violations allegedly harmed the ***PBMs*** – which claimed they were injured by Alliance-owned pharmacies' alleged breaches of contract for which the PBMs claimed damages for chargebacks and refunded rebates. The ***PBMs*'** ***actions to recover for injuries and damages they suffered destroys RICO causation***. *See e.g.* Response, p. 53, n. 31; Compl, ¶ 104 (PBM "contracts [with pharmacies] give PBMs the right to audit pharmacies' compliance and, ***if breaches are discovered, to seek repayment of reimbursements – called "chargebacks"*** – and/or terminate the contract outright.") (emphasis added); Compl., ¶ 106 ("Numerous PBMs

audited, claimed chargebacks, and cancelled their contracts with these Alliance-owned pharmacies"); *see also Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 2 (2010), ("'[t]he general tendency of the law, in regards to damages at least, ***is not to go beyond the first step***,' [here the PBMs] and that 'general tendency' applies with full force to proximate cause inquiries under RICO") (internal citations omitted) (emphasis added), quoting *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 271-272 (1992).

It's illogical for Plaintiff to argue that PBMs suffered no harm and are mere conduits while affirmatively pleading that the PBMs sought to remedy their own legal injuries (*i.e.* seeking chargebacks based on Alliance's alleged breaches of multiple PBM contracts and "deceiv[ing] PBMs into believing they were dispensing retail strips … when they were in fact dispensing NFR strips" (Compl., ¶ 105)).[33] At a minimum, the PBMs suffered legal injuries – violations of their own contractual rights against the Alliance pharmacies – for which they sought remedies (*i.e.* chargebacks) as compensation. *See e.g. Smith Intern., Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (A "[l]egal injury is defined as an injury giving cause of action by reason of its being an invasion of a plaintiff's right.") (internal citation and quotations omitted).

Further, in a recent suit against one of Alliance's PBMs, Express Scripts, Inc. ("ESI"), the United States District Court found that the contract between ESI and the plaintiff (in a similar position as the Manufacturers) required that "[ESI] pursue recovery of 'Overpayment of any Claim made to a Participant,' and ma[de] [ESI] 'liable for all un-recovered Overpayments due to [ESI's]

---

[33] *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 644 (3d Cir. 2015), which Plaintiff cites to argue that Manufacturers suffered direct harm (Response, p. 48), is distinguishable because the alleged intermediaries that defendants claimed destroyed the causal chain – patients and prescribing doctors – ***suffered no injury***. Similarly, Plaintiff's reliance on *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629 (5th Cir. 2016) (Response, p. 49) is also unavailing because the court held a class of plaintiffs need not establish first-party reliance for RICO causation ***but did not address whether a more immediate victim – like the PBMs here – suffered harm***.

breach of this Agreement…'" *New York City Transit Auth. v. Express Scripts, Inc.*, 588 F. Supp. 3d 424, 430 (S.D.N.Y. 2022), reconsideration denied, No. 19-CV-5196 (JMF), 2022 WL 3577426 (S.D.N.Y. Aug. 19, 2022). The *Express Scripts* decision underscores that any alleged injury to the Manufacturers depends on the ***PBM's actions*** (*i.e.*, how well the PBMs performed their contractual duties to pursue overpayments) which is an intervening factor that contributed to the Manufacturers' alleged harm, thus destroying causation. *See Holmes*, 503 U.S. at 272-73. ("If the nonpurchasing customers were allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets …. [T]he law would be shouldering these difficulties despite the fact that those directly injured, the broker-dealers, could be counted on to bring suit for the law's vindication.").

### B.     Vicarious Liability Can't Create RICO Liability for Baker.

Plaintiff ignores that the only RICO claims at issue in *Crowe v. Henry* – a case she claims "rejected an argument that a '[law] firm … cannot be held vicariously liable'" for RICO (Response, p. 58) – were under 18 U.S.C. § 1962 ***(a) and (b)***. 43 F.3d 198, 206 (5th Cir. 1995) ("Finally, the firm argues that it cannot be held vicariously liable for the actions of [its agent]. In examining this question, we note that, as discussed in part IIID above, the only claims that remain open to [plaintiff] are for violations of ***18 U.S.C. § 1962(a) and (b).*** With this in mind, we find no barrier to vicarious liability in this case ***as such liability has been found to be available under subsections (a) and (b) when the principal has derived some benefit from the agent's wrongful acts***."). *Crowe's* pronouncement regarding vicarious liability has no effect on Plaintiff's alleged RICO claims – which are solely under 18 U.S.C. § 1962 (c) and (d) – and thus does not alter *First Nat.*

*Bank of Louisville v. Lustig*'s finding that "*respondeat superior* can *never* be the basis of liability for a civil RICO suit." 727 F. Supp. 276, 280 (E.D. La. 1989) (emphasis in original).

