UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO.  17-32186 (MI) |
| UPLIFT RX, LLC | § | |
| | § | CHAPTER 11 |
| *Debtors* | § | |
| | § | (Jointly Administered) |
| | § | |
| YVETTE AUSTIN, LIQUIDATING | § | |
| TRUSTEE OF THE ALLIANCE HEALTH | § | |
| LIQUIDATING TRUST, | § | ADVERSARY NO. 22-03275 (MI) |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *v.* | § | |
| | § | |
| BAKER & HOSTETLER LLP, | § | |
| | § | |
| *Defendant.* | § | |

**DEFENDANT BAKER & HOSTETLER LLP'S
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

George M. Kryder
  State Bar No. 11742900
  gkryder@velaw.com
Jordan W. Leu
  State Bar No. 24070139
  jleu@velaw.com
Jeremy M. Reichman
  State Bar No. 24083722
  jreichman@velaw.com
Michael C. Lee
  State Bar No. 24109461
  mlee@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas  75201
Telephone: (214) 220-7700

*Attorneys for Baker & Hostetler LLP*

To The Honorable Marvin Isgur, United States Bankruptcy Judge:

Defendant Baker & Hostetler LLP ("Baker") respectfully moves to dismiss the Amended Complaint (Dkt. 142) under Fed. R. Civ. P. 12(b)(6), 9(b), and applicable bankruptcy rules.[1]

Recognizing that the June 2020 tolling agreement amendment drafted and signed by her former attorney David Cimo doesn't retroactively revive and toll the Manufacturers' assigned claims (Counts V-IX), Plaintiff baselessly asks this Court to "reform" an unambiguous document to create a deal her predecessor, Mark Shapiro, never made based on Cimo's alleged "mistake" that Plaintiff can't excuse, let alone describe with particularity under Rule 9(b). But the parties never changed the definition of "Claims" from those the Chapter 11 Trustee possessed at the time of the original March 2019 tolling agreement. And as this Court noted at the May 3, 2023 hearing, "[Y]ou can't do a tolling agreement with Party A and have it apply to Party B. That's silly." Regardless, Plaintiff's reformation claim is ineffective because the Manufacturers' assigned claims were time-barred long before the June 2020 amendment based on pages and pages of admissions and facts concerning the Manufacturers' knowledge which are subject to judicial notice.

Further, Plaintiff – standing in Alliance's dirty shoes as an admitted tortfeasor – can't assert the Manufacturers' assigned claims against Baker as a matter of Texas law which governs the assignment, and any such attempt is invalid. The purportedly assigned claims also are barred

---

[1] The Amended Complaint refers to and quotes from various pleadings, orders, and agreements that were not attached, but of which this Court may take judicial notice. First, this Court may consider documents which are "referred to in the plaintiff's complaint and are central to [her] claim." *See Taylor v. Hartley*, 488 F. Supp.3d 517, 526 (S.D. Tex. 2020); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (quoted in *Taylor*); *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007). Second, "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *See Norris v. Hearst Trust,* 500 F.3d 454, 461 n.9 (5th Cir. 2007), citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir. 1994). For the Court's convenience, Baker has included several of such documents in its contemporaneously filed and paginated Appendix ("App."). Capitalized terms used but not defined in this motion have the meanings given to them in the Amended Complaint. By addressing Plaintiff's allegations as-pled in the Amended Complaint, Baker does not accede to the truth of any such allegations.

by attorney immunity, suffer other incurable deficiencies including a lack of proximate causation under federal RICO standards, and must be dismissed.

Plaintiff's direct claims (Counts I – II) acquired from the Alliance estate likewise must be dismissed because a settling self-confessed tortfeasor (Alliance) in whose dirty shoes Plaintiff stands can't obtain contribution from a purported joint tortfeasor (Baker), no matter how artfully Plaintiff's claims are disguised under different labels, and because Plaintiff has failed plausibly to allege that Baker was the "but for" cause of damage to its alleged clients – Alliance entities who knew they were committing fraud, intended to keep committing fraud, and consistently disregarded attorneys and others who warned them of the potential consequences of that fraud.

Plaintiff also lacks standing and privity to bring malpractice or aiding-and-abetting claims on behalf of non-Debtor and non-client entities, but has failed through vague and inconsistent definitions to assert direct claims only on behalf of the handful of Debtor entities which allegedly were Baker's clients.  For example, out of at least 132 Debtor and non-Debtor entities Plaintiff defines as "Alliance," 70 are non-Debtors.  And out of the subset of 48 "Fiduciary Entities" on which Plaintiff focuses for certain claims, 32 are non-Debtors.  This imprecision and overbreadth along with other reasons addressed below (including several specific legal bars to Plaintiff's aiding and abetting / knowing participation claims) ultimately dooms all of Plaintiff's direct claims.

Plaintiff's unprecedented attempt to disgorge post-petition fees based on alleged pre-petition conduct is barred by this Court's final fee order under *res judicata* as a matter of Fifth Circuit law.  And Plaintiff's avoidance claims seeking to disgorge pre-petition fees fail to satisfy federal pleading standards under Rules 8 (all claims) and 9(b) (actual fraudulent transfer claims).

Plaintiff's complaint fails again despite being re-pled, and this case should be dismissed with prejudice.

# TABLE OF CONTENTS

STATEMENT OF FACTS ................................................................................................. 7

I.    THE MANUFACTURERS' ASSIGNED CLAIMS ARE TIME-BARRED. ..................................... 15

    A.    The Tolling Agreements Applied Prospectively Only to the Alliance
        Chapter 11 Trustee's Claims Acquired From the Debtors, Not Retroactively
        to Revive Other Purported Claims the Manufacturers Assigned to the
        Liquidating Trustee More Than a Year Later. ....................................................... 15

    B.    There Is No Basis to Reform the Tolling Agreements to Create a Deal the
        Parties Never Made to Retroactively Revive the Manufacturers' Time-
        Barred Claims Based on Cimo's Alleged "Mistake" Plaintiff Can't Excuse
        and Hasn't Pled With Particularity Under Rule 9(b). .......................................... 18

    C.    The Manufacturers' Claims Are Facially Time-Barred Based on
        Admissions and Facts of Which This Court Can Take Notice.   Such
        Knowledge Starts the Statute of Limitations Even Without Knowing Every
        Detail, Fact, or Party Involved. ........................................................................... 21

        (1)    The Manufacturers and their shared Patterson attorneys for many
                years knew of the purported Questionable Business Practices and
                contemplated litigation, yet failed to sue before limitations expired. ........ 21

        (2)    The Manufacturers and their shared attorneys knew – or should have
                known – of Baker's legal services involving the PBMs and
                Questionable Business Practices outside the applicable limitations
                period. ...................................................................................................... 24

        (3)    Neither the discovery rule nor the fraudulent concealment doctrine
                revive Plaintiff's time-barred indirect claims. ......................................... 28

II.   THE MANUFACTURERS' ASSIGNED CLAIMS OTHERWISE FAIL AS A MATTER OF
    LAW AND MUST BE DISMISSED. ..................................................................................... 28

    A.    Claims on Behalf of Non-Client Manufacturers Are Barred by Attorney
        Immunity From Suits in Texas Courts. ................................................................ 28

        (1)    Attorney immunity protects attorneys from suits in Texas courts
                based on conduct that was part of representing a client, with no
                applicable exceptions. .............................................................................. 28

        (2)    Plaintiff – as purported assignee of non-client Manufacturers –
                complains about actions Baker took as part of representing the
                Alleged Client Debtors and thus Baker is immune from suit in Texas
                courts as a matter of law. .......................................................................... 30

    B.    The RICO Claims Fail as a Matter of Law for Lack of Causation,
        Participation, or Vicarious Liability ..................................................................... 31

         (1)    The Amended Complaint still facially negates the direct "but-for"
                 causation required to establish a RICO claim because the
                Manufacturers    complain    about    Baker's    alleged    direct

representations to PBMs and only secondary, indirect alleged impact on the Manufacturers. ................................................. 31

(2)    The Amended Complaint facially negates Baker's alleged operation or management of Alliance's alleged enterprise. ..................................... 36

(3)    The Amended Complaint fails to establish Baker as a RICO "person" and fails to meet Rule 9(b)'s heightened pleading requirements. .......................................................................... 37

(4)    Baker can't be held vicariously liable under RICO. ................................. 39

(5)    Plaintiff's failure to plead a plausible RICO claim negates any RICO conspiracy claim. ................................................................ 40

C.    Attorneys (Baker) Can't Conspire With Clients (Alliance) Because Agents and Principals Are Not Two or More Persons Required for a Conspiracy .......... 40

III.    CONTRIBUTION AND ASSIGNMENT LAW BARS ALL CLAIMS REGARDLESS OF ARTFUL LABELS. ................................................................. 42

A.    A Settling Tortfeasor (Alliance) Can't Obtain Contribution From an Alleged Non-Settling Tortfeasor (Baker) and Plaintiff Can't Avoid the Contribution Bar Through Artful Pleading – Seeking the Same Contribution Damages Under Different Labels. ......................................... 42

B.    Texas Law Prohibits a Joint Tortfeasor (Alliance) From Taking an Assignment of a Claim From an Allegedly Injured Party (Manufacturers), Then Prosecuting That Side-Switching Claim Against an Alleged Joint Tortfeasor (Baker). ................................................................. 45

IV.    THE "ALLIANCE" CLAIMS FAIL AS A MATTER OF LAW AND MUST BE DISMISSED. ................................................................... 47

A.    The Alliance Estate's Claims Fail as a Matter of Law for Lack of Causation. ................................................................. 47

(1)    The Amended Complaint still fails plausibly to allege that Baker was the "but for" cause of Alliance's alleged harm. ................................. 48

(2)    Because Alliance is a self-confessed fraudster, its purported claims are barred under causation-negating doctrines and case law including *Peeler*, *Rogers*, and *Rothrock*. .................................... 51

B.    Plaintiff's Overly-Encompassing Use of "Alliance" and "Fiduciary Entities" to Describe Debtors and Non-Debtors, and Clients and Non-Clients, Requires Dismissal of Counts I and II for Lack of Standing, Privity, and Plausibility ................................................................. 53

C.    The Aiding and Abetting/Knowing Participation Claim Fails for Additional Reasons Because: (i) Baker's Alleged Inactions Do Not Constitute Aiding and Abetting/Knowing Participation; (ii) One Fiduciary Cannot Aid and Abet Another Fiduciary's Breach of Duty; and (iii) Baker Is Immune From Suit by the Non-Client "Fiduciary Entities." ..................................... 56

V.    PLAINTIFF'S RELEASE OF BAKER ATTORNEY LEE ROSEBUSH AND HIS "PARTNERS" WHO COMPRISE BAKER & HOSTETLER LLP ALSO RELEASED BAKER. ................................................................................................ 58

VI.    PLAINTIFF'S BANKRUPTCY CLAIMS FAIL AS A MATTER OF LAW. .................................... 59

     A.    This Court's Final, Not-Appealed Fee Order Bars All Claims Based on Baker's Post-Petition Legal Services Under *Res Judicata*. ................................. 59

        (1)    The Fee Order had no limitation on its finality or preclusive effect......... 59

        (2)    This Court entered other orders in the *Uplift Rx* Bankruptcy which expressly had no *res judicata* or collateral estoppel effects. .................... 61

        (3)    As a matter of law, Plaintiff can't recover fees that the Alliance Bankruptcy Estate paid to Baker................................................................ 63

VII.    PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS FOR BAKER'S PRE-PETITION LEGAL SERVICES FAIL TO MEET PLEADING STANDARDS UNDER *TWOMBLY* AND *IQBAL*. ............................................................................................................... 63

## STATEMENT OF FACTS

1.      Plaintiff – as the latest liquidating trustee of a Texas trust[2] created under a plan governed by Texas law[3] – sues Baker on behalf of eight identified "Client Debtors," one of which wasn't a Debtor.[4] Plaintiff also purports to bring malpractice and aiding and abetting claims on behalf of entities for which she lacks standing and privity, including:

- At least 132 Debtor **and non-Debtor** entities which the Amended Complaint vaguely and collectively defines as "Alliance;"[5] and

- A subset of 48 Debtor **and non-Debtor** "Alliance" entities which the Amended Complaint refers to as the "Fiduciary Entities."[6]

As shown below, Alliance **knew** it was running an illegal scheme years before retaining Baker in November 2014, but consistently ignored lawyers and other whistleblowers who warned it about the potential consequences.  There are no plausible allegations that Alliance would have followed

---

[2] *See* APP. P. 412 (Liquidating Trust Agreement, § 10.03) ("This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to the rules governing the conflict of law which would require the application of the law of another jurisdiction").

[3] *See* APP. P. 224 (Amended Joint Plan of Liquidation, § 13.10) ("Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of . . . the State of Texas shall govern the construction and implementation hereof and any agreements, documents, and instruments executed in connection with this Plan . . . .").

[4] The eight "Client Debtors" identified as such in the Amended Complaint are: Alliance Medical Holdings, LLC, Alliance Medical Administration, Inc., Alliance Health Networks, LLC, Alta Distributors, LLC, Stonybrook Pharmacy, LLC, Oak Creek Pharmacy, LLC, New Life Pharmacy, LLC, and Lone Peak Rx, LLC (collectively, the "Alleged Client Debtors").  *See* Am. Compl., pp. 113-14 & ¶ 381. Oak Creek Pharmacy, LLC, however, was not a Debtor. As addressed more fully below, Plaintiff's allegations about which Debtors and non-Debtors Baker represented before the chapter 11 filings are vague and inconsistent throughout the Amended Complaint.

[5] Plaintiff uses "Alliance" to reference the 62 Debtors named in the caption of the Amended Complaint plus dozens of additional non-Debtor affiliates.  *See* Am. Compl., ¶ 1, ¶ 41 & n.7.  In this motion, Baker makes similar use of "Alliance" without conceding that it represented all of the "Alliance" entities.

[6] *See* Am. Compl., ¶¶ 61-67 (identifying the "Fiduciary Entities").  Exhibit 1 (APP. PP. 6-9) to this motion identifies the Alliance entities, Fiduciary Entities, Debtors, and alleged Client Debtors as described in the Amended Complaint.

advice from Baker to stop the scheme while disregarding everyone else.  The scheme *was* Alliance; in Plaintiff's own words, it was the "golden goose."  Am. Compl., ¶ 146.

2.      Plaintiff also sues as the purported assignee – under conditional assignments governed by Texas law – of claims by two diabetic test-strip manufacturers, LifeScan and Roche (the "Manufacturers"),[7] who allege they were damaged by Alliance's scheme by only "indirectly" relying upon adversarial submissions Baker made to pharmacy benefit managers ("PBMs") in adversarial PBM audits of various Alliance pharmacies.  But, as shown below, the assignments violate Texas law, and the Manufacturers and their shared attorneys at Patterson Belknap Webb & Tyler LLP ("Patterson") indisputably knew about Alliance's scheme and even contemplated suing Alliance in 2014 and 2015 – more than four years before any purported tolling agreement Plaintiff now baselessly seeks to "reform."

### *Alliance Knew of its Wrongdoing and Ignored Other Law Firms Before Hiring Baker*

3.      Before suing Baker, Plaintiff sued two other law firms – Brown & Fortunato, P.C. ("Brown") and Bennett Tueller Johnson Deere, LLC ("Bennett") claiming that – years before Baker was retained – those firms failed to stop Alliance's conduct, while admitting that Alliance continuously ignored their advice when they tried.[8]

---

[7] *See* APP. PP. 313-15 (Roche) and APP. PP. 316-18 (LifeScan) (orders approving claim assignments, expressly made "subject to the entry of a final order . . . confirming the Amended Plan" and "of no force or effect" absent Plan confirmation); APP. P. 224 (Texas law governs "agreements, documents, and instruments executed in connection with [the] Plan").

[8] *See* APP. PP. 803, 819, 824, Plaintiff's Second Amended Complaint in *Austin v. Brown & Fortunato, P.C.*, No. 21-03936 (Bankr. S.D. Tex.), ¶¶ 290, 355, 379 (the "Second Amended Brown Complaint"); *see also Austin v. Brown & Fortunato, P.C. (In re Uplift Rx, LLC)*, No. 21-3936, 2023 WL 5355353, at *4-5, 7, 12 (Bankr. S.D. Tex. Aug. 21, 2023) ("Billing entries . . . [identify certain Alliance entities] as clients of Brown & Fortunato as early as 2010"); ("In February 2011 . . . Alliance sent [a Brown attorney] . . . a spreadsheet show[ing] that [Alliance was] shipping not-for-retail strips and billing them as retail strips."); (In November 2012, "Jeffrey Smith [Alliance's CEO] allegedly expressed doubt [to Brown] that Alliance could afford to stop the practice and bring the entities involved in the scheme into compliance with the 'not for retail' restrictions on the products it purchased" and "[i]n April of 2012, Jeffrey Smith expressed concern to [a Brown attorney] over the billing issue as 'potential fraud.'"); ("***The facts plead reflect that Brown &***

4.      As Plaintiff admits in her complaints against Brown:

- "[N]o later than February 10, 2011 [more than three years before Baker represented Alliance], Brown knew that Alliance was engaged in the Questionable Business Practice of shipping NFR products but billing them as if they were retail products;"[9]

- No later than December 2012 – almost two years before Baker represented Alliance – Brown attorneys had discussed the illegality of Alliance's Questionable Business Practices with Alliance's CEO, Jeffrey Smith, who responded that he wanted to sell the entities if he could not bring them into compliance within 90 days, and did not believe doing so was possible;[10]

- In May 2013 – approximately 18 months before Baker represented Alliance – Brown had advised Alliance that memorializing its Questionable Business Practices in writing (and specifically the practice of billing all strips as retail even though the strips were NFR) carried "considerable risk" including contract termination and being turned into the government for "violations of state, federal, and various insurance laws;"[11]

- In July 2013 – only two months later – Brown advised Alliance that its submission of the wrong NDCs to PBMs could be unlawful or fraudulent;[12]

- In 2015, "[d]espite knowing that Alliance was committing the Questionable Business Practices and faced substantial liability for doing so, Alliance's senior management concluded that abandoning the Questionable Business Practices would be financially unfeasible.  They therefore chose to continue the Questionable Business Practices;"[13] and

- "Neither Alliance nor any of its senior management ever obtained a legal opinion that the improper adjudication practices [were] lawful.  This was despite the fact

---

*Fortunato told Alliance on more than one occasion that its practices were fraudulent* and advised Alliance on how to avoid liability for its fraud once it became apparent Alliance could not afford to correct its billing practices") (emphasis added); Dkt. 31-1, pp. 800-01 (December 11, 2012 email between Brown attorneys reflecting that Brown warned Jeffery Smith that Alliance's practices were illegal); APP. PP. 366, 368, Plaintiff's Complaint in *Shapiro v. Bennett Tueller Johnson Deere, LLC*, No. 20-03115 (Bankr. S.D. Tex.) ¶¶ 41, 44-50 (the "Bennett Tueller Complaint") (Plaintiff also alleged that Bennett began representing Alliance in at least 2013, and likewise engaged in wrongdoing and failed to stop Alliance's ongoing illegal scheme).

