United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 11, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 17-32186** |
| **UPLIFT RX, LLC,** *et al.,* | § | |
| | § | **CHAPTER 11** |
| Debtors. | § | |
| | § | |
| **YVETTE AUSTIN,** *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 22-3275** |
| | § | |
| **BAKER & HOSTETLER, LLP,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Yvette Austin, trustee of the Alliance Health Liquidating Trust, filed this adversary proceeding against the Debtors' former chapter 11 attorneys in this chapter 11 case. The complaint brings a wide variety of claims ranging from legal malpractice to fraud and federal RICO offenses. Baker & Hostetler, LLP filed a motion to dismiss the complaint for failure to state a claim. FED. R. CIV. P. 12(b)(6).

Under Rule 12(b)(6), the Court must assume that Austin's well-pled allegations are true. *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007). On that assumption, the motion to dismiss the civil RICO claims is denied. Notwithstanding that assumption, all other claims for relief are dismissed with prejudice.

## BACKGROUND

### I.   THE PARTIES

Yvette Austin is the Liquidation Trustee of the Liquidating Trust established by the Debtors' chapter 11 Plan. The Plan assigned the Debtors' causes of action, including tort, breach of contract, and avoidance claims, to the Liquidating Trust.  ECF No. 142 at 12.

Lifescan and Roche are Test Strip Manufacturers that supplied Alliance with blood glucose test strips for patients with diabetes.  ECF No. 142 at 22.   A Court-approved stipulation and an Amended Liquidating Trust Agreement assigned the Test Strip Manufacturers' claims against Baker Hostetler to Austin on behalf of the Trust.  Case No. 17-32186, ECF No. 1395-2 at 7.

It is largely undisputed that the pre-petition Debtors were engaged in fraudulent conduct that injured the Test Strip Manufacturers.

Baker & Hostetler, LLP is an Ohio-formed national law firm which represented and provided advice for various debtor and non-debtor Alliance entities.   ECF No. 142 at 2.  The Baker Hostetler attorneys involved in Alliance's fraudulent scheme were based in Washington D.C.  ECF No. 142 at 65.

Lee Rosebush, a partner based in the Washington D.C. office, served on Alliance's board of directors from June 9, 2016 until at least November 16, 2016.  ECF No. 142 at 72.  Alliance compensated Baker Hostetler at Rosebush's hourly rate for his services as a board member. ECF No. 142 at 72.

Alliance operated a nationwide network of over 100 entities and pharmacies that specialized in providing prescription medication to patients suffering from chronic health conditions, such as diabetes.  ECF No. 142 at 13.  The Debtors in the chapter 11 case include over 60 Alliance-affiliated entities.  ECF No. 151-1 at 180 n.2.  The Complaint refers to "Alliance" collectively as Baker Hostetler's client.  Austin

asserts that Baker Hostetler's representation covered the entire Alliance network because its billing entries do not distinguish between Alliance entities.  ECF No. 142 at 91 n.11.

The Debtors were collectively owned and controlled by Delaware-formed, Alliance Medical Holdings, LLC.  ECF No. 142 at 14.  Jeffrey Smith was the Chief Executive Officer of Alliance.  David Grant served as Alliance's General Counsel.  ECF No. 142 at 29.

The complaint refers to "certain Alliance management, directors, and executives" and "Alliance employees" as "Scheme Participants." ECF No. 142 at 3.  The Scheme Participants were allegedly involved in or at had personal knowledge of Alliance's fraudulent conduct.  The non-exhaustive list includes Jeff Smith, David Grant, Justin Leavitt, Sahily Paoline, Kassie Thomas, Travis Hughes, Adam Koopersmith, Blaine Smith, Alison Wistner, and Lee Rosebush.  ECF No. 142 at 21.

## II.   THE FRAUDULENT SCHEME

Blood glucose test strips are packaged and sold differently depending on a patient's insurance coverage.  Test strips for patients with pharmacy benefit insurance are labelled for "retail" sale and can be purchased by anyone including patients without insurance.  ECF No. 142 at No. 23.  Test strips for patients with durable medical equipment coverage are labelled as "not for retail sale" ("NFR").

Contracts between manufacturers and distributors require distributors to sell retail strips only to patients with pharmacy benefit insurance and to sell NFR strips only to patients with durable medical equipment coverage.  ECF No. 142 No. 23.  This distinction is important for three reasons: (1) retail test strips are sold at a higher price than NFR test strips, (2) pharmacies can claim reimbursement for selling retail test strips to patients with pharmacy benefit insurance by submitting insurance claims, and (3) manufacturers pay rebates to

pharmacy benefit managers ("PBMs")[1] for each unit of retail test strips sold.  ECF No. 142 at 23–24.

Alliance's fraud involved purchasing low-cost NFR strips from a secondary market and distributing them as retail strips.  ECF No. 142 at 26.  Because each test strip has a unique National Drug Code ("NDC"), Alliance labelled the NFR strips as retail strips by using the corresponding retail strip NDC and sold them to patients.  ECF No. 142 at 27.  Alliance then submitted false insurance reimbursement claims to pharmacy-benefit insurers, stating that they distributed retail strips when in fact they distributed NFR strips.  ECF No. 142 at 26.  When insurance auditors audited insurance claims from Alliance-affiliated pharmacies, Alliance produced doctored invoices or misleading photographs of retail strip inventory.

Numerous PBMs claimed chargebacks and cancelled contracts with Alliance-affiliated pharmacies.  ECF No. 142 at 38.  Alliance concealed its scheme from PBMs by operating pharmacies that appeared independent from Alliance and moving patients to the "independent" pharmacies.  ECF No. 142 at 37–38.

Test Strip Manufacturers suffered from Alliance's fraudulent scheme.  The Manufacturers relied on the fraudulent information provided to the auditors and paid rebates to the pharmacy benefit managers for NFR strips disguised as retail strips.  ECF No 142 at 28.  As a result, Austin alleges that the Test Strip Manufacturers wrongfully paid over $100 million in rebates and suffered lost profits damages compared to their expected profits if Alliance had purchased the higher priced retail strips.  ECF No. 142 at 9.

---

[1]  Pharmacy Benefit Managers are "third-party companies that function as intermediaries between insurance providers and pharmaceutical manufacturers. PBMs create formularies, negotiate rebates (discounts paid by a drug manufacturer to a PBM) with manufacturers, process claims, create pharmacy networks, review drug utilization, and occasionally manage mail-order specialty pharmacies)." *Pharmacy Benefit Managers*, NAIC, https://content.naic.org/insurance-topics/pharmacy-benefit-managers (last updated June 1, 2023).

### III.   BAKER & HOSTETLER'S INVOLVEMENT

Austin alleges that Baker Hostetler was aware of Alliance's fraudulent practices.  She also alleges that the firm assisted Alliance's efforts in furthering and actively concealing the fraudulent scheme. ECF No 142 at 32.

On November 12, 2014, various Alliance-affiliated entities signed engagement letters with Baker Hostetler for legal advice regarding "FDA and Healthcare regulatory counseling matters."  ECF No. 142 at 31.  Between the period of 2014–2016, Baker Hostetler directly engaged with various Alliance-affiliated non-debtor and debtor pharmacies.  ECF No. 142 at 91.

On June 7, 2015, Grant emailed Rosebush about Lifescan's investigation into Alliance's business practices "with regard to secondary market issues and diversion from manufacturer intended distribution channels."  ECF No. 142 at 33.  Paoline specifically contacted Lee Rosebush for his expertise in advising pharmacies on regulatory issues concerning pharmacy benefit managers.  ECF No. 142 at 29.

In November 2015, Rosebush learned that the Department of Health and Human Services was investigating Alliance for its business practices.  ECF No 142 at 34.  In a conference call with Grant, Alliance in-house attorney BJ Forsgren, and outside attorney Barry Johnson, Rosebush allegedly agreed to help Alliance's insurance fraud.  ECF No. 142 at 34.

In February 2016, Rosebush allegedly omitted to identify a potential Johnson & Johnson lawsuit relating to the fraud in response to an audit request for "any pertinent information, pending or threatened litigation, claims, or assessments, including unasserted claims or assessments that ought to be reported."  ECF No. 142 at 36.

Baker Hostetler allegedly assisted Alliance in concealing the fraudulent scheme from auditors by helping establish the "10% PIC"[2] ownership model after various Alliance-affiliated pharmacies were shut down.  ECF No. 142 at 39.  The new pharmacies had independent branding, separate contracts with PBMs, and independent ownerships.  ECF No. 142 at 39.  This prevented PBMs from recognizing whether a pharmacy was affiliated with Alliance.

Each independent pharmacy used software called "FSI" to adjudicate insurance claims by entering a "short code" for the corresponding brand of test strips.  Alliance allegedly modified FSI so that entering the short code adjudicated insurance claims using NDC for retail strips, even when NFR strips were dispensed.  ECF No. 142 at 40.

A former Baker Hostetler associate allegedly testified that she became aware of "billing fraud" after learning that insurance claims were generated using the short codes rather than using specific information about the product that was sold.  ECF No. 142 at 41.

In January 2016, Rosebush emailed counsel at ESI, a PBM, regarding an application by New Life Pharmacy, an Alliance Debtor entity, to join ESI's mail-order network.  ECF No. 142 at 43.  ESI told Rosebush that it "has previously done business with Mr. Smith [Alliance's CEO]" who "provided materially misleading and inaccurate information to [ESI] as part of the credentialing process for another pharmacy."  ECF No. 142 at 43.  Rosebush responded, "there is no fraud or deception on how [New Life Pharmacy] will be doing business."  ECF No. 142 at 43.  Rosebush allegedly did not respond when ESI asked about New Life Pharmacy's relationship to Alliance.  ECF No. 142 at 43.