C.     **Plaintiff Does Not Dispute That Failure to Plead a Plausible RICO Claim Negates any RICO Conspiracy Claim.**

Well-established Fifth Circuit cases require dismissal of Plaintiff's RICO conspiracy claim (Count VIII) because plaintiff failed to plead a substantive RICO claim under § 1962(c). *See* Motion, p. 57-58; *Nolen v. Nucentrix Broadband Networks Inc.*, 293 F.3d 926, 930 (5th Cir. 2002) ("The failure to plead the requisite elements of … a § 1962(c) violation implicitly means that [Nolen] cannot plead a conspiracy to violate either section.") (internal citation and quotation omitted). Plaintiff's lone Fifth Circuit case (*United States v. Delgado*, 401 F.3d 290, 294 (5th Cir. 2005) (Response, p. 60)) is inapposite because it involves **criminal** RICO. The Fifth Circuit has explained that there is an express distinction between criminal and civil RICO liability under § 1962(d). *See Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 551-52 (5th Cir. 2012), as revised (Jan. 12, 2012) ("[a] person need not commit or agree to commit the requisite two or more predicate acts of 'racketeering activity' to be held *criminally* liable as a conspirator under RICO" but to establish a civil RICO conspiracy claim under § 1962(d) "a claimant must allege an injury from an act that is independently wrongful under RICO. Injury caused by acts that are not racketeering or otherwise wrongful under RICO will not establish a viable *civil* RICO claim." (emphasis in original)).

VIII.   **PLAINTIFF'S RELEASE OF BAKER PARTNER LEE ROSEBUSH EXPRESSLY INURES TO THE BENEFIT OF ROSEBUSH'S PARTNERS AND THUS SHIELDS BAKER FROM LIABILITY.**

Plaintiff glosses over the import of ¶ 13 of the Settlement Agreement which provides that the agreement "inure[s] to the benefit of the Parties and their … employees, **partners** …" and others (emphasis added). *See* EX. 9, APP. P. 207; *see also* Response p. 27 n.21. Paragraph 13 belies Plaintiff's assertion that "the only time 'partners' was referred to in the release was with respect

to partners of the *Insurer*." Response, p. 27 (emphasis in original). Thus, the Settlement Agreement unambiguously releases the "Settling Insureds," including Lee Rosebush (a Party to the agreement), but also inures to the benefit of Rosebush's "partners," who comprise Baker & Hostetler, LLP. Accordingly, Plaintiff's release of Rosebush bars Plaintiff's claims against Baker.

## IX. *RES JUDICATA* BARS PLAINTIFF'S ATTEMPT TO BELATEDLY CHALLENGE THIS COURT'S FINAL FEE ORDER.

Plaintiff fails to cite any authority supporting "disgorge[ment] [of] post-petition fees on the basis of . . . prepetition work."[34] This unprecedented theory (and mismatch of timing) should be rejected because it invades this Court's province to enter "an award of fees for professionals, such as [Baker], employed by a bankruptcy estate" which "represents a determination of 'the nature, the extent, and the value of such services.'" *See In re Intelogic Trace, Inc.*, 200 F.3d 382, 387 (5th Cir. 2000) (quoting 11 U.S.C. § 330(a)(3)); *see also In re Southmark Corp.*, 163 F.3d 925, 931 (5th Cir. 1999) ("A *sine qua non* in restructuring . . . is the court's ability to police the fiduciaries . . . . The bankruptcy court must be able to assure itself . . . that court-approved managers . . . are performing their work, conscientiously and cost-effectively"); *In re Frazin*, 732 F.3d 313, 321 (5th Cir. 2013) ("As in *Intelogic*, the bankruptcy court's award of fees to the Attorneys carried with it an implicit finding of quality and value in the services provided by the Attorneys.").

Plaintiff's remaining arguments against *res judicata* all fail as a matter of law. First, *res judicata **can*** be decided on a motion to dismiss, when, as here, the existence of the defense appears on the face of the complaint and/or through judicially noticed facts. *Basic Capital Mgmt., Inc. v. Dynex Capital, Inc.*, 976 F.3d 585, 589, 591 (5th Cir. 2020).[35] Second, the Alliance estate – and

---

[34] Response, p. 65.

[35] The Complaint and judicially noticed facts clearly establish *res judicata* here. The Complaint admits that "[o]n March 28, 2019, the Liquidating Trustee and Baker entered into a tolling agreement that extended the

Plaintiff's current counsel – could have raised any objection to Baker's post-petition fees at the time of the Fee Order, as shown by the fact that Plaintiff's predecessor entered a tolling agreement with Baker four months before Baker's fee application and five months before the Fee Order.[36]