[9] *See* APP. P. 750, Second Amended Brown Complaint, ¶ 106 (emphasis removed).

[10] *See* APP. P. 753, Second Amended Brown Complaint, ¶ 115.

[11] *See* APP. PP. 780-82, Second Amended Brown Complaint, ¶¶ 205-211.

[12] *See* APP. P. 763, Second Amended Brown Complaint, ¶ 151.

[13] *See* APP. PP. 506-07, Plaintiff's Original Complaint (the "Original Brown Complaint") in *Shapiro v. Brown & Fortunato, P.C.*, No. 21-03936 (Bankr. S.D. Tex.), ¶ 211.

that multiple individuals desired such a legal opinion, and that Alliance engaged multiple outside counsel, including Bennett, Baker, and Brown, in connection with issues related to its Questionable Business Practices."[14]

5.     Plaintiff also admits that, on November 4, 2015, Alliance's in-house General Counsel David Grant advised the entire Alliance board of directors in writing about the scheme, then belatedly forwarded his advice to a Baker partner, Lee Rosebush, twenty days later.[15]

6.     Despite the foregoing admissions which make it indisputable that Alliance and its directors already knew their scheme was fraudulent and exposed the company to significant risk, Plaintiff complains that "Baker [allegedly] never advised Alliance that it should stop submitting fraudulent insurance claims . . . . [and] never informed Alliance's Board of Directors that the company was engaged in blatantly illegal activity."  Am. Compl., ¶ 103.  In reality, based on Plaintiff's own allegations and documents referenced in and central to the Amended Complaint, *Alliance's Board already knew everything Plaintiff says Baker should have advised* and Alliance disregarded "repeated and explicit warnings" that its conduct harmed the Manufacturers.

- *See id.* at ¶¶ 295-328 (identifying four internal whistleblowers who complained in detail about the Questionable Business Practices as early as 2014 while admitting that "Alliance's senior management did not respond to these whistleblowers by stopping those practices. Rather, they sought to deter and silence the whistleblowers in order to perpetuate Alliance's Questionable Business Practices and enrich themselves");

- *See id.* at ¶¶ 18-19 & 111 (referencing the November 2015 Grant Memorandum, which, in Plaintiff's own words, "describe[ed] the 'fact' of Alliance's reliance on NDC fraud" and "confirmed it was the regular and deliberate practice at Alliance pharmacies . . . intended to protect the company's high revenues");

- "In other words, Grant advised Alliance management and the Board that Alliance had two choices: (1) continue its practice of improper adjudication and accept risk

---

[14] APP. P. 508, Original Brown Complaint, ¶ 216.

[15] APP. PP. 13-19 (Grant memo as sent to the Board on November 4, 2015); APP. P. 12 (Grant memo as sent to Rosebush on November 24, 2015); *see also* Am. Compl., ¶ 110 ("Grant forwarded Rosebush a copy of his November 4, 2015 memorandum to Alliance's Board of Directors in which Grant confirmed that Alliance had a practice of submitting fraudulent insurance claims containing false NDC numbers").

of liability or (2) stop improperly adjudicating test strips and accept the resulting loss of revenue, which would not be financially feasible";[16]

- "In response [to the Grant Memorandum], Jeffrey Smith, Blaine Smith, Grant, Hughes, Wistner, and Koopersmith chose the former option.  They therefore made the 'business decision' to continue Alliance's Questionable Business Practices, accepting the risk of liability over the devastating loss that would result from ceasing the Questionable Business Practices";[17] and

- "Despite such repeated and explicit warnings that the Questionable Business Practices harmed manufacturers like Roche and LifeScan, Alliance continued that practice—at the Scheme Participants' and Baker's direction—until it was raided by the FBI and went bankrupt in 2017."[18]

*See also* Am. Compl., ¶¶ 146-48 (describing the scheme as Alliance's "golden goose;" an integral part of Alliance's business model, and a foundational practice of the company).

### *The Manufacturers Knew About Alliance's Wrongdoing Outside Limitations Periods*

7.      Alliance's "Questionable Business Practices" also were well-known to the Manufacturers, their Patterson attorneys, and PBMs years before the Alliance bankruptcy. *See* APP. P. 795 (Second Amended Brown Complaint, ¶ 260) ("In the final version of the memorandum provided to the [Alliance] Board in ***November 2015***, Grant made no attempt to deny the ***allegations made by Roche, LifeScan***, ESI, and others that Alliance was engaged in what was described as a '***massive insurance fraud scheme***.'") (emphasis added); APP. P. 360 (Bennett Tueller Complaint, ¶¶ 27-28) (Alliance's "Questionable Business Practices" "came under scrutiny involving serious allegations of misconduct raised by multiple whistleblowers within Alliance" and "***starting in 2015*** . . . LifeScan and Roche, complained about the same alleged misconduct, and independently privately made multiple written demands on Alliance and its Affiliates for payment of damages

---

[16] *See* APP. P. 796, Second Amended Brown Complaint, ¶ 265.

[17] *See* APP. P. 796, Amended Brown Complaint, ¶ 266.

[18] Am. Compl., ¶ 278.

and other relief.") (emphasis added); APP. P. 790 (Second Amended Brown Complaint, ¶ 249) (June 25, 2015 e-mail from LifeScan's Patterson attorney – Geoffrey Potter – to Bennett stating "the current allegation is that *Alliance is engaged in massive billing fraud*") (emphasis added).

8.      Indeed, at least one of the Manufacturers, LifeScan (then owned by Johnson & Johnson), knew of the "Questionable Business Practices" even earlier, because LifeScan alleged in a draft complaint Patterson prepared, referenced multiple times in Plaintiff's Amended Complaint (*see* Am. Compl., ¶¶ 97, 113, 240, 247), that "[i]n April 2014 . . . a pharmacist . . . informed representatives of LifeScan that [an Alliance affiliated pharmacy] was distributing LifeScan's product intended for [NFR patients] to [Retail patients]." APP. P. 38 (draft lawsuit, ¶ 39).

9.      Moreover, LifeScan's Patterson attorneys promised to share a draft complaint against Alliance and agreed to mediate with Alliance based on the *same* "Questionable Business Practices" no later than July 2015, then actually shared their 40-page detailed draft complaint with Alliance in September 2016.  *See* Am. Compl., ¶¶ 113-14 (the suit allegedly was threatened four months before November 2015) & ¶ 240 (a draft LifeScan complaint "alleging fraud and RICO" was presented to Alliance on September 19, 2016); *see also* APP. PP. 22-61 (LifeScan's 40-page draft complaint against Alliance, Alta, and almost two dozen affiliated pharmacies, accusing them of running a "massive criminal scheme" in ¶ 68 (APP P. 37) and including as its last page (APP. P. 62) a letter from LifeScan's Patterson attorneys referring to a related meeting and agreement to mediate between LifeScan and Alliance in July 2015).[19]

---

[19] The draft LifeScan complaint prepared by Patterson clearly confirms that LifeScan knew all about Alliance's scheme years outside the two-year and four-year statutes of limitation governing this case.  *See id*. at ¶¶ 69-70 (APP. P. 38) ("In April 2014, Confidential Witness 1 ("CW1"), a pharmacist at Defendant Cure Rx, informed representatives of LifeScan that Cure Rx was distributing LifeScan product intended for DME Beneficiaries (*i.e.*, White Box Mail-Order Product and/or Gray Box Wholesale Product) to Pharmacy Beneficiaries. CW1 explained that Cure Rx received the LifeScan DME test strips from Defendant Alta

10.    LifeScan's draft complaint further admits that, "[a]s a result of CW1's [July 2014] report and Western Diabetic's suspicious 'shut down' immediately upon the initiation of a[] [July 2014] audit, LifeScan initiated an investigation of Alliance and its affiliated pharmacies.  This investigation revealed the existence of a highly coordinated criminal enterprise between Alliance, Alta Distributors . . . and [twenty named plus] other, as-yet-unidentified pharmacies."  APP. P. 39 (Draft LifeScan Complaint, ¶ 76).

### *Alliance Files Bankruptcy and Enters Multiple Settlements*

11.    On April 7, 2017, certain Alliance entities filed voluntary chapter 11 petitions in this Court.  *See* Case No. 17-32186, Dkt. 1.

12.    On August 5, 2019, this Court approved a settlement agreement and releases between the Chapter 11 Trustee (Ronald L. Glass) and Alliance's officers and directors including Baker partner Lee Rosebush.  The releases expressly inure to the benefit of Rosebush's "partners" (who comprise Baker & Hostetler LLP) and broadly release all claims the trustee "ever had or may now or hereafter own." (APP. PP. 227-294; settlement agreement); (APP. PP. 319-22; order approving settlement).

13.    In August 2019, the Debtors settled with LifeScan and Roche by allowing their proofs of claim against various Debtors in the amounts of $49,339,603 and $80,054.970, respectively. *See* Am. Compl., ¶ 333; APP. PP. 295-303; 313-15 (Roche); APP. PP. 304-312; 316-18 (LifeScan).  Plaintiff now inconsistently characterizes these settlement amounts as "damage to the [eight identified] Client Debtors" or alternatively (and without specifying among at least 132

---

Distributors . . . .  As CW1 told LifeScan, CW1 knew that Defendant Alliance was the parent company to Alta Distributors").

Debtor and non-Debtor "Alliance" entities named in the Amended Complaint) "damages to Alliance." *See* Am. Compl., ¶¶ 383, 403.

14.    In June 2020, Plaintiff's predecessor Liquidating Trustee, Mark Shapiro, represented by Troutman Sanders, ***conditionally*** took assignment of the Manufacturers' purported claims against Baker in exchange for, among other things, waiving Alliance's attorney-client and work-product privileges with Baker and other attorneys following disputes over those privileges between the Liquidating Trustee and the Manufacturers. *See* APP. PP. 378, 380 (stipulation, ¶ 4 & 14(a)).[20] Thus, the Liquidating Trustee sold Alliance's privilege ***with*** Baker in exchange for a purported assignment of the Manufacturers' claims ***against*** Baker. *See* APP. PP. 376-441 (stipulation); APP. P. 444-45 (Order).

### Plaintiff Sues Baker

15.    Plaintiff's Amended Complaint – now spanning 147 pages – still admits in the first paragraph that Alliance's fraud scheme was "***straightforward***" – indeed, the ***same fraud*** which had been going on at least since being disclosed to Brown by February 10, 2011. Am. Compl., ¶ 1; *see also* Facts, ¶ 3-4.[21] Plaintiff's allegations are, at best, self-contradictory concerning the content of Baker's alleged legal advice, acknowledging that Baker partner "Rosebush wrote to Grant on September 26, 2016 that he 'would not go so far as to say that

---

[20] The Manufacturers' purported assignment of their claims to Plaintiff's predecessor was "[s]ubject to the Trustee's compliance with all of the foregoing" conditions identified in ¶¶ 1-7 of the stipulation. *See* APP. PP. 391-93. Plaintiff has not pled that all the conditions have been satisfied.

[21] Specifically, Alliance's personnel allegedly "[1] conspired to obtain not-for-retail ('NFR') blood glucose test strips . . . [2] arranged for Alliance-affiliated pharmacies to dispense these test strips to beneficiaries of pharmacy-benefit insurance plans that covered only retail test strips . . . . then [3] submitted fraudulent insurance claims to the pharmacy-benefit plans, falsely representing that they had dispensed retail strips." Am. Compl., ¶ 15.  The alleged purpose of Alliance's scheme was to exploit "the substantial difference in wholesale list price and insurance reimbursement rates between the NFR strips and the retail strips." Am. Compl., ¶ 16.

secondary market is perfectly legal,' in part because the PBMs will 'bring up that you are dispensing mail order [NFR] in lieu of retail.'" *See* Am. Compl., ¶ 211.

16.     Although Plaintiff also sues on behalf of the Manufacturers, Plaintiff does not allege that Baker communicated directly with the Manufacturers.  Instead, Plaintiff alleges that Baker communicated on Alliance's behalf only with ***PBMs***. *See, e.g., id*. at ¶ 20, 165-66, 175.  But Plaintiff does not bring claims on behalf of any allegedly-defrauded PBMs, even though Plaintiff admits that the PBMs both ***had*** and ***exercised*** contractual rights to seek reimbursements (*i.e.*, "chargebacks") from Alliance pharmacies for amounts the PBMs paid the pharmacies for NFR strips.  *See id*. at ¶¶ 119-121, 216.

17.     After Alliance filed bankruptcy in April 2017, this Court approved Baker to serve as Debtors' counsel.  This Court approved Baker's fee application in a final order dated September 11, 2019 (the "Fee Order").  *See* Am. Compl., ¶ 293; *see also* APP. PP. 348-49.  Plaintiff admits that "Baker has a remaining claim for $779,066.83, which [despite the Fee Order] . . . is being held in reserve by [Plaintiff] pending the resolution of this action via entry of judgment or otherwise." Am. Compl., ¶ 293, n.12.

I.     THE MANUFACTURERS' ASSIGNED CLAIMS ARE TIME-BARRED.

A.     **The Tolling Agreements Applied Prospectively Only to the Alliance Chapter 11 Trustee's Claims Acquired From the Debtors, Not Retroactively to Revive Other Purported Claims the Manufacturers Assigned to the Liquidating Trustee More Than a Year Later.**

Plaintiff alleges that Baker entered a March 28, 2019 tolling agreement which, following multiple amendments, extended the time for Plaintiff to file suit on specifically-defined "Claims" until September 30, 2022 (collectively, the "Tolling Agreements").  Am. Compl., ¶ 344; *see also* APP. PP. 180-82 (March 28, 2019 Tolling Agreement).  But the plain language of the Tolling

Agreements shows that only the Alliance estate's "Claims" were tolled, not the other purported claims the Manufacturers conditionally assigned to Plaintiff more than a year later.

Ronald L. Glass, the Chapter 11 Trustee for Alliance, entered a tolling agreement with Baker on March 28, 2019 (the "Initial Tolling Agreement"). The Initial Tolling Agreement expressly applied prospectively only to the Chapter 11 Trustee's claims by defining "Claims" in the following recital:

> [S]ince his appointment, the [Chapter 11] TRUSTEE and his Court-approved professionals have been investigating *the business and financial affairs of the Debtors, including potential claims* for breach of fiduciary duty, professional negligence and other claims and relief against the Debtors' professionals and other third parties, including BAKER (collectively, the "Claims").

APP. P. 181 (emphasis added).

The Initial Tolling Agreement thus tolled limitations only as to "[a]ll Claims by the [Chapter 11] TRUSTEE against BAKER" as of March 28, 2019 and expressly did not "revive any claim or cause of action that was time barred prior to the Effective Date." *Id.*[22] But the Initial Tolling Agreement (and the September 11 and November 22, 2019 amendments) indisputably *did not apply* to any claims the Liquidating Trustee *later* purportedly acquired from the Manufacturers in 2020 (*i.e.*, Counts V-X in the Amended Complaint).

On June 14, 2020, Plaintiff's predecessor as Liquidating Trustee (Mark Shapiro) and Baker entered another amendment to the Tolling Agreements. The amendment did not change the original definition of "Claims" and thus did not expand the parties' agreement on what was being

---

[22] Plaintiff's predecessor (Mark Shapiro as Liquidating Trustee) entered written amendments to the Initial Tolling Agreement with Baker on September 11, 2019 (extending the tolling period to November 30, 2019) (APP. PP. 346-47) and November 22, 2019 (extending the tolling period to June 30, 2020) (APP. PP. 352-53); Am. Compl., ¶ 344. Each of those agreements was drafted and signed by Plaintiff's former counsel, David Cimo.

tolled.  It merely described Mr. Shapiro as who he purported to be – "assignee of the claims of [the Manufacturers] pursuant to that certain Stipulation by and between [the Manufacturers] and The Trustee (A) Resolving Assertion of Privilege by Trustee and (B) Further Amending Liquidating Trust Agreement [Main Case ECF No. 1395]."[23]

But the June 14, 2020 amendment didn't toll any of the Manufacturers' assigned claims (Counts V-X) because:

- The amendment did not expand or in any way modify the definition of "Claims" held by the Chapter 11 Trustee as of March 28, 2019 covered in the Initial Tolling Agreement and, to the contrary, expressly stated that "*all others [sic] terms and conditions of the Initial Tolling Agreement shall remain in full force and effect*." (emphasis added);[24] and

- The amendment (like the previous amendments) thus *only tolled claims against Baker held by the Chapter 11 Trustee as of the Initial Tolling Agreement*, because the unmodified definition of "Claims" could not encompass any claims later assigned or to be assigned to Plaintiff from the Manufacturers.[25]

At the May 3, 2023 motion to dismiss hearing, the Court agreed that the June 14, 2020 amendment (and subsequent amendments) never tolled claims on behalf of the Manufacturers:

> **The Court:** Now where does [the June 2020 amendment] say [] that [the trustee's] acquired claims [were] tolled?
>
> \*\*\*
>
> **The Court**: Show me where. Read me the language that says that the acquired claims are tolled.
>
> \*\*\*

---

[23] APP. P. 442.