The complaint further alleges that Baker Hostetler lied to pharmacy benefit managers and stonewalled any inquiries about

---

[2]  Under this model, Alliance acquires a pharmacy and grants the pharmacist-in-charge a 10% equity stake.  The 10% equity share is worthless because Alliance would overcharge the pharmacy in fees until the fourth quarter of each year when the pharmacy would break even.  Austin alleges that the pharmacist-in-charge is essentially a strawman.  ECF No. 142 at 45.

Alliance's business practices.  ECF No. 142 at 51.  On May 7, 2015, Alliance requested Rosebush's assistance after a pharmacy benefit manager rejected an Alliance-affiliated pharmacy's invoice evidence to support its retail claims.  ECF No. 142 at 51.  On May 26, 2015, Baker Hostetler responded that the "[p]harmacy's claims accurately stated the Products that were dispensed and contained all the necessary information for processing."  ECF No. 142 at 51.  Austin alleges that Baker Hostetler knew these misrepresentations would mislead Test Strip Manufacturers when the PBMs relayed the fraudulent information to them.  ECF No. 142 at 51–52.

In May 2016, Rosebush falsely misrepresented to General Counsel at ESI that Alta is "not related to my client [Alliance]" and that there was no relationship between Peterson Pharmacy, an Alliance pharmacy, and Alta.  ECF No. 142 at 54.  This misrepresentation was allegedly material because when a PBM discovered a connection between pharmacies conducting fraudulent practices, it would terminate contracts with all the affiliated pharmacies.

On August 23, 2016, Holmes wrote to Rosebush that she avoided citing to the PBM's provider manual while drafting a PBM audit response letter "because we know that we have violated it."  Rosebush responded, "I would not go so far as to say we KNOW we violated.  We want them to tell us what we violated allegedly."  ECF No. 142 at 66.

In September 2016, Alliance-affiliated pharmacies were audited by ESI.  ECF No. 142 at 57.  In response, several Alliance team members were instructed to "separate all retail product from mail order" and "send pictures of product separated on the shelf, only show[ing] primary product in pictures" to Rosebush.  ECF No. 142 at 57.  They were further instructed to block NDC numbers for secondary products at pharmacy sites.  ECF No. 142 at 57.  Primary product allegedly referred to retail strips and secondary product referred to NFR strips.  ECF No. 142 at 58.  Austin alleges that Alliance submitted the photos to the PBMs to mislead them into believing that Alliance was selling retail test strips.

The retail strips were allegedly intended to be photographed, but not to be sold.  ECF No. 142 at 58.

On September 16, 2016, Baker Hostetler wrote letters to ESI on behalf of several Alliance-affiliated pharmacies and attached photos of retail strip numbers. The letter reads:

> [I]n order to demonstrate that Baytree Pharmacy is purchasing retail product from manufacturers and/or what Baytree Pharmacy understands to be "authorized distributors," Baytree Pharmacy has provided several photos of current inventory on Baytree Pharmacy's shelf that contain retail lot numbers and NDCs . . . .

ECF No. 142 at 59.

Austin alleges that Baker Hostetler used invoices bearing retail NDC to mislead PBMs about the test strips that Alliance pharmacies were dispensing.  ECF No. 142 at 60.  On August 22, 2016, Rosebush asked Alliance employees to isolate invoices bearing retail NDC for Lifescan product so he could include those invoices in Baker's Hostetler's audit response on behalf of Alliance.

In October 2016, Rosebush participated in discussions over whether Alliance should disclose its fraudulent business practices to government authorities.  Austin alleges that Rosebush initially wanted Alliance to disclose their practices to the authorities, but ultimately agreed with Baker Hostetler partners that Alliance should not disclose the practices.  ECF No. 142 at 77.  Scott McBride, a former Baker Hostetler partner, advised Alliance against disclosure because the fraudulent billing was a "civil issue" that harmed neither the federal government nor the patients.  ECF No. 142 at 80.

Baker Hostetler and Alliance also used "NDC neutral" invoices, ones that did not contain the NCD code for NFR product, to PBMs. Baker Hostetler allegedly knew that PBMs would be tricked by the neutral invoices into believing that Alliance purchased retail strips for its insurance claims.  ECF No. 142 at 60.  In November 2016, Grant told

Smith and Rosebush that Alliance "pulled a group of invoices from secondary wholesalers that do not identify the product based on NDC number. . . . [W]e will continue the process for the pharmacies with the largest chargebacks until we run out of invoices that do not identify the NDC."  ECF No. 142 at 61.

On December 20, 2016, Grant emailed Rosebush asking about supplying ESI with "the invoices from secondary market suppliers that show the retail NDC."  ECF No. 142 at 63.  Baker Hostetler attorney Gilbert Keteltas, who was cc'd on Rosebush's response, replied to Rosebush privately and warned him, "we cannot provide invoices with retail NDC that we have reason to believe are for not for retail product."  ECF No. 142 at 64.

Alliance further sought Baker Hostetler's assistance to file a lawsuit against ESI for antitrust violations.  Austin alleges this offensive strategy was to recoup losses from PBM cancellations and chargebacks by discouraging ESI from auditing its pharmacies.  ECF No. 142 at 68.  Keteltas advised Grant about the high likelihood that ESI would file a counterclaim for "fraud" due to Alliance's "submission of claims for reimbursement of 'not-for-retail' product under a retail code."  ECF No. 142 at 70.

Baker Hostetler continued to represent Alliance through its chapter 11 filing.  On August 20, 2019, Baker Hostetler was awarded $3,764,891.25 in fees and expenses in the chapter 11 cases.  ECF No. 142 at 92.

## IV.   PROCEDURAL HISTORY

Between April 7, 2017 and April 9, 2017, 62 Alliance-affiliated debtors filed voluntary chapter 11 cases.

On July 28, 2017, Lifescan sued certain officers, directors and employees of Alliance in New Jersey federal district court in relation to the above-mentioned fraud.  ECF No. 142 at 102.  On March 19, 2019,

Roche filed a similar lawsuit in New Jersey federal district court.  ECF No. 142 at 103.

During the pendency of the Plan confirmation process, Alliance entered stipulations with the Test Strip Manufacturers allowing the Test Strip Manufacturers' claims in the bankruptcy case in the aggregate amount of $129,394,573.00.  ECF No. 142 at 103.

On March 28, 2019, Austin's predecessor trustee and Baker Hostetler entered into a Tolling Agreement that tolled certain claims against Alliance's professionals including Baker Hostetler.  ECF No.151 at 16.

On June 14, 2020, the predecessor trustee and Baker Hostetler agreed to an amendment to the Tolling Agreement.  The Tolling Agreement was amended five more times, ultimately extending the time to file certain claims against Baker Hostetler to September 30, 2022.  ECF No. 142 at 144.

On June 20, 2020, the Court approved the assignment of the Test Strip Manufacturers' claims to the Liquidating Trust.  Case No. 17-32186, ECF No. 1403.

Austin filed this adversary proceeding on September 26, 2022.  ECF No. 1.  Baker Hostetler filed its initial motion to dismiss on January 13, 2023.  On May 3, 2023, the Court held a hearing on the motion to dismiss and abated the proceeding for thirty days for the parties to mediate their dispute.  ECF No. 83.  The meditation was unsuccessful.  On October 20, 2023, Austin filed her first amended complaint.  ECF No. 142.

The Court held a hearing on Baker Hostetler's motion to dismiss on March 18, 2024 and took the matter under advisement on April 8, 2024.  ECF No. 168.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). Venue is proper in this District pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2). The dispute has been referred to the Bankruptcy Court under General Order 2012-6.

## LEGAL STANDARD

The Court reviews motions under Federal Rule of Civil Procedure 12(b)(6) "accepting all well-pled facts as true and viewing those facts in the light most favorable to the plaintiffs." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007). However, the Court will not strain to find inferences favorable to the plaintiff. *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

Motions to dismiss for failure to state a claim upon which relief can be granted "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005)).

To avoid dismissal under Rule 12(b)(6), the plaintiff must provide sufficient factual matter to state a claim for relief that is plausible on its face when accepting that factual matter as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The plausibility standard asks for more than "a sheer possibility that the defendant acted unlawfully." *Id.*; *see Lormand*, 565 F.3d at 232 ("[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" (quoting *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007))).

Fraud claims must, in addition, meet Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. Under Rule 9(b), fraud claims must be alleged with particularity concerning the circumstances of the fraud. FED. R. CIV. P. 9(b); *see Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 195 (5th Cir. 1996) (upholding district court dismissal of fraud claims where plaintiff failed to allege when a fraudulent sales charge was incurred or the extent of plaintiff's damages); *Red Rock v. JAFCO Ltd.*, No. 95-20368, 1996 WL 97549, at *3 (5th Cir. Feb. 16, 1996) (holding that plaintiff's allegations did not satisfy Rule 9(b) where they failed to allege the time, place, or content of any misrepresentations). "To plead fraud adequately, the plaintiff must 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 551 (5th Cir. 2010) (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

## DISCUSSION

Austin asserts Estate claims and the Manufacturers' assigned claims against Baker Hostetler. The claims are brought under District of Columbia, Delaware, and Utah law. A choice of law determination is not appropriate at this stage. The Court must instead analyze whether the Complaint plausibly pleads enough facts to survive a motion to dismiss.

This is Austin's second attempt to plead plausible claims after the Court determined that there were several deficiencies with the original complaint. Even so, the amended complaint fails to cure the deficiencies. The parties are represented by sophisticated counsel. The Court will not give Austin another opportunity to replead.

The motion to dismiss the civil RICO claims is denied. All other claims for relief are dismissed with prejudice.