Finally, Plaintiff's baseless attempt to impugn declarations filed by Baker partner Elizabeth Green fails because Ms. Green's statements ***were true***, according to Plaintiff's own allegations:

| Challenged Elizabeth Green Statement[37] | Plaintiff's Own Allegations |
|---|---|
| Baker "advised the Debtors with respect to [an] investigation" of "their former practice of purchasing diabetic testing supplies from the secondary market." | The Complaint agrees; Baker advised Alliance on at least the following such investigations: <br><br> • Investigation by LifeScan (¶ 91) <br> • Investigation by HHS (¶¶ 92-93); <br> • PBM investigations (¶ 189); <br> • Potential self-disclosure of secondary-market issues to the government (¶¶ 214-224); and <br> • The February 2017 FBI raid and related investigation (¶ 235). |
| Baker "did not advise the Debtors on the secondary market strategy prior to its implementation." | The Complaint agrees: <br><br> • Submitting NFR strip-sales as retail strip-sales was Alliance's "golden goose" at least as early as 2012. *See* ¶¶ 17, 85, 128-29. <br><br> • But Baker did not represent Alliance until years later, in November 2014, and allegedly became aware of Alliance's Questionable Business Practices in 2015, several years after Alliance implemented its Questionable Business Practices. |

---

time for the Liquidating Trustee to file suit," and also references Baker's final fee application and order. Compl., ¶¶ 246, 258. The Fee Order is a record of this Court subject to judicial notice.

[36] *Res judicata* based on a fee order requires that the plaintiff had a "***general awareness*** of the real potential for claims" before entry of the order, but does not require that the plaintiff be aware of "all the precise facts" or that the plaintiff have "reached a firm conclusion on [the professional's] performance." *See In re Intelogic Trace, Inc.*, 200 F.3d at 389. The tolling agreement establishes the requisite "general awareness."

[37] *See* Response, pp. 6-7 & p. 64 n.36.

**DEFENDANT BAKER & HOSTETLER LLP'S REPLY SUPPORTING MOTION TO DISMISS PLAINTIFF'S COMPLAINT – PAGE 39**

| Challenged Elizabeth Green Statement[37] | Plaintiff's Own Allegations |
|---|---|
| | Plaintiff's complaint against Brown Fortunato makes clear that Alliance's "secondary market strategy" was in-place by 2011. Motion, ¶ 26.<br><br>As this Court found in its Report & Recommendation on Brown Fortunato's Motion to Withdraw the Reference, Alliance's fraud scheme allegedly dated back to 2010. Motion, ¶ 7. |
| "Two other law firms were retained, together with the Debtors' General Counsel, to provide advice on the Debtors' secondary market strategy including a memorandum regarding this issue to the Board in 2015, without review by [Baker]." | The Complaint agrees: Baker did not receive the November 4, 2015 memorandum, authored by Alliance's general counsel, David Grant, until November 24, 2015 – weeks after it went to the Alliance Board of Directors. *See* ¶¶ 17, 94-97; *see also* Mot. App., pp. 6-13 (Grant Memorandum).<br><br>The Complaint also identifies the two other law firms: Bennett Tueller and Brown Fortunato. *See* ¶ 8; *see also* Response, p. 7 n.7. |

The same First Supplemental Declaration by Ms. Green which Plaintiff selectively quotes in her Response, falsely accusing Baker of "bad faith and duplicitousness,"[38] also contains additional disclosures concerning Baker's pre-petition work for Alliance, which Plaintiff's Response fails to acknowledge. These include:

- "State and federal regulatory issues . . ." (Dkt. 319, ¶ 6(b));
- "Insurance-related advice, including advice related to negotiating (and potentially litigating with) [PBMs,] . . . insurance audits and payment disputes, including certain payment disputes with PBM related to the wholesaler licensing and pedigree information requirements as it related to dispensed products" (Dkt. 319, ¶ 6(c));
- "[R]esponding to audits by certain of the PBMs related to wholesale and pedigree information requirements as it related to dispensed products" (*id.*); and
- "[L]itigation advice, in connection with certain antitrust issues related to mail order prohibitions and certain PBM contracts, relating to a potential class action lawsuit" (*id.*).

---

[38] *See* Response, p. 6.

DEFENDANT BAKER & HOSTETLER LLP'S REPLY SUPPORTING MOTION TO DISMISS PLAINTIFF'S COMPLAINT – PAGE 40

Ms. Green's statements were true and were not misleading in any way. Plaintiff's last-ditch attempt to avoid *res judicata* by impugning Ms. Green's candor to this Court must be rejected.

### CONCLUSION

Baker respectfully requests that the Court enter an order dismissing all claims against Baker with prejudice under FED. R. CIV. P. 12(b)(6) and 9(b) and applicable bankruptcy rules, and granting Baker such other and further relief to which it is entitled.

Respectfully submitted,

*/s/  George M. Kryder*

George M. Kryder
  State Bar No. 11742900
  gkryder@velaw.com
Matthew W. Moran
  State Bar No. 24002642
  mmoran@velaw.com
Jordan W. Leu
  State Bar No. 24070139
  jleu@velaw.com
Michael C. Lee
  State Bar No. 24109461
  mlee@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas  75201
Telephone: (214) 220-7700

*Attorneys for Baker & Hostetler LLP*

### CERTIFICATE OF SERVICE

I certify that on April 13, 2023, a true and correct copy of the foregoing instrument was served on all counsel of record using the Court's electronic filing system.

*/s/  George M. Kryder*

George M. Kryder

US 9701160