[24] APP. P. 443.

[25] Plaintiff's predecessor subsequently entered three further amendments (December 15, 2020 (APP. PP. 446-47), February 22, 2022 (APP. PP. 543-44), and May 3, 2022 (APP. PP. 622-23)), ultimately extending the tolling to September 30, 2022.  But like the June 14, 2020 amendment, the subsequent amendments did not modify the definition of "Claims," expressly incorporated the Initial Tolling Agreement, and thus *only tolled the Chapter 11 Trustee's "Claims"* (as defined in the Initial Tolling Agreement), not the Manufacturers' later-assigned claims.

**Plaintiff's Counsel, Marilee Mark**: [Referencing the Initial Tolling Agreement] So it says, "[i]ncluding potential claims for breach of fiduciary duty, professional negligence," *which obviously I recognize those are estate claims*.

**The Court**: These aren't potential claims that exist somewhere in the universe. These are [Chapter 11 Trustee Glass's] potential claims. He can't go acquire somebody else's claims [*i.e.* the Manufacturers] and have them counted in [the Initial] [T]olling [A]greement. That's an irrational reading of [the Tolling Agreements].

                                        ***

**The Court**: Your firm wrote this. It just doesn't say what you're telling me it says. You're just wrong and there isn't any ambiguity.

App. pp. 714-17 (Hearing on Motion to Dismiss Transcript, 91:9-10, 92:12-13, 93:16-23, 94:8-9) (emphasis added).

Thus, the Tolling Agreements never tolled the Manufacturers' purportedly assigned claims as a matter of law. *See Kern v. Sitel Corp.*, 517 F.3d 306, 309 (5th Cir. 2008) ("Under Texas law, '[i]f the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law.'") (internal citation omitted); *see also* App. p. 713 (Hearing on Motion to Dismiss Transcript, 90:10 (**The Court**: "No, [the Tolling Agreements are] not ambiguous")).

> **B.      There Is No Basis to Reform the Tolling Agreements to Create a Deal the Parties Never Made to Retroactively Revive the Manufacturers' Time-Barred Claims Based on Cimo's Alleged "Mistake" Plaintiff Can't Excuse and Hasn't Pled With Particularity Under Rule 9(b).**

Recognizing that the unambiguous June 2020 amendment drafted and signed by her former attorney David Cimo does not revive or toll the Manufacturers' claims, Plaintiff belatedly asks this Court to "reform" that document to create a deal Baker and her predecessor, Mark Shapiro, never made based on Cimo's alleged "mistake" that she can't excuse or describe with particularity under Rule 9(b). But the parties never changed the definition of "Claims" from those the Chapter 11

Trustee possessed at the time of the Initial Tolling Agreement.  And, as this Court noted at the May 3, 2023 hearing:  "you can't do a tolling agreement with Party A and have it apply to Party B. That's silly."  APP. P. 713; *id.* at 90:2-3.

Mistake allegations must satisfy the heightened pleading requirements under FED. R. CIV. P. 9(b).[26]  Yet, the Amended Complaint offers only bare ***conclusions*** that Cimo failed to document a supposed meeting of the minds between Baker and the Liquidating Trustee that the Tolling Agreements would apply to an entirely new set of unspecified Manufacturers' claims and that "the parties labored under the same misconception that they had agreed to toll the assigned claims" (Am. Compl., ¶ 501).

But Plaintiff makes no plausible allegations – much less allegations sufficient to meet Rule 9(b)'s heightened pleading requirements – regarding:

- Who at Baker purportedly agreed to toll the Manufacturers' claims and with whom did he or she allegedly have a meeting of the minds;

- Which claims the Manufacturers and Baker purportedly agreed to toll;

- How the purported agreement to toll the Manufacturers' claims was reached;

- Where such agreement allegedly was reached;

- When such agreement allegedly was reached;

- Who on the Trustee's behalf purportedly made such agreements (notably, all of the tolling agreements and amendments were signed by former Trustee counsel David Cimo, not by the Liquidating Trustees (Mr. Shapiro and Ms. Austin) themselves); and

---

[26] *See* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1299 (4th ed.) ("A well-pleaded claim grounded on mistake should include allegations of what was intended, what was done, and how the mistake came to be made").  Failure to meet the heightened pleading requirements requires dismissal under Rule 9(b).  *See e.g. Weyerhaeuser Co. v. Burlington Ins. Co.*, 74 F.4th 275, 288 (5th Cir. 2023) (finding a party "insufficiently pleaded mutual mistake and therefore 'failed to meet their heavy burden to warrant reformation.'"); *Zytax, Inc. v. Green Plains Renewable Energy, Inc.*, No. CIV.A.H-09-2582, 2010 WL 2219179, at *6 (S.D. Tex. May 28, 2010) (Rosenthal, J.) (finding allegations of mutual mistake "fail[ed] the Rule 9 test").

- Why Cimo failed to document the purported agreement to toll unspecified claims by the Manufacturers.

These failures require dismissal of the purported reformation claim on the basis of mutual mistake. *See e.g. Hoilien v. OneWest Bank, FSB*, No. CV. 11-00357 DAE-RLP, 2012 WL 1379318, at *15 (D. Haw. Apr. 20, 2012) ("Plaintiff's allegations of mistake are insufficient to meet the rigorous requirements under Rule 9 . . . . Plaintiff's conclusory allegation that the parties entered into the loan based upon mutual mistake is not sufficient to survive a motion to dismiss. Plaintiff utterly fails to assert any 'particularized allegations of the circumstances' constituting mistake, such as the time, place, and nature of the alleged actions, and how each Defendant participated in the mistake.") (internal citations omitted).

The Court should see Plaintiff's reformation claim for what it is: a desperate attempt to have this Court retroactively rewrite the Tolling Agreements to shift onto Baker the consequence of Plaintiff not obtaining any actual tolling of the Manufacturers' already time-barred claims. Plaintiff cannot avoid her (and her predecessors) bargain in the unambiguous Tolling Agreements signed by Cimo on Plaintiff's behalf. *See In re Contractor Tech., Ltd.*, 376 B.R. 156, 159 (S.D. Tex. 2007) (Atlas, J.) ("The 'mutual mistake' doctrine is not available simply to ***'avoid the results of an unhappy bargain.'***") (internal citations omitted) (emphasis added). This is so because Plaintiff's conclusory allegations of mutual mistake do not change that the Tolling Agreements – drafted ***and signed*** by Plaintiff's former counsel – plainly do not toll the Manufacturers' purportedly assigned claims.

Finally, Plaintiff's alternative unilateral mistake allegation must be dismissed under FED. R. CIV. P. 9(b) and 12(b)(6) for the reasons stated above and also because Plaintiff failed to allege that Baker acted fraudulently with respect to the Tolling Agreements. *See Amwest Sav. Ass'n v. Statewide Capital, Inc.*, 144 F.3d 885, 890 (5th Cir. 1998) ("[A] unilateral mistake is not a ground

for reformation of an agreement . . . [unless that] unilateral mistake [is] accompanied by fraud by the other party [which] will warrant reformation").

C.    **The Manufacturers' Claims Are Facially Time-Barred Based on Admissions and Facts of Which This Court Can Take Notice.  Such Knowledge Starts the Statute of Limitations Even Without Knowing Every Detail, Fact, or Party Involved.**

"[I]t is knowledge of the injury itself, not knowledge of every detail, fact, or element of a cause of action that starts the statute of limitation." *Mitts v. Sikorsky Aircraft Corp.*, No. CV H-10-5164, 2012 WL 12893657, at *3 (S.D. Tex. June 26, 2012) (Hittner, J.); *Baxter v. Gardere Wynne Sewell LLP*, 182 S.W.3d 460, 464 (Tex. App.—Dallas 2006, pet. denied) ("The doctrine of fraudulent concealment will not toll limitations unless the wrongdoer fraudulently conceals the plaintiff's cause of action. Appellants were aware of their cause of action in the fall of 1998, but were ***unaware of all the potential defendants.*** Under these circumstances, the ***doctrine of fraudulent concealment will not toll the running of the statute of limitations***.") (internal citations omitted) (emphasis added).

(1)    The Manufacturers and their shared Patterson attorneys for many years knew of the purported Questionable Business Practices and contemplated litigation, yet failed to sue before limitations expired.

Plaintiff's own admissions establish that LifeScan, Roche, and their shared Patterson attorneys knew of the "straightforward" Questionable Business Practices (and causally-linked injury and damages) no later than 2014 and 2015, respectively – ***more than four years*** before Plaintiff allegedly attempted to include them in the June 2020 tolling agreement amendment.  *See* Facts, ¶¶ 7-10; *see also* Am. Compl., ¶¶ 496-500.   The Manufacturers' knowledge of the Questionable Business Practices more than four years before June 2020: (a) means the reformation claim is ineffective because the Manufacturers' claims were time-barred before any purported tolling allegedly should have taken effect; and (b) conclusively refutes (or, at a minimum, renders

implausible) Plaintiff's assertion that the Manufacturers and their attorneys could not have discovered the alleged wrongdoing until July 2017. *See* Facts, ¶¶ 7-10; Am. Compl, ¶ 356.

### LifeScan

- *April 2014* – LifeScan alleged in a *draft lawsuit* Patterson prepared that "[i]n April 2014 . . . a pharmacist . . . informed representatives of LifeScan that [an Alliance affiliated pharmacy] was distributing LifeScan product intended for [NFR patients] to [Retail patients]," after having obtained the NFR strips from Alta, an Alliance subsidiary. APP. P. 38, ¶ 69;

- In its draft lawsuit, LifeScan accused Alliance, Alta, and their affiliated pharmacies of running a "massive criminal scheme" – which LifeScan admittedly uncovered through the April 2014 pharmacist whistleblower and its own July 2014 audit – and *claimed damages amounting "to no less than $38.9 million" for alleged improper reimbursement "[b]etween 2009 and 2015."* APP. PP. 37-39, 46, ¶¶ 68-69, 76, 103, 107 (emphasis added).

- *June 2015* – Plaintiff alleges that "[o]n *June 25, 2015*, LifeScan's Patterson attorneys e-mailed Alliance's outside counsel, Bennett, stating: '*the current allegation is that Alliance is engaged in a massive billing fraud*.'" (emphasis added) *See* APP. P. 790, Second Amended Brown Complaint, ¶ 249; and

- *November 2015* – "In the final version of the memorandum provided to the Board in *November 2015*, Grant made no attempt to deny the [prior] *allegations made by … LifeScan . . . that Alliance was engaged in what was described as a 'massive insurance fraud scheme.'*" APP. PP. 794-95, Second Amended Brown Complaint, ¶ 260 (emphasis added).

### Roche

- Plaintiff alleges that "*starting in 2015* . . . Roche[] complained about the [Questionable Business Practices], and independently privately made multiple written demands on Alliance and its Affiliates for *payment of damages and other relief*." APP. P. 360, ¶ 28 (Bennett Tueller Complaint) (emphasis added); and

- Plaintiff alleged that "[i]n the final version of the memorandum provided to the Board in *November 2015*, Grant made no attempt to deny the [prior] *allegations made by Roche . . . that Alliance was engaged in what was described as a 'massive insurance fraud scheme.'*" APP. PP. 794-95, Second Amended Brown Complaint, ¶ 260 (emphasis added).

Unsurprisingly, at the May 3, 2023 Motion to Dismiss Hearing, the Court expressed its conclusion that the Manufacturers knew of the purported harm from the Questionable Business Practices *in 2014*.

> **The Court**: [W]hat somewhat the undisputed record shows . . . was the date which [the Manufacturers] knew that there was damage being done to them *and that looked like 2014*. They didn't know who was doing it, but in 2014 didn't they know that there were, in fact, people using gray market product and getting retail reimbursement?
>
> ***
>
> **The Court:** [I]n the [Manufacturers] motion for a protective order, they are describing to me elaborate detection mechanisms [for fraud].
>
> ***
>
> [T]here's no way that it is credible that [the Manufacturers] had these very elaborate mechanisms in place that never uncovered any sort of fraud and they left them all in place. Why would [the Manufacturers] waste the money if nobody was committing fraud? **[*The Manufacturers*] *knew there was fraud going on in 2014.*

App. pp. 696-98 (Hearing on Motion to Dismiss Transcript, 73:15-23, 74:6-7, 75:4-8) (emphasis added).

Plaintiff's negligent misrepresentation claim (Count V) is subject to a two-year statute of limitations and clearly was barred no later than 2016 (LifeScan) and 2017 (Roche) because Plaintiff admits that the Manufacturers were aware of facts giving rise to the claim no later than 2014 (LifeScan) and 2015 (Roche). *See Kansa Reinsurance Co., Ltd. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1371 (5th Cir. 1994) (applying a two-year limitations period to negligent misrepresentation claim).[27]

---

[27] "Because Texas state law treats statutes of limitations questions as procedural rather than substantive, federal courts sitting in Texas need not undertake a choice of law analysis—the Court simply enforces Texas's limitations periods." *In re Uplift Rx, LLC*, 2023 WL 5355353, at *10 (internal citation omitted).

Similarly, Plaintiff's RICO and fraud-based claims (Counts VI-IX) – subject to a four-year statute of limitations – have been barred since no later than 2018 (LifeScan) and 2019 (Roche) based on each Manufacturer's admitted knowledge of the Alliance scheme no later than 2014 (LifeScan) and 2015 (Roche). *Rogers v. McDorman*, 521 F.3d 381, 387 (5th Cir. 2008) ("[A]lthough civil RICO does not provide for a statute of limitations, the Supreme Court nevertheless held that civil RICO claims are subject to a four-year statute of limitations."); TEX. CIV. PRAC. & REM. CODE § 16.004 (four-year statute of limitations for fraud claims).

Thus, the Manufacturers' knowledge of the harm from Alliance's Questionable Business Practices requires dismissal of all assigned claims regardless of any tolling agreements or "reformation" claim, because the Manufacturers' claims already were barred before June 2020.

> (2)   The Manufacturers and their shared attorneys knew – or should have known – of Baker's legal services involving the PBMs and Questionable Business Practices outside the applicable limitations period.

Plaintiff's allegations that the Manufacturers indirectly relied on Baker's statements in 2015 and 2016, but somehow could not have discovered Baker's legal services until August 2020 (Am. Compl., ¶ 368) – although irrelevant when applying statutes of limitations – also are implausible based on Plaintiff's admissions and public records.

Plaintiff alleges throughout the Amended Complaint that the Manufacturers indirectly relied on Baker's purported misrepresentations to the PBMs during adversarial audits in 2015 and 2016, *e.g.*:

- **Am. Compl., ¶ 161** – "Rosebush asked Baker associate Lindsay Holmes and another Baker partner, Robert Wolin, to assist with Alliance's response. Baker's May 26, 2015 response, signed by Lee Rosebush, urged Optum to accept the Alta invoices. Moreover, Baker offered a blatant falsehood to Optum: 'Hawkins Pharmacy's claims accurately stated the Products that were dispensed and contained all the necessary information for processing.' In fact, as Baker was aware, Hawkins' claims did not accurately state the products that were dispensed. ***These misrepresentations were relied on by the Manufacturers***." (emphasis added); and

- **Am. Compl., ¶ 341** – "[T]he Manufacturers—with Baker's knowledge—relied on misstatements made by Alliance and Baker to the PBMs during audits, leading [the Manufacturers] to pay rebates for claims submitted in connection with test strips sold by Alliance-affiliated pharmacies that would not have been paid had the Manufacturers and PBMs known the truth."

First, Plaintiff's and the Manufacturers' admissions regarding the Manufacturers' knowledge of the Questionable Business Practices no later than 2014 and 2015 (*see* Facts, ¶¶ 7-10) show the Manufacturers and their shared attorneys knew – or should have known – that Baker's purported adversarial representations to the PBMs denying wrongdoing on behalf of Alliance, Alta, and related pharmacies in 2015 and 2016 were suspect because the Manufacturers already knew about Alliance's and Alta's Questionable Business Practices at that time.  As one significant example, LifeScan (through its and Roche's shared Patterson attorneys) admit they had specifically discovered the affiliation between Alta, Alliance, and Peterson Pharmacy in 2014. APP. PP. 23, 26, 28, 38, 39 (Draft LifeScan Complaint, p. 1 & ¶¶ 15, 24, 72, 76).  Thus, the Manufacturers can't plausibly allege that they relied on any alleged denials of that very same affiliation by Baker in 2016.  *See* Am. Compl., ¶ 171-73.