I.     THE ROSEBUSH SETTLEMENT AGREEMENT DID NOT RELEASE
       CLAIMS AGAINST BAKER HOSTETLER.

Baker Hostetler asserts that it is released from all claims by Austin and the Test Strip Manufacturers.  ECF No. 151 at 58.  The Court finds no basis for this assertion.

The gravamen of the allegation is that Rosebush previously settled all claims against him with a payment made from insurance coverage.  Baker Hostetler wants to "tag along" with the release given to Rosebush.

On August 5, 2019, the Court approved a settlement agreement releasing "Settling Insureds" from "causes of action of any kind, both known and unknown, held by the Trustee . . . relating to any act or omission by any Settled Insured . . . or in any way relating to the Debtors . . . ."  ECF No. 151 at 58.  "Settled Insureds" includes Rosebush and other Scheme Participants affiliated with Alliance.  ECF No. 151-1 at 284–85.  Baker Hostetler alleges that the release given to Rosebush is imputed into the firm, releasing all Baker Hostetler partners from liability, by relying on paragraph 13 of the settlement agreement, which states:

> This Agreement shall inure to the benefit of the parties and their officers, directors, shareholders, employees, *partners*, attorneys in this matter, professionals, representatives, spouses, trustees, heirs, executors, administrators, successors and assigns."

ECF No. 151-1 at 286 (emphasis added).

Baker Hostetler asks the Court to imply that the inurement clause extends the release to Baker Hostetler, LLP.  Baker Hostetler misreads the plain text of the inurement clause.  The inurement clause may release Rosebush's partners within the law firm from liability.  But Rosebush's partners are not defendants in this lawsuit.  Baker Hostetler is a separate legal entity.  Arguably, Rosebush is a partner *in* the law

firm, but there is no argument that the limited liability partnership is Rosebush's partner.  The release does not extend to Baker Hostetler, LLP.

## II.   THE ESTATE CLAIMS

The Complaint brings claims on behalf of the Estate for legal malpractice/professional negligence (Count I), aiding and abetting/knowing participation in breach of fiduciary duty (Count II), avoidance and recovery of fraudulent transfers (Count III), and disgorgement of post-petition fees/turnover (Count IV).

Baker asserts that Counts I–II are contribution claims, artfully pled as direct actions.  ECF No. 151 at 42.  Austin contends that the causes of actions are not contribution claims because they seek damages independent of Manufacturers' settlements.  ECF No. 90 at 96.

The Court does not need to resolve the contribution issue as to the Estate's claims because Counts I–II are dismissed with prejudice for the reasons stated below.

### A.    Legal Malpractice/ Professional Negligence

The legal malpractice/professional negligence claims are brought under District of Columbia and Utah state law.  ECF No. 142 at 114.  To prevail under D.C. law, Austin must prove (1) the applicable standard of care, (2) the breach of the standard of care, and (3) a causal relationship between the violation and the harm complained of."  *Crawford v. Katz*, 32 A.3d 418, 427 (D.C. 2011).  Under Utah law, Austin must establish: (1) an attorney-client relationship, (2) breach of the attorney's fiduciary duty to the client, (3) causation (both actual and proximate), and (4) damages suffered by the client.  *Christensen & Jensen, P.C. v. Barrett & Daines*, 194 P.3d 931, 938 (Utah 2008).

The Complaint alleges that Baker Hostetler "breached its duties of loyalty and/or care to the Client Debtors . . . ."  ECF No. 142 at 114.  Austin defines the Client Debtors as Alliance Medical Holdings, LLC, Alliance Medical Administration, Inc., Alliance Health Networks, LLC, Alta Distributors, LLC, Stonybrook Pharmacy, LLC, Oak Creek

Pharmacy, LLC, New Life Pharmacy, LLC, and Lone Peak Rx, LLC. ECF No. 142 at 113. From that list, it appears that Baker Hostetler has only represented Oak Creek Pharmacy, LLC and Stonybrook Pharmacy, LLC in response to PBM audits. ECF No. 142 at 91. Baker Hostetler also advised Alta Distributors, LLC and Alliance Medical Holdings, LLC. ECF No. 142 at 92.

Baker Hostetler argues that the Complaint "fails to make plausible allegations of a pre-bankruptcy attorney-client relationship with Baker," because Austin cannot attribute the claims to the respective "Client Debtor". ECF No. 142 at 114. The Complaint generalizes the entities harmed by the legal malpractice claims as "Client Debtors." This is not sufficient for pleading purposes because the allegations do not identify any breaches of duty between Baker Hostetler and Alliance Medical Administration, Alliance Health Networks, New Life Pharmacy, or Lone Peak Rx. Additionally, Austin does not plausibly plead what duties Baker Hostetler owed to which particular entity and how each particular entity was harmed individually by the breaches of duty. The Court will not strain to link each element of the claim to each of the eight "Client Debtors" when the Complaint fails to differentiate the entities.

The Complaint instead attempts to group plead, claiming that the Debtors were "collectively owned, managed, operated, and/or controlled by the same group of overlapping Insiders, and were formed and/or otherwise operated within the Alliance Healthcare Network as alter egos of one another . . . ." ECF No. 142 at 17–18. Austin further claims that Baker Hostetler's representation "covered the entire Alliance Healthcare Network," because the law firm's billing records did not differentiate its extensive work between the Alliance entities. ECF No. 142 at 91 n.11.

But Austin fails to provide grounds to the Court justifying why the multiple entities should be treated as one plaintiff for the legal malpractice claim. The Court cannot simply impute a breach of duty harming one Alliance entity to another Alliance entity, especially when

Baker Hostetler's representation varied between entities. Because Austin pleads on behalf of "Client Debtors" without sufficiently pleading the individualized harms or providing grounds to group plead, Rule 8 is not met.

Austin was previously granted leave to amend her complaint on this issue. The amended complaint still fails. Count I is dismissed with prejudice.

### B. Aiding and Abetting/ Knowing Participation of Breach of Fiduciary Duty

Count II brings claims for aiding and abetting/ knowing participation of breach of fiduciary duty. The Complaint brings the predicate claim, breach of fiduciary duty, under Delaware law. ECF No. 142 at 116. The aiding and abetting claim is brought under "the law of the state with the most significant relationship." ECF No. 142 at 116.

The parties do not dispute that Delaware law applies for the breach of fiduciary duty predicate claim. In Delaware, breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty. *McKenna v. Singer*, No. 11371, 2017 WL 3500241, at *15 (Del. Ch. July 31, 2017). What remains unclear is whether the aiding and abetting a breach of fiduciary duty claim can be governed by different state laws. There do not appear to be cases within the Fifth Circuit where a court has applied separate state laws to the "aiding and abetting" derivative claim and to the "breach of fiduciary duty" predicate claim. Generally, federal courts sitting in Texas apply the law of the state of incorporation when a corporation's internal affairs are implicated. *Sommers Drug Stores Co. Emp. Profit Sharing v. Corrigan*, 883 F.2d 345, 353–54 (5th Cir. 1989).

The Court finds that there is no basis to apply different state laws to the predicate and derivative claims for aiding and abetting breach of fiduciary duty. Such application would be inconsistent with the internal affairs doctrine, which states that "only one State should have the authority to regulate a corporation's internal affairs—matters peculiar

to the relationships among or between the corporation and its officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." *Atherton v. F.D.I.C.*, 519 U.S. 213, 224 (1997).

Under Delaware law, to succeed on a claim for aiding and abetting a breach of fiduciary duty, Austin must prove: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) knowing participation in that breach by the non-fiduciary. *Zimmerman v. Crothall*, 62 A.3d 676, 712 (Del. Ch. 2013). "As a matter of law, aiding and abetting liability generally cannot attach to defendants who themselves owe fiduciary duties to the relevant entity and plaintiff." *CMS Inv. Holdings, LLC v. Castle*, No. 9468, 2015 WL 3894021, at *20 (Del. Ch. June 23, 2015) (noting that the "wrongful conduct on the part of the defendant fiduciary simply would give rise to direct liability for a breach of the duties he owes, rather than secondary liability on the theory of aiding and abetting").

Here, Baker Hostetler owed fiduciary duties to those Alliance-affiliated entities that it represented. Because Baker Hostetler is a fiduciary of certain Alliance entities, Austin cannot bring an aiding and abetting claim against Baker Hostetler with respect to Alliance.

The Complaint also does not plausibly plead to which "fiduciary entities" the "Alliance Fiduciaries" owed duties. Fiduciary entities include a number of non-Debtor entities, of which Austin, as Liquidating Trustee, does not have standing. ECF No. 142 at 66–67. The Complaint repeatedly alleges that the "Alliance Fiduciaries activity engaged in breaches of fiduciary duties . . . owed to Alliance." ECF No. 142 at 119. Alliance includes many Debtor and non-Debtor Alliance affiliated entities. Without pleading grounds for justifying group-pleading, Austin cannot plausibly plead on behalf of all Alliance entities for the aiding and abetting fiduciary duty claim.

Austin was given an opportunity to replead this issue. The repleading remains inadequate. Count II is dismissed with prejudice.

### C.    Avoidance and Recovery of Avoidable Transfers

Count III seeks to avoid and recover fraudulent transfers against Baker Hostetler under 11 U.S.C. §§ 544, 548, 550.  ECF No. 142 at 123.  The purported fraudulent transfers are pre-petition legal fees paid by Alliance to Baker Hostetler for legal services in connection to the fraudulent scheme dating from February 26, 2015.  ECF No. 142 at 93.

Baker Hostetler argues that Austin has only made conclusory allegations that Alliance did not receive reasonably equivalent value for the legal fees, that Alliance was insolvent or left with unreasonably small capital at the time of the transfers, and that Alliance intended to incur, or believed or reasonably should have believed, that they would incur debts beyond their ability to pay as they came due.  ECF No. 151 at 64.