Second, the Manufacturers had access to documents showing Baker's alleged role years before they would like to admit.  On July 9, 2018, the Court authorized Plaintiff's predecessor – Chapter 11 Trustee Ronald L. Glass – to waive privilege and produce documents to the Manufacturers which Trustee Glass had originally withheld as presumptively privileged from a March 2018 production.  *See* APP. PP. 80-81 (Order allowing waiver).  The "presumptively privileged" documents produced in ***July 2018*** included over seventy documents to/from/cc Lee Rosebush and numerous others with @bakerlaw.com email addresses and revealed Baker attorneys corresponding with Alliance on the same issues Plaintiff raises in the Amended Complaint, *e.g.*:

- **Main Case Dkt. 878-1** (Doc. No. 8517) – September 16, 2016 email from Baker attorney Lindsay Holmes to David Grant "Re: Inventory Photos." APP. P. 77.

  o **Am. Compl., ¶ 187** – referencing September 16, 2016 emails with the subject "Inventory Photos" between Lindsay Holmes and Alliance employee Kassie Thomas.

- **Main Case Dkt. 878-1** (Doc. Nos. 14787, 14788, 14790) – June 23, 2016 email chain involving Lee Rosebush, Lindsay Holmes, and David Grant "RE: Confirming you received shared folder for Bayer invoices." APP. PP. 78-79.

  o **Am. Compl., ¶ 191** – referencing email from Lee Rosebush stating "'[W]hile the Bayer and Strategic direct invoices are helpful to show direct purchases, they do not answer the questions raised in the audit related to J&J product.'"

The Manufacturers and their shared attorneys thus knew – or through reasonable diligence could have discovered – Baker's legal services relating to the Questionable Business Practices no later than July 2018; more than four years before Plaintiff filed suit on September 26, 2022.

Third, Plaintiff admits that the Manufacturers were aware of Baker's role representing Alliance "related to disputes with PBMs and secondary market purchases" by May 24, 2017. Am. Compl., ¶ 366; *see* APP. P. 67 (Supplemental Declaration of Elizabeth A. Green in Support of Debtors' Application to Employ Baker, ¶ 6(c) ("The Debtors have been a client of [Baker] since 2014 [and Baker] has provided counsel to [Alliance] . . . including the following: Insurance-related advice, including advice related to negotiating (and potentially litigating with) with Pharmacy Benefit Managers (each, a 'PBM'), gaining access into insurance networks, negotiating insurance-related contracts, and insurance audits and payment disputes, including certain payment disputes with PBM related to the wholesaler licensing and pedigree information requirements as it related to dispensed products. B&H provided advice in responding to audits by certain of the PBMs related to wholesale and pedigree information requirements as it related to dispensed products")).

Fourth, Plaintiff's allegations that the Manufacturers relied on Baker's alleged misrepresentations to PBMs in 2015 and 2016 but didn't discover Baker's involvement in those

same alleged misrepresentations until August 2020 are inconsistent and implausible.  Plaintiff can't have it both ways: the Manufacturers either indirectly relied on Baker's representations in 2015 and 2016, or didn't know of Baker's involvement until 2020 and thus couldn't possibly have relied on Baker in 2015 and 2016.  These contradictory allegations render the Manufacturers' attempts to defeat Baker's limitations defense implausible.  *See Mora v. Univ. of Tex. Sw. Med. Ctr.*, 469 F. App'x 295, 299 (5th Cir. 2012) (when claims are "contradicted by the other facts alleged in the complaint," it makes "the claim implausible on its face").

Finally, on March 19, 2019, Roche sued Baker attorney Lee Rosebush in New Jersey based on the same Questionable Business Practices at issue here – ***nearly eighteen months before*** August 2020 when Plaintiff alleges that the Manufacturers discovered Baker's purported involvement in the Questionable Business Practices.  Am. Compl., ¶¶ 331, 368; *see also* APP. PP. 82-179 (Roche's Original Complaint).  Among other things, Roche's March 19, 2019 complaint against Rosebush alleges that "Defendants [including Rosebush] devoted constant attention to the task of hiding their fraud from PBM auditors and government regulators, and to mitigating the fallout when detected" and further alleges that "[i]n his capacity as outside counsel, Rosebush became fully aware of Alliance's fraudulent practices."  APP. PP. 107, 147 (Roche's Original Complaint, ¶¶ 100, 276; *see also* APP. PP. 108-11, *id.* at ¶¶ 107-116 (more detail)).

Plaintiff cannot in candor to this Court continue to advance her theory that the Manufacturers – represented by shared Patterson attorneys who filed Roche's lawsuit alleging detailed RICO and other claims against Rosebush in March 2019 – could not have discovered their claims against Baker until August 2020.  *See* Am. Compl., ¶ 368.

        (3)    <u>Neither the discovery rule nor the fraudulent concealment doctrine revive Plaintiff's time-barred indirect claims.</u>

In any event, the date the Manufacturers actually discovered Baker's purported involvement in the Questionable Business Practices is irrelevant because limitations started when the Manufacturers knew (or should have known) of the ***harm*** caused by the Questionable Business Practices (2014 and 2015, as shown above), not the ***identity*** of each potentially liable party:

- *PPG Industries, Inc. v. JMB/Houston Centers Partners Ltd. Partnership*, 146 S.W.3d 79, 93-94 (Tex. 2004) ("[The discovery rule] tolls limitations ***only until a claimant learns of a wrongful injury*** . . . . ***even if the claimant does not yet know***: the specific cause of the injury; the ***party responsible for it***; the full extent of it; or the chances of avoiding it.") (footnotes omitted) (emphasis added);

- *Timberlake v. A.H. Robins Co., Inc.*, 727 F.2d 1363, 1365-66 (5th Cir. 1984) (limitations began running when plaintiff discovered that a medical device caused her health problems, ***not when plaintiff learned that the device's manufacturer may have engaged in wrongful conduct***, which the Court found that plaintiff should have investigated during the two years after she learned of her injury) (emphasis added); and

- *Tarpley v. Texaco, Inc.*, No. CA-3-96-CV-3209, 1998 WL 133122 (N.D. Tex. Mar. 16, 1998) ("All that is required to commence the running of the limitations period is the discovery of the injury and its general cause, ***not*** the exact cause in fact and ***the specific parties responsible***.") (citing *Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co.*, 866 S.W.2d 740, 743 (Tex. App.—Houston [14th Dist.] 1993, writ denied)) (emphasis added).

The Manufacturers' purportedly assigned claims (Counts V-IX) thus are time-barred because Plaintiff did not file suit until September 26, 2022, long after the two-year (negligent misrepresentation) and four-year (fraud and RICO) statutes of limitations had expired.

**II.    THE MANUFACTURERS' ASSIGNED CLAIMS OTHERWISE FAIL AS A MATTER OF LAW AND MUST BE DISMISSED.**

    **A.    Claims on Behalf of Non-Client Manufacturers Are Barred by Attorney Immunity From Suits in Texas Courts.**

        (1)    <u>Attorney immunity protects attorneys from suits in Texas courts based on conduct that was part of representing a client, with no applicable exceptions.</u>

Attorney immunity broadly protects attorneys from suits in Texas courts based on conduct in which attorneys engage when representing a client – even if that conduct was wrongful, fraudulent, or criminal – if the "complained-of actions were ***part*** of [the attorney's] responsibility to his clients, ***even if done improperly***." *Youngkin v. Hines*, 546 S.W.3d 675, 682 (Tex. 2018) (emphasis added); *Ironshore Europe DAC v. Schiff Hardin, L.L.P.,* 912 F.3d 759, 764 (5th Cir. 2019), and cases cited therein.[28]

In *Ironshore*, the Fifth Circuit reviewed the district court's denial of the law firm's motion to dismiss on the basis of attorney immunity (and other grounds) as an appealable collateral order which the Fifth Circuit reversed and rendered, finding that the Schiff law firm was immune from suit by a non-client claiming it was damaged by Schiff's allegedly negligent misrepresentations. As courts have held, "[t]he only facts required to support an attorney–immunity defense are the type of conduct at issue and the existence of an attorney–client relationship at the time" the attorney engaged in the conduct. *Youngkin*, 546 S.W.3d at 683; *Ironshore*, 912 F.3d at 766. Once those facts are established, the trial court decides "the ***legal question*** of whether said conduct was within the scope of representation." *Youngkin* at 683 (emphasis added); *Ironshore* at 767.

Decisions from the Texas Supreme Court and the Fifth Circuit provide the following further guidelines which require dismissal of Counts V – VII as a matter of law:

- How a plaintiff chooses to label its cause of action is irrelevant. *Troice*, 816 F.3d at 345 ("merely labeling an attorney's conduct 'fraudulent' does not and should not remove it from the scope of client representation or render it 'foreign to the duties of an attorney' such that the attorney would not be immune.") (quoting *Cantey Hanger,*

---

[28] As the Fifth Circuit held in *Ironshore*, "attorney immunity is properly characterized as a true immunity from suit, not as a defense to liability." 912 F.3d at 763. The Fifth Circuit also has observed that attorney immunity is "an issue that is completely separate from the merits." *Troice v. Proskauer Rose, L.L.P.*, 816 F.3d 341, 345-46 (5th Cir. 2016). Thus, immunity is properly raised in a motion to dismiss under Rule 12(b)(6). *See LJH, Ltd. v. Jaffe*, No. 4:15-CV-639 2016 WL 3668170, *8 (E.D. Tex. July 11, 2016) (granting motion to dismiss under Rule 12(b)(6) in favor of law firm based on attorney immunity).

*LLP v. Byrd*, 467 S.W.3d 477, 484 (Tex. 2015)).  "That some of [the attorney's conduct] was allegedly wrongful, or that he allegedly carried out some of his responsibilities in a fraudulent manner, is no matter."  *Troice*, 816 F.3d at 348.

- Rather, "the dispositive question is whether the attorney's conduct was part of the discharge of his duties in representing a [client]."  *LJH, Ltd.,* 2016 WL 3668170, at *6 (emphasis added); *Van Hauen v. Wells Fargo Bank, N.A.*, No. 4:12-CV-344, 2012 WL 4092590, at *1, *3 (E.D. Tex. Aug. 16, 2012) (Mazzant, Mag. J.) (recommending dismissal of defendant law firm under Rule 12(b)(6), because "conduct of providing legal oversight and assistance with the enforcement of security instruments in real property requires the professional training, skill, and expertise of an attorney" such that law firm was protected by attorney immunity), report and recommendation adopted by 2012 WL 4092516 (E.D. Tex. Sept. 17, 2012).

- Immunity focuses on the role the attorney was performing, not the alleged wrongfulness or even asserted criminality, of the attorney's conduct.  *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651 at 657-58 (Tex. 2020); *Youngkin*, 546 S.W.3d at 681; *Cantey Hanger*, 467 S.W.3d 477 at 481 & 485.

- Indeed, in *Cantey Hanger*, the Texas Supreme Court held that even intentionally fraudulent omissions and misrepresentations are not actionable under attorney immunity. 467 S.W.3d at 481.

- In *Bethel*, the Texas Supreme Court rejected the request to create a "criminal conduct" exception to the attorney-immunity defense and applied immunity to litigation conduct alleged to be criminal in nature. 595 S.W.3d at 657; the Fifth Circuit likewise rejected a "criminal conduct" exception in *Troice*, 921 F.3d at 507.

- Claims for alleged conspiracy likewise are barred by attorney immunity. *U.S. Bank National Association v. Sheena*, 479 S.W.3d 475 (Tex. App.—Houston [14th Dist.] 2015, no pet.), (affirming dismissal of claims for fraud, negligence, tortious interference, conversion, and conspiracy based on attorney immunity).

- Immunity applies to attorneys' conduct in both litigation and non-litigation contexts. "Today we confirm that attorney immunity applies to claims based on conduct outside the litigation context, so long as the conduct is the 'kind' of conduct we have described above." *Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 79 (Tex. 2021).

        (2)    <u>Plaintiff – as purported assignee of non-client Manufacturers – complains about actions Baker took as part of representing the Alleged Client Debtors and thus Baker is immune from suit in Texas courts as a matter of law.</u>

Here, *all* – not just "part" – of Baker's conduct allegedly occurred as part of representing the Alleged Client Debtors.  Baker thus is protected by attorney immunity as a matter of law and

Count V (aiding and abetting/knowing participation in fraud/negligent and/or fraudulent misrepresentation), Count VI (fraudulent misrepresentation/fraud), and Count VII (conspiracy to commit fraud) – all of which the Manufacturers purported to assign to Plaintiff in a stipulation governed by Texas law and all of which are alleged in this Texas court – must be dismissed. *See* Facts, ¶¶ 1-2, 14; *see also e.g.*:

- Am. Compl., ¶ 20 ("When PBMs attempted to audit Alliance pharmacies, Baker rebuffed those entities, misrepresented that Alliance entities were not related to one another, and submitted redacted and misleading invoices with the goal of convincing PBMs that Alliance pharmacies had dispensed the same retail test strips for which it had submitted insurance claims. . . .");

- *Id*. at ¶ 136 (In communications with a PBM on behalf of Alliance, "Baker intentionally concealed from PBMs the fact that the 'independent pharmacies' were actually a part of the Alliance network.");

- *Id*. at ¶ 153 ("In 2015 and 2016, Baker took a lead role in helping Alliance conceal its Questionable Business Practices by helping its pharmacies pass PBM audits . . . .");

- *Id*. at ¶ 159 ("Baker frequently attempted to block PBM audits into Alliance's business by arguing that the PBMs were not entitled to demand product tracing or pedigree information beyond Alliance's captive wholesalers . . . .");

- *Id*. at ¶ 165 ("Baker argued that PBMs should accept the invoices that had been provided . . . ."); and

- *Id*. at ¶ 191 ("Lee Rosebush … specifically asked Alliance employees to isolate invoices bearing the retail NDC for LifeScan product so that he could include those invoices in Baker's audit response on behalf of the Alliance pharmacies").

**B.    The RICO Claims Fail as a Matter of Law for Lack of Causation, Participation, or Vicarious Liability**

    (1)    <u>The Amended Complaint still facially negates the direct "but-for" causation required to establish a RICO claim because the Manufacturers complain about Baker's alleged direct representations to PBMs and only secondary, indirect alleged impact on the Manufacturers.</u>

Supreme Court precedent as a matter of law expressly bars Plaintiff's RICO allegations – as purported assignee of the Manufacturers – because the alleged predicate offense – Alliance

submitting false reimbursement claims **to PBMs** – did not **directly** harm the Manufacturers, thus destroying proximate causation as evaluated under RICO.

Commencing with *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992), and subsequent opinions in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) and *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010), the Supreme Court has held that a RICO plaintiff must establish "that a RICO predicate offense 'not only was a 'but for' cause of [the] injury, but was the proximate cause as well.'" *Hemi Group, LLC*, 559 U.S. at 9 (quoting *Holmes*, 503 U.S. at 268). "[P]roximate cause thus requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* Consider *Holmes*, *Anza*, and *Hemi*:

### Holmes

- Securities Investor Protection Corporation (SIPC) alleged that a defendant manipulated stock prices in furtherance of a RICO enterprise. *Holmes*, 503 U.S. at 262-63. SIPC had a duty to reimburse customers of insured broker-dealers if a broker-dealer failed. *Id.* at 261. The defendant's alleged manipulation caused a crash and SIPC was on the hook for $13 million to the bankrupted broker-dealers' customers. In denying SIPC's RICO claim, **the court held that the alleged conspiracy directly harmed the broker-dealers but SIPC's injury was "purely contingent" on that harm.** *Id.* at 271 (emphasis added). Because the SIPC's injury was contingent on harm to the broker-dealers, it was "too remote" to satisfy the direct causation requirement for RICO. *Id.*

### Anza

- Plaintiff alleged RICO against its market competitor alleging that the competitor defrauded the State of New York by failing to remit sales tax and thus undercut plaintiff's prices. *Anza*, 547 U.S. at 458. Against the backdrop of *Holmes*, the court held that plaintiff's alleged injury was too remote to establish RICO because "[t]he direct victim of" the failure to remit sales taxes was "the State of New York, not [plaintiff]." *Id.* The cause of the plaintiff's harm was based on "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* Thus, plaintiff had not established a direct causal connection between the predicate offense (failing to remit sales taxes to the state) and the alleged harm (undercutting plaintiff's prices). *Id.* at 460-61.

*Hemi*

- The City of New York, which taxes the possession of cigarettes, filed a RICO claim against an out-of-state cigarette vendor alleging that the vendor failed to disclose the required customer information to the state, which, in turn, stunted the city's ability to tax its residents. *Hemi*, 559 U.S. at 4. But the city's claim failed, because it could not show that its alleged injury – lost tax revenue – was proximately caused by the alleged RICO violation. *Id.* at 5. The predicate RICO act (failing to file tax related information with the state in violation of the federal Jenkins Act) did not directly lead to the city's alleged injury. There was no direct causation because the city's harm came from the customers' failure to pay the taxes, but the alleged RICO act was the failure to file Jenkins Act reports (*i.e.*, as in *Anza*, the conduct causing the harm was distinct from the alleged RICO act). *Id.* at *11.[29]

Here, the alleged predicate RICO act is mail and wire fraud arising from submitting allegedly false information to **PBMs**, ***not Manufacturers***. *See* Facts, ¶ 16; Am. Compl., ¶ 486 ("Baker . . . by means of wire communication . . . provide[ed] false information and reassurances ***to PBMs***"); *id.* at ¶ 101 ("[The] PBMs were the very entities to which Alliance was submitting fraudulent insurance claims"). The PBMs thus are akin to the parties that were directly harmed in *Holmes* (broker-dealers), *Anza* (the State of New York) and *Hemi* (the State of New York and the federal government) because the alleged scheme – submitting false claims to the PBMs – ***directly harmed the PBMs*** which paid Alliance based on the false claims.[30]

It is untenable and implausible for Plaintiff to allege the PBMs acted as mere pass throughs because "fraudulent adjudication data was passed directly from PBMs to the Test Strip Manufacturers" (Am. Compl., ¶ 468) while also alleging that the purported racketeering acts

---

[29] Under *Anza* and *Hemi*, it makes no difference whether the harm to the Manufacturers was a foreseeable consequence of Alliance or Baker's actions with respect to the PBMs; the RICO claim still fails as a matter of law. *See id*. at 13.