Although the Court must accept allegations as true at the pleading stage, "recitals of the elements of a cause of action, supported by mere conclusory statements" do not suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court finds that Austin has failed to plausibly plead grounds for avoidance of the purported fraudulent transfers on the theory of constructive fraud.  11 U.S.C. § 548(a)(1)(B).  The Complaint has not alleged any facts demonstrating that Alliance was insolvent at the time of the transfers.  There is also no indication that Alliance received less than reasonably equivalent value for the payment of the legal fees.  And there are no facts indicating that Alliance was unable to pay for the legal services as they came due.

The Complaint alternatively alleges that the payment of legal fees was made with actual intent to defraud creditors of Alliance.  ECF No. 142 at 124; 11 U.S.C. § 548(a)(1)(A).  Austin appears to conflate the purported fraudulent transfer and the fraudulent conduct.  The actual intent to defraud creditors must refer to the transfer itself.  Instead, Alliance's actual intent, as alleged in the Complaint, refers to Alliance's motivations in hiring Baker Hostetler to assist the company in its fraudulent conduct.  The actual fraudulent transfer claim must fail.

The Court believes further repleading on this matter would be futile.  Count III is dismissed with prejudice.

### D. Disgorgement of Post-Petition Fees/ Turnover

Count IV seeks relief dependent upon the viability of Counts I–III.[3]  Count IV is a turnover and disgorgement action for post-petition attorneys' fees pursuant to §§ 542, 549.  ECF No. 142 at 125.  On September 11, 2019, the Court entered a final order allowing Baker Hostetler fees in the amount of $3,764,891.25 for the period April 7, 2017 through August 9, 2019.  ECF No. 151-1 at 348–49.  The total amount includes a holdback of fees in the amount of $419,676.47.  ECF No. 151-1 at 348.  Austin seeks to disgorge post-petition legal fees based on the alleged fraudulent pre-petition legal work.  ECF No. 161 at 90.

Baker Hostetler contends that the entry of the final order allowing Baker Hostetler's post-petition attorneys' fees has *res judicata* effect, barring the disgorgement action.  ECF No. 151 at 59.  The Court does not need to resolve whether the final order has *res judicata* effect because Austin has not plausibly pled a claim under § 549.  To avoid a post-petition transfer, the moving party must prove: "(1) that a transfer occurred; (2) that the transfer occurred after the commencement of the case; (3) that the transfer was made without court authority; and (4) that the property transferred was property of the estate."  11 U.S.C. § 549; *In re Advanced Modular Power Systems, Inc.*, 413 B.R. 643, 671 (Bankr. S.D. Tex. 2009) (citing *Havis v. Norman (In re Equator Corp.)*, 362 B.R. 326, 331 (Bankr. S.D. Tex. 2007)).

The post-petition transfer was authorized by the Court when it entered the September 11, 2019 Order approving Baker's fees.  The predecessor-trustee of the Liquidating Trust could have objected at the fee hearing.  He did not.  The third element cannot be met.

Count IV is dismissed with prejudice.

---

[3] Since Counts I–III are dismissed, Count IV is dismissed too.  For good measure, the Court proceeds with evaluating the merits of Count IV.

### III.   THE MANUFACTURERS' CLAIMS

The assigned claims include reformation of tolling agreement (Count X), aiding and abetting/ knowing participation in negligent misrepresentation (Count V), fraud-based claims (Counts V–VII), and federal RICO offenses (Counts VIII–IX).  Baker Hostetler raises various affirmative defenses against the claims.

For the reasons stated below, the motion to dismiss the federal RICO claims is denied.  All other assigned claims are dismissed with prejudice.

### A.   Attorney Immunity

Baker Hostetler raises attorney immunity as a threshold matter, alleging that it is immune from suits by the Test Strip Manufacturers. The parties dispute whether Texas' or another state's attorney immunity doctrine would apply here.   The parties provided supplemental briefing regarding the choice of law question.   Austin argues that Texas law is inapplicable because attorney immunity is a substantive issue and that Texas does not bear the most significant relationship to the issues.  ECF No.  176 at 5.  Baker Hostetler argues that Texas law applies because it is a procedural issue, which is governed by Texas state law.   ECF No. 177 at 2.   The Court is not inclined to make a choice of law determination at this stage.   Instead, the Court finds that Baker Hostetler did not sufficiently establish that its representation of Alliance falls within the protection of Texas' attorney immunity doctrine.

An attorney seeking dismissal based on attorney immunity "bears the burden of establishing entitlement to the defense."   *Kelly v. Nichamoff*, 969 F.3d 471, 375 (5th Cir. 2017) (citing *JJJJ Walker, LLC v. Yollick*, 447 S.W.3d 453, 468 (Tex. App.—Houston [14th District] 2014).  In the rare instances that Texas courts grant attorney immunity at the motion to dismiss stage, the scope of the attorney's representation must be "apparent."  *Kelly v. Nichamoff*, 969 F.3d 371, 375 (5th Cir. 2017).  To meet this burden, the attorney must conclusively establish

that the conduct was within the attorney's legal representation of the client. *Id.* (citing *Candy Hanger, LLP v. Byrd*, 467 S.W.3d 477, 484 (Tex. 2015)).

In Texas, conduct relating to legal representation must involve "the unique office, professional skill, training, and authority of an attorney" to be protected by attorney immunity privilege. *Haynes and Boone, LLP v. NFTD, LLC,* 631 S.W.3d 65, 78 (Tex. 2021). An attorney cannot avoid liability for damages caused by the attorney's participation in a fraudulent scheme because "such acts are entirely foreign to the duties of an attorney." *Poole v. House. & T.C. Ry. Co.*, 58 Tex. 134, 137 (Tex. 1882).

Here, Baker Hostetler does not dispute that the threshold question is whether the firm's conduct fell within its duties as attorneys representing a client. ECF No. 151 at 30. Baker Hostetler alleges that all its conduct occurred as part of representing the Alliance Debtors. ECF No. 151 at 30. But the Fifth Circuit holds that the "mere fact that an attorney was representing a client at the time of alleged fraudulent activity is not enough to warrant immunity." *Kelly*, 969 F.3d at 375. The Complaint alleges that Alliance signed an engagement letter with Baker Hostetler for legal advice regarding "FDA and Healthcare regulatory counseling matters." ECF No. 142 at 31. The Complaint, if taken as true, allege that Baker Hostetler's involvement extended beyond providing legal advice. It alleges that Baker Hostetler's attorneys:

- Assisted Alliance in establishing independent pharmacies to conceal its scheme from PBMs. ECF No. 142 at 35.

- Advised Alliance to adopt a "10% PIC Model" that allowed pharmacies to appear independent from Alliance. ECF No. 142 at 45.

- Used invoices bearing retail NDC in its response to audit responses when Alliance never intended to sell its retail strips. ECF No. 142 at 60.

- Sent pictures purporting to show current inventory of retail NDC to ESI to explain the number of insurance claims for retail strips. ECF No. 142 at 60.

Importantly, it is undisputed that a Baker Hostetler partner, Rosebush, served on Alliance's board of directors.  ECF No. 142 at 74.

The Court does not disagree that the attorney immunity doctrine extends to attorneys that "routinely practice and advise clients in non-litigation matters." *Troice v. Greenberg Traurig, LLP*, 921 F.3d 501, 506 (5th Cir. 2019).   As the Complaint alleges, Baker Hostetler has "significant national reputation" in compliance and regulatory matters in the healthcare industry.  ECF No. 142 at 2.  The allegations in the Complaint and billing records undisputedly show that certain Baker Hostetler actions pertained to legal matters that "involve the unique office, training, skills, and authority of an attorney."   But the allegations, if proven true, show that Baker Hostetler, through Rosebush, assisted Alliance on extra-legal matters like business decisions that do not involve the traditional skills of an attorney.  Most importantly, Baker Hostetler's motion to dismiss wants the Court to disregard the fact that Rosebush served on Alliance's board of directors during the scheme.  Baker Hostetler billed Alliance at Rosebush's hourly rate for his work on the board.  ECF No. 142 at 74.  His role as a board member obscures whether all, or just some, of Baker Hostetler conduct deserves protection of the attorney immunity doctrine.

These allegations and Baker Hostetler's failure to define its scope of representation create a factual issue on whether all, or some, of Baker Hostetler's conduct fall within the attorney immunity doctrine.   The Court will not dismiss the assigned claims on this basis.

### B.   Public Policy Defense Against Assignment of Manufacturers' claim

Baker Hostetler contends that Austin cannot assert the Test Strip Manufacturers' assigned claims on behalf of the Trust beneficiaries because the assignment was invalid for public policy reasons.  ECF No.

151 at 45–46. The Test Strip Manufacturers' assigned claims to the predecessor-trustee of the Liquidating Trust pursuant to a stipulation approved by the Court on June 20, 2020. Case No. 17-32186, ECF No. 1403. In exchange, the predecessor-trustee waived Alliance's attorney-client privilege with Baker Hostetler. Case No. 17-32186, ECF No. 1395-1 at 5. Baker Hostetler did not object to the Stipulation assigning the claims to the predecessor-trustee and did not seek relief from the order approving the stipulation. Case No. 17-32186, ECF No. 1402. Baker Hostetler cannot collaterally attack the final order.

Further, Alliance and Baker Hostetler are the alleged joint tortfeasors. Austin, the liquidation trustee, is not Alliance. The trustee has "the power and authority to prosecute and resolve in the name of the applicable Debtors and/or the name of the Liquidating Trust, the Liquidating Trust Assets." ECF No. 151-1 at 215. The trust assets include causes of actions including the assigned claims that were later acquired. *See* ECF No. 151-1 at 194. This is the power granted by the confirmation of the Chapter 11 plan.