[30] In addition to paying Alliance, Plaintiff also admits that numerous PBMs "audited, claimed chargebacks, and cancelled their contracts" with Alliance pharmacies. *Id.* at ¶ 121 (For example, "Prime, a PBM, claimed a $1,860,423 chargeback against" an Alliance Pharmacy). The PBMs would not have aggressively investigated and asserted millions of dollars in chargebacks against Alliance and canceled contracts with Alliance related pharmacies ***unless they alleged they were harmed***.

produced the "common result of defrauding the Test Strip Manufacturers *and PBMs*" (*id.* ¶ 465). Moreover, Plaintiff alleges *that the PBMs sought to remedy their own injuries* (*i.e.*, seeking chargebacks based on Alliance's alleged breaches of multiple PBM contracts and "deceiv[ing] PBMs into believing they were dispensing retail strips . . . when they were in fact dispensing NFR strips" (Am. Compl., ¶¶ 120-121)).

Just as in *Holmes, Hemi,* and *Anza*, Plaintiff has no RICO claim because the conduct which allegedly was the direct cause of the Manufacturers' damage was not action by Baker, but instead was: (1) *the PBMs' distinct, unidentified representations* (under contracts between the PBMs and Manufacturers) to the *Manufacturers* and (2) the Manufacturers' wholly speculative purported loss of retail sales resulting from *distributors* "willing to breach their contracts with manufacturers and sell NFR strips [to diverters] on the 'secondary' or 'gray' market." Facts, ¶ 16; Am. Compl., ¶¶ 2, 87, 93-94, 119, 469.[31]

In other words, the Manufacturers are situated much like the losing plaintiffs in *Holmes* (SIPC), *Anza* (the competitor), and *Hemi* (the City of New York), who may have been *indirectly* damaged, but were not *proximately* damaged as RICO requires. *See Hemi* 559 U.S. at 2, ("'[t]he general tendency of the law, in regards to damages at least, *is not to go beyond the first step*,' and that 'general tendency' applies with full force to proximate cause inquiries under RICO") (internal citations omitted) (emphasis added), quoting *Holmes*, 503 U.S. at 271-272. Any purported injury to the Manufacturers necessarily was at least one step removed from any direct harm *because*

---

[31] Plaintiff alleges Manufacturers suffered lost profits "each time . . . a box of NFR strips [was substituted] for a box of retail strips . . . [because] such substitution deprived the Test Strip Manufacturers of the sale of a box of retail strips that they would have sold absent" the alleged scheme. Am. Compl., ¶¶ 469, 490. But Plaintiff has not pled a single fact showing that Alliance's customers would have purchased the retail strips – and at what price – or that Baker was the "but for" cause of customers not purchasing retail strips. Plaintiff's purported (and wholly speculative) lost-profits damages *rely on actions of Alliance's customers* – not Baker – and Baker can't be the proximate or "but-for" cause of damages that depend on actions of a third-party – the customers.

***Alliance and Baker are not alleged to have directly communicated with the Manufacturers at all, and are only alleged to have directly communicated with PBMs*** who were the "first step."

Moreover, the *Holmes* court explained that "[i]f the nonpurchasing customers were allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets." *Holmes*, 503 U.S at 272. Likewise here, the Manufacturers' alleged injuries are dependent on the ***PBMs actions*** – including whether the PBMs fulfilled their contractual duties to the Manufacturers in their dealings with Alliance, whether the PBMs effectively monitored and audited various pharmacies, and whether PBMs negligently, knowingly, and/or willfully paid Alliance pharmacies for the sale of NFR strips billed as if they were retail strips. These contingencies and uncertainties destroy any purported direct "proximate" RICO causation link. No matter what, the Manufacturers are at least one step removed from the alleged fraud – Alliance submitting false reports to PBMs and receiving payments from PBMs based on those false reports.[32] So the Manufacturers have no RICO claim and any such claim should be dismissed. *See also Segal v. Lynch*, No. CV H-07-083, 2007 WL 9753726, at *6 (S.D. Tex. June 29, 2007) (dismissing plaintiff's RICO claim under Rule 12(b)(6) because "[a]side from exceedingly general allegations, Plaintiff's Amended Complaint lacks any factual basis as to how the alleged predicate acts "led directly" to Plaintiff's [alleged harm]").

---

[32] In *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 658 (2008), on the other hand, the Supreme Court distinguished *Holmes* and *Anza*, finding that losing bidders at an auction were the only parties injured by the defendants' misrepresentations. But, *Bridge* is inapplicable here because Plaintiff admits the PBMs sought to recover – through chargebacks – for injuries suffered from Alliance's scheme.

(2)   The Amended Complaint facially negates Baker's alleged operation
or management of Alliance's alleged enterprise.

From 2014-2017, Baker provided pre-petition *legal services* – as reflected on more than

650 pages of Baker invoices attached to Plaintiff's original complaint. *See* Am. Compl., ¶ 286 &

Composite Exhibit 1 to Plaintiff's Original Complaint.

Baker allegedly provided legal services in adversarial PBM audits, advocating for

Alliance-related pharmacies against PBM chargebacks and contract cancellations, but ***Baker is not***

***alleged to have communicated with the Manufacturers***. *Id.*  Providing legal services, even to an

alleged RICO enterprise, does not subject Baker to RICO liability. *See Reves v. Ernst & Young*,

507 U.S. 170, 185 (1993) (finding RICO liability applies only to individuals who "participate in

the operation or management of the enterprise itself" not to accountants providing professional

services); *In re Taxable Mun. Bond Sec. Litig.*, No. 90-4714, 1993 WL 534035, at *4 (E.D. La.

Dec. 13, 1993) ("Performance of legal services that facilitate operation of an enterprise does not

represent participation in the 'operation or management' of the enterprise. This is so even when

the defendant has substantial persuasive power to induce certain action by the enterprise, or, as

part of its professional services offers consultation on important management decisions").

In *Reves*, the Supreme Court found that Ernst & Young's professional services in

compiling financials and failing to advise the company's board regarding allegedly fraudulent

financial statements were too passive to qualify as "conducting" the "operation or management"

of a RICO enterprise. *Reves*, 507 U.S. at 184-86. Plaintiff similarly complains about Baker's

professional services – "Baker [allegedly] never advised Alliance that it should stop submitting

fraudulent insurance claims . . . [and] never informed Alliance's Board of Directors that the

company was engaged in blatantly illegal activity" – which, under *Reves*, cannot rise to the level

of "conducting" the "operation or management" of Alliance's alleged enterprise. *See* Am. Compl., ¶ 103.

Moreover, the 147-page Amended Complaint still is devoid of any plausible allegations that Baker actively participated in or directed the alleged enterprise. [33] As this Court has found, "[m]erely alleging that a party associated with conspiring parties does not satisfy the 'agreement' requirement of a RICO conspiracy claim." *In re Uplift Rx, LLC*, 2023 WL 5355353, at *21. Courts around the country – including this Circuit – have consistently held that a law firm (Baker) providing legal services to a client (Alliance) – does not support a RICO claim. *See St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) (upholding the district court's dismissal of plaintiff's RICO claim because "'patterns of racketeering activity' [plaintiffs'] alleged [inaccurate billing practices, among others] are at worst violations of the rules of professional responsibility."); *see also Rolfes v. MBNA Am. Bank N.A.*, 416 F.Supp.2d 745, 752 (D.S.D. 2005) (dismissing client's RICO claim against an attorney who provided traditional legal services); *Penn, LLC v. Prosper Bus. Dev. Corp.*, No. 2:10-CV-993, 2011 WL 2118072, at *13 (S.D. Ohio May 27, 2011) (same).

        (3)      <u>The Amended Complaint fails to establish Baker as a RICO "person" and fails to meet Rule 9(b)'s heightened pleading requirements.</u>

Plaintiff has not plausibly pled that Baker is a RICO "person" because vague allegations that "Baker, on multiple occasions . . . [violated] the federal wire fraud statute" (Am. Compl.,

---

[33] Any allegations that Lee Rosebush's brief stint on the Alliance board in 2016 can sustain RICO claims against Baker must fail, because Plaintiff already broadly released all claims against Rosebush. *See* Section V below (explaining Plaintiff released Rosebush and the release inures to the benefit of Rosebush's "partners"); *see also* Am. Compl., ¶¶ 229-30 (Rosebush allegedly joined the Board June 9, 2016 and remained until November 16, 2016). Moreover, Plaintiff lacks standing to assert any claims against Rosebush in his capacity as an Alliance director because the "Manufacturers [did] not convey[] any claims that are currently pending or could be asserted against any current defendant [*i.e.* Rosebush] in either of the NJ Actions or that in the future could be asserted in any jurisdiction against any other person or entity." *See* APP. P. 393 (stipulation).

¶ 480) are insufficient to establish Baker as a RICO "person," particularly where Baker's alleged conduct consisted of ***advising*** the Alleged Client Debtors and sending ***adversarial*** e-mails and letters to PBMs in the course of defending PBM audits – traditional legal services which are not a continuous threat of racketeering activity.  According to the Fifth Circuit and this Court, "isolated and sporadic . . . acts spread out over a four-year period, simply do not show the continuous threat of racketeering activity that RICO was designed to address."  *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995); *In re Uplift Rx, LLC*, 2023 WL 5355353, at *21 ("The Fifth Circuit [*Crowe*] held that the 'sporadic' involvement of a law firm that did little more than advise a client on how to fill out forms or draw up documents did not present the threat Congress intended the RICO provisions to address, so it was inappropriate to hold the law firm in that case liable").

Importantly, Plaintiff alleges that "the ***Scheme Participants***' [*i.e.*, not Baker's] racketeering acts were multiple and repeated, with tens of thousands occurring every year from 2011 [over three years before Alliance retained Baker] until Alliance's bankruptcy in 2017."  Am. Compl., ¶¶ 464, 481. But, just as the Court found when dismissing Plaintiff's claims against Brown, Baker's purported "level of involvement in the scheme cannot be said to have risen to the level necessary for [Baker] to be held liable for a RICO offense or conspiring to commit a RICO offense—even on the assumption that the Scheme Participants and Former Officers' actions could."  *See In re Uplift Rx, LLC*, 2023 WL 5355353, at *21.

Ultimately, Plaintiff has not pled any facts to support her legal conclusion that Baker is a RICO person.  *See* Am. Compl., ¶¶ 458, 475; *Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 625, 648 (S.D. Tex. 2007), aff'd sub nom. 337 Fed. Appx. 397 (5th Cir. 2009) (finding plaintiff failed to establish law firm as RICO person because "the acts pled are too isolated and discrete to satisfy RICO's continuity requirement"). Allegations that Baker has "'willfully committed

multiple, related acts of mail and/or wire fraud' . . . fail to adequately plead the existence of a RICO person, since [Plaintiff's Amended Complaint] alleges nothing that would constitute a continuous threat on the part of [Baker] to bring them within the definition of RICO persons." *Goldin, Peiser & Peiser, L.L.P. v. Delta Brands, Inc.*, No. 3:02-CV-0127-M, 2002 WL 550450, at *2 (N.D. Tex. Apr. 11, 2002).

Similarly, the Amended Complaint still fails to meet Rule 9(b)'s and Rule 7009's heightened pleading requirements for the predicate acts of mail and wire fraud because the allegations fail to identify the who, what, when, where, and why of Baker's purported acts of fraud.[34]  *See FMC Intern. A.G. v. ABB Lummus Glob., Inc.*, No. CIV. A. H-04-3896, 2006 WL 213948, at *4 (S.D. Tex. Jan. 25, 2006) ("In the civil RICO context, Rule 9(b) also requires the plaintiff to allege specifically how *each* act of mail or wire fraud furthered the fraudulent scheme, who caused what to be mailed or wired when, and how the mailing or wiring furthered the fraudulent scheme.") (Stacy, Mag. J.) (emphasis in original).

(4)   <u>Baker can't be held vicariously liable under RICO.</u>

Baker's alleged involvement with Alliance was purely vicarious:  it occurred through the legal services provided by the Baker attorneys who represented Alliance entities, and through the service of a Baker partner, Rosebush, briefly on Alliance's board of directors.  *See* Compl., ¶¶ 466, 483, 486.  But "*respondeat superior* can *never* be the basis of liability for a civil RICO suit."  *First National Bank of Louisville v. Lustig*, 727 F. Supp. 276, 280 (E.D. La. 1989) (emphasis in original). "[I]t is necessary to distinguish between a corporation that actively violates the [RICO] statute and

---

[34] The Amended Complaint baldly asserts that "Baker utilized wire communications to advise the Scheme Participants about the most effective ways to hide their scheme, and to provide false information and reassurance to PBMs" without alleging the specifics regarding each purported act as Rule 9(b) requires. *See* Am. Compl., ¶ 486

a corporation whose disloyal employee violates the statue without his employer's complicity or knowledge." *Id.* at 280-81. Baker is not a proper RICO defendant because it cannot be held liable for RICO on a vicarious-liability theory.

(5) Plaintiff's failure to plead a plausible RICO claim negates any RICO conspiracy claim.

Fifth Circuit precedent mandates that Plaintiff first establish a substantive civil RICO claim (which she has not) in order to maintain a claim for RICO conspiracy. Failing properly to plead the substantive RICO claim under § 1962(c) (Count IX) means that Plaintiff's RICO conspiracy claim under § 1962 (d) (Count VIII) also must fail. *See e.g. N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 203 (5th Cir. 2015) ("Since North Cypress failed to properly plead a claim under §§ 1962(a), (b), or (c), it correspondingly failed to properly plead a claim under § 1962(d)."); *Nolen v. Nucentrix Broadband Networks Inc.,* 293 F.3d 926, 930 (5th Cir. 2002) ("The failure to plead the requisite elements of . . . a § 1962(c) violation implicitly means that [Nolen] cannot plead a conspiracy to violate either section.") (internal citation and quotation omitted); *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 552 (5th Cir. 2012), as revised (Jan. 12, 2012) (finding plaintiff "failed to establish injury from an act that is independently wrongful under RICO [§ 1962(c)]," thus destroying its RICO conspiracy claim under § 1962(d)).

## C. Attorneys (Baker) Can't Conspire With Clients (Alliance) Because Agents and Principals Are Not Two or More Persons Required for a Conspiracy

Plaintiff's allegation that Baker engaged in a conspiracy to commit fraud (Count VII)[35] fails as a matter of law because an allegation that an attorney conspired with a client does not

---

[35] "The elements of civil conspiracy are: (1) two or more people; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Shunta v. Westergren*, No. 01-08-00715-CV, 2010 WL 2307083, at *17-18 (Tex. App.—Houston [1st Dist.] June 10, 2010, no pet.). "A specific intent to agree to accomplish the unlawful purpose or to accomplish the lawful purpose by unlawful means is also required." *Boales v. Perry Homes,*

allege a conspiracy of two or more persons. *See Martinez-Bey v. Bank of Am., N.A.*, No. 3:12-CV-4986-G BH, 2013 U.S. Dist. LEXIS 85440, at **8-9 (N.D. Tex. June 18, 2013); RESTATEMENT (THIRD) OF TORTS § 27TD(d) (2018) ("To be held liable for participating in a conspiracy, the lawyer must be shown to have acted . . . in a capacity other than as the client's counsel and representative."); 1 RONALD E. MALLEN, LEGAL MALPRACTICE § 6:10 (2022) ("Lawyers have been sued frequently for allegedly conspiring with their clients or others to commit a variety of wrongs.  The rule is that wrongs attributed to an attorney, as the client's agent, cannot support a conspiracy.") (footnotes omitted).

Indeed, cases rejecting attorney-client conspiracy claims exemplify a broader rule under Texas law that an agent cannot conspire with its principal.  *See Bradford v. Vento*, 48 S.W.3d 749, 761 (Tex. 2001) (recognizing that Bradford could not have conspired with two other defendant-entities (Simon and Golden Ring) because "Bradford was the agent of Simon and Golden Ring");[36] *see also Lyons v. Lindsey Morden Claims Mgmt.*, Inc., 985 S.W.2d 86, 92 (Tex. App.—El Paso 1998, no pet.) ("As a matter of law, the acts of an agent and its principal are the acts of a single entity and cannot constitute conspiracy."); 15A CORPUS JURIS SECUNDUM § 10 ("A conspiracy cannot exist between a principal and an agent").

---

*J.V.*, No. 14-98-00975-CV, 2000 WL 674922, at *6 (Tex. App.—Houston [14th Dist.] May 25, 2000, pet. denied).

[36] In the Court of Appeals, the defendant-appellants successfully argued that "it is a rule of law that agents and their principals cannot conspire together."  *Bradford v. Vento*, 997 S.W.2d 713, 729 (Tex. App.—Corpus Christi 1999).  Specifically, they argued that the parties' unanimous concession "that Bradford was the agent of Simon and Golden" meant that, without evidence Simon and Golden were separate companies, none of Bradford, Simon, and Golden could have conspired with each other.  *Id.*  The Supreme Court affirmed the Court of Appeals' opinion rejecting the conspiracy claim, expressly stated that it "agree[d] with the court of appeals' analysis and judgment on this issue[.]").  48 S.W.3d at 760-61.