Baker Hostetler relies on Texas law which prohibits "a joint tortfeasor [from] the right to purchase a cause of action from a plaintiff to whose injury the tortfeasor contributed." ECF No. 151 at 46; *Int'l Proteins Corp. v. Ralston-Purina Co.*, 744 S.W.2d 932, 934 (Tex. 1988). In *Ralston*, the plaintiff sued two alleged joint tortfeasors on theories of product liability and negligence in connection to the sale of contaminated chicken feed. *Id.* at 933. The plaintiff settled with one defendant. *Id.* As part of the settlement agreement, the plaintiff assigned its original causes of action to the defendant, which then prosecuted the plaintiff's assigned claims against the co-defendant. *Id.*

*Ralston* is not applicable here. The assignment of Manufacturers' claims was not bargained for in a settlement agreement. On August 5, 2019, Alliance settled with Test Strip Manufacturers allowing their claims in the bankruptcy case in the aggregate amount of $129,394,573.00. ECF No. 142 at 103. The assignment of claims occurred more than 10 months later on June 20, 2020. Case No. 17-

32186, ECF No. 1403. As a result of the allowance of the $129 million claim, the Test Strip Manufacturers became recognized beneficiaries of the Liquidating Trust. Far from settling with an adverse party, the 10-month later assignment allowed a unified lawsuit to be brought against Baker Hostetler. The Liquidating Trust waived Alliance's attorney-client privilege. The claims of both parties were strengthened. Alliance did not acquire the Manufacturers' claims in exchange for a liability or damages settlement with the Manufacturers.

It is also critical to note that the Liquidating Trust should not, in equity, carry Alliance's baggage. The Liquidating Trust was established to provide a recovery for unsecured creditors, including the victims of the alleged fraud. The Manufacturers' claims were assigned to the Liquidating Trust, which is a separate legal entity from the alleged tortfeasor. None of the equitable tug in *Ralston* applies here. Austin is bringing the assigned claims on behalf of the beneficiaries of the Trust. Alliance's owners will get none of the recoveries. *Ralston* does not apply in this situation.

With the assignment, Baker Hostetler alleges that public policy should control and bar Austin from prosecuting the assigned claims. This argument is nearly identical to the issue of whether a bankruptcy trustee can be charged with an *in pari delicto* defense.

This Court addressed the *in pari delicto* defense under Texas law at length in a similar context. *See In re Today's Destiny, Inc.*, 388 B.R. 737 (Bankr. S.D. Tex. 2008) (holding that the *in pari delicto* defense did not bar a chapter 7 trustee from asserting claims against insiders of the debtor corporation). This Court held that *"in pari delicto* is not an automatic bar" at the dismissal stage and that application of the defense requires consideration of "how the facts and equities of the individual case interact with the policy *in pari delicto* was designed to serve."[4] *Id.* at 749.

---

[4] In determining whether *in pari delicto* applies, the Texas Supreme has stated:

Austin alleges that the damages awarded in this matter would serve as "renumeration" to the victims of the scheme.  ECF No. 161 at 39.  This would influence the application of *in pari delicto* here.   The Court should not dismiss the assigned claims at this Rule 12(b)(6) stage.

## C.  Reformation of Tolling Agreement

The plain language of the June 14, 2020 amendment to the Tolling Agreement only extended the limitations period as to claims owned by the predecessor trustee as of March 28, 2019.  The predecessor trustee did not own the assigned claims until claims were assigned, as approved in an order entered June 20, 2020.   The order was not retroactive to March 28, 2019. Case No. 17-32186, ECF No. 1403.  The language did not toll claims held by the Test Strip Manufacturers.

 Count X of the complaint argues for reformation of the Tolling Agreement on grounds of mutual mistake or in the alternative, unilateral mistake.   The Complaint alleges that the June 14 Amendment to the Tolling Agreement should be reformed to reflect the parties' intent to toll the Test Strip Manufacturers' assigned claims.

A party may be entitled to the equitable remedy of reformation if the movant can prove that the agreement is the result of mutual mistake.  *Technical Automation Services Corp.* v. *Liberty Surplus Ins. Corp.*, 573 F.3d 399, 408 (5th Cir. 2012).  "The underlying objective of reformation is to correct a mutual mistake in preparing a written instrument, so that the instrument truly reflects the *original* agreement of the parties."  *Id.* (quoting *Cherokee Water Co. v. Forderhause*, 741

---

The rule is adopted not for the benefit of either party and not to punish either of them but for the benefit of the public . . . .  There is often involved, in reaching a decision as to granting or withholding relief, the question whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other.  The solution of the question depends upon the peculiar facts and equities of the case, and the answer usually given is that which it is thought will better serve public policy.

*Lewis v. Davis*, 199 S.W.2d 146, 151 (Tex. 1947).

S.W.2d 377, 379 (Tex. 1987)).   Reformation requires an original agreement and a mutual mistake that occurred when reducing the agreement in writing.   *Id.*

A party asserting a mutual mistake must show that there was a mistake of fact held mutually by the parties and that the mistake materially affects the agreement.   *Hardy v. Bennefield*, 368 S.W.3d 643, 652 (2012).   Rule 9(b) pleading standards govern allegations of "mistake".   Allegations of mistake must state with particularity the circumstances constituting the mistake.   FED. R. CIV. P. 9(b); *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009); *see Zytax, Inc. v. Green Plains Renewable Energy, Inc.*, 2010 WL 2219179, at *8 (S.D. Tex. 2010).   A well-pled claim based on mistake "should include averments of what was intended, what was done, and how the mistake came to be made."   *Zytac, Inc. v. Green Plains Renewable Energy, Inc.*, 2010 WL 4702303, at *7 (S.D. Tex. 2010) (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1299 (3d ed.)).   Unlike in pleading fraud, the complainant does not need to identify the "who, what, when, where, and how" of the mistake.   *Id.* at *8.

The Complaint alleges that the failure of the June 14 Tolling Agreement in tolling the Manufacturers' claims was a result of mutual mistake.   Austin alleges that both parties agreed that Baker Hostetler would toll the assigned claims from the manufacturers before the June 14 Amendment was reduced in writing.   ECF No. 142 at 144.   The allegation is solely based on the fact that the Amendment language designating the predecessor trustee as the "assignee of the claims of Lifescan, Inc., Roche Diagnostics Corp., and Roche Diabetics Care, Inc. . . . ." is evidence of parties' mutual intent to toll the assigned claims. ECF No. 142 at 145.   Both parties then "labored under the same misconception that they had agreed to toll the assigned claims."   ECF No. 142 at 145.   But the Complaint fails to plead with particularity beyond these allegations.   There are no particularized details or allegations of a mutual agreement between the parties to toll the assigned claims.   The language describing the trustee as the "assignee"

of Manufacturers' claims without more, does not show that Baker Hostetler agreed to toll the assigned claims.   On its face, the Complaint insufficiently pleads for reformation on the grounds of mutual mistake. There is, in fact, zero evidence of the mutuality of any mistake.

Alternatively, Austin pleads unilateral mistake as justifying reformation.  The Complaint alleges that the predecessor trustee made a unilateral mistake regarding the date of Assignment and the scope of tolled claims when reducing the agreement to writing.  ECF No. 142 at 145.  Austin argues that Baker Hostetler had knowledge of this mistake and knew that the predecessor trustee intended to include assigned claims in the tolling amendment.

Under Texas law, unilateral mistake needs to be accompanied by fraud to warrant reformation.  *Amwest Sav. Ass'n v. Statewide Capital, Inc.*, 144 F.3d 855, 890 (5th Cir. 1998).  There are no allegations in the complaint of fraud that induced or was associated with the predecessor trustee's unilateral mistake.

Repleading mutual mistake would be futile.   Both parties are represented by sophisticated counsel and the agreements were heavily negotiated.  The Court will not strain to fix deficiencies here.  Count X is dismissed with prejudice.

### D. Aiding and Abetting/Knowing Participation in Negligent Misrepresentation

Count V purports to state a claim for aiding and abetting/ knowing participation in negligent misrepresentation.  The Complaint alleges that Baker Hostetler (1) did not correct materially inaccurate or false statements that Alliance made to PBMs, (2) knew and intended that the PBMs would rely on the misrepresentations, and (3) knew the misrepresentations would percolate to the Manufacturers.  ECF No. 142 at 126–27.  As a result, the Manufacturers were injured in an amount of $129 million.  ECF No. 142 at 127.

Baker Hostetler's motion to dismiss raises Texas' two-year statute of limitations for negligent misrepresentation as an affirmative defense.[5]  The aiding and abetting/ knowing participation in negligent misrepresentation claim is barred by the statute of limitations.

Under the *Erie* doctrine, federal courts apply federal procedural law and state substantive law.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Federal courts treat the statute of limitations question as a matter of substantive law, so the Court looks to state law to decide which statute of limitations applies.  *See Ellis v. Great Sw. Corp.*, 646 F.2d 1099, 1103 (5th Cir. 1981).  Because Texas state law treats statute of limitations questions as procedural rather than substantive, federal courts sitting in Texas need not undertake a choice of law analysis.  The Court simply applies Texas' limitation periods.  *In re NP p.l.c. Sec. Litig.*, 51 F. Supp. 3d 693, 697 (S.D. Tex. 2014) (citing *Robinson v. Crown Cork & Seal Co., Inc.*, 335 S.W.3d 126, 141 (Tex. 2010)).