III.   CONTRIBUTION AND ASSIGNMENT LAW BARS ALL CLAIMS REGARDLESS OF ARTFUL
       LABELS.

A settling tortfeasor (Alliance) in whose dirty shoes Plaintiff stands can't obtain

contribution from a purported joint tortfeasor (Baker), no matter how artfully the contribution

claims are disguised under different labels.  Likewise, Plaintiff can't pursue claims purchased from

the Manufacturers whose injury Plaintiff admits was caused by Alliance against Alliance's alleged

joint tortfeasor, Baker.

A.   A Settling Tortfeasor (Alliance) Can't Obtain Contribution From an Alleged
     Non-Settling Tortfeasor (Baker) and Plaintiff Can't Avoid the Contribution
     Bar Through Artful Pleading – Seeking the Same Contribution Damages
     Under Different Labels.

On August 5, 2019, this Court approved a stipulation between Alliance and Roche settling

Roche's proofs of claim for $80,054,970.00.  *See* Facts, ¶ 13; Am. Compl., ¶ 333.  That same day,

this Court also approved a stipulation between Alliance and LifeScan, settling LifeScan's proofs

of claim for $49,339,603.00.  *See id.*  The LifeScan and Roche settlements allowed claims in the

aggregate amount of $129,394,573.00 (the "Claim Settlements").  Plaintiff's original complaint

asserted a contribution claim under Chapter 33 of the Texas Civil Practice & Remedies Code

attempting to recover the Claim Settlements from Baker.

Plaintiff admits defeat in the Amended Complaint by removing her expressly-labeled

contribution claim after accepting that Alliance (a settling person) can't pursue contribution from

a non-settling alleged tortfeasor (Baker).  *See Perlstein v. Vuono*, No. 07-133, 2008 WL 3539769,

at *5 (S.D. Tex. Aug. 13, 2008) (Hanen, J.) ("The Supreme Court of Texas has consistently held

based on Chapter 33 of the Texas Civil Practice and Remedies Code *that a settling person cannot*

*pursue an action for contribution from a non-settling person or entity*.") (emphasis added)

(internal citations omitted).

But Plaintiff's removal of the expressly labeled contribution claim from the Amended Complaint doesn't change that Plaintiff's purported claims for negligence (Count I) and aiding and abetting/knowing participation in breach of fiduciary duty (Count II) must be dismissed because they still seek barred contribution damages **under different labels**.

For example, Plaintiff seeks to recover $129,394,573.00 – the aggregate amount of the settled Claim Settlements – for negligence (Am. Compl., ¶ 383[37]) and aiding and abetting breach of fiduciary duty (Am. Compl., ¶ 398[38]), the **same contribution damages** sought in the original complaint.  Plaintiff can't overcome the bar to contribution by artfully pleading a contribution claim with different labels. In *FG Holdings, Inc. v. London Am. Risk Specialists, Inc.*, No. 09-05-522 CV, 2007 WL 4341408 (Tex. App.—Beaumont Dec. 13, 2007, pet. denied), the court expressly rejected a party's attempt to do just that. There, a third-party plaintiff ("FG") brought claims against a third-party defendant ("London American") for negligence, misrepresentation, violation of the insurance code, and indemnity based on "London American's acts or omissions in obtaining coverage for [plaintiff ('TGS')] [that] subjected FG to liability and damages." *Id.* at *6.

FG argued that it was "'**forced to spend $5 million in settlement with TGS because of London America's actions, including both misrepresentations and omission**.'" *Id.* at *7 (emphasis added).  As a result, the court held that "**FG [could not] recast its contribution claim by artful pleading to avoid claim preclusion** under Chapter 33 of the Texas Civil Practice and Remedies Code [because] . . . . FG's negligence, misrepresentation, and [insurance] claims [**were actually**] **contribution claims barred by FG's settlement with TGS**." *Id.* (emphasis added); *see*

---

[37] "The [alleged] foregoing breaches [by Baker] . . . proximately caused damages to the [Alleged] Client Debtors, totaling no less than $129,394,573, which represents a partial measure of the aggregate amount of the increased liabilities the Company faced as a result of Baker's malpractice."

[38] "Each of the above breaches adversely impacted and conferred no benefit to Alliance, and as a direct and proximate result of the same, caused damage to the Fiduciary Entities totaling no less than $129,394,573[.]"

*also Int'l Proteins Corp. v. Ralston-Purina Co.*, 744 S.W.2d 932, 934 (Tex. 1988) (holding that, as a matter of public policy, a settling joint tortfeasor could not avoid a contribution bar by "choos[ing] to define its right to reimbursement under the settlement agreement as a right of direct action rather than a right of contribution"); *Walden v. Jeffery*, 907 S.W.2d 446, 447 (Tex. 1995) (finding that a plaintiff could not "simply recast her negligence claim as a DTPA claim" to avoid a statutory bar prohibiting negligence claims against a medical professional); *Viviano v. Moore*, 899 S.W.2d 326, 327 (Tex. App.—Houston [14th Dist.] 1995, writ denied) ("The supreme court has recently reiterated that a plaintiff cannot simply recast a claim in order to avoid having a cause of action statutorily barred"). *FG Holdings, Ralston,* and *Walden* are dispositive. A plaintiff can't disguise a contribution claim with different labels to escape the bar on settling tortfeasors seeking contribution from non-settling alleged joint tortfeasors.

Moreover, Plaintiff alleges that Utah law arguably may apply to Counts I and II.[39] Baker disagrees, but regardless, the outcome is the same under Utah law; a settling tortfeasor (Alliance) is prohibited from recovering any amount of the Claim Settlements from an alleged joint-tortfeasor (Baker). The Utah Supreme Court squarely addressed this issue, finding that a plaintiff did "not have a claim for negligence, partial indemnity, or contribution for monies it paid in settlement for damages partially caused by [an accounting firm] and [the accountant]." *Zions First Nat. Bank, N.A. v. Fox & Co.*, 942 P.2d 324, 325 (Utah 1997). In *Zions*, plaintiff filed suit against its accounting firm and accountant after settling with a third-party and sought to recover a "portion of the settlement amount it paid to the [third-party] that it would have avoided but for the [accounts'] negligence." *Id.* at 326. The court held that "[b]y forgoing its right to have a trier of

---

[39] Am. Compl., ¶ 381 (Count I "This is an action by [Plaintiff] . . . for professional negligence/malpractice under Washington DC, Utah, and/or other applicable law."); Am. Compl., ¶ 388 (Count II "[T]his claim for aiding and abetting is governed by the law of the state with the most significant relationship").

fact adjudicate the causation and amount of the [third party's] claims against it, ***[plaintiff] lost the ability to seek an allocation of a portion of those damages to the [accounting firm and accountant].***" *Id.* (emphasis added).

The Utah rule thus mirrors Texas, and because Alliance voluntarily entered the Claim Settlements, Plaintiff (in Alliance's shoes) cannot recover the $129 million in alleged contribution damages against Baker, regardless of the label on the claim. *Id.*; *see also Chevron Pipe Line Co. v. PacifiCorp*, No. 2:12-CV-287-TC, 2017 WL 3913255, at *3 (D. Utah Sept. 6, 2017) ("[Plaintiff], by foregoing trial on causation and by settling with the [third-party] without input from [defendant], gave up its right to allocate any portion of the settlement to [defendant]").

> **B.     Texas Law Prohibits a Joint Tortfeasor (Alliance) From Taking an Assignment of a Claim From an Allegedly Injured Party (Manufacturers), Then Prosecuting That Side-Switching Claim Against an Alleged Joint Tortfeasor (Baker).**

Plaintiff asserts six causes of action as the purported assignee from the Manufacturers under assignments governed by Texas law:  Count V (Aiding and Abetting/Knowing Participation in Fraud/Negligent or Fraudulent Misrepresentation), Count VI (Fraudulent Misrepresentation/Fraud), Count VII (Conspiracy to Commit Fraud), Count VIII (Conspiracy to Violate Federal RICO), Count IX (Violation of Federal RICO), and Count X (Reformation of the Tolling Agreement).

But, Plaintiff, standing in Alliance's dirty shoes as an admitted tortfeasor, can't assert these assigned claims against Baker as a matter of Texas law, and any such assignment or assertion is invalid.[40]  Under *Ralston*, the Manufacturers' assignment is invalid because "***it is contrary to***

---

[40] An assignment of a claim is invalid if it violates the law of the state whose law governs the assignment itself.  *Nicolls Pointing Coulson, Ltd. v. Transportation Underwriters of Louisiana, Inc.*, 777 F. Supp. 493, 496 (E.D. La. 1991) ("There is no federal law of assignments, and the Fifth Circuit has held that the validity of a particular assignment of a federal cause of action is governed by the state law that the appropriate

***public policy to permit a joint tortfeasor the right to purchase a cause of action from a plaintiff to whose injury the tortfeasor contributed***."   *See Ralston-Purina Co.*, 744 S.W.2d at 934 (emphasis added); *see also State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 710 (Tex. 1996) (citing *Ralston* and stating "we held that a tortfeasor cannot take an assignment of a plaintiff's claim as part of a settlement agreement with the plaintiff and prosecute that claim against a joint tortfeasor."); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Am. Eurocopter Corp.*, 692 F.3d 405, 409 (5th Cir. 2012) (affirming dismissal of plaintiff's contribution claim and quoting *Ralston* which "reflects Texas's public policy against 'permit[ting] a joint tortfeasor the right to purchase a cause of action from a plaintiff to whose injury the tortfeasor contributed.'"); *see also PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 82, 89 (Tex. 2004) ("[W]e find the personal and punitive aspects of DTPA claims cannot be squared with a rule allowing them to be assigned as if they were mere property;" explaining that there is "a 'personal' aspect in being 'duped' that does not pass to subsequent buyers the way a warranty does").[41]  Here, the Liquidating Trustee improperly took assignment of the Manufacturers' purported claims against Baker through a stipulation where the Liquidating Trustee sold Alliance's privilege to the Manufacturers.  This side-switching assignment is invalid under the foregoing authorities.

Moreover, Texas law prohibits assignments that encourage parties to take "positions that appeared contrary to their natural interest for no other reason than to obtain a judgment" against a third-party because it "tend[s] to increase and distort litigation[;]" and determining true liability is unfairly made "even more difficult when [the tortfeasor's] opposing position must be reconstructed

---

conflict of laws principles dictate should control the contract.").  Here, Texas law governs the assignment. *See* Facts, ¶¶ 1-2.

[41] The assignment also violates fundamental Texas principles of attorney immunity, discussed above in Section II. A.

and its merits assessed without [the tortfeasor's] cooperation." *See Gandy*, 925 S.W.2d at 707, 711-714, citing *In Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 317-18 (Tex. App.—San Antonio 1994, writ ref'd) (prohibiting assignment of attorney malpractice claims because of their use as a "transparent device to replace a judgment-proof, uninsured defendant with a solvent defendant" causing an "abrupt and shameless shift of positions").

Plaintiff is not only disincentivized to defend Alliance's business practices as in *Gandy*, but actively incentivized to assert that Alliance caused maximum damage to the Manufacturers in this side-switching litigation against Baker resulting from the Liquidating Trustee's sale of Alliance's privilege to the Manufacturers. *See* Facts, ¶ 14. Again, this is invalid as a matter of applicable Texas law. *See id.*; *see also Chemetron Corp. v. Syngas Co.*, No. B14-90-00389-CV, 1991 WL 22391, at *5 (Tex. App.—Houston [14th Dist.] Feb. 21, 1991, writ denied) (finding plaintiff could not maintain claims assigned to it by an injured party because the plaintiff purchased the claims through settlement and had contributed to the injury it now sought to redress).

## IV.   THE "ALLIANCE" CLAIMS FAIL AS A MATTER OF LAW AND MUST BE DISMISSED.

### A.   The Alliance Estate's Claims Fail as a Matter of Law for Lack of Causation.

Proximate cause requires both cause-in-fact and foreseeability. Cause in fact requires: (1) that the defendant's conduct was "a substantial factor in bringing about the harm", (2) "'but for' [which], the harm would not have occurred." *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016); *Rogers v. Zanetti*, 518 S.W.3d 394, 403 (Tex. 2017) ("our cause-in-fact standard requires not only that the act or omission be a substantial factor but also that it be a but-for cause of the injury or occurrence"). Foreseeability requires that "a person of ordinary intelligence should have anticipated the danger" created by the defendant's conduct. *Id*.

Plaintiff can't plead that Baker proximately caused Alliance any injury because: (a) as a self-confessed fraudster, Alliance (not Baker) was the sole proximate cause of its own harm, (b)

the Amended Complaint's allegations and other public records make clear that Alliance knew it was committing fraud (on advice from its in-house general counsel and despite the advice of other outside law firms – *see* Facts, ¶¶ 3-6) and (c) Plaintiff's new conclusory allegations that Alliance would have ceased the Questionable Business Practice if given different advice by Baker are rendered implausible by other pled facts. Counts I and II thus must be dismissed.

(1)   <u>The Amended Complaint still fails plausibly to allege that Baker was the "but for" cause of Alliance's alleged harm.</u>

Plaintiff sprinkled various conclusory statements throughout the Amended Complaint that Alliance – despite repeatedly refusing to stop the Questionable Business Practices on the advice of other outside counsel and internal whistleblowers – would have ceased the Questionable Business Practices at Baker's behest. *See e.g.* Am. Compl., ¶ 18 ("[H]ad Baker advised Alliance to *stop* the Questionable Business Practices, Alliance would have done so.") (emphasis in original); *id.* at ¶ 69 (alleging that there were "Innocent Insiders" at Alliance without meaningfully identifying the dates of their service, their roles, or otherwise pleading any facts to suggest these purported "Innocent Insiders" could have stopped the Questionable Business Practices or explaining why they did not); *id*,. at ¶ 382 (complaining that Baker allegedly failed to "inform the Board of Directors and Innocent Insiders that the Company was engaged in blatantly illegal activity").[42]

Plaintiff's new allegations still fail to plausibly allege that Baker was the "but for" cause of Alliance's alleged harm because: (a) despite vague and conclusory references to "Innocent

---

[42] Plaintiff vaguely pled that purported "Innocent Insider" Scott Klossner "was the CFO of Alliance Medical Holdings, LLC starting in 2016" without any further detail.  Am. Compl., ¶ 64.  The other purported "Innocent Insiders" are merely identified as "additional board members and officers" without information about their dates of service or what they allegedly knew or didn't know about Alliance's scheme.  *See* Am. Compl., ¶¶ 66, 69. Also, there is no plausible allegation how any person would have stopped any conduct.

Insiders" and conclusory allegations that Alliance was willing to listen to legal advice, Plaintiff has admitted specific, non-conclusory *facts* showing that Alliance ignored outside legal advice from Brown concerning the illegality of Alliance's scheme **years before** Baker's retention (Facts, ¶¶ 3-4), (b) Plaintiff similarly admits specific, non-conclusory *facts* showing that Alliance ignored and overruled numerous warnings by internal non-lawyer whistleblowers despite any purported "Innocent Insiders;" (Facts, ¶ 6) and (c) Plaintiffs' admissions about Alliance's repeated and willful actions to protect its "golden goose" – all supported by specific allegations of pled fact (Facts, ¶¶ 3-6) – make it implausible to instead credit Plaintiff's made-for-litigation conclusory allegations that Alliance or any barely described Innocent Insiders would have followed advice from Baker to cease its wrongful conduct.

To the contrary, the Amended Complaint makes clear that "[Alliance] knew [it was] committing – indeed, fully intended to commit – fraud, [so] it is not apparent how [Baker's alleged] failure to tell [Alliance] what [it] already knew could be a negligent breach of a lawyer's duty to the client." *Reneker v. Offill*, No. CIV.A.3:08-CV-1394-D, 2009 WL 3365616, at *5 (N.D. Tex. Oct. 20, 2009) (dismissing plaintiff's negligence claim against a law firm under Rule 12(b)(6) and finding the causation allegations implausible because the complaint did not "allege that the . . . Clients were unaware of the illegality of their actions or that their illegal actions were unintentionally so."); *see also Taylor v. Scheef & Stone, LLP*, No. 3:19-CV-2602-D, 2020 WL 4432848, at *6 (N.D. Tex. July 31, 2020) (dismissing negligence claim against a law firm under Rule 12(b)(6) because plaintiff's "failure to plead that the [clients] were unaware of the illegality of their conduct [was] fatal to his [malpractice] claim").[43]

---

[43] "Breach of the standard of care and causation are separate inquiries . . . and an abundance of evidence as to one cannot substitute for a deficiency of evidence as to the other." *Alexander v. Turtur & Associates, Inc.*, 146 S.W.3d 113, 119 (Tex. 2004).

*Reneker* and *Taylor* stand for a straightforward proposition which is dispositive here: a plaintiff fails to plead facts necessary to support an allegation that a law firm's actions were the "but for" cause of plaintiff's alleged damages when the plaintiff can't plausibly plead that the client would have heeded the lawyer's advice. *Id.*; *see also Smith v. O'Donnell*, 288 S.W.3d 417, 422 (Tex. 2009) (If a client "would have ignored [the attorney's] advice no matter how competently provided, the malpractice claim will fail for lack of proximate causation").

Baker can't plausibly be the "but for" cause of Alliance's purported damages because the Amended Complaint and public record still indicate Alliance was aware of and fully intended to engage in the "Questionable Business Practices," ***regardless of Baker's advice***, as evidenced by:

- Alliance's failure to heed advice from Brown and Bennett regarding the illegality of the Questionable Business Practices well before Baker's involvement (Facts, ¶¶ 3-6);

- Alliance's continued engagement in "Questionable Business Practices," despite repeated warnings that such practices harmed manufacturers and were illegal (Facts, ¶ 6); and

- The fact that two of the four purported "Innocent Insiders" identified in Am. Compl., ¶ 69 – Greg Duncan and Matthew Simas – were board members who received Alliance General Counsel David Grant's November 4, 2015 memorandum about the Alliance fraud scheme on its original distribution to the Alliance Board of Directors, twenty days before it even went to Rosebush (APP. P. 10).