Texas applies a two-year statute of limitations to claims for negligent misrepresentation.  *Collective Asset Partners, LLC v. McDade*, 400 S.W.3d 213, 217 (Tex. App. 2013).  Section 108(a) of the Bankruptcy Code extends the statute of limitations after a party files a bankruptcy petition in limited circumstances:

> If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of –

---

[5]  Baker Hostetler appears to construe Count V as a claim for "negligent misrepresentation" when the Complaint's Count V is a claim for aiding and abetting/ knowing participation in negligent misrepresentation.  This is inconsequential for purposes of statute of limitations.  "Aiding and abetting" is a derivative claim, which takes the statute of limitations period of the underlying tort.  *See Gandy v. Williamson*, 634 S.W.3d 214, 241 (Tex. App.—Houston [1st District] 2021).

(1) The end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) Two years after the order for relief

11 U.S.C. § 108(a). This Code provision sets the deadline to file a complaint to the later of two years after the petition date or whenever the period would run under the applicable limitations period under state law, whichever is longer. *Id.* The two-year extension past the petition date only applies for claims which have "not expired before the date of the filing of the petition." *Id.* Because the June 14 Amendment did not toll this claim, Austin's deadline to file an aiding abetting/knowing participation in negligent misrepresentation claim was the later of either April 9, 2019 (two years post-petition date), or whenever the statute of limitations on the claim ran under applicable law. Generally, a cause of action accrues when a wrongful act causes an injury. *Sabine Towing & Transp. Co., Inc. v. Holliday Ins. Agency, Inc.*, 54 S.W.3d 57, 60 (Tex. App.—Texarkana 2001). The alleged acts occurred throughout 2014–2016, so the statute of limitations ran not later than 2018, subject to any extension under the discovery rule. The discovery rule applies to the negligent misrepresentation and delays the start of the limitations period if the injury is inherently undiscoverable. *Id.* at 61. As discussed at length in the proceeding sections, the Manufacturers discovered their injuries in 2017 at the latest. If the discovery rule applies, the statute of limitations ran not later than 2019. This proceeding was commenced on September 26, 2022. The statute of limitations for this action had expired before the lawsuit was filed.

Count V is dismissed with prejudice.

### E.    Fraud-Based Claims

Austin asserts Manufacturers' claims against Baker for aiding and abetting/ knowing participation in fraudulent misrepresentation (Count V), fraudulent misrepresentation/ fraud (Count VI), and

conspiracy to commit fraud (Count VII). For the reasons stated below, these claims are barred by the statute of limitations. The fraud-based claims are dismissed with prejudice.

Under Texas law, fraud claims are subject to the four-year statute of limitations. TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.004, 16.051; *Williams v. Khalaf*, 802 S.W.2d 651, 658 (Tex. 1990). "A fraud claim does not accrue until the plaintiff knew or in the exercise of reasonable diligence should have known of the wrongful act and resulting injury." *See S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996); *Ruebeck v. Hunt*, 176 S.W.2d 738, 739 (Tex. 1943). A defendant asserting a statute of limitations defense at the pleading stage has the burden to establish the accrual date and to negate the applicability of the discovery rule. *Trigo v. TDCJ–CID Officials*, No. 05-2012, 2010 WL 3359481, at *9 (S.D. Tex. Aug. 24, 2010). A court should dismiss based on the statute of limitations only if that bar to relief appears on the face of the complaint or other appropriately considered materials. *Garrett v. Commonwealth Mortgage Corp. of Am.*, 938 F.2d 591, 594 (5th Cir. 1991).

Baker Hostetler claims that the statute of limitations started accruing in 2014 and 2015. ECF No 151 at 28. Baker Hostetler's pleadings allege that Lifescan became aware, as early as April 2014, that an Alliance-affiliated pharmacy was distributing LifeScan's NFR test strips as retail test strips. ECF No. 151 at 12. In 2015, Lifescan and Roche allegedly complained about the fraudulent business practices and made multiple written demands to Alliance for damages. ECF No. 151 at 11–12. If the limitations clock started in 2014 or 2015, the statute of limitations would have expired in 2019. Because the Tolling Agreement did not toll the assigned claims, Austin is barred from bringing the fraud claims.

The Complaint alleges that the discovery rule applies to delay accrual to a later date. ECF No. 142 at 107. Austin argues that "even with the exercise of reasonable diligence, the Test Strip Manufacturers could not have discovered prior to August 20, 2020, that Baker Hostetler knowingly participated in the fraud, conspired to commit fraud, and

aided and abetted the fraud." ECF No. 142 at 110. Discovery of Baker Hostetler's involvement was "frustrated by Baker's invocation of the attorney-client privilege and attorney work-product doctrine." ECF 142 No. 142 at 110. It was not until August 20, 2020 after Baker Hostetler produced around 4,500 of privileged documents, when the predecessor trustee discovered the extent of Baker Hostetler's involvement in the fraudulent scheme. ECF No. 142 at 112. Austin's assertion, however, does not justify a later accrual date.

The relevant inquiry for the discovery rule is whether the injury could be discovered through the exercise of reasonable diligence. *McGowan v. S. Methodist Univ.*, No. 18-00141, 2024 WL 455340, at *4 (N.D. Tex. Feb. 5, 2024). The discovery rule "does not turn on whether the injured person knows the exact identity of the tortfeasor or all the ways in which the tortfeasor was at fault in causing the injury." *Schlumberger Tech. Corp. v. Pasko*, 544 S.W.3d 830, 934 (Tex. 2018).

What matters for purposes of accrual of statute of limitations, is when the Manufacturers discovered the wrongful act and their resulting injury. On July 28, 2017, Lifescan sued several officers, directors, and employees of Alliance in New Jersey federal district court relating to the fraudulent scheme. ECF No. 142 at 102. In 2017, the Test Strip Manufacturers subjected Alliance to a deposition, which "revealed the extent of other pharmacies' involvement such that the manufacturers could put those pharmacies' submissions as part of their injury." ECF No 172 at 31. In sworn deposition testimony given on July 19, 2017, two Alliance employees admitted to such wrongful conduct, with one describing it as "the foundational practice" of the company. Such testimony provided the first concrete and objective verification of the wrongful conduct and the Test Strips Manufacturers' resulting injuries. ECF 142 at 109. "When the plaintiff learns of the injury, the limitations clock begins running, even if the plaintiff does not know the specific cause of the injury or the party responsible for it." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 93 (Tex. 2004). Therefore, the statute of limitations started accruing in 2017 at the

latest.  Even taking a later accrual date than the ones alleged by Baker
Hostetler, Austin's cause of action for fraud expired in 2021 before this
proceeding commenced.

Austin also pleads that the fraudulent concealment doctrine tolls
the statute of limitations for the fraud claims.  Under Texas law,
fraudulent concealment is an equitable doctrine that tolls the statute of
limitations when a defendant is under a duty to disclose but
"fraudulently conceals the existence of a cause of action from the party
to whom it belongs . . . ."  *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex.
1983).  The party asserting the doctrine bears the burden of showing
that the defendant was under a duty to make a disclosure.  *Timberlake
v. A.H. Robins Co., Inc.*, 727 F.2d 1363, 1366 (5th Cir. 1984).  The
defendant is estopped from asserting a statute of limitations as an
affirmative defense until the plaintiff learns of the cause of action or
should have learned through exercising reasonable diligence.  *Id.*

Austin failed to sufficiently satisfy the burden of invoking the
fraudulent concealment doctrine.  Baker Hostetler did not have a duty
to disclose to its non-clients, the Test Strip Manufacturers.  *See Adams
v. Nissan North America, Inc.*, 395 F. Supp. 3d 838, 849 (S.D. Tex. 2018)
("Under Texas law, a duty to disclose in the context of fraudulent
concealment arises only in limited circumstances where there is a
fiduciary or confidential relationship.").  Further, the Test Strip
Manufacturers discovered their injuries in 2017 at the latest.
Fraudulent concealment only tolls the statute of limitations when the
cause of action is concealed, not when the tortfeasors concealed their
own identities.  Therefore, fraudulent concealment is inapplicable here
because the parties knew of their injuries.

The fraud-based claims are barred due to the statute of
limitations.  Counts V–VII are dismissed with prejudice.

## F.   Civil RICO Claims

The Complaint brings claims for conspiracy to violate federal
RICO (Count VIII) and violation of federal RICO (Count IX).  The federal

RICO statute provides a private cause of action for persons injured by a violation of § 1964.  Austin alleges a violation of § 1964(c), which reads:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  The elements of a § 1962(c) violation are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima S.P.R.L v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Baker Hostetler contends that the RICO claims should be dismissed because the claims are barred by the statute of limitations, there is a lack of proximate causation, and the Complaint fails to plead a RICO person engaged in a pattern of racketeering activity.

For the reasons stated below, the motion to dismiss the RICO claims is denied.

### (1) Statute of Limitations

Baker raises the statute of limitations as an affirmative defense. ECF No. 151 at 28.  The statute of limitations to bring a civil RICO claim is four years.  *Agency Holding Corp. v. Malley-Duff & Assocs. Inc.*, 483 U.S. 143, 156 (1987).  The Fifth Circuit adopts the injury discovery rule of accrual for civil RICO actions.  *Love v. Nat'l Med. Enterprises*, 230 F.3d 765, 773 (5th Cir. 2000).  Under the injury discovery rule, a civil RICO claim accrues when the plaintiff discovers, or should have discovered the injury.  *Id.* at 772.

As analyzed in the fraud-based claims section, the manufacturers knew of their injuries in 2017 at the latest.  Baker Hostetler argues that Lifescan and Roche learned of their injuries in as early as 2014 and 2015.