The Court has no obligation to accept Plaintiff's conclusory assertions that Alliance would have heeded Baker's advice, or implausible speculations about "Innocent Insiders" – two of whom (Duncan and Simas) didn't stop the fraud scheme after receiving the Grant memorandum in November 2015, and a third (Klossner) who apparently became Alliance's CFO just a few months before the FBI raid in February 2017[44] – because such allegations are directly contradicted by other allegations in the Amended Complaint and public record. *See Cicalese v. Univ. of Tex. Med.*

---

[44] *See* APP. P. 10; *see also* Am. Compl, ¶¶ 64 & 261 (Klossner became Alliance's CFO in 2016 as a replacement for Justin Leavitt); *id.* at ¶ 62 (Justin Leavitt was CFO until at least November 16, 2016).

*Branch*, 456 F. Supp. 3d 859, 872 (S.D. Tex. 2020) ("When considering a Rule 12(b)(6) motion, the court is not required to strain to accept conclusory allegations or unwarranted factual inferences") (citing *Gersten v. Rundle*, 833 F. Supp. 906 (S.D. Fla. 1993) (holding the court does not accept as true facts ***alleged in a complaint that are internally inconsistent or run counter to facts of which court can take judicial notice***")) (emphasis added).

> (2)     Because Alliance is a self-confessed fraudster, its purported claims are barred under causation-negating doctrines and case law including *Peeler*, *Rogers*, and *Rothrock*.

Plaintiff, standing in Alliance's dirty shoes, can't recover from Baker because, under well-established law, ***a plaintiff cannot establish causation where the complained of damages were caused by its own intentional misconduct***.  *See e.g. Rothrock v. Akin, Gump, Hauer & Feld*, No. 05-94-01965-CV, 1996 WL 179439, at *6 (Tex. App.—Dallas Apr. 16, 1996, writ denied) (finding that the debtor's alleged damages "were caused by [his] own actions: his intentionally fraudulent conversion of non-exempt assets into exempt [assets] . . . [and] any advice given by [the law firm] Akin Gump, negligent or otherwise, [was] immaterial because Akin Gump's advice did not lead to the [complained of harm]."); *see also Zanetti*, 518 S.W.3d at 403-04 (finding that the plaintiff's fraudulent acts before the attorneys' alleged negligence rendered the "malpractice allegation causally irrelevant").

Here, like the plaintiffs in *Rothrock* and *Zanetti*, Plaintiff cannot escape Alliance's admitted knowledge about the illegality of the "Questionable Business Practices" and that Alliance's Board already knew the very things Plaintiff says Baker should have advised yet Alliance continued its fraud despite "repeated and explicit warnings" that its conduct harmed the Manufacturers both before and after Baker was retained. *See* Facts, ¶ 6; *see also* Am. Compl., ¶ 146.[45]

---

[45] "One of the foundational 'disciplines' of Alliance was 'Productive Paranoia.' A ***May 9, 2012*** slide presentation to Alliance's Board of Directors described 'productive paranoia' as 'The Company's plan for

Further, Alliance admits committing wire fraud in violation of 18 U.S.C. § 1343 (Am. Compl., ¶¶ 463, 480) which destroys proximate causation, and, under public policy, prevents Plaintiff from recovering from Baker for the consequences of Alliance's admitted crimes.  In *Peeler v. Hughes & Luce*, the Texas Supreme Court held that Peeler, who admitted to committing federal crimes, was barred from maintaining her negligence claim against her attorneys because "as a matter of law, it is the illegal conduct [of Peeler] ***rather than the negligence of*** [***Peeler's*** ***counsel that is the cause in fact*** of any injuries flowing from the conviction." 909 S.W.2d 494, 495, 498 (Tex. 1995).  Like Peeler, Alliance admits that it committed federal crimes by repeatedly violating the federal wire fraud statute, 18 U.S.C. § 1343, a violation subject to criminal prosecution.[46] Am. Compl., ¶¶ 463, 480. Plaintiff ignores "the public policy principle at issue that [Alliance, which admitted to wrongdoing] may not shift the consequences of [its] crime to a third party [Baker]." *Peeler*, 909 S.W.2d at 494.  Thus, Plaintiff (standing in Alliance's dirty shoes) is prevented from shifting the consequences of Alliance's wrongdoing to Baker.

Similarly, "[u]nder the unlawful acts rule, [Alliance] cannot recover for [its] claimed injury [because], at the time of the injury, [Alliance] was engaged in the illegal act." *Sharpe v. Turley*, 191 S.W.3d 362, 366 (Tex. App.—Dallas 2006, pet. denied) (finding plaintiff's fraud claim against his law firm was barred under the unlawful acts rule ***because the claim was based on plaintiff's*** ***own unlawful act of stealing***) (emphasis added).[47]  Public policy "prevents a plaintiff from

---

'protecting the golden goose.'" As the source of over 90% of Alliance's revenue, the 'golden goose' was the improper adjudication of NFR strips as retail strips.'" Baker did not begin representing an Alliance entity until November 2014 and even that was on an unrelated issue. Am. Compl. ¶ 95.

[46] *See e.g. United States v. Scully*, 951 F.3d 656, 670 (5th Cir. 2020), cert. denied, 208 L. Ed. 2d 79, 141 S. Ct. 344 (2020) (finding the government provided sufficient evidence to convict defendant for wire fraud and conspiracy to commit wire fraud).

[47] In *Dugger*, the Texas Supreme Court held that "the common law unlawful acts doctrine is not available as an affirmative defense ***in personal injury and wrongful death cases*** …. [because] it was abrogated by Chapter 33's proportionate responsibility scheme." *Dugger v. Arredondo*, 408 S.W.3d 825, 836 (Tex. 2013)

recovering claimed damages that arise out of [its] . . . own illegal conduct." *Id.* (citing *Saks v. Sawtelle, Goode, Davidson & Troilo*, 880 S.W.2d 466, 467 (Tex. App.—San Antonio 1994, writ denied) (because legal malpractice plaintiffs' damages "were suffered by reason of their own illegal conduct, recovery is barred as a matter of law for reasons of public policy.")). Although there was no underlying criminal conviction, the *Sharpe* court held that, whenever a plaintiff has engaged in an "illegal act [that] is inextricably intertwined with the claim and the alleged damages would not have occurred but for the illegal act, the plaintiff is not entitled to recover as a matter of law." *Id.* at 366.

Alliance's unlawful acts (confessed participation in a fraudulent scheme – *see* Facts, ¶ 6) are "inextricably intertwined" with Plaintiff's alleged damages.  And Plaintiff admits Alliance knowingly engaged in the Questionable Business Practices. *See e.g.* Am. Compl., ¶ 358 ("the Scheme Participants, had actual knowledge that Alliance pharmacies were dispensing NFR strips while adjudicating claims using the NDCs for retail strips"). The policy of preventing a plaintiff from recovering for her own unlawful acts "particularly applies when the plaintiff commits the illegal act knowingly and willfully." *Andrew Shebay & Co., P.L.L.C. v. Bishop*, 429 S.W.3d 644, 649 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).  And it bars Plaintiff's claims here.

**B.  Plaintiff's Overly-Encompassing Use of "Alliance" and "Fiduciary Entities" to Describe Debtors and Non-Debtors, and Clients and Non-Clients, Requires Dismissal of Counts I and II for Lack of Standing, Privity, and Plausibility.**

First, Plaintiff cannot sue on behalf of the numerous non-Debtor "Alliance" and "Fiduciary Entities" because Plaintiff does not own their claims.[48]  Any purported claim alleging damages to

---

(emphasis added). But, the court recognized that several Texas courts have extended the reasoning set forth in the wrongful acts doctrine to bar negligence claims against attorneys, and expressly "limit[ed] the holding in [*Dugger*] to personal injury and wrongful death cases." *Id.* at 33.

[48] Out of the 132 "Alliance" entities, more than half – 70 – are non-Debtors.  Likewise, 32 of the subset of 48 "Fiduciary Entities" are non-Debtors.  *See* APP. PP. 6-9 (chart of entities).  Plaintiff does not own the claims of these non-Debtor entities.  Under the Plan, "Liquidating Trust Assets means all Estate Assets

these entities thus must be dismissed as a matter of law.  *See In re Levenson Group, Inc.*, 613 B.R. 418, 424 (Bankr. N.D. Tex. 2020) ("The trustee's role is limited to pursuing the legal and equitable interests **of the debtor**—that is, the estate's own causes of action.") (emphasis in original); *see also Pelletier v. InterBank*, No. 6:19-CV-0089, 2020 WL 2576266, at *4 (S.D. Tex. May 20, 2020) (Hoyt, J.) ("To this end, 'a plaintiff generally must assert his legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties'").

Second, Plaintiff cannot state any pre-bankruptcy claims on behalf of entities – whether Debtors or non-Debtors – for which Plaintiff fails to make plausible allegations of a pre-bankruptcy attorney-client relationship with Baker.[49]  *See Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex. 1996) (Under the common-law "privity barrier," "an attorney owes a duty of care only to his or her client").  Plaintiff, however, vaguely and inconsistently pleads that Baker's conduct damaged: (a) the Client Debtors (eight entities identified on Am. Compl. p. 113 which are **different** from the alleged Baker clients in Am. Compl. ¶ 288, and **different still** from the vague allegation that Baker represented all of the Alliance entities in Am. Compl. ¶ 287 n.11) or (b) the amorphous group of at least 132 Debtor and non-Debtor entities she characterizes as "Alliance."  *See* Compl., ¶¶ 386, 403.

Regardless of the confusion created by Plaintiff's vague and inconsistent framing, Plaintiff can't bring claims on behalf of any Alliance-related entities which weren't Baker's clients.  *See*

---

including the Causes of Action."  APP. P. 194 (Plan, § 1.48).  Unsurprisingly, "Estate Assets" means "property . . . of each of the Debtors, as defined in section 541 of the Bankruptcy Code," not property and claims of the various non-Debtors Plaintiff now defines as part of Alliance.  APP. P. 193 (Plan, § 1.41).

[49] *See* Am. Compl., p. 113 (Plaintiff names eight Alliance entities as "Client Debtors," although one of those entities, Oak Creek Pharmacy, LLC, does not appear to have been a Debtor); *see also* Am. Compl., ¶ 288 (identifying over a dozen additional Debtor and non-Debtor pharmacies as alleged Baker clients); *id.* at ¶ 287 n.11 (vaguely alleging that "on information and belief, Baker's representation covered the entire Alliance Healthcare Network").

*also* APP. P. 605 (April 6, 2022 Hearing Transcript in the Brown Fortunato case, p. 61:18-22) (The

Court:  "I need to link claim to client. And if they were assisting in misrepresentation, or if they

were assisting somebody in the continuing a fraud, or if they were giving bad advice, I don't think

I can deal on a group plaintiff basis."); APP. P. 608 (*id*. at 64:12-17)  ("[I]f you're telling me that

you . . . don't have to plead it client-by-client . . . . [y]ou have to do the full veil piercing . . . .").

       Plaintiff's conclusory and generic allegations that "Alliance" operated as a single business

enterprise or alter ego (*see* Am. Compl., ¶¶ 56, 59) fail plausibly to show grounds for veil piercing

and thus cannot survive Rule 12(b)(6) because the Amended Complaint is devoid of any facts

necessary to pierce the veil as to any specific entities.  *See Clapper v. Am. Realty Inv'rs, Inc*., No.

3:14-CV-2970-D, 2015 WL 3504856, at *11 (N.D. Tex. June 3, 2015) ("Plaintiffs fail to plausibly

allege any facts in support of their alter ego allegations.  For example, they do not specify ***which***

entities' funds were commingled or allege any facts in support of this allegation . . . and they do

not plead any facts demonstrating that defendants failed to keep ART's assets separate or that there

was confusion between separate properties, records, and control") (emphasis added); *Gurganus v.

Furniss*, No. 3:15-CV-03964-M, 2016 WL 3745684, at *5 (N.D. Tex. July 13, 2016)("It is

impossible to tell from the Complaint what corporate veil Plaintiff seeks to pierce — that of FPMC

Services, The Management Company at Forest Park Medical Center, glendonTODD Capital, LLC,

or FPMC Services, LLC. She fails to allege which entity acted fraudulently or as an alter ego for

which other party . . . . In addition to being conclusory and formulaic, this type of group pleading

fails to meet the pleading requirements of Federal Rule of Civil Procedure 8"); *Rolls-Royce Corp.

v. Heros, Inc.*, 576 F. Supp. 2d 765, 789 (N.D. Tex. 2008) ("[T]he complaint is devoid of any

factual assertions to support Rolls–Royce's alter ego claim. If Rolls–Royce's allegation that

defendants helped each other commit illegal acts were a sufficient factual basis to support an alter

ego claim, then plaintiffs would be able to state an actionable alter ego claim any time they could

adequately allege participation by an owner of a company in the company's illegal conduct").

    **C.**    **The Aiding and Abetting/Knowing Participation Claim Fails for Additional Reasons Because: (i) Baker's Alleged Inactions Do Not Constitute Aiding and Abetting/Knowing Participation; (ii) One Fiduciary Cannot Aid and Abet Another Fiduciary's Breach of Duty; and (iii) Baker Is Immune From Suit by the Non-Client "Fiduciary Entities."**

Plaintiff focuses on a subset of 48 "Fiduciary Entities" – only sixteen of which were

Debtors[50] – in an effort to support the aiding and abetting/knowing participation in breach of

fiduciary claim (Count II).  *See* Am. Compl., ¶¶ 61-67, 388.  Claim II fails for the reasons stated

in Section IV. B and numerous additional reasons.

First, Plaintiff's allegations that Baker knowingly participated or aided and abetted the

Alliance Fiduciaries by ***failing to act*** do not state a claim because alleged omissions are insufficient

to support an aiding-and-abetting or knowing "participation" claim.  *See, e.g.,* Am. Compl., ¶ 400

(alleging that Baker failed to consult and advise the Fiduciary Entities regarding the Questionable

Business Practices); *Malt Family Tr. v. 777 Partners LLC*, No. 2022-0652-MTZ, 2023 WL

7476966, at *14 (Del. Ch. Nov. 13, 2023) ("Knowing participation 'has two dimensions:

knowledge and ***culpable participation***.' Aiding and abetting liability 'requires that the accessory

actor's conduct be informed by knowledge of the primary duty or its breach and that [the accessory

---

[50] *See* APP. PP. 6-9 (Demonstrative identifying all purported Alliance entities, the Fiduciary Entities, the *Uplift* Bankruptcy Debtors, and the Alleged Client Debtors).  The following 32 "Fiduciary Entities" were not debtors in the *UpLift* Bankruptcy: AHN Holding Company, LLC, Alameda Rx Holdings, LLC, Alameda Rx, Inc., Baytree Rx, Inc., Best Rx Holdings, LLC, Better Care Rx Holdings, LLC, Brookside Rx Holdings, LLC, Bubba's Rx Holdings, LLC, Care Health Foundation, LLC, Central Medical, LLC, Cheshire Rx Holdings, LLC, Cloud Management, LLC, CSL Capital Holdings, LLC, Genshai Holdings, LLC, Hawkins Pharmacy Holdings, LLC, Hawkins Rx, LLC, Health Saver Holdings, LLC, Improve Rx Holdings, LLC, Ingram Diabetic, LLC, Ingram Medical Administration, Inc., JTK Medical, LLC, Kendall Pharmacy, LLC, Namaste Capital Holdings, LLC, New Jersey Rx Holdings, LLC, Newton Rx Holdings, LLC, Norwood Pharmacy, LLC, Peach Holdings, LLC, Peach Medical Holdings, LLC, Pharmacare Holdings, LLC, Steel Medical, LLC, Warner Diabetic, LLC,  and White Capital Management, LLC. *Id*.

actor] make a ***causally significant contribution*** to the wrong suffered by the party to whom the primary actor owes a duty.'") (internal citations omitted) (emphasis added).