Austin contends that the fraudulent concealment doctrine tolls the statute of limitations for the civil RICO claims.  Fraudulent

concealment is grounds to toll the limitations period or estop a defendant from asserting a limitations defense if the plaintiff is reasonably diligent in discovering the RICO cause of action. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 181 (1997).   Federal RICO law is unclear whether the concealment of the identity of the tortfeasor is enough to toll the RICO statute of limitations under the fraudulent concealment doctrine.  The Fifth Circuit provides some guidance on this question:

> "Knowledge of the wrongdoer is not required to start the clock on the statute of limitations; knowledge of the injury alone suffices for the claim to accrue. . . . However, the plaintiff may be entitled to tolling by fraudulent concealment when: (1) the wrongdoer fraudulently conceals the "facts forming the basis for the claim," *including the wrongdoer's own identity as the wrongdoer*; and (2) the plaintiff cannot access these facts through reasonably diligent investigation."

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.,* 9 F.4th 247, 253 n.4 (5th Cir. 2021) (emphasis added).

Unlike in civil fraud cases, the Fifth Circuit recognizes that concealment of the tortfeasor's identity can be grounds for tolling the statute of limitations in RICO cases.  The Complaint pleads that Baker Hostetler failed to disclose the extent of its involvement in Alliance's fraudulent insurance scheme.  ECF No. 142 at 109.  In Baker Hostetler's application for employment in the bankruptcy case, the law firm initially did not disclose its prior work for Alliance.  Case No. 17-32186, ECF No. 274.   However, extensive disclosure was given in a supplemental statement by Baker Hostetler filed two weeks later on May 24, 2017.  Case No. 17-32186, ECF No. 319 at 5.  This cannot be a basis to toll statute of limitations on the grounds of fraudulent concealment.  Even if Baker Hostetler had failed to supplement its disclosure, mere silence by itself does not rise to the level of fraudulent concealment.  *Petrobas* relies on *State of Tex. v. Allan Const. Co.* for the proposition that identity concealment may toll limitations for RICO claims.  *See* 851 F.2d 1526,

1532 (5th Cir. 1988). The exception is quite narrow. Absent a fiduciary relationship, neither failing to speak nor a denial of involvement constitutes concealment. *Id.* With a fiduciary relationship, the fiduciary may rely on the silence or denials such that there is an act of concealment sufficient to toll the RICO statute. *Id.*

Austin alleges that Baker Hostetler concealed its involvement in Alliance's fraudulent scheme from Mark Shapiro, the predecessor trustee. The alleged concealment occurred in 2017 when Baker Hostetler was retained by Shapiro. If the RICO claims had belonged to Shapiro at the time, then Shapiro was entitled to rely on his fiduciary (Baker Hostetler) and the RICO claims might have been tolled.

However, in 2017, the RICO claims were owned by the Test Strip Manufacturers. Baker Hostetler had no fiduciary relationship with the Test Strip Manufacturers. Any linkage to the RICO claims that would be tied to a duty to disclose under a fiduciary relation did not arise until the predecessor-trustee received the assignment from the Test Strip Manufacturers after June, 14, 2020.

Nevertheless, Austin's further allegations support a claim of fraudulent concealment to toll the statute of limitations. At first glance, the Court questions whether the Complaint is sufficient to allow the Court to even reach the substantive merits of the RICO claims. Applying *Iqbal* and *Twombly*, Austin appears to reach speculative conclusions about Baker Hostetler's alleged fraudulent concealment.

The issue is whether the Court finds it credible that Baker Hostetler withheld and delayed the turnover of allegedly privileged documents after it was instructed by the Trustee that the privilege was waived.

After much contemplation, the Court has concluded that the alleged circumstantial evidence—if proven at trial—would toll the statute of limitations based on fraudulent concealment. Here are the concerns that has led the Court to determine the sufficiency of the

pleading of the RICO claims, taking *Iqbal* and *Twombley* into full account:

- On May 24, 2017 and on August 18, 2017, Baker Hostetler filed updated disclosures with respect to its pre-petition representation of Alliance.  The updated disclosures appear to describe a broad range of activities with which the firm was involved.  These include advising Alliance with respect to Alliance's untoward conduct.  The nature of the advice was not disclosed.  Case No. 17-32186, ECF No. 319 at 5.

- Rosebush was lead counsel in the Alliance representation.  He was a member of Alliance's board and (accepting the allegations in the complaint as true) instructed others on how to cover-up the fraudulent conduct.

- It is reasonable to believe that the additional disclosures were made after consultation with Rosebush.

- The additional disclosures fail to disclose Rosebush's actions that appear to have assisted Alliance in concealing its fraud.

- The Court is confident that Baker Hostetler would have been forthright about such advice if Rosebush had informed Baker Hostetler prior to May 24, 2017.

- At some point well before 2020, Baker Hostetler learned about credible allegations concerning Rosebush's direct involvement in perpetuating the wrongful conduct.

- In late 2020, it is alleged that the firm stone-walled requests to turn over documents after being instructed to do so by its client.  ECF No. 142 at 112–13.

- There is possibility that (i) the firm's disclosure failed to include information that the firm knew about Rosebush; (ii) Rosebush was untruthful with the firm; or (iii) the allegations against Rosebush are false.

- Rosebush continues to be a partner at the firm. This may indicate that the firm has concluded that Rosebush did not engage in wrongful conduct. That will be a matter for trial. But the well-pled Rule 9 allegations in the Complaint lend credence to the allegations that Rosebush was a participant in the fraud. That too, will be a matter for trial.

This series of facts leaves many unanswered questions. There may be valid answers to all of them. But, accepting those alleged facts as true, they create a reasonable possibility, subject to proof at trial, that the firm actively engaged in concealing Rosebush's and the firm's conduct. Because Austin has raised sufficient alleged grounds for tolling the statute of limitations, the Court will not dismiss the RICO claims on this basis.

The Court emphasizes that this conclusion only addresses whether the particularized allegations, accepted as true, require dismissal under Rule 12(b)(6). Accepting them as true, the Court finds proper grounds to estop Baker Hostetler from using the limitations defense to obtain a preemptive dismissal of the RICO claims. Nevertheless, Austin bears the burden at trial to sustain the fraudulent concealment allegations.

### (2)    *Proximate Causation*

Baker Hostetler asserts that Austin does not have standing to bring a RICO claim. ECF No. 151 at 32.

To have standing, the plaintiff must show: (1) a RICO violation, (2) an injury to business or property, and (3) that the injury was proximately caused by RICO violation. *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 259 (1992). Proximate causation asks whether the

alleged violation led directly to the plaintiff's injury. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). A plaintiff does not have standing if some other conduct directly caused the harm. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10, 12 (2010).

Here, Baker Hostetler argues that the Test Strip Manufacturers' injuries were not proximately caused by its alleged fraudulent conduct because the false claims "directly harmed the PBMs," which reimbursed Alliance based on the false claims. ECF No. 151 at 33. The Test Strip Manufacturers' injuries in making rebate payments were directly caused by PBM's injuries in wrongfully reimbursing pharmacies for false retail strips. ECF No. 151 at 34. Baker Hostetler also asserts that the Test Strip Manufacturers' purported loss of retail sales resulted not just from Alliance's diversion of NFR strips into retail strips, but from distributors willing to breach their contracts with manufacturers and to sell NFR strips on the secondary market. ECF No. 151 at 34.

Baker Hostetler misses the point. Applying the *Anza* and *Holmes* standard, the alleged RICO violation proximately caused the Test Strip Manufacturers' injuries. Austin is not alleging that the PBMs were injured victims of the RICO violations. Rather, Austin alleges that the PBMs unknowingly "pass through" the alleged fraudulent misstatements to the Test Strip Manufacturers, which rely on the misstatements in paying rebates. ECF No. 132 at 126. The rebates that the Test Strip Manufacturers pay to the PBMs correspond to the amount in reimbursements that the PBMs would make to the Alliance-affiliated pharmacies. ECF No. 142 at 126. While a PBM relies on the Alliance pharmacies in their invoices, the injury from the RICO offenses manifests in the Test Strip Manufacturers, which pay the PBMs rebates proportional to the reimbursements that the PBMs provide to the pharmacies. The PBMs did not suffer the alleged injury; the Test Strip Manufacturers were directly harmed by Baker Hostetler's alleged RICO violation. Proximate causation is satisfied.

### (3)      *Pattern of Racketeering Activity*

To state a claim for civil RICO violation under § 1962(c), a plaintiff must allege a pattern of racketeering activity. *In re Burzynski*, 989 F.2d 733, 741–42 (5th Cir. 1993). A pattern of racketeering activity "requires two or more predicate acts and a demonstration that the racketeering predicates are related and amount to or pose a threat of continued criminal activity." *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996).

The Complaint alleges instances of mail and wire fraud as predicate acts that form a pattern of racketeering activity. "To state a claim for mail or wire fraud to support a RICO violation under § 1341 or § 1343, a plaintiff must establish three elements; '(1) a scheme or artifice to defraud or to obtain money or property by means of false pretenses, representations, or promises; (2) a use of the interstate mails or wires for the purpose of executing the scheme; and (3) a specific intent to defraud either by [d]evising, participating in, or abetting the scheme.'" *Van Duzer v. U.S. Bank Nat. Ass'n*, 995 F. Supp. 2d 673, 690–91 (S.D. Tex.), *aff'd*, 582 F. App'x 279 (5th Cir. 2014) (quoting *Hewlett-Packard Co. v. Byd: Sign, Inc.*, No. 05-456, 2007 WL 275476, at *3 (E.D. Tex. 2007)).