Second, Plaintiff admits that "Delaware statutory and common law governs the breaches of fiduciary duty" of Alleged Client Debtor Alliance Medical Holdings, LLC (Am. Compl., ¶ 388) but ignores well-settled Delaware law holding that an entity (like Baker) which had its own, independent fiduciary duty to the plaintiff can't be liable for aiding and abetting. *CMS Inv. Holdings, LLC v. Castle*, No. CV 9468-VCP, 2015 WL 3894021, at *20 (Del. Ch. June 23, 2015) ("Delaware cases dealing with claims for aiding and abetting a breach of fiduciary duty have held that, as a matter of law, aiding and abetting liability generally cannot attach to defendants who themselves owe fiduciary duties to the relevant entity and plaintiff."); *In re Legendary Field Exhibitions, LLC*, No. 19-50900-CAG, 2023 WL 7852657, at *16 (Bankr. W.D. Tex. Nov. 13, 2023) ("Delaware courts 'generally prohibit aiding and abetting claims against parties that already stand in direct fiduciary relationships.'") (internal citation omitted).  This negates any aiding-and-abetting claim on behalf of any Fiduciary Entity which was Baker's alleged client.[51]

Third, the attorney immunity doctrine prohibits Plaintiff from bringing suit against Baker on behalf of any ***non-client*** "Fiduciary Entities" because all of Plaintiff's claims are based on Baker's alleged legal services to the Alleged Client Debtors. *See e.g. Alpert v. Riley*, No. CIV.A. H04CV-3774, 2008 WL 304742, at *18 (S.D. Tex. Jan. 31, 2008) (Rosenthal, J.) (granting motion to dismiss and finding "[t]he plaintiffs' state-law claims for aiding and abetting Riley in breaching his fiduciary duties to the plaintiffs and in conspiring with Riley to breach his fiduciary duties to the plaintiffs are barred [under attorney immunity]"); *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App.—Dallas 2007, no pet.) ("The supreme court has not . . . include[d] an

---

[51] This is because Baker would owe its own, independent fiduciary duty to any entity which was its client.

aiding and abetting breach of fiduciary duty claim asserted by a non-client based upon the rendition

of legal advice to a tortfeasor client"); *Troice*, 816 F.3d at 349 ("[a]ttorney immunity is intended

to assure attorneys that they will not be 'liable for damages' full stop, not that they are protected

from liability but only from opposing parties.") (citing *Kruegel v. Murphy*, 126 S.W. 343, 345

(Tex. Civ. App.—Dallas 1910, writ ref'd)); *Cantey Hanger*, 467 S.W.3d at 481 ("attorneys are

immune from civil liability to non-clients 'for actions taken in connection with representing a

client in litigation.'") (emphasis added) (quoting *Alpert v. Crain, Caton & James, P.C.*, 178

S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)). "The idea is to immunize

conduct, not to protect attorneys only from certain potential plaintiffs." *Id.*

## V.   PLAINTIFF'S RELEASE OF BAKER ATTORNEY LEE ROSEBUSH AND HIS "PARTNERS" WHO COMPRISE BAKER & HOSTETLER LLP ALSO RELEASED BAKER.

On June 27, 2019, Plaintiff's former counsel filed a motion on behalf of a predecessor

trustee, Ronald L. Glass, for an order approving a Settlement Agreement. *See* APP. PP. 227-94.

This Court approved the Settlement Agreement on August 5, 2019. *See* APP. PP. 319-22.

The Settlement Agreement, governed by Texas law, releases the "Settling Insureds" –

which includes Baker attorney Lee Rosebush and expressly inures to the benefit of his "partners"[52]

who comprise Baker & Hostetler LLP – from "any and all claims . . . or causes of action of any

kind, both known and unknown, held by the Trustee . . . relating to any act or omission by any

Settling Insured . . . or in any way relating to the Debtors, the Debtors' estates . . . ." and bars all

claims "that the Trustee ever had or may now or ***hereafter own***[.]" *See* APP. PP. 279-80 (Settlement

Agreement, ¶ 3). The Settlement Agreement thus releases Rosebush and Baker not only from:

---

[52] Paragraph 13 provides that the Settlement Agreement "inure[s] to the benefit of the Parties and their . . . employees, ***partners***" and others (emphasis added).  Paragraph 14 provides that the Settlement Agreement "shall be governed by, and construed and enforced in accordance with the laws of the State of Texas, without regard to its conflict of law principles." *See* APP. P. 286.

> all clams . . . or causes of action of any kind, both known and
> unknown, held by the Trustee . . . relating to any act or omission by
> any Settling Insured [Rosebush and his partners] . . . or in any way
> relating to the Debtors

but also extends to claims the Trustee may "hereafter" own – including any acquired by assignment

from the Manufacturers. *See id.*; *see also Kern*, 517 F.3d at 309 ("Under Texas law, '[i]f the

written instrument is so worded that it can be given a certain or definite legal meaning or

interpretation, then it is not ambiguous and the court will construe the contract as a matter of

law.'") (internal citation omitted).

## VI. PLAINTIFF'S BANKRUPTCY CLAIMS FAIL AS A MATTER OF LAW.

### A. This Court's Final, Not-Appealed Fee Order Bars All Claims Based on Baker's Post-Petition Legal Services Under *Res Judicata*.

#### (1) The Fee Order had no limitation on its finality or preclusive effect.

Under two controlling Fifth Circuit cases, *Intelogic Trace* and *Frazin*, this Court's

September 11, 2019 Fee Order (APP. PP. 348-49) bars all claims against Baker arising from its

post-petition services to Debtor entities through August 9, 2019.

In *Intelogic Trace*, a chapter 7 trustee brought negligence and malpractice claims against

Ernst & Young "arising from services Ernst & Young performed during [Intelogic's] previous

chapter 11 bankruptcy proceeding." 200 F.3d at 383. In response, Ernst & Young asserted that

the bankruptcy court's approval of its chapter 11 fee application was *res judicata* barring the

trustee's claims. *Id.* at 385-86. In affirming the bankruptcy court's dismissal based on *res judicata*,

the Fifth Circuit explained that "an award of fees for professionals . . . employed by a bankruptcy

estate represents a determination of 'the nature, the extent, and the value of such services.'" *Id.* at

387 (quoting 11 U.S.C. § 330). "By granting Ernst & Young's fee application, the bankruptcy

court implied a finding of quality and value in Ernst & Young's services" and there was an

"identity of claims between the fee application hearing and [the] malpractice suit," resulting in *res judicata*. *Id*. at 387-88.[53]

As here, the debtor in *Intelogic Trace* never objected to Ernst & Young's fee application. *See id*. at 384. The Fifth Circuit thus considered "whether [Intelogic] could and should have brought its malpractice claims in the former [fee application] proceedings." *Id*. at 388. In doing so, the court noted "that [Intelogic] was sufficiently aware of the real possibility of there being errors by Ernst & Young such as now alleged and of their likely consequences before the fee hearing." *Id*. Accordingly, because "[r]es judicata bars claims that **should have** been litigated in a previous proceeding," the court found the trustee's claims barred, even though Intelogic's "Board may not have been aware of all the precise facts or reached a firm conclusion on Ernst & Young's performance . . . ." *Id.* (emphasis added); *see also id*. at 389 ("[Intelogic] had sufficient **general awareness** of the real potential for claims against Ernst & Young such as those here asserted") (emphasis added).

Here (as in *Intelogic Trace*), Alliance was "aware of the real possibility of there being errors by [Baker] such as now alleged and of their likely consequence before the fee hearing"[54] and the Fee Order. For example, Ronald L. Glass, the Chapter 11 Trustee for Alliance, entered the Initial Tolling Agreement with Baker on March 28, 2019 attempting to toll potential claims against Baker, "including potential claims for breach of fiduciary duty, professional negligence

---

[53] Although *res judicata* has four elements (that the parties be identical, the prior judgment be rendered by a court of competent jurisdiction, there be a final judgment on the merits, and the same cause of action be involved in both cases), the Fifth Circuit in *Intelogic Trace* only analyzed the final element because the first three elements were undisputed. *See id*. 386. As in *Intelogic Trace*, the parties here are identical (Alliance/Plaintiff and Baker), the prior judgment was from a court of competent jurisdiction (this Court), and there was a final judgment on the merits (*see* APP. P. 349; Fee Order, ¶¶ 1-2). Accordingly, the first three elements of *res judicata* are not further addressed because their existence is both obvious and indisputable.

[54] *See* 200 F.3d at 388.

and other claims and relief." APP. P. 181. Baker filed its final fee application on August 20, 2019 [APP. PP. 323-45] – ***more than four months after the Initial Tolling Agreement*** – but the Liquidating Trustee, despite knowledge of the facts allegedly giving rise to the claims now asserted against Baker and being represented by various attorneys other than Baker, failed to object.

*Frazin* similarly addressed a debtor's malpractice claims against his court-approved attorneys at Haynes and Boone, except that the *Frazin* debtor had unsuccessfully objected to the fee application, then filed state-law counterclaims. *See* 732 F.3d at 316-17. Nevertheless, as in *Intelogic Trace*, the Fifth Circuit in *Frazin* recognized that "in awarding fees, the bankruptcy court . . . . necessarily rejected the claims of malpractice contained within Frazin's fee objections." 732 F.3d at 320. Moreover, the court found that a "malpractice claim for those services 'cannot stand alone' from the determination of quality the bankruptcy court made in determining fees." *Id.* at 321-22 (quoting *Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 931 (5th Cir. 1999)).

> (2)    This Court entered other orders in the *Uplift Rx* Bankruptcy which expressly had no *res judicata* or collateral estoppel effects.

The Liquidating Trustee's actions with other fee applicants demonstrate that the Liquidating Trustee (and her former counsel other than Baker) knew that this Court's Fee Order was *res judicata*. For example, on October 15, 2019, this Court entered an order approving Alliance's accounting firm's (Tanner, LLC) final fee application, but the order expressly stated that "this Order *shall not* be deemed a final order … [and] this Order [shall not] be deemed or otherwise result in any *res judicata*." (APP. P. 351) (emphasis in original).

In contrast, the Fee Order approving Baker's fees has no limitation on its finality or *res judicata* effect. Thus, the Liquidating Trustee deliberately refrained from objecting to the Fee Order knowing that this Court's approval of the final Fee Order was *res judicata*. A comparison

of the Tanner order [Main Dkt. 1346] and the Baker Fee Order portrays the key differences, including the specific limitations on finality of the Tanner order (in blue) and the absence of the same language in the Fee Order.

> 2. ~~Applicant is finally allowed compensation of $1,666,508.90 for professional services rendered and $71,153.46 for reimbursement of actual and necessary expenses incurred on behalf of the Debtors during the Second Interim Period of January 1, 2018 through August 9, 2019, for a total amount of $1,737,662.36.~~
>
> 2. Applicant shall credit $20,000.00 toward the total amount awarded herein to account for the post-petition payment made to Applicant by the Debtors.
>
> 3. All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms as set forth in the ~~Second Interim and Final Application~~Application. For the avoidance of any doubt, this Order *shall not* be deemed a final order, with court appointed Liquidating Trustee Mark Shapiro (the "Liquidating Trustee") expressly reserving, as set forth in the confirmed Plan of Reorganization, all rights, claims, and demands against the Applicant of and related to services it rendered to or otherwise performed for or on behalf of the Debtors prior to the Petition Date, nor shall this Order be deemed or otherwise result in any *res judicata*, collateral estoppel, issue preclusion, and/or claim preclusion in regard to any such pre-Petition Date rights, claims, or demands of the Debtors, the estates of the Debtors, the Liquidating Trust[2], or the Liquidating Trustee.

For the same reasons as in *Intelogic Trace* and *Frazin*, Plaintiff's purported claims against Baker to recover post-petition fees are facially barred by *res judicata* from this Court's Fee Order. Indeed, this Court should enforce its Fee Order in the Main Case and require Plaintiff immediately to pay the $779,066.83 the Trust Estate still owes Baker for post-petition work.

(3)   As a matter of law, Plaintiff can't recover fees that the Alliance Bankruptcy Estate paid to Baker.

The Alliance bankruptcy estate "is a distinct entity, legally separate from the [Alliance] debtor[s]." *McCann v. Spencer Plantation Investments Ltd*, No. 4:18-CV-02505, 2020 WL 1430021, at *1 (S.D. Tex. Mar. 19, 2020) (Eskridge, J.). This Court's Fee Order allowed Baker's fees and expenses for post-petition services provided to the ***Alliance bankruptcy estate***.

Plaintiff's unprecedented attempt to disgorge "fees paid to Baker [by the Alliance bankruptcy estate] from and ***after the Petition Date***" based on Baker's alleged ***pre-petition*** conduct while representing the Client Debtors thus fails as a matter of law, because a client is not entitled to disgorgement of fees paid by another client. *See* Am. Compl., ¶ 414; *see also Liberty Mut. Ins. Co. v. Gardere & Wynne, L.L.P.*, 82 Fed. Appx. 116, 121 (5th Cir. 2003) (finding that the "district court did not err in refusing to allow forfeiture of fees paid by other clients."); *see also Gregory v. Porter & Hedges, LLP*, 398 S.W.3d 881, 886 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("A client seeking forfeiture of an attorney's fees is not entitled to recover fees paid by another party, and it is not for this court to change well-settled law").

## VII.   PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS FOR BAKER'S PRE-PETITION LEGAL SERVICES FAIL TO MEET PLEADING STANDARDS UNDER *TWOMBLY* AND *IQBAL*.

Under Supreme Court pleading standards, "a pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Similarly, conclusory statements in a pleading "are not entitled to the assumption of truth." *Id*. at 679-81.

Failure to meet these standards under Rule 8(a)(2) mandates dismissal under Rule 12(b)(6). *See Clapper v. Am. Realty Inv'rs, Inc.*, No. 3:14-CV-2970-D, 2018 WL 3868703, at *9 (N.D. Tex. Aug. 14, 2018) (dismissing fraudulent transfer claim because the "allegations d[id] not satisfy Rule 8 because plaintiffs d[id] not allege facts that allow the court to draw the reasonable inference that

defendants acted with constructive fraudulent intent: *e.g.*, that the transfer of property occurred 'without receiving a reasonably equivalent value in exchange for the transfer or obligation.'").

Additionally, FED. R. CIV. P. 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Under longstanding Fifth Circuit precedent, the plaintiff must plead "the who, what, when, where, and how" of any fraud – which Plaintiff fails to do. *See Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 652 (N.D. Tex. 2020) ("The Court concludes that Rule 9 applies to actual fraudulent transfer claims"); *Clapper*, 2018 WL 3868703, at *9 ("If plaintiffs rely on actual fraudulent intent, their allegations fail to satisfy Rule 9(b)'s heightened pleading requirements.").

Plaintiff's "constructive" fraudulent transfer claim is largely based on vague and conclusory allegations that "[Alliance] did not receive reasonably equivalent value for the Baker Transfers and [it]: (i) [was] insolvent or left with unreasonably small capital at the time of the Baker Transfers; or (ii) intended to incur, or believed or reasonably should have believed, that [it] would incur debts beyond [its] ability to pay as they came due or matured." Am. Compl., ¶ 409. Such allegations fail to state a claim because they are wholly inadequate under Rule 8(a), *Iqbal*, and *Twombly*. *See Campbell v. Tex. Tea Reclamation, LLC*, No. 3:20-CV-00090, 2021 WL 2211690, at *6 (S.D. Tex. May 6, 2021) (Edison, Mag. J.), report and recommendation adopted, No. 3:20-CV-90, 2021 WL 2211807 (S.D. Tex. June 1, 2021) (citing *Twombly* and finding that the complaint's mere repetition of "the words 'without receiving reasonably equivalent value' over and over and over does not survive a motion to dismiss under Rule 12(b)(6)."); *In re Cyr*, 602 B.R. 315, 332 (Bankr. W.D. Tex. 2019) (finding that the trustee "failed to properly plead insolvency for purposes of a constructively fraudulent transfer claim . . . [because] [t]he Trustee presented no

allegations regarding the value of the Cyr's debt relative to the value of the Cyr's assets at the time the transfers were made").

Plaintiff identifies payments to Baker for a variety of legal services provided to Alliance during the years before it filed for bankruptcy. Am. Compl., ¶ 294. However, the mere identification of payments does not suggest (much less plausibly show) a lack of reasonably equivalent value, especially where Plaintiff has not identified the work it complains of.  The Complaint also cannot sustain a fraudulent transfer claim because it contains only conclusory allegations about Alliance's financial condition at various times – without alleging anything about Alliance's financial condition at the time of the alleged payments to Baker.  These allegations fail to go beyond the legal elements of a claim and fall far short of federal pleading standards.

Plaintiff's failures are even worse when it comes to "Actual Fraudulent Transfer."  *See In re Specialty Select Care Ctr. of San Antonio, LLC*, No. 17-44248-ELM, 2021 WL 3083522, at *16 (Bankr. N.D. Tex. July 21, 2021) (dismissing "actual" fraudulent transfer claims because the complaint failed to meet Rule 9(b) standards – the "Complaint fails to specify (1) whether the Debtor intended to hinder its creditors, intended to delay its creditors, or intended to defraud its creditors (or some specified combination thereof), (2) how or in what way the Debtor intended such harm, (3) towards which creditors or groups or categories of creditors the Debtor's conduct was directed, and (4) the factual basis for the Trustee's belief that the Debtor intended such conduct to affect these creditors or groups or categories of creditors (including, as applicable, any relevant badges of fraud and the factual basis for the existence of such badges of fraud)"); *In re Almazan*, 2011 WL 841349, at *2 (Bankr. S.D. Tex. Mar. 7, 2011) (finding plaintiff failed to state a claim for "actual" fraudulent transfer because there were no allegations as to the transferor's intent). Although Plaintiff makes a conclusory allegation that "the Baker Transfers were made by

[Alliance] with actual intent to hinder or delay creditors of [Alliance]" (Am. Compl. ¶ 410), Plaintiff alleges no facts that could support a finding of "actual" fraudulent transfers to Baker.

## CONCLUSION

Plaintiff had a months-long opportunity to amend, but failed once again to state any claims. Accordingly, the Court should dismiss all claims against Baker with prejudice and grant Baker such other and further relief to which it is entitled.

Respectfully submitted,

*/s/  George M. Kryder*
George M. Kryder
  State Bar No. 11742900
  gkryder@velaw.com
Jordan W. Leu
  State Bar No. 24070139
  jleu@velaw.com
Jeremy M. Reichman
  State Bar No. 24083722
  jreichman@velaw.com
Michael C. Lee
  State Bar No. 24109461
  mlee@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas  75201
Telephone: (214) 220-7700

*Attorneys for Baker & Hostetler LLP*

## CERTIFICATE OF SERVICE

I certify that on December 19, 2023, a true and correct copy of the foregoing instrument was served on all counsel of record using the Court's electronic filing system.

*/s/  George M. Kryder*
George M. Kryder