Baker Hostetler argues that the Complaint fails to meet the Rule 9 pleading requirements for each predicate act of mail and wire fraud. ECF No. 151 at 39. The Court identifies the following allegations as sufficient claims of mail/wire fraud that could form the pattern of racketeering activity, if they are ultimately proven at trial. The Court reaches no conclusion that the allegations are meritorious:

- On May 26, 2015, in response to an audit request by Optum regarding Hawkins Pharmacy's claims for retail test strips, a Baker Hostetler attorney stated that "Hawkins Pharmacy's claims accurately stated the Products that were dispensed and contained all the necessary information for processing."

Baker Hostetler allegedly knew that the claims were false. ECF No. 142 at 51.

- In January 2016, Rosebush allegedly misrepresented to ESI that he did not represent Stonybrook Pharmacy to intentionally conceal from PBMs that the independent pharmacies were in fact affiliated with Alliance.  ECF No. 147 at 43.

- On August 22, 2016, Rosebush told Alliance employees to isolate invoices showing retail test strips to use in Baker's audit response on behalf of Alliance pharmacies.  ECF 142 at 60.

- On August 23, 2016, in a letter to PBM Express Scripts, Rosebush allegedly stated that Cure Pharmacy (an Alliance pharmacy) had documents that would "demonstrate that Cure had *retail-based product*, currently in stock."  ECF No. 142 at 56.

- On September 16, 2016, a Baker Hostetler attorney wrote letters to ESI on behalf of Alliance affiliated pharmacies to show photos of "current inventory" of retail test strips.  The retail test strips were never intended to be dispensed and the photos were used to mislead PBMs into believing Alliance in fact dispensed the test strips.  ECF No. 142 at 58–59.

These allegations may constitute a pattern of racketeering activity.  The acts were made to obtain higher insurance reimbursements through false pretenses and representations.  The acts are related in furthering Alliance's insurance fraud scheme and were continuous over a two-year period.

### (4)    RICO Person

The critical issue is whether Baker Hostetler is a RICO person under § 1962(c).  To be held liable under § 1962(c), the RICO person must have "participated in the operation or management of the

enterprise itself to be subject to liability." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (holding that merely providing accounting services did not rise to the level of participation in the management or operation of the enterprise needed to subject an accounting firm to RICO liability). Baker Hostetler argues that merely providing legal services to Alliance does not establish the law firm as a RICO person. ECF No. 151 at 36. Baker Hostetler is correct in that legal proposition.

However, Rosebush's conduct allegedly far exceeded just providing legal services. Rosebush sat on Alliance's board of directors, and allegedly advised Alliance with adopting a business model to conceal its fraudulent scheme and encouraged Alliance affiliates to doctor their invoices to bear retail test strips. These allegations, if proven to be true, could show that Rosebush exerted a level of control over "the operation or management of the enterprise." The Complaint plausibly states a claim against Rosebush as a RICO person. Rosebush, however, is not named as a "RICO person" or as a defendant. Instead, the Complaint designates his law firm, Baker Hostetler, as the "RICO person." The Court must determine whether Austin can plausibly allege that the law firm is the RICO person based on the actions of one of its partners.

The Court must analyze how pervasive the services provided by Baker & Hostetler were during the relevant time period. Was the alleged conduct limited to Mr. Rosebush, or did he engage other members of the firm to join with him in supporting Alliance's fraud? In *Crowe v. Henry*, the plaintiff named two RICO persons: his joint venture partner and the partner's law firm. 43 F.3d 198, 204 (5th Cir. 1995). The Fifth Circuit found that while the partner was a proper RICO person, the law firm was not a RICO person because the firm's acts were "too isolated and sporadic." *Id.* ("The firm only appears a few times in this drama. Specifically, Crowe refers to the firm's involvement in drawing up court documents for the 1987 sale and the 1990 eviction and to the firm writing . . . what Crowe contends was an unauthorized check for legal fees in the amount of $30,000.").

41 / 45

The Fifth Circuit's ruling in *Crowe* leaves open the question of when a law firm has liability for the RICO violations of its partner. Unlike in *Crowe*, Baker Hostetler's alleged involvement in the fraudulent scheme, if proven true, was not merely incidental. The Complaint is replete with allegations (at this stage unproven) that Rosebush enlisted members of Baker Hostetler to advise Alliance and support the fraudulent conduct:

- A former Baker Hostetler associate and Robert Wolin (a Baker Hostetler partner) assisted Rosebush in responding to certain audit requests. The responses were misleading. ECF No. 142 at 51, 52.

- On September 23, 2016, Rosebush and the former associate advised Alliance to ensure that pharmacists did not provide harmful information to audit requests. ECF No. 142 at 55.

- On September 16, 2016, the former associate spoke with an Alliance fiduciary about providing misleading inventory photos. ECF No. 142 at 59.

- In October 2016, Rosebush and the former associate participated in calls to discuss generating misleading invoices to supply to the PBMs. ECF No. 142 at 62.

The Complaint also alleges members of the firm knew the extent of the fraud and cautioned Rosebush against it:

- The former associate testified that she believed there was a "billing fraud" at Alliance. ECF No. 142 at 41.

- On August 23, 2016, in the context of drafting a PBM audit response letter, the former associate wrote to Rosebush that she avoided citing the PBM's provider manual "because we know that we have violated it." Rosebush responded, "I would not go so far as to say we KNOW we violated. We want them to tell us what we violated allegedly." ECF No. 142 at 66.

- Baker partner Gilbert Keteltas emailed Rosebush "we cannot provide invoices with retail NDC that we have reason to believe are for not for retail product. If Alliance wanted to provide such invoices with the goal of misleading PBMs, we should not be part of it and should help him find other counsel." ECF No. 142 at 64.

Despite Keteltas' stark advice, the firm allegedly continued to acquiesce to the violations of the law and benefitted from the continued legal fees in representing Alliance.

Baker Hostetler might be liable for any injury caused by its partner, Rosebush under theories of partnership or vicarious liability. 11 CORPUS JURIS SECUNDUM § 9 (2024); *see Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547, 556 (D.C. Md. 1998) (holding a partnership liable under RICO for a partner's racketeering activity). Under the Uniform Partnership Act, each partner is an agent of the partnership and can bind the partnership if the partner had authority to act for the partnership. UNIFORM PARTNERSHIP ACT § 301 (2013). The partnership is liable for harm caused to a third party for the actions of a partner acting in the ordinary course of business of the partnership. *Id.* § 305.

Courts within the Fifth Circuit have dealt with the application of vicarious liability, a doctrine related to partnership liability, in the RICO context. In *Landry v. Air Line Pilots Ass'n Int'l*, the Fifth Circuit held that vicarious liability is inapplicable with a § 1962(c) claim when the defendant is alleged to be the enterprise. 901 F.2d 404, 425 (5th Cir. 1990). Section 1962(c) requires the RICO person to be distinct from the RICO enterprise because the language deals with a "person employed by or associated with any enterprise." *Id.*; 18 U.S.C. § 1962(c). The Fifth Circuit held that holding the defendant-enterprise vicariously liable as a RICO person would be incongruous with the language of the statute. *Landry*, 901 F.2d at 425. Baker Hostetler is not alleged to be a RICO enterprise, so *Landry* does not pose a problem here. The alleged enterprise is comprised solely of various Alliance affiliated entities.

ECF No. 142 at 129. The Court finds the holding in *First Nat'l Bank of Louisville v. Lustig* instructive:[6]

> RICO must provide a means of holding a perpetrator corporation liable without subjecting the victim or "passive instrument" corporation to treble damages; it is necessary to distinguish between a corporation that actively violates the statute and a corporation whose disloyal employee violates the statute without his employer's complicity or knowledge.

727 F. Supp. 276, 280 (E.D. La. 1989).

As discussed above, the allegations show that Baker Hostetler was not a "passive instrument" through which Rosebush committed the RICO predicate acts. Rosebush was not a disloyal employee acting on his own accord. Considering Baker Hostetler's alleged level of involvement in the scheme and its acquiescence to Rosebush's actions, it could be determined that the Court should impute Rosebush's actions to the firm under theories of partnership or vicarious liability.

Austin may have a heavy burden to prove her case. But, taken as a whole and accepting the allegations in the Complaint as true, the firm is a plausible RICO person under § 1962(c).

### (5) *Conspiracy to Violate RICO*

The Complaint also brings a claim for conspiracy to violate federal RICO. To properly allege a RICO conspiracy, Austin must plausibly allege that (i) two or more people agreed to commit the acts which constitute the RICO violation and (ii) that Baker Hostetler knew of and agreed to the overall objective of the RICO offense. *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010) (citing *United States v. Sharpe*, 193 F.3d 852, 869 (5th Cir. 1999)).

---

[6] The Court is aware that *First Nat'l Bank* also ruled that *respondent superior* can never be the basis of liability for a civil RICO suit even if the defendant is not alleged to be the § 1962(c) enterprise. *First Nat'l Bank*, 727 F. Supp. at 280. However, the court differentiated the possibility of liability between a passive and a perpetrator corporation.

Baker Hostetler argues that the conspiracy claim must fail as a matter of law because an attorney-client relationship is akin to a principal-agent relationship, which cannot be a conspiracy of two or more defendants. ECF No. 151 at 41; *see Lyons v. Lindsey Morden Claims Mgmt., Inc.*, 985 S.W.2d 86, 92 (Tex. App.—El Paso 1998) ("As a matter of law, the acts of an agent and its principal are the acts of a single entity and cannot constitute conspiracy.").

However, RICO conspiracy claims may be sufficient when the attorney-client "arrangement involves more than standard legal representation." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017). As discussed at length throughout this opinion, Rosebush's alleged conduct, if proven at trial, involved far more than typical legal representation.

The motion to dismiss the RICO conspiracy claim is denied.

## CONCLUSION

The Court will enter an order consistent with this Memorandum Opinion.

SIGNED 12/11/2024

_____
Marvin Isgur
United States Bankruptcy Judge